## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

COSTAR GROUP, INC., COSTAR REALTY
INFORMATION, INC., and LOOPNET, INC.,

        Plaintiffs,

        v.

XCELIGENT, INC.

        Defendant.

Civil Action No. _____

**JURY TRIAL
DEMANDED**

1.      Plaintiff CoStar Group, Inc. ("CoStar Group"), a public company, and Plaintiff CoStar Realty Information, Inc. ("CoStar Realty"), its wholly owned subsidiary, together are the nation's leading providers of commercial real estate information. LoopNet, Inc. ("LoopNet"), another CoStar Group subsidiary, operates the country's most popular commercial real estate marketing website. Plaintiffs are referred to herein collectively as "CoStar."

2.      CoStar brings this case against Defendant Xceligent, Inc. ("Xceligent") to redress its brazen and widespread theft of CoStar's intellectual property.

3.      On a systematic basis, Xceligent improperly accesses CoStar's databases in order to steal CoStar-copyrighted photographs and proprietary real estate data in breach of contract and in violation of state and federal law. After it copies, en masse, CoStar's intellectual property—generated by CoStar researchers at enormous cost—Xceligent integrates the stolen intellectual property into its own, lower-priced rival products. The scale of Xceligent's piracy is remarkable: A preliminary review of the publicly available content on Xceligent's website reveals no fewer than ***nine thousand*** instances of copyrighted CoStar photographs, copied and published without permission, and hundreds of unique CoStar proprietary data values stolen from CoStar's

databases. Moreover, these findings almost certainly constitute a mere fraction of the total infringement and theft present in Xceligent's subscription database.

4. Xceligent has the resources to compete fairly with CoStar: Xceligent is part of an English conglomerate with a market capitalization of more than $3.2 billion. Instead, Xceligent has chosen to build its products on CoStar's back using, in many instances, low-paid "researchers" in India and The Philippines to copy CoStar content wholesale.

5. As a consequence of Xceligent's unlawful actions, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

\* \* \* \*

6. CoStar employs more than two-and-a-half thousand people in the United States and, as a result of their diligent efforts—and the investment of more than a billion dollars over the last thirty-plus years—CoStar has developed the most comprehensive commercial real estate information database available in the world.

7. This subscription database contains copyrighted photographs of, and professionally researched information about, commercial properties across the country. The database has approximately one hundred thousand subscribers, including all of the leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, REITs, and other professionals. The subscription database is also used by a number of federal, state, and local government entities and agencies.

8. While the subscription database provides exceptional benefits to CoStar's paying customers, it also has a positive impact on consumer welfare in the larger commercial real estate ecosystem. CoStar's subscription database provides greater transparency in the form of readily

available, professionally researched, and regularly updated commercial real estate information. The existence of this information has made traditional commercial real estate transactions more efficient, and has also facilitated a more diverse range of commercial real estate deals. The net result is greater liquidity and significantly mitigated risk in one of the world's most valuable and important asset classes: commercial real estate.

9. CoStar licenses its subscription database content for a monthly fee. Those fees, which vary according to the scope of access a user seeks, generate significant revenue for CoStar.

10. Along with the CoStar subscription database, LoopNet.com (hereinafter "LoopNet" and, together with the subscription database, the "CoStar databases") contributes to market transparency, and further fosters market liquidity, by providing the nation's most heavily trafficked commercial real estate marketing platform. In addition to broker-generated content, LoopNet relies on CoStar-copyrighted photographs and professionally researched information to provide a database that currently includes more than half a million for-lease and for-sale listings. LoopNet is one of the company's biggest revenue generators.

11. Because CoStar's photographs and professionally researched data are central to its businesses, CoStar regularly registers its photographs with the United States Copyright Office and protects its proprietary data both through technological means and contractually binding Terms of Service.

12. Xceligent, founded seventeen years ago, is a long-time CoStar competitor. It offers a product, known as CDX, to compete with CoStar's subscription database, and a rival commercial real estate listing marketing platform like LoopNet, called CommercialSearch (www.commercialsearch.com). Xceligent publicly claims to provide similar products to CoStar

at lower prices by using innovative methods and relationships with the commercial real estate community. Yet, the truth stands in stark contrast. Instead of investing the resources necessary to generate and update its own content, Xceligent has populated CommercialSearch, and almost certainly CDX, with CoStar content. In the words of one Xceligent employee, "***90% of our updates are made based off of information from our largest competitor's websites***. . . ."

13. That competitor is CoStar. According to the same employee, Xceligent researchers "***constantly get blocked out of LoopNet***." In other words, Xceligent "researchers" spend so much time copying CoStar images and information that they repeatedly trigger CoStar's abuse-monitoring software, which is designed to prevent mass copying. Undeterred, that same Xceligent employee reports that the Xceligent researchers then "***get unblocked***"—i.e., deliberately circumvent CoStar's attempts to protect its information—so that the researchers can continue to "***steal*** [CoStar's] ***information***." Another former Xceligent employee similarly described Xceligent's method of building its business as based on "***stealing***" CoStar information, a practice that the former employee correctly described as "***unethical***."

14. These damning admissions are confirmed by the publicly available content on Xceligent's CommercialSearch website. A preliminary review of that website found more than ***nine thousand*** instances of copyrighted CoStar photographs, a large percentage of which now bear CommercialSearch's logo. Those images are merely the tip of the iceberg, as CommercialSearch contains only a fraction of the content in Xceligent's flagship CDX database.

15. CommercialSearch's public listings—just one of Xceligent's commercial real estate products—show that CoStar's data have been copied en masse. Indeed, Xceligent was so eager to pick the CoStar databases clean that it even copied hundreds of data points that are unique to CoStar.

4

16.     The Xceligent employees' admissions are further supported by a wealth of other direct evidence.  A review of the activity of Xceligent IP addresses and the IP addresses of Xceligent's agents shows, unsurprisingly, that Xceligent employees and contractors in the United States and abroad bombard LoopNet on a daily basis in order to copy CoStar content.  And they do so despite technological blocking and repeated notice—displayed more than **600 times**—that such conduct is prohibited.  In fact, **hundreds** of Xceligent employees and agents created nearly **4,000** CoStar Group accounts and made more than **1.7 million individual requests for information** on LoopNet.

17.     And in addition to inundating LoopNet and circumventing CoStar's digital security measures, there is evidence that Xceligent and its senior managers are inducing CoStar customers to provide them with direct access to CoStar's subscription database from which to steal the proprietary information necessary to expand to new markets.

18.     While extremely troubling, Xceligent's illegal behavior should not come as a complete surprise.  Cutting corners and stealing CoStar content in order to build a rival database is part of Xceligent's DNA.  In Xceligent's first expansion market, San Diego, Xceligent's database was so full of stolen CoStar content that its own lawyers advised that it had to delete the entire database and start from scratch.

19.     In its latest attempt to expand rapidly, Xceligent has fallen back on its old playbook:  steal CoStar's data and copyrighted images, integrate that intellectual property into its own database, and then try to sell it back to CoStar customers at a lower price.

20.     Xceligent's misconduct cannot be explained away as undue competitive zeal or a frolic by a rogue employee.  This is theft of intellectual property on an industrial scale.  These efforts harm CoStar, its employees, its shareholders, its customers, and the commercial real

5

estate marketplace at-large. This lawsuit therefore seeks damages for Xceligent's unlawful mass piracy, and a permanent injunction to ensure that Xceligent stops stealing CoStar's intellectual property.

