## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

COSTAR GROUP, INC., COSTAR REALTY
INFORMATION, INC., and LOOPNET, INC.,

        Plaintiffs,

        v.

XCELIGENT, INC.

        Defendant.

Case No. 4:16-cv-01288-FJG

**JURY TRIAL
DEMANDED**

## AMENDED COMPLAINT

1.     Plaintiff CoStar Group, Inc. ("CoStar Group"), a public company, and Plaintiff

CoStar Realty Information, Inc. ("CoStar Realty"), its wholly owned subsidiary, together are the

nation's leading providers of commercial real estate information.  LoopNet, Inc. ("LoopNet"),

another CoStar Group subsidiary, operates the country's most popular commercial real estate

marketing website.[1]  Plaintiffs are referred to herein collectively as "CoStar."

2.     CoStar brings this case against Defendant Xceligent, Inc. ("Xceligent") to redress

its brazen and widespread theft of CoStar's intellectual property.

3.     On a systematic basis, Xceligent improperly accesses CoStar's products in order

to steal CoStar-copyrighted photographs and proprietary real estate data in breach of contract and

in violation of state and federal law.  After it copies, en masse, CoStar's intellectual property—

generated by CoStar researchers at enormous cost—Xceligent integrates the stolen intellectual

property into its own, lower-priced rival products.  Put simply, Xceligent is ripping off CoStar,

---

[1] On January 1, 2017, LoopNet merged into CoStar Realty.  CoStar Realty is thus a successor in
interest as to LoopNet's claims.

its employees, and shareholders, and bilking Xceligent's customers, by having those customers pay for copied CoStar content.

4.      The scale of Xceligent's piracy is remarkable:  A preliminary review of the publicly available content on Xceligent's website reveals no fewer than ***nine thousand*** instances of copyrighted CoStar photographs, copied and published without permission, and hundreds of unique CoStar proprietary data values stolen from CoStar's products.  Moreover, these findings almost certainly constitute a mere fraction of the total infringement and theft present in Xceligent's subscription database.

5.      Xceligent has the resources to compete fairly with CoStar:  Xceligent is part of an English conglomerate with a market capitalization of more than $3.2 billion.  Instead, Xceligent has chosen to build its products on CoStar's back using, in many instances, low-paid "researchers" in India and the Philippines to copy CoStar content wholesale.

6.      As a consequence of Xceligent's unlawful actions, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

*       *       *       *

7.      CoStar employs more than three thousand people in the United States and, as a result of their diligent efforts—and the investment of nearly five billion dollars over the last thirty-plus years—CoStar has developed the most comprehensive commercial real estate information database available in the world.

8.      This subscription database contains copyrighted photographs of, and professionally researched information about, commercial properties across the country.  All of the leading commercial real estate brokerages in the United States, as well as a significant

2

number of smaller brokerages, property owners, banks, retailers, REITs, and other professionals, are subscribers. The subscription database is also used by a number of federal, state, and local government entities and agencies.

9. While the subscription database provides exceptional benefits to CoStar's paying customers, it also has a positive impact on consumer welfare in the larger commercial real estate ecosystem. CoStar's subscription database provides greater transparency in the form of readily available, professionally researched, and regularly updated commercial real estate information. The existence of this information has made traditional commercial real estate transactions more efficient, and has also facilitated a more diverse range of commercial real estate deals. The net result is greater liquidity and significantly mitigated risk in one of the world's most valuable and important asset classes: commercial real estate.

10. CoStar licenses its subscription database content for a monthly fee. Those fees, which vary according to the scope of access a user seeks, generate significant revenue for CoStar.

11. The CoStar subscription database, LoopNet.com, and other internet listing sites owned and operated by CoStar, including Showcase.com, Cityfeet.com, and the Apartments.com Network, which includes Apartments.com and ApartmentFinder.com (together herein, the "CoStar Products"), contribute to market transparency, and further foster market liquidity, by providing the nation's most heavily trafficked commercial real estate marketing and information platform. Nearly thirty million visitors access CoStar websites every month, and the CoStar subscription database alone has one hundred thousand subscribers. In addition to broker-generated content, the CoStar Products rely on CoStar-copyrighted photographs and

3

professionally researched information. LoopNet alone provides information on more than half a million for-lease and for-sale listings, and is one of the company's biggest revenue generators.

12. Because CoStar's photographs and professionally researched data are central to its businesses, CoStar regularly registers its photographs with the United States Copyright Office and protects its proprietary data both through technological means and contractually binding Terms of Service.

13. Xceligent, founded seventeen years ago, is a long-time CoStar competitor. It offers a product, known as CDX, to compete with CoStar's subscription database, and a rival commercial real estate listing marketing platform like LoopNet, called CommercialSearch (www.commercialsearch.com). Xceligent publicly claims to provide similar products to CoStar at lower prices by using innovative methods and relationships with the commercial real estate community. Yet, the truth stands in stark contrast. Instead of investing the resources necessary to generate and update its own content, Xceligent has populated CommercialSearch, and almost certainly CDX, with CoStar content. In the words of one Xceligent employee, "*90% of our updates are made based off of information from our largest competitor's [i.e., CoStar's] websites*. . . . " As explained by another, former Xceligent employee, discussing Xceligent's expansion into various U.S. cities: "Xceligent did not get property information for these markets in the right way. Instead, when launching these markets, Xceligent Market Analysts including myself initially *populated the Xceligent databases using information that we copied mainly from LoopNet*. We did so because *that was what Xceligent managers told us to do*."

14. Systematic piracy triggers CoStar's abuse-monitoring software, which is designed to prevent mass copying from the CoStar Products. Thus, according to a third employee, Xceligent researchers "*constantly get blocked out of LoopNet*." That same employee reports

4

that the Xceligent researchers, undeterred, then "***get unblocked***"—i.e., deliberately circumvent CoStar's attempts to protect its information—so that the researchers can continue to "***steal*** [CoStar's] ***information***."

15.     This widespread theft weighs on some of Xceligent's rank-and-file employees. One researcher characterizes Xceligent as having "serious ethical issues," while another former employee states:  "It bothered me and struck me as ***dishonest and wrong*** that CoStar had worked to create this data and ***Xceligent charged customers for the data after simply copying it from LoopNet***."

16.     These damning admissions are confirmed by the publicly available content on Xceligent's CommercialSearch website.  A preliminary review of that website found more than ***nine thousand*** instances of copyrighted CoStar photographs, a large percentage of which now bear CommercialSearch's logo.  Those images are merely the tip of the iceberg, as CommercialSearch contains only a fraction of the content in Xceligent's flagship CDX database.

17.     CommercialSearch's public listings—just one of Xceligent's commercial real estate products—show that CoStar's data have been copied en masse.  Indeed, Xceligent was so eager to pick the CoStar Products clean that it even copied hundreds of data points that are unique to CoStar.

18.     The Xceligent employees' admissions are further supported by a wealth of other direct evidence.  A review of the activity of Xceligent IP addresses and the IP addresses of Xceligent's agents shows, unsurprisingly, that Xceligent employees and contractors in the United States and abroad bombard LoopNet on a daily basis in order to copy CoStar content.  And they do so despite technological blocking and repeated notice—displayed more than ***600 times***—that such conduct is prohibited.  In fact, ***hundreds*** of Xceligent employees and agents created nearly

*4,000* CoStar Group accounts and made more than *1.7 million individual requests for information* to LoopNet.

19.    Since filing its initial Complaint, CoStar has obtained additional incriminating evidence from Xceligent's agent in the Philippines, Avion BPO Corporation ("Avion"), as a result of a civil seizure order issued by a Philippines court. The order was issued after an evidentiary hearing, based on the court's finding of probable cause that copyright infringement was occurring. The Avion evidence further confirms Xceligent's mass-piracy scheme. Indeed, records recovered from Avion's computers include screenshots of researcher activities taken in real time which show Xceligent's copying of CoStar content. For example, the following screenshot shows an Avion researcher named Joemar Pascual hard at work for Xceligent. He is copying data into Xceligent's CDX database while he has CoStar's LoopNet listing platform (indicated by the red CoStar Star Logo) open to the same listing. Note also the "Access Denied" notification. That indicates that Mr. Pascual has just been expressly notified that his use of LoopNet is in breach of the LoopNet Terms of Service, which prohibit competitive use.



20.     In another example, Avion researcher Joy P. Ediynne, who has dual monitors in her workstation, is entering data on Town West Center in Indianapolis, Indiana into Xceligent's CDX database on one screen, while simultaneously viewing the corresponding LoopNet listing for Town West Plaza (which is the same property) on her other screen.  The screen recorder installed on Ms. Ediynne's computer captures both screens and shows her accessing LoopNet using a proxy service called KProxy (used to circumvent CoStar's blocking software), then deploying Greenshot—a photo editing software—to record a copy of the listing exactly as it

7

appears on LoopNet. The LoopNet listing was updated on November 21, 2016 and is being

updated by Avion in CDX on November 22, 2016—one day later. Xceligent, likely actively

monitoring listings on LoopNet, has noticed that the "Last Updated" date for Town West Plaza

has changed. Indeed, Ms. Ediynne has highlighted that "Gross Leasable Area" on LoopNet

differs from the "Building Size SF" value recorded in CDX.



21.     In the next screenshot, Avion researcher "Mac Darren," who is working for

Xceligent, likewise uses KProxy to circumvent LoopNet's security and continue accessing

LoopNet after he has been blocked. This is apparent from the multiple "Access Denied" tabs on

his web browser and the URL beginning "server.2kproxy.com." The third tab on the screenshot

corresponds to the Xceligent database, and the fifth and sixth tabs correspond to CoStar

8

Products, Showcase.com and Cityfeet.com.  The screen captured by the screen recorder shows a prominent reference to the LoopNet Terms and Conditions, which, as noted above, prohibit competitive use of the site, at the top of the page.  Mr. Darren appears ready to select "Watch This Property" so he can receive real time updates should future changes be made to the listing.



22.     The next screenshot from an Avion "research" workstation catches copying as it happens:  the Avion researcher is accessing LoopNet using a proxy service called "hideme.be" to obtain information about a property at 895 Energy Way.  The researcher has highlighted

Case 4:16-cv-01288-FJG     Document 62-1     Filed 05/23/17     Page 9 of 78

"Building Size," presumably to copy it into the Xceligent database, which is also open in the browser.



23.     Xceligent's copying of CoStar content is not just limited to LoopNet, Showcase, and Cityfeet.  Its "research" also involves accessing and harvesting content from CoStar's Apartments.com Network.  The following screenshot shows Avion researcher Angelica Garcia working from a Google spreadsheet and accessing, via KProxy, information on the apartment building located at 2900 E 91st Street, Chicago, Illinois on Apartments.com, while a tab for

Xceligent Research is also open in her browser.



24.     CoStar also uncovered evidence in Avion's files that Xceligent has stolen, and is using, proprietary data directly from CoStar's subscription database.[2]  Stored on Avion's computers are numerous spreadsheets that apparently have been directly and methodically exported from CoStar.  By way of example, the first spreadsheet excerpted below was found in Avion's files. The second excerpt is from a spreadsheet exported from the CoStar subscription database.  The spreadsheets are identical, from the font type and size, down to the sort order of the property records.