## THE PARTIES

21.     CoStar Group is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia 20005.

22.     CoStar Realty is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia 20005. It is a wholly owned subsidiary of CoStar Group. CoStar Realty holds the copyrights that are referred to generally as CoStar copyrights herein.

23.     LoopNet is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 101 California Street, 43rd Floor, San Francisco, California 94111. It is a wholly owned subsidiary of CoStar Group.

24.     Xceligent is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 103 SE Magellan Drive, Blue Springs, Missouri 64014. Xceligent operates the real estate information database CDX, as well as the publicly accessible online marketing platform CommercialSearch. The domain names www.xceligent.com and www.commercialsearch.com are registered to Xceligent.

## JURISDICTION AND VENUE

25.     This action arises in part under the Copyright Act, 17 U.S.C. § 101, *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*, and the Digital

6

Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, *et seq.* The Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because that claim arises from the same set of operative facts. The state law claim is so closely related to the federal claims as to form part of the same case or controversy.

26. The Court has personal jurisdiction over Xceligent because its principal place of business is Blue Springs, Missouri.

27. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because Xceligent's principal place of business is in this judicial district.

## FACTUAL ALLEGATIONS

**I.      CoStar's Investment in Creating and Maintaining the Nation's Most Comprehensive and Most Visited Commercial Real Estate Databases Benefits Its Customers, the Marketplace, and the Economy at Large.**

28. Like many innovative technology companies, CoStar's business began over thirty years ago in its founder's basement with a simple idea: empower the commercial real estate industry with professionally researched, unbiased commercial property information. Since its founding, and thanks to investment in excess of one billion dollars, CoStar has become a leading provider of commercial real estate information.

29. CoStar's primary product revolves around the company's database of professionally researched commercial real estate information and millions of copyrighted photographs. The database is part of an integrated suite of online services that includes for-lease and for-sale listings, historical data, building photographs, comparable sales, tenant information, maps, and floor plans. CoStar generates and updates the database's content at a cost of over $100 million each year.

30.     The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with the service.  Each day, users conduct nearly nine million searches for commercial real estate on the CoStar and LoopNet platforms.  CoStar estimates that its databases play a part in supporting one trillion dollars of commercial real estate leases, sales, and mortgage originations in the United States each year.

31.     CoStar provides commercial real estate intelligence to professionals throughout the American economy, including real estate brokers and brokerage firms, owners and investors, property managers, lenders, developers, appraisers and valuation professionals, as well as retailers, vendors, and corporations.  For example, brokers and brokerages use the CoStar databases in their day-to-day business to identify available spaces for lease and evaluate potential sales.  Pursuant to licenses, these users utilize CoStar's professional, copyrighted photographs to market their listings in brochures and elsewhere.  CoStar also offers products (specifically, CoStar Connect and LoopLink) that allow brokers to license CoStar's technology and content, including CoStar's photographs and data, to help market property listings directly on their own corporate websites.

32.     Federal, state, and local government agencies rely on CoStar's data for a variety of purposes.  For example, government agencies use CoStar's data to value commercial properties for tax purposes.  CoStar's investment in accurate information also benefits the U.S. banking sector.  CoStar forecasts, risk modeling, or advisory services are used by fifteen of the top twenty "Systemically Important Financial Institutions," as well as federal regulators involved in stress testing those banks.  CoStar's census of the commercial real estate environment and daily data updates allow these banks and regulators to better manage risks of the sort that led to the 2008 financial crisis, thereby benefitting the national economy.

8

33.     CoStar's databases also power product offerings that directly allow owners, investors, property managers, and lenders to minimize risk and maximize returns—through analysis of market fundamentals, economic forecasts, and asset pricing. CoStar's information illuminates both the big picture and the details, providing granular, property-level specifics on key measures such as vacancy, rents, comparable properties, and tenants.

34.     In addition, when a business needs to search for a new office or location for itself, it can browse available commercial real estate vacancies across multiple brokerages in a given market and customize search results using over 150 different criteria. Or, when a business decides to target a particular vacancy, the CoStar databases provide comparable space information, allowing the potential lessee or buyer to evaluate an offer intelligently. In fact, when Xceligent itself was looking for office space to expand its footprint in the New York market, its broker used CoStar's subscription database to identify and compare available properties.

35.     In April 2012, when CoStar Group purchased LoopNet, Inc., it added to its business the nation's most widely used commercial real estate marketing platform—which attracts more than five million monthly unique visitors.[1] LoopNet provides an online marketplace to post and search commercial real estate listings. LoopNet supports the greater commercial real estate ecosystem by allowing non-registered users to view some listings for free. Users that wish to list properties or gain more robust searching capabilities must purchase a

---

[1] When CoStar Group purchased LoopNet, Inc., CoStar entered into a consent decree with the Federal Trade Commission. As a condition of sale, LoopNet, Inc. agreed to divest its holdings in Xceligent. The consent decree also limits CoStar's ability to exercise certain of its contractual rights against its own customers—particularly those seeking to enter into contracts with CoStar competitors like Xceligent. The consent decree does not, of course, permit the infringement or misappropriation of CoStar's images or data.

9

subscription. If a listing party subscribes to both LoopNet and the CoStar subscription database, it may use CoStar-copyrighted photographs, under license, in connection with its LoopNet listings.

36.     Together the CoStar databases provide broad access to vast commercial real estate data, helping to level the playing field in a $17 trillion per year industry. Ultimately, CoStar's investment in its databases provides enormous benefits to CoStar's customers, other participants in the commercial real estate market, and the economy at large. CoStar delivers value not only by bringing together parties that are looking to transact, but also by ensuring the reliability of the information that is shared across its platform. By supplying comprehensive data to the marketplace, CoStar helps reduce transaction- and search-related costs in the commercial real estate market, leading to efficiency gains that benefit potential buyers, sellers, lessees, and lessors, as well as third-party consumers of CoStar's information, such as government agencies. And because one of the key drivers of CoStar's value is ensuring that its platform is trusted, CoStar is incentivized to invest in creating and updating a highly reliable database. CoStar was recently honored as one of the Most Innovative Growth Companies by Forbes Magazine based on its continued efforts to make commercial real estate information more accurate.

37.     Although CoStar has a number of competitors in each of its businesses, it has fought to outwork and outperform the competition through continual innovation and re-investment in its products over three decades. Nearly thirteen thousand CoStar researchers have contributed to the subscription database since its creation, adding nearly five million properties, taking over twelve million photographs, and driving and flying over two million miles per year.

38.     As it innovates and grows, CoStar continues to generate new, high-paying American jobs. CoStar is currently expanding its real estate research capacity in the United

States, including a brand new facility in Richmond, Virginia, announced in October 2016, which will employ more than seven hundred people.

39.     The benefits that CoStar's products provide to its customers and the market at large, and CoStar's ability to continue generating American jobs, are a direct result of the company's efforts to research, collect, and create data and photographs.  The protection of CoStar-copyrighted images and proprietary data—and CoStar's ability to vindicate its rights in that intellectual property—is therefore critically important.

## II.     At Great Effort and Expense, CoStar Protects Its Intellectual Property.

40.     CoStar protects its intellectual property in three primary ways.  First, CoStar registers its photographs with the Copyright Office.  Second, users assent to CoStar's binding Terms of Service in order to use any CoStar products.  Third, CoStar employs state-of-the-art anti-piracy technology.