Spreadsheet Found in Avion's Files (excerpted)

| | Building Address | Building Class | Building Location | Building Name | City | Zip | Year Built | Year Renovated | County Name | Zoning | Rentable Building Area |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | 29 N 1st St | C | | | Alhambra | 91801 | 1987 | | Los Ange | ALRPD* | 7548 |
| 3 | 30 N 1st St | C | | | Alhambra | 91801 | 1955 | | Los Ange | ALRPD* | 5576 |
| 4 | 33 N 1st St | C | | | Alhambra | 91801 | 1961 | | Los Ange | ALRPD | 6020 |
| 5 | 34 N 1st St | C | | | Alhambra | 91801 | 1956 | | Los Ange | ALRPD* | 6326 |
| 6 | 108-112 N 1st S | C | | | Alhambra | 91801 | 1952 | | Los Ange | ALRPD* | 16184 |
| 7 | 117 N 1st St | C | | | Alhambra | 91801 | 1976 | | Los Ange | ALRPD* | 8800 |
| 8 | 118 N 1st St | C | | | Alhambra | 91801 | 1977 | | Los Ange | ALRPD* | 7562 |
| 9 | 308 N 1st St | C | | | Alhambra | 91801 | 1964 | | Los Ange | ALRPD* | 7134 |
| 10 | 312 N 1st St | C | | | Alhambra | 9.2E+08 | 1963 | | Los Ange | RPD, Alh | 14452 |

Identical CoStar Export File (excerpted)

| | Building Address | Building Class | Building Location | Building Name | City | Zip | Year Built | Year Renovated | County Name | Zoning | Rentable Building Area |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | 29 N 1st St | C | | | Alhambra | 91801 | 1987 | | Los Ange | ALRPD* | 7548 |
| 3 | 30 N 1st St | C | | | Alhambra | 91801 | 1955 | | Los Ange | ALRPD* | 5576 |
| 4 | 33 N 1st St | C | | | Alhambra | 91801 | 1961 | | Los Ange | ALRPD | 6020 |
| 5 | 34 N 1st St | C | | | Alhambra | 91801 | 1956 | | Los Ange | ALRPD* | 6326 |
| 6 | 108-112 N 1st S | C | | | Alhambra | 91801 | 1952 | | Los Ange | ALRPD* | 16184 |
| 7 | 117 N 1st St | C | | | Alhambra | 91801 | 1976 | | Los Ange | ALRPD* | 8800 |
| 8 | 118 N 1st St | C | | | Alhambra | 91801 | 1977 | | Los Ange | ALRPD* | 7562 |
| 9 | 308 N 1st St | C | | | Alhambra | 91801 | 1964 | | Los Ange | ALRPD* | 7134 |
| 10 | 312 N 1st St | C | | | Alhambra | 9.2E+08 | 1963 | | Los Ange | RPD, Alh | 14452 |

[2] Discovery will show whether Xceligent and/or its agents are directly accessing the CoStar subscription database, or inducing their customers and/or associates to do so, or both.

25.     After copying CoStar content, at the direction of Xceligent, Avion attempts to disguise that it came from CoStar.  The following are examples of notes written by Avion auditors working for Xceligent, and provided directly to Xceligent management, exemplifying this misconduct:

- *"Everytime you add listing notes from Loopnet, please rephrase the listing notes."*
  – Avion auditor Davina Secretario to Avion market analyst Ginalyn Baldonado (emphasis added)

- *"Please revise verification notes (do not mention 'loopnet' . . . . )"*
  – Avion auditor Kristine Asuncion to Xceligent market analyst David Brumbaugh (emphasis added)

26.     The rampant data theft taking place on behalf of Xceligent happens side by side with the infringement of countless CoStar-copyrighted photographs, such as this photograph, containing a CoStar watermark and found on Avion's computers:



13

27.     Avion's files thus make clear that Xceligent's business is built on CoStar content. While extremely troubling, that illegal behavior should not come as a complete surprise. Cutting corners and stealing CoStar content in order to build a rival database is part of Xceligent's DNA. In Xceligent's first expansion market, San Diego, Xceligent's database was so full of stolen CoStar content that its own lawyers advised that it had to delete the entire database and start from scratch. In its latest attempt to expand rapidly, Xceligent has fallen back on its old playbook: steal CoStar's data and copyrighted images, integrate that intellectual property into its own database, and then try to sell it back to CoStar customers at a lower price.

28.     Xceligent has no remorse regarding its free-riding on CoStar, and shows contempt for the law. For example, it continues, brazenly and willfully, to copy and publish CoStar watermarked photographs on its website today, months after CoStar filed this lawsuit. To take one example, the following listing, complete with three CoStar watermarked, copyrighted photographs, was still being published on Xceligent's commercialsearch.com website in May 2017, six months after the original Complaint was filed:



29.     Xceligent's misconduct cannot be explained away as undue competitive zeal or a frolic by a rogue employee. This is willful and calculated theft of intellectual property on an industrial scale. These efforts harm CoStar, its employees, its shareholders, its customers, and the commercial real estate marketplace at large. This lawsuit therefore seeks damages for Xceligent's unlawful mass piracy, and a permanent injunction to ensure that Xceligent stops stealing CoStar's intellectual property.

## THE PARTIES

30.     CoStar Group is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia 20005.

31.     CoStar Realty is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia 20005. It is a wholly owned subsidiary of CoStar Group. CoStar Realty holds the copyrights that are referred to generally as CoStar copyrights herein.

32.     LoopNet was a corporation organized and existing under the laws of the State of Delaware and had its principal place of business and corporate offices located at 101 California Street, 43rd Floor, San Francisco, California 94111. On January 1, 2017, LoopNet merged into CoStar Realty. CoStar Realty is thus a successor in interest as to LoopNet's claims.

33.     Xceligent is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 103 SE Magellan Drive, Blue Springs, Missouri 64014. Xceligent operates the real estate information database CDX, as well as the publicly accessible online marketing platform CommercialSearch. The domain names www.xceligent.com and www.commercialsearch.com are registered to Xceligent.

15

**JURISDICTION AND VENUE**

34.    This action arises in part under the Copyright Act, 17 U.S.C. § 101, *et seq.*, the

Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*, and the Digital

Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, *et seq.*  The Court has federal question

jurisdiction over these claims pursuant to 28 U.S.C. § 1331.  The Court has supplemental

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims arise

from the same set of operative facts.  The state law claims are so closely related to the federal

claims as to form part of the same case or controversy.

35.    The Court has personal jurisdiction over Xceligent because its principal place of

business is Blue Springs, Missouri.

36.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because

Xceligent's principal place of business is in this judicial district.

**FACTUAL ALLEGATIONS**

I.     **CoStar's Investment in Creating and Maintaining the Nation's Most
       Comprehensive and Most Visited Commercial Real Estate Products Benefits Its
       Customers, the Marketplace, and the Economy at Large.**

37.    Like many innovative technology companies, CoStar's business began over thirty

years ago in its founder's basement with a simple idea:  empower the commercial real estate

industry with professionally researched, unbiased commercial property information.  Since its

founding, and thanks to investment in excess of nearly five billion dollars, CoStar has become a

leading provider of commercial real estate information.

38.    CoStar's primary product is a subscription database of professionally researched

commercial real estate information and millions of copyrighted photographs.  That database

comprises an integrated suite of online services that includes for-lease and for-sale listings,

historical data, building photographs, comparable sales, tenant information, maps, and floor

plans. CoStar generates and updates the database's content at an annual cost of over $165 million.

39.     The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with the service. Each day, users conduct nearly nine million searches for commercial real estate on the CoStar Products. CoStar estimates that its products play a part in supporting one trillion dollars of commercial real estate leases, sales, and mortgage originations in the United States each year.

40.     CoStar provides commercial real estate intelligence to professionals throughout the American economy, including real estate brokers and brokerage firms, owners and investors, property managers, lenders, developers, appraisers and valuation professionals, as well as retailers, vendors, and corporations. For example, brokers and brokerages use the CoStar Products in their day-to-day business to identify available spaces for lease and evaluate potential sales. Pursuant to licenses, these users utilize CoStar's professional, copyrighted photographs to market their listings in brochures and elsewhere. CoStar also offers products (specifically, CoStar Connect and LoopLink) that allow brokers to license CoStar's technology and content, including CoStar's photographs and data, to help market property listings directly on their own corporate websites.

41.     Federal, state, and local government agencies rely on CoStar's data for a variety of purposes. For example, government agencies use CoStar's data to value commercial properties for tax purposes. CoStar's investment in accurate information also benefits the U.S. banking sector. CoStar forecasts, risk modeling, or advisory services are used by fifteen of the top twenty "Systemically Important Financial Institutions," as well as federal regulators involved in stress testing those banks. CoStar's census of the commercial real estate environment and

17

daily data updates allow these banks and regulators to better manage risks of the sort that led to the 2008 financial crisis, thereby benefitting the national economy.

42.     The CoStar Products also directly allow owners, investors, property managers, and lenders to minimize risk and maximize returns—through analysis of market fundamentals, economic forecasts, and asset pricing.  CoStar's information illuminates both the big picture and the details, providing granular, property-level specifics on key measures such as vacancy, rents, comparable properties, and tenants.

43.     In addition, when a business needs to search for a new office or location for itself, it can browse available commercial real estate vacancies across multiple brokerages in a given market and customize search results using over 150 different criteria.  Or, when a business decides to target a particular vacancy, the CoStar Products provide comparable space information, allowing the potential lessee or buyer to evaluate an offer intelligently.  In fact, when Xceligent itself was looking for office space to expand its footprint in the New York market, its broker used CoStar's subscription database to identify and compare available properties.

44.     In April 2012, when CoStar Group purchased LoopNet, Inc., it added to its business the nation's most widely used commercial real estate marketing platform—which attracts more than five million monthly unique visitors.[3]  LoopNet provides an online marketplace to post and search commercial real estate listings.  LoopNet supports the greater

---

[3] When CoStar Group purchased LoopNet, Inc., CoStar entered into a consent decree with the Federal Trade Commission.  As a condition of sale, LoopNet, Inc. agreed to divest its holdings in Xceligent.  The consent decree also limits CoStar's ability to exercise certain of its contractual rights against its own customers—particularly those seeking to enter into contracts with CoStar competitors like Xceligent.  The consent decree does not, of course, permit the infringement or misappropriation of CoStar's images or data.

18

commercial real estate ecosystem by allowing non-registered users to view some listings for free. Users that wish to list properties or gain more robust searching capabilities must purchase a subscription. If a listing party subscribes to both LoopNet and the CoStar subscription database, it may use CoStar-copyrighted photographs, under license, in connection with its LoopNet listings.

45.     In addition to the CoStar subscription database and LoopNet, CoStar also owns and operates other commercial real estate information websites, including Showcase.com, Cityfeet.com, and the sites in the Apartments.com Network, which, like LoopNet, are online marketplaces that contain, in addition to broker-provided content, CoStar-copyrighted photographs and proprietary data.

46.     Together the CoStar Products provide broad access to vast commercial real estate data, helping to level the playing field in a $17 trillion per year industry. Ultimately, CoStar's investment in its products provides enormous benefits to CoStar's customers, other participants in the commercial real estate market, and the economy at large. CoStar delivers value not only by bringing together parties that are looking to transact, but also by ensuring the reliability of the information that is shared across its products. By supplying comprehensive data to the marketplace, CoStar helps reduce transaction- and search-related costs in the commercial real estate market, leading to efficiency gains that benefit potential buyers, sellers, lessees, and lessors, as well as third-party consumers of CoStar's information, such as government agencies. And because one of the key drivers of CoStar's value is ensuring that its products are trusted, CoStar is incentivized to invest in creating and updating a highly reliable database. CoStar was recently honored as one of the Most Innovative Growth Companies by Forbes Magazine based on its continued efforts to make commercial real estate information more accurate.

19

47.     Although CoStar has a number of competitors in each of its businesses, it has fought to outwork and outperform the competition through continual innovation and re-investment in its products over three decades.  Nearly thirteen thousand CoStar researchers have contributed to the subscription database since its creation, adding nearly five million properties, taking over twelve million photographs, and driving and flying over two million miles per year.