### A.     CoStar Regularly Registers Its Photographs with the United States Copyright Office.

41.     CoStar owns the largest library of commercial real estate images in the world, including millions of photographs of commercial real estate taken by CoStar researchers.  As discussed above, these copyrighted photographs are used on LoopNet and in the CoStar subscription database.

42.     As photographs are added to the CoStar databases, they are routinely registered with the Copyright Office.  CoStar is currently registering more than 80,000 photographs per month.  CoStar hosts its copyrighted photographs on servers in the United States.

11

**B.    Access to CoStar Products Is Governed by Binding Terms of Service Made Clear to Every User Who Accesses Its Products.**

43.    CoStar requires registered users to agree to binding Terms of Service.  A genuine copy of LoopNet's Terms of Service is attached hereto as **Exhibit A** and a genuine copy of the CoStar subscription database's Terms of Service is attached hereto as **Exhibit B**.

44.    Non-registered users who, for example, are directed to LoopNet by search engines such as Google, immediately encounter prominent notice on the top of every LoopNet webpage telling them that their access is subject to their agreement to the binding Terms of Service.  The only way this notice can be removed is for the user to click on an X on the far right side of the notice.



45.    The Terms of Service provide that by viewing, using, or accessing CoStar products, the user agrees to be bound by those Terms.

    a.    "By viewing, using or accessing the Service, You agree that these Terms and Conditions are a binding legal agreement between You and LoopNet."  Ex. A.

    b.    "[Terms of Use] constitute a legal contract between you and CoStar, and by accessing or using any part of the Site you represent and warrant that you have

12

the right, power and authority to agree to and be bound by these Terms of Use." Ex. B.

46. The Terms of Service expressly prohibit using the CoStar databases for

competitive purposes.

      a. A user "shall not use the Service in any other manner for or in connection with any other listing service or device. You shall not use the LoopNet Service as part of any effort to compete with LoopNet, including without limitation using the LoopNet Service to provide, alone or in combination with any other product or service, any database services to any third party or any use that causes a reduction or loss from an existing or potential LoopNet customer, nor shall You remove, erase, or tamper with any copyright or other proprietary notice printed on, affixed to, or encoded or recorded in the . . . Service." Ex. A.

      b. A user shall not "provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar (by way of example, a 'direct or indirect competitor' of CoStar includes, but is not limited to, Internet listing services or other real estate information services and employees, independent contractors and agents of such services)." Ex. B.

      c. A user further shall not "[u]se or distribute any Information from the Product, including Information that has been verified or confirmed by you or anyone else, to directly or indirectly create or contribute to the development of any database or product." Ex. B.

47. The Terms of Service also emphasize the proprietary nature of the information in

the databases.

      a. "You agree to treat all information obtained from the Service, including LoopNet Materials, listings, member directory, historical transaction information ('Property Comps'), and any information otherwise made available to You in the Service (individually and collectively, the 'Content') as proprietary to LoopNet. You agree that Content reserved for Members will be maintained as confidential . . . ." Ex. A.

      b. "The information, data, text, software, photographs, images, graphics, organization, layout, design, and other content contained on or provided through this Site (collectively, the 'Content') are proprietary to CoStar and its licensors, and are protected by copyright and other Canadian and international intellectual property rights, laws and treaties." Ex. B.

Case 4:16-cv-01288-SWH   Document 1   Filed 12/12/16   Page 13 of 44

48. When a user fails to abide by these Terms of Service, CoStar may block the user's access.

    a. If that user "fails to abide by the Terms and Conditions" "LoopNet has the right to refuse or terminate service to any Member, individual, organization, or firm (and all persons associated or affiliated with said organization or firm) that fails to abide by the Terms and Conditions." *See* Ex. A.

    b. "CoStar reserves the right to terminate or suspend your use of a CoStar service or to terminate your License Agreement upon a good faith determination of a violation of the terms of any material provision of any other agreement between the parties or their affiliates." Ex. B.

49. As noted above, CoStar licenses its copyrighted photographs and database content to commercial real estate brokerages for use on their own websites and in their own marketing material subject to various contractual restrictions that, among other things, preclude those brokerages from posting or providing CoStar photographs or other CoStar information on or to third-party websites. The brokerages remain free to provide their own photographs and information to such websites.

50. Brokerages that choose to use CoStar Connect or LoopLink to power their own websites are required to post prominently the relevant Terms of Service, which warn users that the database constitutes the valuable property and copyrighted information of CoStar and forbids users from uploading, posting or otherwise transmitting any portion of CoStar's information. LoopLink pages also include a copyright warning advising that users may not reproduce or transmit the information without express written consent. *See* Exs. A & B.

51. CoStar protects its intellectual property through binding Terms of Service in part because there are no significant structural barriers to entering the commercial real estate data market. All that is required is a sufficient investment of time and money and, as a result,

14

competitors to CoStar spring up on a regular basis. A sampling of headlines from the trade press over just the last two years illustrates this phenomenon:

- "53 Tech Startups Reshaping Commercial Real Estate," https://www.cbinsights.com/blog/commercial-real-estate-tech-market-map-company-list/ (May 10, 2016);

- "Burgeoning CRE Tech Solutions," http://news.theregistrysf. com/burgeoning-solutions/ (Aug. 14, 2016) ("Tech ventures for the commercial real estate industry received some $161 million in venture capital funding last year, up 1.6 percent from 2014 and more than triple the amount invested in such ventures two years ago, according to a recent report by CRE//Tech, which hosts conferences on the intersection between technology and commercial real estate.");

- "14 Real Estate Tech Startups You Need to pay Attention To," https://www.bisnow.com/national/news/tech/10-real-estate-tech-startups-you-need-to-be-paying-attention-to-50516?single-page (Oct. 2, 2015);

- "How Two Millennials Launched Reonomy, A Real Estate Data Startup That Has Secured $22M In Funding," http://www.forbes.com/sites/viviennedecker/2016/03/31/the-millennials-behind-reonomy-are-renovating-the-commercial-real-estate-industry-through-tech/2/#5dfc56978be8 (Mar. 31, 2016).

### C. CoStar Further Protects Its Databases Using Technological Means.

52. In addition to protecting its photographs and data through copyright registration and binding Terms of Service, CoStar takes other technological steps to protect against unauthorized access to its databases for competitive purposes.

53. First, LoopNet employs a country-blocking filter. This filter prevents access to the website by IP addresses from certain countries where there is little or no basis for legitimate use.

54. Second, LoopNet employs an excess access filter. If a single IP address views an excessive number of listings on the LoopNet website, consistent with access by a competitor or other user that is systematically copying listings, that IP address is temporarily blocked from accessing LoopNet. If either of these "abuse monitor" filters is tripped, the user is presented

with the following "Access Denied" notice which expressly states that the user is in breach of the Terms of Service and that further access to LoopNet is not authorized:

## Access Denied

You are in breach of the binding LoopNet Terms and are blocked from accessing LoopNet. By continuing to access LoopNet or accessing after the block has expired, you are reaffirming your agreement to the LoopNet Terms. Users who do not comply with these Terms are not authorized to access LoopNet.

55.     As discussed in more detail below, Xceligent was presented with this notice more than 600 times.  The notice states unequivocally that these users were in breach of the LoopNet Terms of Service and that any further attempt to access LoopNet was subject to the LoopNet Terms of Service.

56.     Third, CoStar employs a number of third-party products to protect against improper use including, but not limited to, firewalls, IP reputation blocking, as well as anti-virus, anti-botnet, and anti-malware programs.