48.     As it innovates and grows, CoStar continues to generate new, high-paying American jobs.  CoStar is currently expanding its real estate research capacity in the United States, including a brand new facility in Richmond, Virginia, announced in October 2016, which now employs more than five hundred people.

49.     The benefits that the CoStar Products provide to its customers and the market at large, and CoStar's ability to continue generating American jobs, are a direct result of the company's efforts to research, collect, and create data and photographs.  The protection of CoStar-copyrighted images and proprietary data—and CoStar's ability to vindicate its rights in that intellectual property—is therefore critically important.

## II.     At Great Effort and Expense, CoStar Protects Its Intellectual Property.

50.     CoStar protects its intellectual property in three primary ways.  First, CoStar registers its photographs with the Copyright Office.  Second, users assent to CoStar's binding Terms of Service in order to use any of the CoStar Products.  Third, CoStar employs state-of-the-art anti-piracy technology.

### A.     CoStar Regularly Registers Its Photographs with the United States Copyright Office.

51.     CoStar owns the largest library of commercial real estate images in the world, including millions of photographs of commercial real estate taken by CoStar researchers.  As

discussed above, these copyrighted photographs are used on LoopNet, the CoStar subscription database, and the other CoStar Products.

52.     As CoStar adds photographs to its products, it routinely registers them with the Copyright Office.  CoStar is currently registering more than 80,000 photographs per month. CoStar hosts its copyrighted photographs on servers in the United States.

**B.     Access to CoStar Products Is Governed by Binding Terms of Service Made Clear to Every User Who Accesses Its Products.**

53.     CoStar requires registered and non-registered users of the CoStar Products to agree to binding Terms of Service.

54.     A genuine copy of LoopNet's Terms of Service is attached hereto as **Exhibit A,** and a genuine copy of the CoStar subscription database's Terms of Service is attached hereto as **Exhibit B**.  The other CoStar Products impose substantially similar Terms of Service.  *See, e.g.*, http://www.apartments.com/advertise/disclaimers/terms-of-service; http://www.apartmentfinder.com/termsofuse.

55.     Non-registered users who, for example, are directed to LoopNet by search engines such as Google, immediately encounter prominent notice on the top of every LoopNet webpage telling them that their access is subject to their agreement to the binding Terms of Service.  The only way this notice can be removed is for the user to click on an X on the far right side of the notice.

21



56.     The Terms of Service provide that by viewing, using, or accessing a CoStar

Product, the user agrees to be bound by those Terms.  For example:

    a.   "By viewing, using or accessing the Service, You agree that these Terms and Conditions are a binding legal agreement between You and LoopNet."  Ex. A.

    b.   "[Terms of Use] constitute a legal contract between you and CoStar, and by accessing or using any part of the Site you represent and warrant that you have the right, power and authority to agree to and be bound by these Terms of Use."  Ex. B.

57.     The Terms of Service expressly prohibit using a CoStar Product for competitive

purposes.  For example:

    a.   A user "shall not use the Service in any other manner for or in connection with any other listing service or device.  You shall not use the LoopNet Service as part of any effort to compete with LoopNet, including without limitation using the LoopNet Service to provide, alone or in combination with any other product or service, any database services to any third party or any use that causes a reduction or loss from an existing or potential LoopNet customer, nor shall You remove, erase, or tamper with any copyright or other proprietary notice printed or stamped on, affixed to, or encoded or recorded in the . . . Service."  Ex. A.

    b.   A user shall not "provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar (by way of example, a 'direct or indirect competitor' of CoStar includes, but is not limited to, Internet listing services or other real estate information services and employees, independent contractors and agents of such services)."  Ex. B.

22

c. A user further shall not "[u]se or distribute any Information from the Product, including Information that has been verified or confirmed by you or anyone else, to directly or indirectly create or contribute to the development of any database or product." Ex. B.

58. The Terms of Service also emphasize the proprietary nature of the information in the CoStar Products. For example:

a. "You agree to treat all information obtained from the Service, including LoopNet Materials, listings, member directory, historical transaction information ('Property Comps'), and any information otherwise made available to You in the Service (individually and collectively, the 'Content') as proprietary to LoopNet. You agree that Content reserved for Members will be maintained as confidential . . . ." Ex. A.

b. "The information, data, text, software, photographs, images, graphics, organization, layout, design, and other content contained on or provided through this Site (collectively, the 'Content') are proprietary to CoStar and its licensors, and are protected by copyright and other Canadian and international intellectual property rights, laws and treaties." Ex. B.

59. When a user fails to abide by these Terms of Service, CoStar may block the user's access.

a. If that user "fails to abide by the Terms and Conditions" "LoopNet has the right to refuse or terminate service to any Member, individual, organization, or firm (and all persons associated or affiliated with said organization or firm) that fails to abide by the Terms and Conditions." *See* Ex. A.

b. "CoStar reserves the right to terminate or suspend your use of a CoStar service or to terminate your License Agreement upon a good faith determination of a violation of the terms of any material provision of any other agreement between the parties or their affiliates." Ex. B.

60. As noted above, CoStar licenses its copyrighted photographs and content to commercial real estate brokerages for use on their own websites and in their own marketing material subject to various contractual restrictions that, among other things, preclude those brokerages from posting or providing CoStar photographs or other CoStar information on or to third-party websites. The brokerages remain free to provide their own photographs and information to such websites.

23

61.    Brokerages that choose to use CoStar Connect or LoopLink to power their own websites are required to post prominently the relevant Terms of Service, which warn users that the database constitutes the valuable property and copyrighted information of CoStar and forbids users from uploading, posting, or otherwise transmitting any portion of CoStar's information. LoopLink pages also include a copyright warning advising that users may not reproduce or transmit the information without express written consent. *See* Exs. A & B.

62.    CoStar protects its intellectual property through binding Terms of Service in part because there are no significant structural barriers to entering the commercial real estate data market. All that is required is a sufficient investment of time and money and, as a result, competitors to CoStar spring up on a regular basis. A sampling of headlines from the trade press over just the last two years illustrates this phenomenon:

- "53 Tech Startups Reshaping Commercial Real Estate," https://www.cbinsights.com/blog/commercial-real-estate-tech-market-map-company-list/ (May 10, 2016);

- "Burgeoning CRE Tech Solutions," http://news.theregistrysf.com/burgeoning-solutions/ (Aug. 14, 2016) ("Tech ventures for the commercial real estate industry received some $161 million in venture capital funding last year, up 1.6 percent from 2014 and more than triple the amount invested in such ventures two years ago, according to a recent report by CRE//Tech, which hosts conferences on the intersection between technology and commercial real estate.");

- "14 Real Estate Tech Startups You Need to pay Attention To," https://www.bisnow.com/national/news/tech/10-real-estate-tech-startups-you-need-to-be-paying-attention-to-50516?single-page (Oct. 2, 2015);

- "How Two Millennials Launched Reonomy, A Real Estate Data Startup That Has Secured $22M In Funding," http://www.forbes.com/sites/viviennedecker/2016/03/31/the-millennials-behind-reonomy-are-renovating-the-commercial-real-estate-industry-through-tech/2/#5dfc56978be8 (Mar. 31, 2016).

**C. CoStar Further Protects Its Products Using Technological Means.**

63.     In addition to protecting its photographs and data through copyright registration and binding Terms of Service, CoStar takes other technological steps to protect against unauthorized access to the CoStar Products for competitive purposes.

64.     First, LoopNet and the other CoStar Products employ a country-blocking filter. This filter prevents access to the websites by IP addresses from certain countries where there is little or no basis for legitimate use, including the Philippines.

65.     Second, LoopNet and the other CoStar Products employ an excess access filter. If a single IP address views an excessive number of listings on the site, consistent with access by a competitor or other user that is systematically copying listings, that IP address is temporarily blocked from accessing the site.  On LoopNet, for example, if either of these "abuse monitor" filters is tripped, the user is presented with the following "Access Denied" notice which expressly states that the user is in breach of the Terms of Service and that further access to LoopNet is not authorized:

## Access Denied

You are in breach of the binding LoopNet Terms and are blocked from accessing LoopNet. By continuing to access LoopNet or accessing after the block has expired, you are reaffirming your agreement to the LoopNet Terms. Users who do not comply with these Terms are not authorized to access LoopNet.

66.     As discussed in more detail below, Xceligent was presented with this notice more than 600 times.  The notice states unequivocally that these users were in breach of the LoopNet Terms of Service and that any further attempt to access LoopNet was subject to the LoopNet Terms of Service.

67.     There are numerous copies of LoopNet "Access Denied" messages in the materials seized from Avion, including this one:



68.     Third, CoStar employs a number of third-party products to protect against improper use including, but not limited to, firewalls, IP reputation blocking, as well as anti-virus, anti-botnet, and anti-malware programs.

69.     CoStar is constantly implementing new security procedures to protect its most valuable resources—its data and images—at a significant cost.  Efforts to circumvent these technological safeguards significantly increase these costs.

III.    **Even Though Xceligent Is Prohibited from Using the CoStar Products for Competitive Purposes, It Is Nevertheless Stealing and Repackaging CoStar's Intellectual Property.**

70.     Xceligent is a direct competitor of CoStar that purports to operate similar commercial real estate research platforms.  Xceligent's majority owner is dmg information ("DMGI"), a U.S.-based business-to-business information company that has reported annual

revenue of over $500 million. DMGI is a wholly owned subsidiary of the Daily Mail and General Trust plc ("DMGT"). DMGT, which also owns the Daily Mail—the second largest-selling daily newspaper in the United Kingdom—has a current market capitalization of $3.2 billion.

71.     In addition to U.S.-based researchers, including those at Xceligent's headquarters in Blue Springs, Missouri, Xceligent hires offshore researchers to supplement that work. Indeed, Xceligent researchers based in the Philippines and in India widely advertise their work for Xceligent. *See* **Exhibit C** (MaxVal & Avion LinkedIn Profiles).

72.     Although Xceligent, part of a multi-billion dollar conglomerate, has more than enough resources to compete fairly, Xceligent's business model is based on theft from CoStar. Instead of focusing on developing broker lists, contacting those brokers to get relevant information about their properties, and taking original photographs of commercial real estate, Xceligent's "research" apparatus consists, in significant part, of mass copying CoStar's information and photographs market-by-market. Once a market is open, Xceligent can then sanitize the stolen content by contacting brokers to "update" listings.

73.     Neither brokerages nor Xceligent are permitted to infringe or alter CoStar-copyrighted images, to copy CoStar information in breach of contract, or to access CoStar's Products without authorization. And Xceligent is fully aware of those facts. First, Xceligent itself imposes similar restrictions on the use of its own content in its online Terms of Service. *See, e.g.*, **Exhibit D** ("CommercialSearch.com Terms and Conditions") ("You agree that you shall not (directly or indirectly): use or reproduce any content that is obtained from CommercialSearch . . . for or in connection with any other listing service or device . . . ."). Second, the LoopNet Terms of Service included similar provisions when Xceligent was affiliated

with LoopNet. Third, as is described in greater detail below, more than 600 times, users accessing LoopNet via Xceligent IP addresses and the IP addresses of Xceligent's foreign agents have been presented with actual notice that their access is not authorized, and that their actions breach the LoopNet Terms of Service, which expressly forbid the use of LoopNet for competitive purposes. As noted above, numerous screenshots of this Access Denied message were found in the materials seized from Xceligent's agent in the Philippines.

74.     The value of any commercial real estate information product, as Xceligent's CEO Doug Curry has publicly explained, is not in any individual datum, but in "***aggregating*** [commercial research data] because it cost [*sic*] a lot [to do]." In Xceligent's case, he explained, that is why "***we don't want people downloading our aggregate data set we've spent over $100 million building and sending it off because that wouldn't be right for the industry***." Jennifer Leclaire, "Xceligent Demonstrates the Power of Big Data at CCIM Thrive" (Oct. 31, 2016) (emphasis added).