57.     CoStar is constantly implementing new security procedures to protect its most valuable resources—its data and images—at a significant cost.  Efforts to circumvent these technological safeguards significantly increase these costs.

**III.    Even Though Xceligent Is Prohibited from Using the CoStar Databases for Competitive Purposes, It Is Nevertheless Stealing and Repackaging CoStar's Intellectual Property.**

58.     Xceligent is a direct competitor of CoStar that purports to operate similar commercial real estate research platforms.  Xceligent's majority owner is dmg information ("DMGI"), a U.S.-based business-to-business information company that has reported annual revenue of over $500 million.  DMGI is a wholly owned subsidiary of the Daily Mail and General Trust plc ("DMGT").  DMGT, which also owns the Daily Mail—the second largest-

16

selling daily newspaper in the United Kingdom—has a current market capitalization of $3.2 billion.

59.    In addition to U.S.-based researchers, including those at Xceligent's headquarters in Blue Springs, Missouri, Xceligent hires offshore researchers to supplement that work.  Indeed, Xceligent researchers based in the Philippines and in India widely advertise their work for Xceligent.  *See* **Exhibit C** (MaxVal & Avion LinkedIn Profiles).

60.    Although Xceligent, part of a multi-billion dollar conglomerate, has more than enough resources to compete fairly, Xceligent's business model is based on theft from CoStar. Instead of focusing on developing broker lists, contacting those brokers to get relevant information about their properties, and taking original photographs of commercial real estate, Xceligent's "research" apparatus consists, in significant part, of mass copying CoStar's information and photographs market-by-market.  Once a market is open, Xceligent can then sanitize the stolen content by contacting brokers to "update" listings.

61.    Neither brokerages nor Xceligent are permitted to infringe or alter CoStar-copyrighted images, to copy CoStar information in breach of contract, or to access CoStar's databases without authorization.  And Xceligent is fully aware of those facts.  First, Xceligent itself imposes similar restrictions on the use of its own content in its online Terms of Service. *See, e.g.*, **Exhibit D** ("CommercialSearch.com Terms and Conditions") ("You agree that you shall not (directly or indirectly): use or reproduce any content that is obtained from CommercialSearch . . . for or in connection with any other listing service or device . . . .").  Second, the LoopNet Terms of Service included similar provisions when Xceligent was affiliated with LoopNet.  Third, as is described in greater detail below, more than 600 times, users accessing LoopNet via Xceligent IP addresses and the IP addresses of Xceligent's foreign agents

17

have been presented with actual notice that their access is not authorized, and that their actions breach the LoopNet Terms of Service, which expressly forbid the use of LoopNet for competitive purposes.

62.     The value of any commercial real estate information product, as Xceligent's CEO Doug Curry has publicly explained, is not in any individual datum, but in "***aggregating*** [commercial research data] because it cost [*sic*] a lot [to do]." In Xceligent's case, he explained, that is why "***we don't want people downloading our aggregate data set we've spent over $100 million building and sending it off because that wouldn't be right for the industry***." Jennifer Leclaire, "Xceligent Demonstrates the Power of Big Data at CCIM Thrive" (Oct. 31, 2016) (emphasis added)).

63.     Yet Xceligent, Curry's own company, is doing just that to CoStar. In direct violation of the binding Terms of Service, as well as federal law and industry norms, Xceligent researchers are copying CoStar's aggregate data and copyrighted images and using that intellectual property to build and populate Xceligent's competing products.

64.     In fact, one Xceligent employee has stated that "***90% of [Xceligent's] updates are made based off of information from our largest competitor's [i.e., CoStar's] websites – per our customers' request***," and admitted that Xceligent's researchers "***constantly get blocked out of Loopnet***"—i.e., Xceligent researchers are "constantly" triggering CoStar's abuse monitor because of their attempts to copy data and images from LoopNet on a wholesale basis.

65.     But, the employee continued, the undeterred Xceligent researchers then "***get unblocked to steal [CoStar's] information***." That is, in order to continue stealing from CoStar Xceligent researchers take steps—such as switching IP address, using Virtual Private Networks (VPNs), or using IP address anonymizers—to circumvent CoStar's security measures.

Case 4:16-cv-01288-SWH   Document 1   Filed 12/12/16   Page 18 of 44

66. These statements are confirmed not only by the presence of a huge volume of CoStar photographs and data in CommercialSearch but also by the Internet traffic patterns of Xceligent and its agents.

67. Xceligent IP addresses, and those of its agents, bombard LoopNet on a daily basis. CoStar recently discovered that more than 3,000 registered LoopNet user accounts tied to more than 300 distinct IP addresses—almost certainly a fraction of all of the IP addresses and user accounts utilized by Xceligent and its agents—have accessed LoopNet. Worse, these users and those browsing anonymously from the IP addresses of Xceligent and its agents have made over *1.7 million requests for information*.

68. These IP addresses have tripped LoopNet's abuse monitor *more than 100 times*. Moreover, Xceligent and its agents have been presented the "Access Denied" notice described above *more than 600 times*. Nevertheless, since first receiving that notice, Xceligent has made *more than 45,000* new requests for information from LoopNet. In addition, users accessing from the IP addresses that have triggered the abuse monitor have also directly viewed the LoopNet Terms of Service more than twenty times.

69. In order to sidestep CoStar's anti-piracy measures, Xceligent and its agents have adopted the following approach: When an IP address hits the abuse monitor, Xceligent and its agents use another IP address (or "rotate" the IP address) to circumvent CoStar's security methods and access LoopNet in order to copy CoStar content.

70. While damning, this picture of Xceligent's repeated and knowingly unauthorized use is far from complete. Not only are Xceligent's employees and agents systematically rotating their IP addresses, they are also accessing LoopNet using "anonymizer" services such as TOR— a service often used for the anonymous sale of narcotics, weapons, and stolen credit card

19

numbers—and "KProxy"—a web service like HideDoor.com which claims to "[b]ypass any filter" in order to avoid detection and circumvent CoStar's country-blocking technology.

71.     Despite the use of evasive access patterns, which makes it difficult to determine the specific identity of Xceligent's employees and agents, some have carelessly registered for LoopNet accounts using thinly veiled pseudonyms or, in some cases, their Xceligent-issued e-mail addresses.  For example, these registered and recently active LoopNet users include:

| | |
|---|---|
| Cheryl Boeschen | Cboeschen@xceligent.com |
| Casey Steimel | Csteimel@xceligent.com |
| Carolyn Kirkman | Ckirkman@xceligent.com |
| Kaysie Searcy | Ksearcy@xceligent.com |
| Horace Peterson | Hpeterson@xceligent.com |
| Leon Shearer | Lshearer@xceligent.com |
| Christina Jordan | Cjordan@xceligent.com |
| Jeremy Wilson | Jwilson@xceligent.com |
| Trent Elliott | Telliott@xceligent.com |
| Brad Parks | Bparks@xceligent.com |
| Greg Hoard | Ghoard@xceligent.com |
| Michelle Geib | Mgeib@xceligent.com |
| Peggy Hawkins | Phawkins@xceligent.com |
| Nathan Lipowicz | Nlipowicz@xceligent.com |
| Karen Sloan | Ksloan@xceligent.com |
| Dustin Robinett | Drobinett@xceligent.com |
| Laura Lemasters | Llemasters@xceligent.com |
| Tina Ramey | Tramey@xceligent.com |
| Sherri Kieffer | Skieffer@xceligent.com |
| Lori Belsha | Lbelsher@xceligent.com |
| Eric Groth | Egroth@xceligent.com |
| Anna Boyle | Aboyle@xceligent.com |
| Dawn Harpster | Dharpster@xceligent.com |
| Kevin Talbot | ktalbot@xceligent.com |

72.     Many of these @xceligent.com user accounts have accessed LoopNet from multiple IP addresses, suggesting a deliberate effort to skirt the LoopNet abuse monitor and evade detection.  For example, Xceligent Chief Research Officer Nate Lipowicz and Executive

Vice President Kevin Talbot have together accessed LoopNet from **_multiple IP addresses_** since 2012.