75.     Yet Xceligent, Curry's own company, is doing just that to CoStar. In direct violation of the binding Terms of Service, as well as federal and state law and industry norms, Xceligent researchers are copying CoStar's aggregate data and copyrighted images and using that intellectual property to build and populate Xceligent's competing products.

76.     In fact, one Xceligent employee has stated that "***90% of [Xceligent's] updates are made based off of information from our largest competitor's [i.e., CoStar's] websites – per our customers' request***," and another admitted that Xceligent's researchers "***constantly get blocked out of Loopnet***"—i.e., Xceligent researchers are "constantly" triggering CoStar's abuse monitor because of their attempts to copy data and images from LoopNet on a wholesale basis.

28

77.     But, as one of the Xceligent employees continued, the undeterred Xceligent

researchers then "**get unblocked to steal [CoStar's] information**."  That is, in order to continue

stealing from CoStar, Xceligent's research and technical teams take steps—such as switching IP

addresses, using Virtual Private Networks (VPNs), or using IP address anonymizers—to

circumvent CoStar's security measures.  In the words of another, former Xceligent employee, "I

was told by management, including [Chief Research Officer] Nate Lipowicz, that **access to**

**LoopNet was 'business critical' for Xceligent** and I was instructed to change the Xceligent IP

address in order to re-gain access to LoopNet."

78.     Thus, as yet another former Xceligent employee observes, "[w]hile there were

other ways to get this information properly, Xceligent simply refused to put the time and money

to get the data and images properly."

79.     These statements are confirmed not only by the presence of a huge volume of

CoStar photographs and data in CommercialSearch but also by the Internet traffic patterns of

Xceligent and its agents, as well as direct evidence of circumvention recovered from Xceligent's

agent in the Philippines, Avion.

80.     Xceligent IP addresses, and those of its agents, bombard LoopNet on a daily

basis.  CoStar recently discovered that more than 3,000 registered LoopNet user accounts tied to

more than 300 distinct IP addresses—almost certainly a fraction of all of the IP addresses and

user accounts utilized by Xceligent and its agents—have accessed LoopNet.  Worse, these users

and those browsing anonymously from the IP addresses of Xceligent and its agents have made

over **1.7 million requests for information** to LoopNet.

81.     These IP addresses have tripped LoopNet's abuse monitor **more than 100 times**.

Moreover, Xceligent and its agents have been presented the "Access Denied" notice described

above **more than 600 times**.  Nevertheless, since first receiving that notice, Xceligent has made **more than 45,000** new requests for information from LoopNet.  In addition, users accessing from the IP addresses that have triggered the abuse monitor have also directly viewed the LoopNet Terms of Service more than twenty times.

82.     In order to sidestep CoStar's anti-piracy measures, Xceligent and its agents have adopted multiple approaches, including the following:  When an IP address used by one or more researchers hits the abuse monitor (because the researcher or researchers have been accessing an excessive number of property listings), Xceligent and its agents use another IP address (or "rotate" the IP address) to circumvent CoStar's security methods and access LoopNet in order to keep copying CoStar content.  Xceligent is changing the IP address as a means of hiding its true identity, the cyber equivalent of creating and using a fake I.D.  One former Xceligent employee reports that, "[d]uring my time at Xceligent, I recall getting multiple emails a week about the IP address change. . . .  It was known by me and my fellow researchers that **the IT department changed the IP address every week or every other week for the express purpose of providing access to LoopNet** because CoStar was trying to block Xceligent."

83.     In addition to rotating their IP addresses, Xceligent's employees and agents also access LoopNet using "anonymizer" services such as TOR—a service often used for the anonymous sale of narcotics and weapons, as well as computer crime, child pornography, and sex trafficking[4]—and proxy services such as "KProxy"—which, according to its website, can

---

[4] *See, e.g.*, Cara McGoogan, *Dark Web Browser Tor Is Overwhelmingly Used for Crime, Says Study*, Daily Telegraph, Feb. 2, 2016 ("57 per cent of the sites designed for Tor . . . facilitate criminal activity, including drugs, illicit finance, and extreme pornography. . . .  Tor has been associated with child pornography, gun trading and murder long before now. . . .  It's used for criminal services, fraud, extreme, illegal pornography, cyber attacks and computer crime."), http://www.telegraph.co.uk/technology/2016/02/02/dark-web-browser-tor-is-overwhelmingly-used-for-crime-says-study/.

"[b]ypass any filter"—in order to avoid detection and circumvent CoStar's country-blocking technology. As one former Xceligent employee explains, "[b]ecause Xceligent researchers spent so much time every day on LoopNet, they would be blocked by the site for excessive use. **Xceligent management made sure that we had workarounds**. For example, the **IT department installed a TOR browser on many researchers' computers to hide their identity from LoopNet**."

84.     Despite the use of evasive access patterns, which makes it difficult to determine the specific identity of Xceligent's employees and agents, some have carelessly registered for LoopNet accounts using thinly veiled pseudonyms or, in some cases, their Xceligent-issued e-mail addresses. For example, these registered and recently active LoopNet users include:

| | |
|---|---|
| Cheryl Boeschen | Cboeschen@xceligent.com |
| Casey Steimel | Csteimel@xceligent.com |
| Carolyn Kirkman | Ckirkman@xceligent.com |
| Kaysie Searcy | Ksearcy@xceligent.com |
| Horace Peterson | Hpeterson@xceligent.com |
| Leon Shearer | Lshearer@xceligent.com |
| Christina Jordan | Cjordan@xceligent.com |
| Jeremy Wilson | Jwilson@xceligent.com |
| Trent Elliott | Telliott@xceligent.com |
| Brad Parks | Bparks@xceligent.com |
| Greg Hoard | Ghoard@xceligent.com |
| Michelle Geib | Mgeib@xceligent.com |
| Peggy Hawkins | Phawkins@xceligent.com |
| Nathan Lipowicz | Nlipowicz@xceligent.com |
| Karen Sloan | Ksloan@xceligent.com |
| Dustin Robinett | Drobinett@xceligent.com |
| Laura Lemasters | Llemasters@xceligent.com |
| Tina Ramey | Tramey@xceligent.com |
| Sherri Kieffer | Skieffer@xceligent.com |
| Lori Belsha | Lbelsher@xceligent.com |
| Eric Groth | Egroth@xceligent.com |
| Anna Boyle | Aboyle@xceligent.com |
| Dawn Harpster | Dharpster@xceligent.com |
| Kevin Talbot | ktalbot@xceligent.com |

85.    Many of these @xceligent.com user accounts have accessed LoopNet from multiple IP addresses, suggesting a deliberate effort to skirt the LoopNet abuse monitor and evade detection.  For example, Xceligent Chief Research Officer Nate Lipowicz and Executive Vice President Kevin Talbot have both accessed LoopNet from multiple IP addresses since 2012.

86.    That said, these @xceligent.com user IDs represent only a small subset of the user IDs that CoStar has reason to believe belong to Xceligent and its agents.  For example, there are a number of user IDs that identify Xceligent in the username (e.g., bparks.xceligent@gmail.com) and others which are clearly concocted but which are tied exclusively to IP addresses used by Xceligent and its agents.  To take one such example, Czarina Pimienta, whose LinkedIn profile identifies her as a "Junior Market Analyst at Avion BPO Corporation, Agent – Xceligent," registered multiple accounts: jma.avi075@gmail.com, jma.avi076@gmail.com, and czarinamae16@gmail.com.

87.    In each case, when these Xceligent users signed up for or logged into LoopNet, they were required to click a button affirmatively representing that by signing up for a LoopNet account, they were subject to the LoopNet Terms of Service which expressly prohibit the use of the LoopNet platform for competitive purposes.

88.    As time has passed, Xceligent's organized theft from CoStar has become more brazen.  Indeed, some Xceligent researchers boast in their online resumes that they gained expertise using CoStar products while working for Xceligent's offshore agents.  *See* **Exhibit E** ("LinkedIn Profile of Hamendar Singh") (used CoStar's subscription database—CoStar Property Professional—while working for Xceligent's Indian agent, MaxVal Technologies Pvt.).

89.    These Xceligent IP traffic and user-account patterns, and direct admissions, are not entirely surprising for a company that is trying to grow at a remarkable—if not legitimately

32

impossible—pace. As Doug Curry has said publicly, between 2013 and 2015 Xceligent went from 33 to 46 U.S. markets, and Xceligent is, at present, attempting to expand into some of the largest markets nationwide, including New York and, very recently, South Florida.

90.     Yet, while CoStar has invested over a billion dollars in the past thirty years to continually improve its products here in the United States, Xceligent is expanding on the cheap and on the sly. As the evidence described above shows, insofar as Xceligent is actually accomplishing its goal of national expansion, it is not doing so by focusing on innovative technologies, large domestic research teams, or the ability to leverage relationships with the commercial real estate community. Rather, it is once again free-riding on CoStar, this time by hiring researchers, largely abroad and presumably for low wages, to copy photographs and information from the CoStar Products in order to generate a knock-off product. Xceligent then undercuts CoStar's rates, picking the pockets of CoStar's thousands of U.S.-based employees, shareholders, customers, and other stakeholders, while undermining competition.

**IV.     Xceligent Is Stealing and Displaying CoStar's Copyrighted Photographs on a Massive Scale.**

91.     Although the full breadth of Xceligent's unlawful misconduct cannot be known until discovery is complete, CoStar is aware of thousands of instances of Xceligent's illegal copying and republishing of CoStar's intellectual property without CoStar's permission.

92.     Indeed, CommercialSearch, Xceligent's freely accessible product, is full of CoStar-copyrighted content. CoStar found more than nine thousand instances of CoStar-copyrighted photographs on this Xceligent website, most of which now bear a CommercialSearch logo.

93.     Setting aside the direct evidence discussed above showing that Xceligent is systematically and constantly utilizing CoStar's intellectual property, Xceligent may try to point

the finger at its customers, claiming that some of these copyrighted photographs were uploaded to CommercialSearch by, or at the direction of, individual brokers. But this cannot possibly account for all, or even a significant number, of the infringing images. As Doug Curry, Xceligent's CEO often boasts, Xceligent cross-populates CDX listings and CommercialSearch listings. Because CDX supposedly is a professionally researched database that brokers cannot update directly, many, if not most, of these images are coming directly from Xceligent and not from brokers. *See, e.g.*, Michael Bull, Xceligent: The Source for Commercial Real Estate Information, Interview with Doug Curry, The Commercial Real Estate Show (Nov. 14, 2015), https://www.youtube.com/watch?v=F_uln-_w-BE (Curry: "That same [CDX] database will feed up to the new CommercialSearch"); Michael Bull, Xceligent Commercial Real Estate Research Firm Adds Markets and Services, Interview with Doug Curry, The Commercial Real Estate Show (Nov. 9, 2013); https://www.youtube.com/watch?v= aEiAwvLWLV0 (Curry: "CommercialSearch is actually fed by Xceligent.").

94.     Indeed, Xceligent's own former employees confirm that its mass copying was overwhelmingly driven by management and researchers, not requested by brokers:

- "When I was unable to obtain information about those properties directly from brokers, ***Xceligent managers . . . instructed me, and other researchers, to access LoopNet listings and copy all of property listing information (e.g. rate, square footage) to populate Xceligent's databases.***"

- "***The searches on LoopNet and LoopLink were almost never the result of a broker request, but rather at the direction of Xceligent senior management***."

- "***In addition to copying from LoopNet, the Xceligent managers also instructed me and other Market Analysts to populate Xceligent databases using any content I could retrieve from a Google search, including data on broker sites that were clearly designated as being powered by LoopLink or CoStar***. That said, nine times out of ten when I ran a Google search ***LoopNet would be the first source that would pop up in the search results, and that was what we would use***."