73.    That said, these @xceligent.com user IDs represent only a small subset of the user IDs that CoStar has reason to believe belong to Xceligent and its agents.  For example, there are a number of user IDs that identify Xceligent in the username (e.g., bparks.xceligent@gmail.com) and others which are clearly concocted but which are tied exclusively to Xceligent IP addresses (e.g., Czarina Pimienta, whose LinkedIn profile identifies her as a "Junior Market Analyst at Avion BPO Corporation, Agent – Xceligent," registered multiple accounts: jma.avi075@gmail.com, jma.avi076@gmail.com, and czarinamae16@gmail.com).

74.    In each case, when these Xceligent users signed up for or logged into LoopNet, they were required to click a button affirmatively representing that by signing up for a LoopNet account, they were subject to the LoopNet Terms of Service which expressly prohibit the use of the LoopNet platform for competitive purposes.

75.    As time has passed, Xceligent's organized theft from CoStar has become more brazen.  Indeed, some Xceligent researchers boast in their online resumes that they gained expertise using CoStar products while working for Xceligent's offshore agents.  **_See_ Exhibit E** ("LinkedIn Profile of Hamendar Singh") (used CoStar's subscription database—CoStar Property Professional—while working for Xceligent's Indian agent, MaxVal Technologies).

76.    These Xceligent IP traffic and user-account patterns, and direct admissions, are not entirely surprising for a company that is trying to grow at a remarkable—if not legitimately impossible—pace.  As Doug Curry has said publicly, between 2013 and 2015 Xceligent went from 33 to 46 U.S. markets, and Xceligent is, at present, attempting to expand into some of the largest markets nationwide, including New York and, very recently, South Florida.

77.     Yet, while CoStar has invested over a billion dollars in the past thirty years to continually improve its databases here in the United States, Xceligent is expanding on the cheap and on the sly.  As the evidence described above shows, insofar as Xceligent is actually accomplishing its goal of national expansion, it is not doing so by focusing on innovative technologies, large domestic research teams, or the ability to leverage relationships with the commercial real estate community.  Rather, it is once again free-riding on CoStar, this time by hiring researchers, largely abroad and presumably for low wages, to copy photographs and information from the CoStar databases in order to generate a knock-off product.  Xceligent then undercuts CoStar's rates, picking the pockets of CoStar's thousands of U.S.-based employees, shareholders, customers, and other stakeholders, while undermining competition.

## IV.   Xceligent Is Stealing and Displaying CoStar's Copyrighted Photographs on a Massive Scale.

78.     Although the full breadth of Xceligent's unlawful misconduct cannot be known until discovery is complete, CoStar is aware of thousands of instances of Xceligent's illegal copying and republishing of CoStar's intellectual property without CoStar's permission.

79.     Indeed, CommercialSearch, Xceligent's freely accessible product, is full of CoStar-copyrighted content.  More than nine thousand instances of CoStar-copyrighted photographs are currently on this Xceligent website, most of which now bear a CommercialSearch logo.

80.     Setting aside the direct evidence discussed above showing that Xceligent is systematically and constantly utilizing CoStar's intellectual property, Xceligent may try to point the finger at its customers, claiming that some of these copyrighted photographs were uploaded to CommercialSearch by, or at the direction of, individual brokers.  But this cannot possibly account for all, or even a significant number, of the infringing images.  As Doug Curry,

22

Xceligent's CEO often boasts, Xceligent cross-populates CDX listings and CommercialSearch listings. Because CDX supposedly is a professionally researched database that brokers cannot update directly, many, if not most, of these images are coming directly from Xceligent and not from brokers. *See, e.g.*, Michael Bull, Xceligent: The Source for Commercial Real Estate Information, Interview with Doug Curry, The Commercial Real Estate Show (Nov. 14, 2015), https://www.youtube.com/watch?v=F_uln-_w-BE (Curry: "That same [CDX] database will feed up to the new CommercialSearch"); Michael Bull, Xceligent Commercial Real Estate Research Firm Adds Markets and Services, Interview with Doug Curry, The Commercial Real Estate Show (Nov. 9, 2013); https://www.youtube.com/watch?v= aEiAwvLWLV0 (Curry: "CommercialSearch is actually fed by Xceligent.").

81.  The infringing photographs themselves also, in many cases, display independent indications of direct copying by Xceligent, as opposed to broker involvement.

82.  First, many CommercialSearch listings display CoStar-copyrighted photos that do *not* appear anywhere on the listing broker's marketing materials (or, for that matter, as far as CoStar can tell, anywhere else on the Internet) alongside photos that *are* in the broker's marketing materials. It defies logic that a broker would upload the CoStar-copyrighted photos to his or her CommercialSearch listing—an action that is prohibited by the CoStar license agreement—while systematically excluding those photos from his or her own marketing materials—a use that is permitted by CoStar. Rather, the only plausible explanation (and the one consistent with Xceligent's pattern of repeated unauthorized use of LoopNet) is that Xceligent itself took the CoStar-copyrighted photographs directly from one of the CoStar databases and added those photographs to the relevant CommercialSearch listing.

23

83.     By way of example, a CoStar-copyrighted photograph of a commercial building located at 1344 South Apollo Boulevard, Melbourne, FL 32901, appears on CommercialSearch (albeit with a CommercialSearch logo instead of a CoStar logo), yet the broker brochure on CommercialSearch contains different, non-CoStar copyrighted photos also available on the CommercialSearch listing:

<u>CoStar</u>



<u>CommercialSearch</u>



Broker Brochure (different images including one on CommercialSearch)



84.     Second, Xceligent has inadvertently revealed its direct and systematic copying in the way it uses the CommercialSearch logo.

85.     In June 2016, CommercialSearch adopted a new logo.  The new logo—viewed, as it typically is, as a small grayscale image at the bottom right corner of a photograph—is almost indistinguishable from CoStar's own logo.

CoStar Watermark   CommercialSearch Watermark

86.     In a large percentage of the copyrighted CoStar photos that appear on CommercialSearch, the CoStar logo has been intentionally cropped out and the *very similar* CommercialSearch logo has been added to the image in nearly the same place on the newly cropped image.

87.    The extent and uniformity of this cropping demonstrates that Xceligent is directly responsible for this deliberate attempt to "rebrand" CoStar's images for Xceligent's own purposes.  In addition, the presence of these images is consistent with the LinkedIn profile of an offshore researcher who boasted that he gained experience "*cropp[ing] attachments,*" including "aerial map, interior photo, map photo, ***building photo***, building signage, [and] demographic documents," to "***input in the database***" while working at Xceligent's Philippine agent Avion BPO.  *See* **Exhibit F** (LinkedIn Profile of Jake Rhian Ramos).

88.    For example, the right side of the CoStar image for 3940 Metro Pky, Fort Myers, FL 33916 has been cropped—notice on the right side of the image that one palm tree has been cropped out—just enough so that the CoStar logo could be removed and then the CommercialSearch logo could be added in roughly the same location.