34

95. Also, the infringing photographs themselves, in many cases, display independent indications of direct copying by Xceligent, as opposed to broker involvement.

96. First, many CommercialSearch listings display CoStar-copyrighted photos that do *not* appear anywhere on the listing broker's marketing materials (or, for that matter, as far as CoStar can tell, anywhere else on the Internet) alongside photos that *are* in the broker's marketing materials. It defies logic that a broker would upload the CoStar-copyrighted photos to his or her CommercialSearch listing—an action that is prohibited by the CoStar license agreement—while systematically excluding those photos from his or her own marketing materials—a use that is permitted by CoStar. Rather, the only plausible explanation (and the one consistent with the statements of Xceligent's former employees and Xceligent's pattern of repeated unauthorized use of LoopNet) is that Xceligent itself took the CoStar-copyrighted photographs directly from one of the CoStar Products and added those photographs to the relevant CommercialSearch listing.

97. By way of example, a CoStar-copyrighted photograph of a commercial building located at 1344 South Apollo Boulevard, Melbourne, Florida, appears on CommercialSearch (albeit with a CommercialSearch logo instead of a CoStar logo), yet the broker brochure on CommercialSearch contains different, non-CoStar copyrighted photos also available on the CommercialSearch listing:



CoStar Photo



Photo on CommercialSearch



Broker Brochure on CommercialSearch

Photo also on CommercialSearch

98.     Second, Xceligent has inadvertently revealed its direct and systematic copying in the way it uses the CommercialSearch logo.

99.     In June 2016, CommercialSearch adopted a new logo.  The new logo—viewed, as it typically is, as a small grayscale image at the bottom right corner of a photograph—is almost indistinguishable from CoStar's own logo.



100.     In a large percentage of the copyrighted CoStar photos that appear on CommercialSearch, the CoStar logo has been intentionally cropped out and the *very similar* CommercialSearch logo has been added to the image in nearly the same place on the newly cropped image.

101.     The extent and uniformity of this cropping demonstrates that Xceligent is directly responsible for this deliberate attempt to "rebrand" CoStar's images for Xceligent's own purposes.  Indeed, according to one former Xceligent employee, Xceligent managers instruct researchers to crop watermarks from photographs they copy, including CoStar watermarks, and researchers are trained to use software tools, including SnapShot, to do so:

- "***Xceligent managers specifically instructed me and my colleagues to crop out the watermark on any image that we copied from the internet, including the CoStar watermarks on photos we copied from LoopNet***.  The removal of watermarks was part of the training I received at Xceligent.  We used a software tool called SnapShot to crop out all watermarks including CoStar watermarks."

- "My memory is that SnapShot was installed on my Xceligent computer by the Xceligent IT department.  We used SnapShot for removing watermarks and cropping photos.  ***I understood that removing the watermarks meant that Xceligent was less likely to be caught copying CoStar's photographs.***"

102.    The cropping is reflected in CoStar-copyrighted photographs on CommercialSearch.  For example, the right side of the CoStar image for 3940 Metro Pky, Fort Myers, Florida has been cropped—notice on the right side of the image that one palm tree has been cropped out—just enough so that the CoStar logo could be removed and then the CommercialSearch logo could be added in roughly the same location.

<u>CoStar</u>



<u>CommercialSearch</u>



103.    Indeed, this standardized cropping is rampant throughout the publicly available CommercialSearch listings.  Based on the uniform nature of the cropping, it appears that Xceligent is using a digital tool systematically:  (1) to crop the image to remove the CoStar logo and (2) to add the CommercialSearch watermark in the "new" right hand corner.  For example:



104.    Further, in a number of infringing images, Xceligent carelessly placed the CommercialSearch logo *on top of CoStar's logo* or incompletely removed CoStar's logo. For example, the CommercialSearch listing for 485-505 South Broadway Street, Akron, Ohio includes just such an image:

CoStar



CommercialSearch



105.    Third, a number of stolen CoStar photographs are displayed on

CommercialSearch at a significantly lower resolution than the original CoStar image.  The

presence of these photographs on CommercialSearch at such a low resolution indicates that

Xceligent manually copied them using a "snipping tool" or other software for creating

screenshots.  After all, Xceligent's goal is to display the greatest *number* of listings and images,

as opposed to an individual broker's goal, which is to display its properties in the most flattering

light. For example, the CoStar-copyrighted photograph of 2525 Willow Street North in Little

Rock, Arkansas is very clear on CoStar, but exceptionally blurry on CommercialSearch:

CoStar



CommercialSearch



106. Attached as **Exhibit G** are 100 examples of the more than 9,000 instances of

CoStar-copyrighted photographs found on Xceligent's CommercialSearch website. Attached as

**Exhibit H** is a chart summarizing information about those infringing images, including the

CommercialSearch URL where each image was published by Xceligent.

107. Any attempt by Xceligent to deflect the blame onto Xceligent's customers would

fail. For example, the overwhelming majority—at least 88—of these exemplar CoStar-

copyrighted images were uploaded directly into Xceligent's database by Xceligent employees or its agents at Avion.

108.    Although CoStar has already found thousands of instances of its copyrighted photographs in CommercialSearch, those instances almost certainly constitute only a fraction of Xceligent's infringement.  Because Xceligent admittedly cross-populates data to this smaller, publicly available site (CommercialSearch) from its larger, paywall-protected database (CDX), that paywall-protected database likely has thousands or tens of thousands of additional CoStar photographs across its hundreds of thousands of listings.

109.    The presence of these various categories of CoStar-copyrighted photos on CommercialSearch demonstrates that Xceligent's infringement is willful, intentional, volitional, and purposeful in nature.  Moreover, that CoStar has not and would not authorize Xceligent to copy, distribute, republish, and publicly display its intellectual property is a matter of common sense and common knowledge in the industry.  Indeed, that norm is reflected in Xceligent's own Terms of Service.  *See* Ex. D.

110.    Further, internal Xceligent and Avion documents confirm that Xceligent knew that their researchers were not allowed to copy—or, at least, must not be caught copying—CoStar photographs, underscoring the willfulness of the thousands upon thousands of violations by Xceligent and its agents:

42

**YOU MUST NOT USE ANY RESOURCE AFFILIATED WITH COSTAR.  DO NOT USE THE FOLLOWING:**

www.COSTAR.com

www.LOOPNET.com

www.SHOWCASE.com

www.APARTMENTS.COM

ALSO BE AWARE THAT COSTAR MAY BUY **ADDITIONAL ONLINE DATABASES**, SO BE ON THE LOOKOUT FOR THIS LOGO AND WE MUST **NEVER USE ANY RESOURCE WITH THIS LOGO**:





CoStar uses the same logo on most of their websites.  If you see this logo, do not use the information.

43

111.    These documents also demonstrate that Xceligent (and Avion) understood that the CoStar/LoopNet watermark and logos indicate that such photographs may be CoStar-copyrighted:



112.    Yet despite these acknowledgements by Xceligent and Avion that it is impermissible to copy from CoStar, the mass copying continued on a daily basis, leading to thousands of CoStar images on Xceligent's CommercialSearch website.

113.    As noted above, there is no dispute that Xceligent and Avion researchers uploaded into Xceligent's system the vast majority of the 100 sample CoStar-copyrighted photographs identified in the original Complaint.  And CoStar found among Avion's files copies of its copyrighted photographs plainly displaying the CoStar watermark, such as the photograph displayed in paragraph 25 above.

**V.    Xceligent Is Stealing CoStar's Professionally Researched, Proprietary Data on a Wholesale Basis.**

114.    In addition to its mass unlawful copying and publication of CoStar-copyrighted photos, Xceligent also has stolen CoStar's professionally researched, proprietary data on an industrial scale.

115.    The CoStar Products contain certain data that cannot be derived by independent research and which therefore act as a digital fingerprint to catch thieves stealing CoStar's proprietary information.  These data include, for example, values estimated using proprietary CoStar tools and data where the CoStar Products contain a unique value distinct from the broker marketing materials and other sources.  A preliminary review of the publicly-available CommercialSearch database found hundreds and hundreds of these fingerprints.

116.    The chart below includes examples of such fingerprints which appeared first on CoStar, now appear on CommercialSearch, and, to the best of CoStar's knowledge, are distinct from the relevant data points found in the public record, on the Internet, or elsewhere, *e.g.*, a broker brochure.  The chance that these data points have been independently researched by Xceligent or submitted to Xceligent by a listing broker is therefore remote:

| Address | Data Field | CoStar Value | Xceligent Value | True Value |
|---------|-----------|--------------|-----------------|------------|
| 1720 West End Ave | Parking Ratio | 3.3 | 3.3 | 4.54 |
| 5501 Lakeland Ave | Parking Ratio | 2.85 | 2.85 | 4.375 |
| 801 W State Rd 436 | Parking Ratio | 3.85 | 3.85 | 4.37 |
| 2102 Business Center Dr | Parking Ratio | 7.02 | 7.02 | 4.12 |
| 5675 Jimmy Carter Blvd | Lot Size - Acres | 12.4 | 12.4 | 9.68 |
| 411 E Town St | Lot Size - Acres | 0.2 | 0.2 | 0.15 |
| 13330 - 13420 College Blvd | Lot Size - Acres | 7.47 | 7.47 | 5.36 |

45

| 1700 Wyandotte St | Lot Size - Acres | 0.4 | 0.4 | 0.2 |
|---|---|---|---|---|
| 744 Royal Ave | Year Built | 1962 | 1962 | 1952 |
| 1409 - 1411 W 11th St | Year Built | 1978 | 1978 | 1914 |
| 544 Flint River Rd | Year Built | 1987 | 1987 | 1984 |
| 1103 NE McClain Rd | Year Built | 1995 | 1995 | 2002 |
| 2105 Academy Cir | RBA | 7,876 | 7,876 | 9,163 |
| 11410 W 105th St S | RBA | 4,865 | 4,865 | 4,835 |
| 3590 Recker Hwy | RBA | 7,600 | 7,600 | 8,032 |
| 843 S Cherry Ln | RBA | 3,040 | 3,040 | 3,388 |

117.     The most obvious explanation for the presence of these unique CoStar values in Xceligent's databases is also the most likely:  they were copied wholesale from CoStar as part of Xceligent's massive piracy scheme.

118.     Just as with the thousands of copyrighted photographs that Xceligent is infringing, the true scope of this data misappropriation is almost certainly much broader than that uncovered by CoStar to date.  First, to the extent that Xceligent engages in follow-up research after it copies CoStar's data, thereby eliminating some errors, it is highly likely that the overlaps in the databases that can still be identified are significantly underestimating the true scope of Xceligent's copying.  Second, the examples discussed above are only a snapshot of Xceligent's misappropriation taken from its publicly available commercial real estate website.  Because, as discussed above, Xceligent cross-populates data to CommercialSearch from its larger CDX database, that paywall-protected database likely has many of the same issues across its hundreds of thousands of listings.  Third, the evidence obtained from Avion shows mass copying in progress.  Screenshots of Avion researchers working show them viewing LoopNet listings while updating spreadsheets for Xceligent.  For example, in the image below, an Avion researcher is

46

viewing a listing on LoopNet via the "hideme" proxy for a property located on Staten Island,[5] while

simultaneously accessing a Google spreadsheet called "NYC Manhattan."



---

[5] "NYC Manhattan" is a misnomer—the spreadsheet covers a broader portion of the New York metro area, including at a minimum Staten Island, the Bronx, Brooklyn, and northern New Jersey, in addition to Manhattan, based on the listings visible in a screenshot of that spreadsheet.