<u>CoStar</u>



<u>CommercialSearch</u>



89.    This standardized cropping is rampant throughout the publicly available CommercialSearch listings.  Based on the uniform nature of the cropping, it appears that Xceligent is using a digital tool such as Adobe Photoshop systematically:  (1) to crop the image to remove the CoStar logo and (2) to add the CommercialSearch watermark in the "new" right hand corner.  For example:



90.    Further, in a number of infringing images, Xceligent carelessly placed the CommercialSearch logo *on top of CoStar's logo* or incompletely removed CoStar's logo.  For

example, the CommercialSearch listing for 485-505 South Broadway Street, Akron, OH includes just such an image:

CoStar



CommercialSearch



91.    Third, a number of stolen CoStar photographs are displayed on CommercialSearch at a significantly lower resolution than the original CoStar image.  The presence of these photographs on CommercialSearch at such a low resolution indicates that Xceligent manually copied them using a "snipping tool" or other software for creating screenshots.  After all, Xceligent's goal is to display the greatest *number* of listings and images, as opposed to an individual broker's goal, which is to display its properties in the most flattering

light. For example, the CoStar-copyrighted photograph of 2525 Willow Street North in Little Rock, AR, 72114 is very clear on CoStar, but exceptionally blurry on CommercialSearch:

<u>CoStar</u>



<u>CommercialSearch</u>



92.     Attached as **Exhibit G** are 100 examples of the more than 9,000 instances of CoStar-copyrighted photographs found on Xceligent's CommercialSearch website. Attached as **Exhibit H** is a chart summarizing information about those infringing images, including the CommercialSearch URL where each image was published by Xceligent.

93.     The presence of these various categories of CoStar-copyrighted photos on CommercialSearch demonstrates that Xceligent's infringement is willful, intentional, volitional, and purposeful in nature. Moreover, that CoStar has not and would not authorize Xceligent to

copy, distribute, republish, and publicly display its intellectual property is a matter of common sense and common knowledge in the industry. Indeed, that norm is reflected in Xceligent's own Terms of Service. *See* Ex. D.

94. Although CoStar has already found thousands of instances of its copyrighted photographs in CommercialSearch, those instances almost certainly constitute only a fraction of Xceligent's infringement. Because Xceligent admittedly cross-populates data to this smaller, publicly available site (CommercialSearch) from its larger, paywall-protected database (CDX), that paywall-protected database likely has thousands or tens of thousands of additional CoStar photographs across its hundreds of thousands of listings.

## V. Xceligent Is Stealing CoStar's Professionally Researched, Proprietary Data on a Wholesale Basis.

95. In addition to its mass unlawful copying and publication of CoStar-copyrighted photos, Xceligent also has stolen CoStar's professionally researched, proprietary data on an industrial scale.

96. The CoStar database contains certain data that cannot be derived by independent research and which therefore act as a digital fingerprint to catch thieves stealing CoStar's proprietary information. These data include, for example, values estimated using proprietary CoStar tools and data where the CoStar databases contain a unique value distinct from the broker marketing materials and other sources. A preliminary review of the publicly-available CommercialSearch database found hundreds and hundreds of these fingerprints.

97. The chart below includes examples of such fingerprints which appeared first on CoStar, now appear on CommercialSearch, and, to the best of CoStar's knowledge, are distinct from the relevant data points found in the public record, on the Internet, or elsewhere, *e.g.*, a

Case 4:16-cv-01288-SWH   Document 1   Filed 12/12/16   Page 30 of 44

broker brochure. The chance that these data points have been independently researched by Xceligent or submitted to Xceligent by a listing broker is therefore remote:

| Address | Data Field | CoStar Value | Xceligent Value | True Value |
|---|---|---|---|---|
| 1720 West End Ave | Parking Ratio | 3.3 | 3.3 | 4.54 |
| 5501 Lakeland Ave | Parking Ratio | 2.85 | 2.85 | 4.375 |
| 801 W State Rd 436 | Parking Ratio | 3.85 | 3.85 | 4.37 |
| 2102 Business Center Dr | Parking Ratio | 7.02 | 7.02 | 4.12 |
| 5675 Jimmy Carter Blvd | Lot Size - Acres | 12.4 | 12.4 | 9.68 |
| 411 E Town St | Lot Size - Acres | 0.2 | 0.2 | 0.15 |
| 13330 - 13420 College Blvd | Lot Size - Acres | 7.47 | 7.47 | 5.36 |
| 1700 Wyandotte St | Lot Size - Acres | 0.4 | 0.4 | 0.2 |
| 744 Royal Ave | Year Built | 1962 | 1962 | 1952 |
| 1409 - 1411 W 11th St | Year Built | 1978 | 1978 | 1914 |
| 544 Flint River Rd | Year Built | 1987 | 1987 | 1984 |
| 1103 NE McClain Rd | Year Built | 1995 | 1995 | 2002 |
| 2105 Academy Cir | RBA | 7,876 | 7,876 | 9,163 |
| 11410 W 105th St S | RBA | 4,865 | 4,865 | 4,835 |
| 3590 Recker Hwy | RBA | 7,600 | 7,600 | 8,032 |
| 843 S Cherry Ln | RBA | 3,040 | 3,040 | 3,388 |

98.    The most obvious explanation for the presence of these unique CoStar values in Xceligent's databases is also the most likely: they were copied wholesale from CoStar as part of Xceligent's massive piracy scheme.

99.    Moreover, just as with the thousands of copyrighted photographs that Xceligent is infringing, the true scope of this data misappropriation is almost certainly much broader than that

uncovered by CoStar to date. First, to the extent that Xceligent engages in follow-up research after it copies CoStar's data, thereby eliminating some errors, it is highly likely that the overlaps in the databases that can still be identified are significantly underestimating the true scope of Xceligent's copying. Second, the examples discussed above are only a snapshot of Xceligent's misappropriation taken from its publicly available commercial real estate website. Because, as discussed above, Xceligent cross-populates data to CommercialSearch from its larger CDX database, that paywall-protected database likely has many of the same issues across its hundreds of thousands of listings.

## VI. Xceligent Was Previously Forced To Purge an Entire Database Because It Contained CoStar Content.

100. After Doug Curry founded Xceligent in Kansas City in 1999, the company sought to expand into the San Diego market. But that effort foundered because the database that it built in San Diego was filled with content taken from CoStar.

101. According to a former Xceligent Director of Client Services, Cinnamon Trimmer, Xceligent was forced—on the advice of its attorneys—to purge its entire database of all San Diego listings. Xceligent did so because, according to Ms. Trimmer, there was no way that Xceligent "could prove that the information they were using was not CoStar's information." *See* https://www.youtube.com/watch?v=L0YClxmf3dU.

102. Xceligent and its management are therefore on notice that taking and publishing CoStar's content is illegal, yet have returned to that same theft-based business model, ignoring the prior advice from their own lawyers. That Xceligent's misconduct is willful, and that the actions of its managers are with knowledge of their illegality, is beyond dispute.

32

## VII. Xceligent Is Building Its New Markets Using CoStar's Subscription Database.

103. Xceligent's willful misappropriation and deliberate free-riding is further evidenced by its intentional misuse of CoStar's subscription database to open new markets to compete with CoStar.