119.     Ironically, Xceligent has claimed that this lawsuit has no basis and was filed to interfere with its expansion into the New York market.  The Avion evidence, in addition to corroborating CoStar's allegations, also demonstrates that Xceligent was expanding into New York by harvesting CoStar's information from LoopNet.  The following screenshot, for example, shows an Avion researcher populating a Google spreadsheet called "NYC Manhattan – No Contact Company."



120.    Note also that the screenshot above demonstrates that this "research" is not broker driven.  The comments in the spreadsheet make plain that Xceligent was researching properties with no listings or off-market listings, and the title of the spreadsheet straightforwardly explains that Xceligent does not have a contact associated with the properties being "researched."

121.    In addition to copying data from LoopNet, the cache of documents obtained from Avion also reveals that Xceligent is populating its websites and databases using reports that were impermissibly exported from CoStar's subscription database.  These reports are discussed in more detail in Section VIII below.

122.    In sum, the CoStar data published on CommercialSearch, combined with the documents obtained from the computers of Avion researchers working for Xceligent, demonstrate that Xceligent's data research consists in large part of copying information generated by CoStar, in violation of the contracts governing access to the CoStar Products, and contrary to law.

## VI.    Xceligent Was Previously Forced To Purge an Entire Database Because It Contained CoStar Content.

123.    After Doug Curry founded Xceligent in Kansas City in 1999, the company sought to expand into the San Diego market.  But that effort foundered because the database that it built in San Diego was filled with content taken from CoStar.

124.    According to a former Xceligent Director of Client Services, Cinnamon Trimmer, Xceligent was forced—on the advice of its attorneys—to purge its entire database of all San Diego listings.  Xceligent did so because, according to Ms. Trimmer, there was no way that Xceligent "could prove that the information they were using was not CoStar's information."  *See* https://www.youtube.com/watch?v=L0YClxmf3dU.

125.    Xceligent and its management are therefore on notice that taking and publishing CoStar's content is illegal, yet have returned to that same theft-based business model, ignoring the prior advice from their own lawyers.  That Xceligent's misconduct is willful, and that the actions of its managers are with knowledge of their illegality, is beyond dispute.

**VII.    Xceligent Is Building Its New Markets Using CoStar's Subscription Database.**

126.    Xceligent's willful misappropriation and deliberate free-riding is further evidenced by its intentional misuse of CoStar's subscription database to open new markets to compete with CoStar.

127.    For example, for years Xceligent unsuccessfully tried to expand to the Phoenix market.  Yet, only on Xceligent's most recent attempt was it successful because Xceligent's Director of Client Services, Katie Glass, used a CoStar subscription database account registered to her husband, Braxton Glass, in order to obtain all of the information necessary to build reliable and complete Phoenix data.

128.    CoStar recently learned that on August 19, 2014, as Xceligent was starting yet another Phoenix "market launch," Braxton Glass's CoStar account—provided to him by his employer, Orion Investment Real Estate ("Orion")—was used from the Glass residence to run a dozen or so "market share" reports.  The reports were run by property type (e.g., office, industrial, or flex retail) and by type of brokerage or representation (e.g., landlord representatives, for-sale representatives, or leasing companies), initiated with no apparent limiting search criteria and printed in serial fashion.  Together the properties in these market share reports accounted for almost 100 percent of the Phoenix market.  Braxton Glass, whose business is focused entirely on investment sales deals, had no legitimate business need, as far as CoStar is aware, to generate such market share reports.  Yet, his wife, in her Xceligent capacity, had a critical need for these reports to ascertain which brokers, brokerages, and other players to

50

target in the Phoenix market. Indeed, during the exact timeframe when these reports were being printed, Katie Glass was playing a pivotal role in Xceligent's data certification process for the Phoenix market—a project required as Xceligent's first step in opening a new market. *See* John Salustri, "Xceligent Grows with Phoenix Market,"

http://www.globest.com/sites/globest/2015/03/30/xceligent-grows-with-phoenix-market/?slreturn=20161107173318.

129. Thus, that Ms. Glass was impermissibly printing reams of CoStar data for Xceligent's benefit is plain. Moreover, later the same day, Braxton Glass logged into his CoStar account from Orion's IP address and conducted activity consistent with his regular CoStar usage, further evidencing the fact that Katie Glass was misusing CoStar's database.

130. In addition to the brokerage market share reports in 2014, CoStar also recently discovered that Braxton Glass's CoStar subscription account was used extensively from home to run reports about properties and availabilities in the Phoenix marketplace, which together provided information on thousands of properties in the Phoenix area. Braxton Glass did not have a history of running similar reports from the Orion network before his wife joined Xceligent, nor do such reports appear necessary for him to fulfill his professional responsibilities. Instead, these reports contained large quantities of basic property information that would be highly useful to developing information for adding the Phoenix market to Xceligent's offerings, such as a list of *all* property listings in the Phoenix area of less than 3,000 square feet and *all* real estate company names in Phoenix, searched for and printed off from A-to-Z.

131. To take an example, on February 21, 2014, Braxton Glass's CoStar account was used to run over four thousand pages of "Space Full Detail" reports, encompassing thousands of properties in the greater Phoenix area. This type of report is sometimes called a "Confirmation"

report because it is typically used by researchers to confirm the details of a particular broker or leasing company's active listings. An investment sales broker like Braxton Glass would have no obvious use for such a report, but it is exactly the kind of report that a CoStar competitor launching a new market would want to use to create a repository of base building information and current availabilities. Unsurprisingly, properties that were exported or printed from Braxton Glass's CoStar account have appeared on CommercialSearch over 1,100 times.

132.    While the account usage evidence is strong by itself, CoStar also heard directly from a former Xceligent employee that Katie Glass deliberately acquired print-outs of individual property listings from her husband using his CoStar subscription database credentials to help Xceligent expand into Phoenix to compete with CoStar. That former employee described Xceligent's business practices as "unethical."

133.    Another former Xceligent employee further corroborated this episode, stating that, "[w]hen she provided this information to me, ***Ms. Glass indicated that she had acquired these reports from CoStar's database using her husband's CoStar subscription. She told me that I should use the information for the purpose of building Xceligent's Phoenix market, but that I should not attribute the source of the data.***"

134.    This deliberate misuse of the CoStar subscription database and copying of its content by an Xceligent manager echoes the other forms of willful and systematic copying and misuse detailed above. The misconduct underscores the willful and unethical culture of misappropriation that permeates Xceligent.

## VIII.    Xceligent Employs Agents Abroad To Execute Its Mass Piracy.

135.    In December 2016, a trial court in the Philippines found probable cause to conclude that Avion was infringing CoStar's intellectual property rights, or at least committing contributory copyright infringement. The trial court issued Writs of Search and Seizure,

52

implemented on December 13, 2016, which authorized the seizure from Avion's premises in the Philippines of more than 250 computers and hard drives containing approximately 35 terabytes of data.[6]

136. The as-yet limited review of materials seized from Avion has uncovered a wealth of new evidence revealing that Xceligent pays and trains the Avion "researchers" to steal CoStar content, and supervises their mass theft of CoStar's intellectual property. Avion is not a typical outside contractor providing services to Xceligent. The evidence shows that Xceligent controls and directs every detail of Avion's daily work for Xceligent, from assigning Avion employees @Xceligent.com email addresses to tracking daily metrics ranging from hours worked to number of listing-updates made. Researchers working for Xceligent, whether located in the Philippines at Avion's offices or in the United States at Xceligent's offices, are effectively indistinguishable in the eyes of Xceligent senior management.

137. Xceligent poorly attempted to mask its connection to Avion. Invoices recovered from Avion's files show that Xceligent pays Avion to "research" CoStar content by routing payments through a bank account in the name of a company called "Xanivo"—an anagram of "Avion X"—which is owned and operated by Avion's CEO (Von Ryan Nagasangan) and COO (Joy Nagasangan), registered in the Seychelles, and based in Hong Kong. Also, daily Skype chats and e-mails between Xceligent managers and Avion employees, and photographs of Xceligent managers posing for pictures with Avion employees in the Philippines, illustrate Xceligent's close, continuous, and on-site direction of Avion's illicit activities.

---

[6] Given the enormous volume of data, CoStar's analysis is ongoing and far from complete. Moreover, the review process has been slowed by the discovery of indecent images of children in Avion's files, and by the fact that many of the Avion researchers working for Xceligent were also copying third-party content for another client, a website that has been found to facilitate child sex trafficking.

53

138.     Avion's files confirm that its employees, at Xceligent's direction, deliberately circumvent CoStar's country-blocking software in order to access CoStar's LoopNet website. To do so, Avion's researchers use TOR browsers, proxy server services, and virtual private networks ("VPNs").  A Philippines court-approved forensic examination team determined that Avion's CEO installed a TOR browser and a VPN launcher on his computer, and that Avion employees conducted Skype chats with Xceligent managers in which they discussed directly accessing LoopNet by bypassing CoStar's firewall.

139.     For example, in one instance, Leslie Houston, an Xceligent manager and corporate trainer, addressed the Avion team's complaint that they were "currently not able to access loopnet through any sort of proxy site as an alternative" and that "TOR isn[']t working as well," by replying, "LoopNet blocks us after so many hits from our IP addresses and we have to switch IP [a]ddresses."  Other chat logs further illustrate Xceligent's instructions to bypass CoStar's security measures:

- "***Guys you can use TOR browser to access Loopnet***."
  - Xceligent manager to Avion employee

- "Good Morning [sir,] I believe that Brent [presumably Hansen, an Xceligent manager] sent you sir an email regarding a ***software that shall be used by a couple of our agents in accessing [L]oop[N]et***. . . . If you have the copy sir if it would be possible to forward it to the ITs. Thank you sir and have a great morning."
  - Avion employee to Xceligent manager

- "***If just in case TOR for [L]oop[N]et is not working, try kproxy.com*** or other proxy browser [or] server, . . . inform us any message prompted by your browser if you can't access the said site."
  - Xceligent manager to Avion employee

140.     Once LoopNet has been covertly accessed, Avion then performs "research" at Xceligent's behest:  In Avion's files, CoStar found additional proof that Xceligent directs Avion

54

employees to perform wholesale copying of CoStar's photographs and listings data for integration into Xceligent's databases, and closely supervises that work. For example, Avion's files contain extensive "[a]uditor [n]otes" by an Avion supervisor who repeatedly directed junior researchers to "rephrase" data from LoopNet when "copying" it:

| Auditor Notes |
|---|
| When copying listing notes from Loopnet, please rephrase it. |

This "audit," admitting theft of CoStar content, then went to Ashley Soendker, a research manager at Xceligent for her review.