104. For example, for years Xceligent unsuccessfully tried to expand to the Phoenix market. Yet, only on Xceligent's most recent attempt was it successful because Xceligent's Director of Client Services, Katie Glass, used a CoStar subscription database account registered to her husband, Braxton Glass, in order to obtain all of the information necessary to build reliable and complete Phoenix data.

105. CoStar recently learned that on August 19, 2014, as Xceligent was starting yet another Phoenix "market launch," Braxton Glass's CoStar account—provided to him by his employer, Orion Investment Real Estate ("Orion")—was used from the Glass residence to run a dozen or so "market share" reports. The reports were run by property type (e.g., office, industrial, or flex retail) and by type of brokerage or representation (e.g., landlord representatives, for-sale representatives, or leasing companies), initiated with no apparent limiting search criteria and printed in serial fashion. Together the properties in these market share reports accounted for almost 100 percent of the Phoenix market. Braxton Glass, whose business is focused entirely on investment sales deals, had no legitimate business need, as far as CoStar is aware, to generate such market share reports. Yet, his wife, in her Xceligent capacity, had a critical need for these reports to ascertain which brokers, brokerages, and other players to target in the Phoenix market. Indeed, during the exact timeframe when these reports were being printed, Katie Glass was playing a pivotal role in Xceligent's data certification process for the Phoenix market—a project required as Xceligent's first step in opening a new market. *See* John Salustri, "Xceligent Grows with Phoenix Market,"

http://www.globest.com/sites/globest/2015/03/30/xceligent-grows-with-phoenix-market/?slreturn=20161107173318.

106.    Thus, that Ms. Glass was impermissibly printing reams of CoStar data for Xceligent's benefit is plain.  Moreover, later the same day, Braxton Glass logged into his CoStar account from Orion's IP address and conducted activity consistent with his regular CoStar usage, further evidencing the fact that Katie Glass was misusing CoStar's database.

107.    In addition to the brokerage market share reports in 2014, CoStar also recently discovered that Braxton Glass's CoStar subscription account was used extensively from home to run reports about properties and availabilities in the Phoenix marketplace, which together provided information on thousands of properties in the Phoenix area.  Braxton Glass did not have a history of running similar reports from the Orion network before his wife joined Xceligent, nor do such reports appear necessary for him to fulfill his professional responsibilities.  Instead, these reports contained large quantities of basic property information that would be highly useful to developing information for adding the Phoenix market to Xceligent's offerings, such as a list of *all* property listings in the Phoenix area of less than 3,000 square feet and *all* real estate company names in Phoenix, searched for and printed off from A-to-Z.

108.    To take an example, on February 21, 2014, Braxton Glass's CoStar account was used to run over four thousand pages of "Space Full Detail" reports, encompassing thousands of properties in the greater Phoenix area.  This type of report is sometimes called a "Confirmation" report because it is typically used by researchers to confirm the details of a particular broker or leasing company's active listings.  An investment sales broker like Braxton Glass would have no obvious use for such a report, but it is exactly the kind of report that a CoStar competitor launching a new market would want to use to create a repository of base building information

34

and current availabilities. Unsurprisingly, properties that were exported or printed from Braxton Glass's CoStar account have appeared on CommercialSearch over 1,100 times.

109. While the account usage evidence is strong by itself, CoStar also heard directly from a former Xceligent employee that Katie Glass deliberately acquired print-outs of individual property listings from her husband using his CoStar database credentials to help Xceligent expand into Phoenix to compete with CoStar. That former employee described Xceligent's business practices as "unethical."

110. This deliberate misuse of CoStar's platform and copying of its content by an Xceligent manager echoes the other forms of willful and systematic copying and misuse detailed above. The misconduct underscores the willful and unethical culture of misappropriation that permeates Xceligent.

## VIII. Xceligent's Executives, Managers and Researchers Will Be Held Individually Liable.

111. The evidence described above demonstrates that Xceligent's actions are part of a master business plan to pilfer CoStar's intellectual property and then sell it to CoStar's customers at a lower price. The presence of thousands of CoStar copyrighted images on CommercialSearch, the relentless accessing of CoStar's data by Xceligent "researchers," the use of anonymizers and proxies to mask some access, the admissions by Xceligent employees and agents, the cropping of CoStar photographs, the use of a CoStar-clone logo, and the many other indicia of organized theft and deception set forth above, individually and collectively show that Xceligent's misconduct is coordinated and sanctioned by its executives and managers and implemented knowingly by its employees and agents.

112. Those executives, managers, employees, and agents know that Xceligent is willfully engaging in wrongdoing. That is plain from the efforts to hide or obscure the

35

misconduct, the frank admissions of "steal[ing]," restrictions placed on use of Xceligent's own website, industry norms, and Xceligent's prior experience—including the order to purge its San Diego database of CoStar content and its "unethical" and impermissible use of CoStar content to take a shortcut into the Phoenix market. Once discovery yields a complete picture of the involvement of individuals in this mass piracy, they will individually be held to account.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Copyright Infringement**
**(Brought by CoStar Realty)**

113.     CoStar Realty repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

114.     Each of CoStar Realty's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

115.     CoStar Realty owns or has exclusive rights to all rights, title, and interest in such photographs.

116.     Xceligent had and has access to such photographs hosted on U.S. based servers through the Internet and/or other means.

117.     Xceligent has copied, reproduced, distributed to the public, and/or displayed publicly copyrighted photographs belonging to CoStar Realty—including without limitation those copyrighted works identified in Exhibit G hereto—without the consent or authority of CoStar Realty, thereby infringing upon CoStar Realty's copyrights.

118.     Xceligent's copies, reproductions, distributions, and displays are identical and/or substantially similar to CoStar Realty's photographs.

36

119.    Xceligent is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

120.    The infringement of CoStar Realty's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

121.    Xceligent's acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act.  Xceligent knew its acts were infringing and intentionally or recklessly disregarded the law by its conduct.

122.    CoStar did not authorize Xceligent's infringing acts.

123.    As a result of Xceligent's willful copyright infringement, CoStar Realty has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, in an amount to be proven at trial.

124.    Xceligent's conduct also has caused irreparable and incalculable harm to CoStar Realty and the injuries are ongoing.  Unless enjoined, Xceligent's conduct will cause further irreparable and incalculable injury—among others, the further integration of CoStar Realty copyrighted photographs into Xceligent's proprietary database—for which CoStar Realty has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**

125.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

126.    Any user of the CoStar subscription database, LoopNet, or any other CoStar product may do so only pursuant to contractually binding Terms of Service.

127.     The Terms of Service are expressly agreed to by each and every registered user of any CoStar product, including CoStar's subscription database and LoopNet, by clicking their agreement when they register for their account.

128.     Non-registered users on LoopNet are provided actual notice through prominently displayed banner messages at the top of every webpage that their access is predicated on their agreement to binding Terms of Service.

129.     Such Terms of Service are common in the industry.  In fact, Xceligent has similar terms of service which prevent the use of its products by competitors for competitive ends.

130.     These Terms of Service are enforceable against and binding on Xceligent.

131.     Xceligent's authorized employees and agents—including Xceligent's Chief Research Officer Nate Lipowicz and Executive Vice President Kevin Talbot—registered and/or utilized already registered accounts recently, sometimes under fictitious names.

132.     Registered users easily identified as working for Xceligent or its agents tripped the LoopNet "abuse monitor" more than a hundred times.  While blocked, Xceligent and its agents tried to access LoopNet, and more than 600 times were presented with the "Access Denied" notice discussed above, stating that their use of LoopNet was in violation of the Terms of Service.  Xceligent employees and agents then used technological means—including IP address anonymizers and IP address rotation—to circumvent CoStar's security measures and re-access LoopNet to copy CoStar content in violation of the Terms of Service.