141.     Other notes from Avion auditors underscore that Avion employees routinely obtain data from LoopNet for Xceligent and take steps to hide their misconduct:

- "***Everytime you add listing notes from Loop[N]et, please rephrase the listing notes.***"
  – Avion auditor Davina Secretario to Avion market analyst Ginalyn Baldonado (emphasis added)

- "Edit marketing website.  Change lot size to 20,000 sf.  Rename attachment, change Site Plan to Aerial Photo.  ***Information is from loopnet.***"
  – Avion auditor Michael Borromeo to Avion market analyst Jamilla Domingo

142.     The Xceligent auditors understood that copying from LoopNet was wrong and thus endeavored to wipe references to LoopNet from the researcher's records.  In the auditor spreadsheet excerpted below, the auditor cautions: "***We cannot use the term 'LoopNet' in the verification notes.***"  Another audit note specifically instructs the researcher to mask the copying of content from LoopNet by using the phrase "per email" if a LoopNet URL has been sent via email or identifying the information as coming from a "third party source" if the LoopNet listing was accessed via a Google search.



| Auditor Notes | |
|---|---|
| Lease Term of 36 months. | |
| We cannot use the term "Loopnet" in the verification notes. | |
| No marketing website added. | |

*marketing web: www.svn.com/find-properties/?propertyId=82106-lease

*Please revise verification notes (do not mention "loopnet" as much as possible, if the loopnet link has been sent through email, you can use "per email" as your reference and/or for google searches, you can use "third party source")

*add lease terms: 36 months (listing tab)

*add Zoning Code: C-3

143. Avion's files also confirm that Xceligent has stolen, and is using, proprietary information from CoStar's subscription database. For example, the following spreadsheet, found in Avion's files, is unmistakably a data export from the CoStar subscription database:

**Spreadsheet Found in Avion's Files (excerpted)**

| | Building Address | Building Class | Building Location | Building Name | City | Zip | Year Built | Year Renovated | County Name | Zoning | Rentable Building Area |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | 29 N 1st St | C | | | Alhambra | 91801 | 1987 | | Los Ange | ALRPD* | 7548 |
| 3 | 30 N 1st St | C | | | Alhambra | 91801 | 1955 | | Los Ange | ALRPD* | 5576 |
| 4 | 33 N 1st St | C | | | Alhambra | 91801 | 1961 | | Los Ange | ALRPD | 6020 |
| 5 | 34 N 1st St | C | | | Alhambra | 91801 | 1956 | | Los Ange | ALRPD* | 6326 |
| 6 | 108-112 N 1st St | C | | | Alhambra | 91801 | 1952 | | Los Ange | ALRPD* | 16184 |
| 7 | 117 N 1st St | C | | | Alhambra | 91801 | 1976 | | Los Ange | ALRPD* | 8800 |
| 8 | 118 N 1st St | C | | | Alhambra | 91801 | 1977 | | Los Ange | ALRPD* | 7562 |
| 9 | 308 N 1st St | C | | | Alhambra | 91801 | 1964 | | Los Ange | ALRPD* | 7134 |
| 10 | 312 N 1st St | C | | | Alhambra | 9.2E+08 | 1963 | | Los Ange | RPD, Alh | 14452 |

**Identical CoStar Export File (excerpted)**

| | Building Address | Building Class | Building Location | Building Name | City | Zip | Year Built | Year Renovated | County Name | Zoning | Rentable Building Area |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | 29 N 1st St | C | | | Alhambra | 91801 | 1987 | | Los Ange | ALRPD* | 7548 |
| 3 | 30 N 1st St | C | | | Alhambra | 91801 | 1955 | | Los Ange | ALRPD* | 5576 |
| 4 | 33 N 1st St | C | | | Alhambra | 91801 | 1961 | | Los Ange | ALRPD | 6020 |
| 5 | 34 N 1st St | C | | | Alhambra | 91801 | 1956 | | Los Ange | ALRPD* | 6326 |
| 6 | 108-112 N 1st St | C | | | Alhambra | 91801 | 1952 | | Los Ange | ALRPD* | 16184 |
| 7 | 117 N 1st St | C | | | Alhambra | 91801 | 1976 | | Los Ange | ALRPD* | 8800 |
| 8 | 118 N 1st St | C | | | Alhambra | 91801 | 1977 | | Los Ange | ALRPD* | 7562 |
| 9 | 308 N 1st St | C | | | Alhambra | 91801 | 1964 | | Los Ange | ALRPD* | 7134 |
| 10 | 312 N 1st St | C | | | Alhambra | 9.2E+08 | 1963 | | Los Ange | RPD, Alh | 14452 |

56

144. The column headers, font type, font size, and font bolding in both spreadsheets are identical. This is no coincidence, as these represent the default settings for Excel spreadsheet exports from the CoStar subscription database. Additionally, the ordering of the rows on the spreadsheet (one row per property) is identical. That Xceligent could have independently created the spreadsheet defies common sense.

145. Further betraying their origin, CoStar reports found in Avion's files contain unique "Property ID" fields generated by CoStar to track properties. For example, in the document below, which was found among Avion's files, the rightmost column (Column AV) shows the CoStar Property ID. The column header has been renamed "Prop. No." to disguise its origin; however, Xceligent did not delete the actual CoStar Property IDs, presumably because it needs these unique identifiers to cross-reference properties between CDX and the CoStar subscription database.



The first property on this spreadsheet, located at 1200 1st Ave. in San Diego, California, has "Prop. No." 9323593. The property at 1200 1st Ave. in San Diego, California in CoStar's subscription database bears the same CoStar Property ID. This is not an isolated incident; the pattern repeats for each entry on the spreadsheet:



146. These "Prop. Nos." (i.e., CoStar Property IDs) in Avion's spreadsheets are thus tell-tale signs that Avion "researchers" are "researching" listings for Xceligent by copying CoStar data.

147. Avion spreadsheets hosted by Google, i.e., "in the cloud," show still more evidence of Avion's impermissible copying from LoopNet for Xceligent. For example, the following screenshot from the Google account of "jma.avi30@gmail.com" shows an Avion

researcher identifying LoopNet as the source of listings information about several properties associated with "CDX# 1281889":



148. Note that while updating the spreadsheet in one tab, the researcher has LoopNet open in another browser tab, displaying information about the property at issue (6001 Broken Sound Parkway in Florida).

149. Along with mountains of copied CoStar data, Avion's files also include original, CoStar-copyrighted reports, like this one:



150. Avion's extensive use of LoopNet is not accidental—Avion employees did not stumble upon LoopNet listings, they actively searched for them. For example, in the screenshot below, Avion employee Kathleen Mae ran a Google search for a geographic area and then added the search term "Loopnet" at the end. Predictably, the first four results of the search are LoopNet listings:



151.    She then clicked on the first link, pulling up the first result of her Google search,

which is the LoopNet listing for space for lease in the property located at 3740 W 104th St.,

Hialeah, Florida:



In the process, Ms. Mae viewed a banner at the top of the webpage alerting her that by using the site, she was agreeing to the LoopNet Terms and Conditions, which she was violating by using the site on Xceligent's behalf as part of her "research." The Total Space Available field in the LoopNet listing shows her highlighting the square footage—128,000 square feet—indicating she is preparing to copy the information out of LoopNet and put it in CDX.

152.     Avion's systematic copying for Xceligent reached photographs as well.  For

example, CoStar discovered instances in which Avion employees viewed listings on LoopNet,

which were then copied and published on Xceligent's website, CommercialSearch, complete

with infringing images owned by CoStar.  For example, after Avion researcher Czarina Pimienta

viewed the listing for 688 N Alfaya Trl, Orlando, Florida, the listing, including the infringing

photo shown below, appears on CommercialSearch.



CoStar Copyrighted Photo



Infringing Photo on CommcercialSearch

153.     Computer monitoring logs and other similar records retrieved from Avion's files

show that as a matter of routine practice, Avion employees use "screenshot" tools, such as

Greenshot, to copy LoopNet listings and upload the copied content to Xceligent's websites and

databases.

154.     For example, computer monitoring software installed on Avion researcher Mark

Jan Abrinica's computer captured a log of his internet browsing and application usage history.

As shown in the following log excerpt, Mr. Abrinica deploys KProxy to circumvent CoStar's

security measures, then he accesses a property listing on LoopNet, uses Greenshot to copy the

image from LoopNet, and finally uploads the copied image into "Xceligent Research":

63

- New Tab - Google Chrome

- KPROXY - Free Anonymous Web Proxy - Anonymous Proxy - Google Chrome

- Loading......... - Google Chrome

- 85- 95 Revere Drive, Northbrook, IL, 60062 - Office Building Property For Lease   on LoopNet.com - Google Chrome

- Untitled - Google Chrome

- Greenshot capture form

- Xceligent Research - Google Chrome

155.    In addition to being instructed to copy images, Avion employees working for Xceligent also are instructed to crop out watermarks that would identify the owner of the copied images:

**Auditor Notes**

Put taxes(1.66) as per website. Crop the Photos not to include the watermarks.

In the attachments tab- remove the house included photo, and crop the photos not to include the watermarks

156.    Given these instructions, it is no surprise that CoStar's watermarked photos, post-cropping, were found in Avion's files, such as this one:





| CoStar Copyrighted Photo | Cropped Photo in Avion Files |

157.    The computer monitoring software installed on the Avion researchers' computers also captured researchers viewing CoStar watermarked photos on LoopNet, just prior to uploading those photos to Xceligent's system.



158.    The photo from the LoopNet listing above was apparently copied by an Avion researcher, who forgot to crop out the CoStar watermark per Xceligent's instructions.  The photo and two other CoStar-copyrighted and watermarked photos were then published to CommercialSearch:



159.    Notably, this listing, with its multiple CoStar watermarked images, was still being displayed by Xceligent on CommercialSearch in May 2017, six months after the original Complaint was filed, and was updated by Xceligent as recently as May 19, 2017.  Xceligent continues to thumb its nose at the law, showing that the mere filing of this lawsuit will not deter its willful misconduct.  Only significant damages and a permanent injunction will do so.

160.    In sum, the material seized from Avion lays bare Xceligent's efforts to launder CoStar content on the sly by:  (i) using evasive measures—including TOR browsers, proxy servers, and rotating IP addresses—to circumvent CoStar's security efforts in order to search the CoStar Products for listings data and copyrighted images; (ii) obtaining data and reports pulled from CoStar's subscription database; (iii) copying CoStar data and copyrighted images wholesale; and (iv) uploading the CoStar content directly into Xceligent's database, while rephrasing the copied material and cropping out watermarks to obscure the piracy.  Xceligent thus uses its offshore "researchers" as instruments to perpetrate its systematic stealing.

## IX.    Xceligent's Executives, Managers, and Researchers Will Be Held Individually Liable.

161.    The evidence described above demonstrates that Xceligent's actions are part of a master business plan to pilfer CoStar's intellectual property and then sell it to CoStar's customers at a lower price.  The presence of thousands of CoStar-copyrighted images on CommercialSearch, the relentless accessing of CoStar's data by Xceligent "researchers," the use of anonymizers and proxies to mask some access, the admissions by Xceligent employees and agents, the cropping of CoStar photographs, the use of a CoStar-clone logo, the direct evidence in Avion's files of security circumvention and copying from the CoStar Products, and of Xceligent involvement and oversight, and the many other indicia of organized theft and deception set forth above, individually and collectively show that Xceligent's misconduct is

67

coordinated and sanctioned by its executives and managers and implemented knowingly by its employees and agents.

162.    Those executives, managers, employees, and agents know that Xceligent is willfully engaging in wrongdoing.  That is plain from the efforts to hide or obscure the misconduct, including those detailed in Avion's files; the frank admissions of "steal[ing]"; restrictions placed on use of Xceligent's own website; industry norms; and Xceligent's prior experience—including the order to purge its San Diego database of CoStar content and its "unethical" and impermissible use of CoStar content to take a shortcut into the Phoenix market. Some of these executives—like the Chief Research Officer—have even used LoopNet accounts tied to their @xceligent.com e-mail addresses.  Once discovery yields a complete picture of the involvement of individuals in this mass piracy, they will individually be held to account.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Copyright Infringement**
**(Brought by CoStar Realty)**

163.    CoStar Realty repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

164.    Each of CoStar Realty's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

165.    CoStar Realty owns or has exclusive rights to all rights, title, and interest in such photographs.

166.    Xceligent had and has access to such photographs hosted on U.S. based servers through the Internet and/or other means.

167.     Xceligent has copied, reproduced, distributed to the public, and/or displayed publicly copyrighted photographs belonging to CoStar Realty—including without limitation those copyrighted works identified in Exhibit G hereto—without the consent or authority of CoStar Realty, thereby infringing upon CoStar Realty's copyrights.

168.     Xceligent's copies, reproductions, distributions, and displays are identical and/or substantially similar to CoStar Realty's photographs.