133.     The Terms of Service prohibit competitors from accessing CoStar products for competitive ends.

134.     The LoopNet Terms of Service expressly prohibit the use of LoopNet "in connection with any other listing service . . . [or] as part of any effort to compete. . . ."  Ex. A.

38

135. The CoStar subscription database Terms of Service expressly prohibit anyone from "[u]s[ing] or distribut[ing] any Information from the [database], including Information that has been verified or confirmed by you or anyone else, to directly or indirectly create or contribute to the development of any database or product." Ex. B.

136. The LoopNet Terms of Service expressly prohibit anyone from "remov[ing], eras[ing], or tamper[ing] with any copyright or other proprietary notice printed or stamped on, affixed to, or encoded or recorded in the . . . Service." Ex. A.

137. In direct violation of these contracts, once inside the CoStar databases, Xceligent (through its employees and agents) continually copied CoStar content for the express purpose of integrating that content into Xceligent's own competing databases.

138. In direct violation of these contractual provisions Xceligent also removed the images from the CoStar databases and removed the CoStar watermarks.

139. Xceligent's breaches of the binding Terms of Service have been material, willful, repeated, and systematic.

140. CoStar has performed any conditions, covenants, and promises required of it in accordance with the Terms of Service or, in the alternative, any such conditions, covenants, and promises have been waived.

141. Xceligent has caused damage and continues to cause irreparable harm to CoStar by building its own database based on content derived as a result of these contractual breaches.

142. Any conditions precedent to suit have been met or have been waived.

143. CoStar is therefore entitled to damages in an amount to be proven at trial, injunctive relief, and other relief as the Court deems appropriate.

## THIRD CLAIM FOR RELIEF
### Violation of the Computer Fraud and Abuse Act

144.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

145.    LoopNet's computers and servers, located in the United States, are involved in interstate and foreign commerce and communication.

146.    Xceligent's access to LoopNet's computers and servers is subject to its binding Terms of Service.

147.    When Xceligent and its employees and agents violated these Terms of Service, CoStar provided express notice to them more than six hundred times that their access to LoopNet computers and servers was unauthorized.  This notice stated that: (1) the user was in breach of the binding Terms of Service and (2) further access to LoopNet was not authorized.

148.    Nevertheless, Xceligent (through its employees and agents) knowingly and intentionally circumvented CoStar's technological security measures in order to continue accessing CoStar's computers and servers for competitive purposes in breach of its Terms of Service, including, but not limited to, by bypassing country-blocking software and using IP anonymizers such as TOR and KProxy.

149.    Xceligent's repeated unauthorized access to CoStar's computers and servers allowed it to access, obtain, and use CoStar-copyrighted photos and contractually protected proprietary information involving interstate communication in violation of 18 U.S.C. § 1030.

150.    Costar has suffered over $5,000 worth of damages and losses over a one-year period, in an amount to be proven at trial, including without limitation costs incurred assessing and responding to the unauthorized access and illegal activity by Xceligent and its agents.

151.     CoStar has suffered and will continue to suffer irreparable harm as a result of Xceligent's continued access to its computers and servers without authorization and in excess of authority, which entitles CoStar to injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Digital Millennium Copyright Act ("DMCA")**

152.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

153.     With respect to the more than nine thousand instances of copyrighted CoStar photographs referenced above as having been found on CommercialSearch, and additional CoStar-copyrighted photographs infringed by Xceligent to be identified in the course of discovery, CoStar's watermark constitutes copyright management information ("CMI"), as it identifies CoStar as the copyright owner of such photographs.  Xceligent's CommercialSearch watermark is CMI, as it indicates to users of CommercialSearch that CommercialSearch is the copyright owner of the photographs that are so marked.

154.     In many such photographs, including several specifically identified above as examples, Xceligent intentionally and systematically cropped out CoStar's watermark from CoStar-copyrighted photos and intentionally and systematically added its own CommercialSearch watermark, thus removing CoStar CMI and replacing it with false CMI.

155.     In other photos, Xceligent simply placed its own watermark on top of the CoStar watermark, thus altering CoStar CMI and replacing it with false CMI.

156.     Xceligent removed and altered CoStar's CMI and added its own, false CMI, while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(a) & (b).

Case 4:16-cv-01288-SWH   Document 1   Filed 12/12/16   Page 41 of 44

157. CoStar has suffered damage and loss as a result of these violations.

158. CoStar has suffered and will continue to suffer irreparable harm as a result of Xceligent's continued removal and alteration of CoStar CMI on CoStar-copyrighted photographs and as a result of Xceligent's continued addition of false CMI to CoStar-copyrighted photographs.

## PRAYER FOR RELIEF

WHEREFORE, CoStar prays for judgment against Xceligent as follows:

A. For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining Xceligent and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

B. For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and Xceligent's profits or, alternatively at CoStar's election, for statutory damages for Xceligent's infringement and willful infringement—including without limitation for the instances of infringement identified in Exhibit G and any others proven at trial—in the maximum amount allowable by law;

C. For a finding that Xceligent has willfully infringed upon CoStar's federally registered copyrights;

D. For an award of damages arising from Xceligent's breaches of CoStar's binding Terms of Service and the misappropriation of CoStar material as a result of those breaches;

42

E.      For an award pursuant to 18 U.S.C. § 1030(g) for compensatory damages and permanent injunctive relief preventing Xceligent's continued unauthorized access and continued access in excess of authorization of CoStar's computers and servers;

F.      For an award pursuant to 17 U.S.C. § 1203 of CoStar's actual damages and Xceligent's profits or, alternatively at CoStar's election, for statutory damages for Xceligent's violations of the DMCA in the maximum amount allowable by law;

G.      For further permanent injunctive relief as deemed necessary by the Court, including without limitation the purging of all CoStar content from Xceligent's database(s) and system(s) by an independent source that reports to CoStar and the Court and monitors Xceligent's future compliance with the Court's orders;

H.      For an award of CoStar's costs, including its reasonable attorneys' fees and disbursements of counsel, as permitted by law;

I.      For prejudgment and post-judgment interest according to law;

J.      For exemplary and punitive damages to the extent available; and

K.      For such further and additional relief as the Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

CoStar demands a trial by jury on all issues properly tried to a jury.

Dated:  December 12, 2016                    Respectfully submitted,

                                             By: /s/ Eric M. Anielak
                                             Eric M. Anielak – MO Bar #: 45653
                                             Elizabeth Fessler – MO Bar #: 67169
                                             SHOOK, HARDY & BACON L.L.P.
                                             2555 Grand Boulevard
                                             Kansas City, Missouri 64108
                                             Telephone:  (816) 474-6550
                                             Facsimile:  (816) 421-5547
                                             eanielak@shb.com
                                             efessler@shb.com

43

Nicholas J. Boyle (*pro hac vice* forthcoming)
C. Bryan Wilson (*pro hac vice* forthcoming)
Matthew H. Blumenstein (*pro hac vice*
forthcoming)
Jonah E. Perlin (*pro hac vice* forthcoming)
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
nboyle@wc.com
bwilson@wc.com
mblumenstein@wc.com
jperlin@wc.com

*Attorneys for Plaintiffs CoStar Group, Inc., CoStar
Realty Information, Inc., and LoopNet, Inc.*