169.     Xceligent is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

170.     The infringement of CoStar Realty's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

171.     Xceligent's acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act.  Xceligent knew its acts were infringing and intentionally or recklessly disregarded the law by its conduct.

172.     CoStar did not authorize Xceligent's infringing acts.

173.     As a result of Xceligent's willful copyright infringement, CoStar Realty has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, in an amount to be proven at trial.

174.     Xceligent's conduct also has caused irreparable and incalculable harm to CoStar Realty, and the injuries are ongoing.  Unless enjoined, Xceligent's conduct will cause further irreparable and incalculable injuries—among others, the further integration of CoStar Realty copyrighted photographs into Xceligent's proprietary database—for which CoStar Realty has no adequate remedy at law.

69

## SECOND CLAIM FOR RELIEF
**Breach of Contract**

175.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

176.    Any user of the CoStar subscription database, LoopNet, or any other CoStar Product may do so only pursuant to contractually binding Terms of Service.

177.    The Terms of Service are expressly agreed to by each and every registered user of any CoStar Product, including, for example, CoStar's subscription database and LoopNet, by clicking their agreement when they register for their account.

178.    Non-registered users on LoopNet and other CoStar Products are provided actual notice through prominently displayed messages that their access is predicated on their agreement to binding Terms of Service.

179.    Such Terms of Service are common in the industry.  In fact, Xceligent has similar terms of service which prevent the use of its products by competitors for competitive ends.

180.    These Terms of Service are enforceable against and binding on Xceligent.

181.    Xceligent's authorized employees and agents—including Xceligent's Chief Research Officer Nate Lipowicz and Executive Vice President Kevin Talbot—registered and/or used previously registered accounts recently, sometimes under fictitious names.

182.    Registered users easily identified as working for Xceligent or its agents tripped the LoopNet "abuse monitor" more than a hundred times.  While blocked, Xceligent and its agents tried to access LoopNet, and more than 600 times were presented with the "Access Denied" notice discussed above, stating that their use of LoopNet was in violation of the Terms of Service.  Xceligent employees and agents then used technological means—including IP

70

address anonymizers and IP address rotation—to circumvent CoStar's security measures and re-access LoopNet to copy CoStar content in violation of the Terms of Service.

183.    The Terms of Service prohibit competitors from accessing the CoStar Products for competitive ends.  For example, the LoopNet Terms of Service expressly prohibit the use of LoopNet "in connection with any other listing service . . . [or] as part of any effort to compete. . . ."  Ex. A.  The CoStar subscription database Terms of Service expressly prohibit anyone from "[u]s[ing] or distribut[ing] any Information from the [database], including Information that has been verified or confirmed by you or anyone else, to directly or indirectly create or contribute to the development of any database or product."  Ex. B.

184.    The LoopNet Terms of Service also expressly prohibit anyone from "remov[ing], eras[ing], or tamper[ing] with any copyright or other proprietary notice printed or stamped on, affixed to, or encoded or recorded in the . . . Service."  Ex. A.

185.    In direct violation of the Terms of Service that govern the use of the CoStar Products, once inside the CoStar Products, Xceligent (through its employees and agents) continually copied CoStar content for the express purpose of integrating that content into Xceligent's own competing products.

186.    In direct violation of these contractual provisions Xceligent also removed images from the CoStar Products and removed CoStar watermarks.

187.    Xceligent's breaches of the binding Terms of Service have been material, willful, repeated, and systematic.

188.    CoStar has performed any conditions, covenants, and promises required of it in accordance with the Terms of Service or, in the alternative, any such conditions, covenants, and promises have been waived.

71

189.    Xceligent has caused damage and continues to cause irreparable harm to CoStar by building its own database based on content derived as a result of these contractual breaches.

190.    Any conditions precedent to suit have been met or have been waived.

191.    CoStar is therefore entitled to damages in an amount to be proven at trial, injunctive relief, and other relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
**Violation of the Computer Fraud and Abuse Act**

192.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

193.    LoopNet's computers and servers, located in the United States, are involved in interstate and foreign commerce and communication.

194.    Xceligent's access to LoopNet's computers and servers is subject to its binding Terms of Service.

195.    Xceligent and its employees and agents violated these Terms of Service.  CoStar provided express notice to them more than six hundred times that their access to LoopNet computers and servers, for example, was unauthorized.  This notice stated that: (1) the user was in breach of the binding Terms of Service and (2) further access to LoopNet was not authorized.

196.    Nevertheless, Xceligent (through its employees and agents) knowingly and intentionally circumvented CoStar's technological security measures in order to continue accessing CoStar's computers and servers for competitive purposes in breach of its Terms of Service, including, but not limited to, by bypassing country-blocking software and using IP anonymizers such as TOR and KProxy.

72

197. Xceligent's repeated unauthorized access to CoStar's computers and servers allowed it to access, obtain, and use CoStar-copyrighted photos and contractually protected proprietary information involving interstate communication in violation of 18 U.S.C. § 1030.

198. CoStar has suffered over $5,000 worth of damages and losses over a one-year period, in an amount to be proven at trial. Xceligent's unauthorized access consumed time and money spent identifying, investigating, and attempting to block and otherwise respond to Xceligent's unauthorized access, as described throughout this Complaint. Further, Xceligent's unauthorized access has impaired and corrupted CoStar's efforts to measure and analyze legitimate website traffic, thus impairing the soundness and therefore the value of those data and analyses, which are used for multiple business purposes including search engine optimization and search engine marketing.

199. CoStar has suffered and will continue to suffer irreparable harm as a result of Xceligent's continued access to its computers and servers without authorization and in excess of authority, which entitles CoStar to injunctive relief.

## FOURTH CLAIM FOR RELIEF
### Violation of the Digital Millennium Copyright Act ("DMCA")

200. CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

201. With respect to the more than nine thousand instances of copyrighted CoStar photographs referenced above as having been found on CommercialSearch, and additional CoStar-copyrighted photographs infringed by Xceligent to be identified in the course of discovery, CoStar's watermark constitutes copyright management information ("CMI"), as it identifies CoStar as the copyright owner of such photographs. Indeed, internal Xceligent and Avion communications demonstrate that Xceligent and its agents understood that they should not

copy photographs with the CoStar watermark and logos, but that they did so anyway. Likewise, Xceligent's CommercialSearch watermark is CMI, as it indicates to users of CommercialSearch that CommercialSearch is the copyright owner of the photographs that are so marked.

202. In many CoStar photographs, including several specifically identified above as examples, Xceligent intentionally and systematically cropped out CoStar's watermark from CoStar-copyrighted photos and intentionally and systematically added its own CommercialSearch watermark, thus removing CoStar CMI and replacing it with false CMI.

203. In other photos, Xceligent simply placed its own watermark on top of the CoStar watermark, thus altering CoStar CMI and replacing it with false CMI.

204. Xceligent removed and altered CoStar's CMI and added its own, false CMI, while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(a) & (b).

205. CoStar has suffered damage and loss as a result of these violations.

206. CoStar has suffered and will continue to suffer irreparable harm as a result of Xceligent's continued removal and alteration of CoStar CMI on CoStar-copyrighted photographs and as a result of Xceligent's continued addition of false CMI to CoStar-copyrighted photographs.

## FIFTH CLAIM FOR RELIEF
### Unfair Competition

207. CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

208. Xceligent and CoStar are direct competitors in the commercial real estate marketplace.

74

209.    In order to compete with CoStar, Xceligent and its agents, including Avion and Maxval, are stealing CoStar's content on an industrial scale.

210.    These business practices by Xceligent and its agents are unfair, violate traditional rules of fair play, and amount to commercial hitchhiking and unlawful free-riding. While CoStar has employed over 10,000 people to research properties, take millions of photographs, and fly and drive millions of miles per year, Xceligent has expanded in large part by stealing content from CoStar and then undercutting CoStar's rates with its pirated products.

211.    Former Xceligent employees attest that Xceligent employs unfair methods to compete with CoStar:

- "Xceligent did not get property information for these markets in the right way. Instead, when launching these markets, Xceligent Market Analysts including myself initially populated the Xceligent databases using information that we copied mainly from LoopNet. We did so because that was what Xceligent managers told us to do."

- "While there were other ways to get this information properly, Xceligent simply refused to put the time and money to get the data and images properly."

- "It bothered me and struck me as dishonest and wrong that CoStar had worked to create this data and Xceligent charged customers for the data after simply copying it from LoopNet."

212.    The unfairness of Xceligent's business practices is further underscored by the fact that the conduct is tortious and wrongful in that it violates federal copyright law, the CFAA, and the DCMA, and constitutes breach of contract.

213.    Xceligent does not disclose to customers and prospective customers that its websites and databases are populated with CoStar content, which was accessed and stolen in violation of state and federal law. To the contrary, Xceligent represents that it populates its database legitimately, using public sources and information from brokers. In essence, Xceligent is selling CoStar's wares as its own and deceiving the public as to their source. Xceligent's

75

deceptive omissions and misstatements would be material to purchasing decisions by actual and prospective customers.

214.    This misconduct has resulted in extensive damage to CoStar's reputation and its business, as described above.

215.    CoStar has also suffered and will continue to suffer irreparable harm as a result of Xceligent's unfair competition and will continue to suffer irreparable harm if Xceligent is not enjoined from continuing its unauthorized and illegal activities.

## PRAYER FOR RELIEF

WHEREFORE, CoStar prays for judgment against Xceligent as follows:

A.    For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining Xceligent and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

B.    For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and Xceligent's profits or, alternatively at CoStar's election, for statutory damages for Xceligent's infringement and willful infringement—including without limitation for the instances of infringement identified in Exhibit G and any others proven at trial—in the maximum amount allowable by law;

C.    For a finding that Xceligent has willfully infringed upon CoStar's federally registered copyrights;

D.      For an award of damages arising from Xceligent's breaches of CoStar's binding Terms of Service and the misappropriation of CoStar proprietary data and content as a result of those breaches;

E.      For an accounting and/or disgorgement of profits or gains, an award of damages arising from Xceligent's unfair competition, and an order enjoining such;

F.      For an award pursuant to 18 U.S.C. § 1030(g) for compensatory damages and permanent injunctive relief preventing Xceligent's continued unauthorized access and continued access in excess of authorization of CoStar's computers and servers;

G.      For an award pursuant to 17 U.S.C. § 1203 of CoStar's actual damages and Xceligent's profits or, alternatively at CoStar's election, for statutory damages for Xceligent's violations of the DMCA in the maximum amount allowable by law;

H.      For further permanent injunctive relief as deemed necessary by the Court, including without limitation the purging of all CoStar content from Xceligent's database(s) and system(s) by an independent source that reports to CoStar and the Court and monitors Xceligent's future compliance with the Court's orders;

I.      For an award of CoStar's costs, including its reasonable attorneys' fees and disbursements of counsel, as permitted by law;

J.      For prejudgment and post-judgment interest according to law;

K.      For exemplary and punitive damages to the extent available; and

L.      For such further and additional relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

CoStar demands a trial by jury on all issues properly tried to a jury.

Dated:  May 23, 2017

Respectfully submitted,

By: /s/ Eric M. Anielak
Eric M. Anielak – MO Bar #: 45653
Elizabeth Fessler – MO Bar #: 67169
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone:  (816) 474-6550
Facsimile:  (816) 421-5547
eanielak@shb.com
efessler@shb.com

Nicholas J. Boyle (*pro hac vice*)
C. Bryan Wilson (*pro hac vice*)
Matthew H. Blumenstein (*pro hac vice*)
Jonah E. Perlin (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
nboyle@wc.com
bwilson@wc.com
mblumenstein@wc.com
jperlin@wc.com

*Attorneys for Plaintiffs CoStar Group, Inc., CoStar*
*Realty Information, Inc., and LoopNet, Inc.*