## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

COSTAR GROUP, INC., *et al.*,

               Plaintiffs,

v.

XCELIGENT, INC.,

               Defendant.

**Case No. 4:16-cv-01288-FJG**

## ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant Xceligent, Inc. ("Xceligent"), by and through its undersigned counsel, for its Answer to the Amended Complaint (Doc. 84) ("Amended Complaint") of Plaintiffs CoStar Group, Inc. ("CoStar Group"), CoStar Realty Information, Inc. ("CoStar Realty") and LoopNet, Inc. ("LoopNet") (collectively, "CoStar" or the "CoStar Companies"), admits, denies and avers as follows:

1.      Xceligent admits only that (i) CoStar Group is a public company; (ii) CoStar Realty is a wholly owned subsidiary of CoStar Group; and (iii) LoopNet was a CoStar Group subsidiary. Xceligent admits that the CoStar Companies control substantial shares in the commercial real estate ("CRE") listings database and information services markets, including the operation of a commercial real estate marketing website, in the United States. Xceligent denies all remaining allegations in ¶ 1 of the Amended Complaint.

2.      Xceligent admits that CoStar filed this case. Xceligent denies all remaining allegations contained in ¶ 2 of the Amended Complaint.

3.      Xceligent denies all allegations contained in ¶ 3 of the Amended Complaint.

1

4.     Xceligent denies all allegations contained in ¶ 4 of the Amended Complaint.

5.     Xceligent denies all allegations contained in ¶ 5 of the Amended Complaint.

6.     Xceligent denies the allegation that it has engaged in unlawful actions, and denies all remaining allegations contained in ¶ 6 of the Amended Complaint.

*     *     *     *

7.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 7 of the Amended Complaint and, therefore, denies the same.

8.     Xceligent denies all allegations contained in ¶ 8 of the Amended Complaint. Xceligent acknowledges that CoStar Group and LoopNet control substantial shares in the CRE listings database and information services markets. Xceligent is, however, without knowledge or information sufficient to form a belief as to the truth of the specific allegations contained in ¶ 8 of the Amended Complaint and, therefore, denies the same.

9.     Xceligent denies all allegations contained in ¶ 9 of the Amended Complaint.

10.     Xceligent admits only that CoStar operates a subscription database for a monthly fee. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 10 of the Amended Complaint and, therefore, denies the same.

11.     Xceligent denies that the operation of LoopNet.com contributes to market transparency, or further fosters market liquidity. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 11 of the Amended Complaint and, therefore, denies the same.

2

12.     The allegation that CoStar employs "contractually binding Terms of Service" constitutes a legal conclusion and no facts are stated in support of the conclusion. Xceligent therefore denies the allegation. Xceligent denies the allegation that data regarding CRE property features that is housed on CoStar databases is owned, or otherwise proprietary to CoStar. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 12 of the Amended Complaint and, therefore, denies the same.

13.     Xceligent admits it was incorporated in 2000, and has committed over $150 million dollars to expand its market presence to compete with CoStar, but that CoStar's anticompetitive and exclusionary conduct has slowed Xceligent's growth, raised Xceligent's costs, and restricted Xceligent's access to customers in the product markets where CoStar and Xceligent compete. Xceligent admits it operates CDX, a CRE information services product that provides detailed property-level information (*e.g.*, information about specific real property or structures) gathered and made available primarily to enable customers to locate, research, or evaluate CRE, and CommercialSearch, an online catalogue of CRE availabilities that allows users to both publish and search for available CRE space for sale and for lease. Xceligent admits its products are offered at price points lower than similar products offered by CoStar, and that Xceligent utilizes innovative methods and the fostering of positive partnerships within the commercial real estate community in order to achieve these price points. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that unidentified current or former employees made the accusations alleged by CoStar in ¶ 13 of the Amended Complaint, and, therefore, denies the same. Xceligent does, however, deny the false and defamatory accusations contained in those alleged quotes from employees that attribute

3

unethical behavior to Xceligent, and accusing Xceligent of populating its database with information from CoStar's websites. Xceligent denies all remaining allegations contained in ¶ 13 of the Amended Complaint. Xceligent invests substantial resources to generating and updating its database content with in-depth property level and listings information, including property and listings information obtained through the on-site inspection of property, from recorded property records and public data feeds, and from contacts with listings brokers.

14.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 14 of the Amended Complaint and, therefore, denies the same. Xceligent can neither admit nor deny that an unidentified employee made the accusations alleged by CoStar in ¶ 14 of the Amended Complaint, but Xceligent does deny the false and defamatory accusations attributing theft and unethical behavior to Xceligent. Although Xceligent employees have experienced being "blocked out of LoopNet", such blocking occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application. These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website. Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information.

15.     Xceligent denies any allegation that Xceligent has committed "widespread theft." Xceligent is without knowledge or information sufficient to form a belief as to the truth of whether the statements attributed to current or former Xceligent employees in the allegations contained in ¶ 15 of the Amended Complaint were actually made and, therefore, denies the same.

Although Xceligent can neither admit nor deny that these unidentified current or former employees made the accusations alleged by CoStar in ¶ 15 of the Amended Complaint, Xceligent denies the false and defamatory accusations attributing unethical behavior to Xceligent, and also denies all remaining allegations contained in ¶ 15 of the Amended Complaint.

16.     Xceligent denies any allegation that statements made by an anonymous, terminated employee constitute admissions of Xceligent, and denies any allegation that alleged instances of CoStar copyrighted photographs on CommercialSearch constitute the "tip of the iceberg".  With regard to the remainder of the allegations contained in ¶ 16 of the Amended Complaint, Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies the same.

17.     Xceligent denies all allegations contained in ¶ 17 of the Amended Complaint.

18.     Xceligent denies any allegation that statements made by anonymous current or former employees constitute admissions of Xceligent.  Xceligent admits that employees have experienced being "blocked out of LoopNet", and that such blocking occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application.  These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website.  Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information.  With regard to the remainder of the allegations contained in ¶ 18 of the Amended Complaint, Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies the same.

19.     Xceligent admits that a civil seizure order was issued by a Philippines court to seize records and property from Avion BPO Corporation ("Avion"), and that the seizure order was issued *ex parte* without providing Avion notice or other due process. Xceligent denies involvement in any "mass-piracy scheme". Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 19 of the Amended Complaint and, therefore, denies the same.

20.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 20 of the Amended Complaint and, therefore, denies the same.

21.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 21 of the Amended Complaint and, therefore, denies the same.

22.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 22 of the Amended Complaint and, therefore, denies the same.

23.     Xceligent denies any allegation that "accessing and harvesting content" from CoStar's websites is a part of Xceligent's research process. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 23 of the Amended Complaint and, therefore, denies the same.

24.     Xceligent denies the allegation that it has "stolen, and is using, proprietary data directly from CoStar's subscription database." Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 24 of the Amended Complaint and, therefore, denies the same.

25.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that the "notes" contained in ¶ 25 of the Amended Complaint were "notes" sent by Avion auditors directly to Xceligent management.  Xceligent denies all remaining allegations contained in ¶ 25 of the Amended Complaint.   Xceligent states further that "content" on LoopNet is not proprietary to CoStar, and that CoStar's effort to claim ownership over such content is evidence of CoStar's anticompetitive scheme aimed at denying Xceligent and other competitors access to non-proprietary CRE data, including brokers' own listings information.

26.     Xceligent denies CoStar's false and defamatory accusations attributing theft to Xceligent.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 26 of the Amended Complaint and, therefore, denies the same.

27.     Xceligent denies the allegations contained in ¶ 27 of the Amended Complaint, and states that they consist of false and defamatory accusations that grossly misrepresent Xceligent's business and history.

28.     Xceligent denies the allegations contained in the first sentence of ¶ 28 of the Amended Complaint.  Xceligent admits that three photographs bearing the CoStar watermark were inadvertently displayed on CommercialSearch associated with the property located at 2021 E. Commercial Blvd., Fort Lauderdale, Florida 33308.  Each of these photographs was removed immediately upon receiving notice via CoStar's Amended Complaint, and Xceligent is investigating how these photographs bearing CoStar watermarks were uploaded and displayed on CommercialSearch.  Xceligent states that to the extent any claimed CoStar watermarked or copyrighted photograph has been displayed on CommercialSearch, that display would have been

7

inadvertent, as Xceligent was either without knowledge of the photograph's source or any applicable copyrights, or was without Xceligent's authorization. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 28 of the Amended Complaint and, therefore, denies the same.

29.     Xceligent denies the allegations contained in ¶ 29 of the Amended Complaint, and states that they consist of false and defamatory accusations.

30.     Xceligent admits the allegations contained in ¶ 30 of the Amended Complaint.

31.     Xceligent admits CoStar Realty is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia 20005. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 31 of the Amended Complaint and, therefore, denies the same.

32.     Xceligent admits LoopNet was a corporation organized and existing under the laws of the State of Delaware and had its principal place of business and corporate offices located at 101 California Street, 43rd Floor, San Francisco, California 94111. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 32 of the Amended Complaint and, therefore, denies the same.

33.     Xceligent admits the allegations contained in ¶ 33 of the Amended Complaint.

## JURISDICTION AND VENUE

34.     Xceligent admits this Court has subject matter jurisdiction over this action.

35.     Xceligent admits this Court has personal jurisdiction over the parties to this action.

36.     Xceligent admits venue is proper in this Court.

8

## COSTAR'S FACTUAL ALLEGATIONS

37.     Xceligent admits that the CoStar Companies control a monopoly share of both the commercial CRE listings database and CRE information services markets.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 37 of the Amended Complaint and, therefore, denies the same.

38.     Xceligent admits, on information and belief, that CoStar offers a product that provides access to a database containing CRE data that includes for-lease and for-sale listings, historical data, property photographs, comparable sales information, tenant information, maps, and floor plans.  Xceligent admits that the input costs for generating and updating a database covering the nationwide inventory of CRE property ranges in the hundreds of millions to billions of dollars, and presents a high entry barrier to any competitor seeking to enter the market occupied by CoStar.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 38 of the Amended Complaint and, therefore, denies the same.

39.     Xceligent admits that CoStar currently plays an "important role" in the CRE market.  But that role is by default.  The products offered by the CoStar Companies have become obligatory not based upon quality or value.  Rather, many CRE industry participants are compelled to use CoStar products because, in many instances, CoStar is the sole source for CRE information and has cloaked that information under a false veil of ownership intended to preclude competitors, and even customers, from utilizing non-proprietary CRE information other than in connection with the CoStar Companies' products or services.  On information and belief, Xceligent admits that, because the CoStar Companies are in many instances the sole source of CRE information, a substantial number of searches are conducted for CRE on CoStar Products,

9

and that CoStar Products are used in connection with a substantial number of annual CRE leases, sales, and mortgage originations. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 39 as to the number of searches that occur per day, or the total annual value of CRE transactions in relation to which CoStar Products are used and therefore denies the same. Xceligent denies all remaining allegations contained in ¶ 39 of the Amended Complaint.

40. Xceligent denies the allegations contained in ¶ 40 concerning LoopLink and CoStar Connect to the extent CoStar suggests that those products are utilized by brokers to market property listings using only CoStar photographs and content held in CoStar databases. On information and belief, a broker's own listings displayed via the LoopLink product on a broker's own website are, at least originally, broker generated with the broker's own content, and often including the broker's own photographs. Xceligent admits the remaining allegations contained in the first two sentences of ¶ 40 of the Amended Complaint. Xceligent admits the CoStar Companies offer the CoStar Connect and LoopLink products that allow brokers to utilize CoStar's technology and CRE content held in CoStar databases, as well as the brokers' own content, to market property listings directly on the brokers' own websites. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained ¶ 40 of the Amended Complaint, including the allegations in the third sentence of ¶ 40 and, therefore, denies the same.

41. Xceligent denies the allegation that the current anticompetitive operation of the CoStar Companies business is beneficial to the national economy, and denies the allegation that the CoStar Companies have made an "investment in accurate information." Xceligent admits that "[f]ederal, state, and local governments rely on CoStar's data for a variety of purposes",

including to value commercial properties for tax purposes. Xceligent admits that the banking sector relies on CoStar's CRE information services (as defined in the Counterclaim below). Xceligent admits, on information and belief, that CoStar's CRE information services are used by 15 of the top 20 "Systemically Important Financial Institutions", as well federal regulators, which is one hallmark of CoStar's monopoly power in the CRE information services market (as defined in the Counterclaim below). Xceligent states that one reason why CoStar Products are used by these institutional customers is that the CoStar Companies are the sole source for CRE information and have cloaked that information under a false veil of anticompetitive proprietary claim intended to preclude competitors, and even customers from utilizing non-proprietary CRE information other than in connection with the CoStar Companies' products or services. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained ¶ 41 of the Amended Complaint, and, therefore, denies the same.

42. Xceligent admits CoStar Products are used by CRE property owners, investors, property managers, and lenders, including to obtain CRE data regarding vacancy, rents, comparable properties, and tenants. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained ¶ 42 of the Amended Complaint, and, therefore, denies the same.

43. On information and belief, Xceligent admits the allegations contained in ¶ 43 of the Amended Complaint. .

44. Xceligent admits CoStar Group purchased LoopNet in April 2012. Xceligent admits the CoStar Companies entered into a consent decree with the Federal Trade Commission ("FTC") in order to obtain approval of the purchase of LoopNet. Xceligent is without

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 11 of 139

knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 44 of the Amended Complaint and, therefore, denies the same.

45. Xceligent denies the allegation that non-photograph CRE data contained in CoStar's websites, including those listed in ¶ 45, is proprietary to CoStar. Xceligent admits the remainder of the allegations contained in ¶ 45.

46. Xceligent admits that access to CRE data provides enormous benefits to CRE industry participants, including, but not limited to, brokers, owners, property managers, federal, state and local governments, banks, investors, etc. Xceligent denies that CoStar's anticompetitive operation of its CRE data businesses is beneficial to CRE industry participants or to the industry, and denies that CoStar's monopoly control implemented and exercised over CRE data, much of which is not generated by CoStar and exists independent of CoStar, is beneficial to CRE industry participants or to the industry. Xceligent denies the allegation that CoStar ensures the reliability of information shared across its products. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 46 of the Amended Complaint and, therefore, denies the same.

47. Xceligent denies the allegation that CoStar "has a number of competitors in each of its businesses." Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 47 of the Amended Complaint and, therefore, denies the same.

48. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 48 of the Amended Complaint and, therefore, denies the same.

49. Xceligent denies all allegations contained in ¶ 49 of the Amended Complaint.

50.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 50 of the Amended Complaint and, therefore, denies the same.

51.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 51 of the Amended Complaint and, therefore, denies the same.

52.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 52 of the Amended Complaint and, therefore, denies the same.

53.     Xceligent admits the CoStar Products include links to Terms of Service and that CoStar purports to require registered and non-registered users to agree to the Terms of Service. The allegation that such Terms of Service are "binding" constitutes a legal conclusion and no facts are stated in support of the conclusion. Xceligent therefore denies the allegation. Xceligent denies all remaining allegations contained in ¶ 53 of the Amended Complaint

54.     Xceligent admits that Exhibit A and Exhibit B appear to be copies of Terms of Service that are currently available via the publically available LoopNet.com and CoStar.com websites, respectively. The allegation that Terms of Service imposed by other CoStar Products are "substantially similar" constitutes a legal conclusion and no facts are stated in support of the conclusion. Xceligent therefore denies the allegation. Any remaining allegations contained in ¶ 54 of the Amended Complaint are denied.

55.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 55 of the Amended Complaint and, therefore, denies the same.

56.     Xceligent admits that quotations from select portions of Exhibit A and Exhibit B appear to be accurate quotations from Exhibit A and Exhibit B, respectively.  The remaining allegations contained in ¶ 56 of the Amended Complaint constitute legal conclusions and no facts are stated in support of the conclusion.  Xceligent therefore denies the allegations.

57.     Xceligent admits that quotations from select portions of Exhibit A and Exhibit B appear to be accurate quotations from Exhibit A and Exhibit B, respectively.  The remaining allegations contained in ¶ 57 of the Amended Complaint constitute legal conclusions and no facts are stated in support of the conclusion.  Xceligent therefore denies the allegations.

58.     Xceligent admits that quotations from select portions of Exhibit A and Exhibit B appear to be accurate quotations from Exhibit A and Exhibit B, respectively.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 58 of the Amended Complaint and, therefore, denies the same.

59.     Xceligent admits that quotations from select portions of Exhibit A and Exhibit B appear to be accurate quotations from Exhibit A and Exhibit B, respectively.  The remaining allegations contained in ¶ 59 of the Amended Complaint constitute legal conclusions and no facts are stated in support of the conclusion.  Xceligent therefore denies the allegations.

60.     Xceligent admits that CoStar may not restrict brokerages or individual brokers from sharing their own photographs, or from sharing data regarding CRE property features with third-party websites, including Xceligent.  The remaining allegations contained in ¶ 60 of the Amended Complaint constitute legal conclusions and no facts are stated in support of the conclusion.  Xceligent therefore denies the allegations.

61. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 61 of the Amended Complaint and, therefore, denies the same.

62. Xceligent denies all allegations contained in ¶ 62 of the Amended Complaint.

63. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 63 of the Amended Complaint and, therefore, denies the same.

64. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 64 of the Amended Complaint and, therefore, denies the same.

65. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 65 of the Amended Complaint and, therefore, denies the same.

66. Xceligent admits that Xceligent employees have been denied access to "LoopNet", and that the "notice" set forth above ¶ 66 of the Amended Complaint has accompanied this denial of access, which occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application. These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website. Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information. Xceligent further states that CoStar's denial of access to broker's own websites integrated with LoopNet is

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 15 of 139

anticompetitive and exclusionary, in violation of the FTC's Decision and Order issued August 29, 2012, Docket No. C-4368 ("FTC Order"), attached here as Exhibit A and incorporated by reference, and antitrust laws, and that the "terms of service" offered as legal support for this unlawful denial of access are unenforceable and anticompetitive in their application. Those "terms of service" referenced in ¶ 66 of the Amended Complaint, are ambiguous, but otherwise speak for themselves as to content, and Xceligent denies any inconsistent allegations or characterizations of such terms of service. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in ¶ 66 of the Amended Complaint and, therefore, denies the same.

67.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 67 of the Amended Complaint and, therefore, denies the same.

68.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 68 of the Amended Complaint and, therefore, denies the same.

69.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 69 of the Amended Complaint and, therefore, denies the same.

70.     Xceligent admits it is a direct competitor to CoStar that offers products in the markets for CRE listings databases (as defined in the Counterclaim below) and CRE information services (as defined in the Counterclaim below). Xceligent denies the allegation that it merely "purports" to operate similar CRE research platforms. Xceligent admits that dmg information ("DMGI"), is Xceligent's majority owner and is a wholly owned subsidiary of the Daily Mail

16

and General Trust plc ("DMGT"). Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 70 of the Amended Complaint and, therefore, denies the same

71.     Xceligent admits it has utilized U.S.-based researchers, including researchers headquartered in Blue Springs, Missouri, as well as offshore researchers to supplement that work. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in ¶ 71 of the Amended Complaint and, therefore, denies the same.

72.     Xceligent denies all allegations contained in ¶ 72 of the Amended Complaint.

73.     The allegations contained in the first sentence of ¶ 73 constitute legal conclusions and no facts are stated in support of the conclusion. Xceligent therefore denies the allegations contained in the first sentence of ¶ 73 of the Amended Complaint. Xceligent denies the allegations contained in the second sentence of ¶ 73 of the Amended Complaint. Xceligent states that the terms of service included with its products speak for themselves, and Xceligent denies any inconsistent allegations or characterizations of such terms of service. Xceligent states that the Terms of Service included with CoStar Products, including the LoopNet Terms of Service, are ambiguous, but otherwise speak for themselves, and Xceligent denies any inconsistent allegations or characterizations of such Terms of Service. Xceligent admits that Xceligent employees have been denied access to "LoopNet", and that the "notice" set forth above ¶ 66 of the Amended Complaint has accompanied this denial of access, which occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application. These visits generally occur with the express permission or direction from a broker to update or obtain

listings information from the broker's own listings available on the broker's or brokerage firm's own website. Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information. Xceligent further states that CoStar's denial of access to broker's own websites integrated with LoopNet is anticompetitive and exclusionary, in violation of the FTC Order and antitrust laws, and that the "terms of service" offered as legal support for this unlawful denial of access are unenforceable and anticompetitive in their application. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in ¶ 73 of the Amended Complaint and, therefore, denies the same.

74.      Xceligent admits Doug Curry was quoted by Jennifer Leclaire in an October 31, 2016 article titled "Xceligent Demonstrates the Power of Big Data at CCIM Thrive" as stating:

> "There is a value to aggregating because it cost a lot …. We are going to go ahead and take a risk and say, 'Open the platform up to connections to other workflow tools.' That is a risk. Our agreements are crafted in such a way that the firms that use the data don't have to worry legally about what they are going to do with it. But the one caveat is we don't want people downloading our aggregate data set we've spent over $100 million building and sending it off because that wouldn't be right for the industry."

Xceligent states that the quotation speaks for itself, and Xceligent denies any inconsistent allegations or characterizations of the quotation. Xceligent denies any remaining allegations contained in ¶ 74 of the Amended Complaint.

75.      Xceligent denies all allegations contained in ¶ 75 of the Amended Complaint.

76.      Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that unidentified current or former employees made the accusations alleged by CoStar in ¶ 76 of the Amended Complaint, and, therefore, denies the same. Xceligent admits that employees have experienced being "blocked out of LoopNet", and that such blocking

occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application. These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website. Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information. Xceligent denies the allegation that 90% of updates are made based off of information from CoStar's websites, and denies the allegation that Xceligent "attempts to copy data and images from LoopNet on a wholesale basis". Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in ¶ 76 of the Amended Complaint and, therefore, denies the same.

77.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that unidentified current or former employees made the accusations alleged by CoStar in ¶ 77 of the Amended Complaint, and, therefore, denies the same. Although Xceligent can neither admit nor deny that an unidentified employee made the accusations alleged by CoStar in ¶ 77 of the Amended Complaint, Xceligent does deny the false and defamatory accusations attributing theft to Xceligent. Xceligent admits utilizing similar types of technological measures that have been used by CoStar in the past to avoid blocking activities, including changing its IP address, in order to work around CoStar's anticompetitive and unlawful impediments employed to block access to brokers' own listings, and to broker owned photographs. Xceligent admits that access to broker listings, and in particular to the factual information that is available within broker listings, is essential to effective competition in the CRE listings database and CRE information services markets. Xceligent is without knowledge

19

or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 77 of the Amended Complaint and, therefore, denies the same.

78.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that unidentified former employee made the accusations alleged by CoStar in ¶ 78 of the Amended Complaint, and, therefore, denies the same.  Although Xceligent can neither admit nor deny that an unidentified employee made the accusations alleged by CoStar in ¶ 78 of the Amended Complaint, Xceligent denies the allegation that Xceligent has "refused to put the time and money to get [CRE] data and images properly."

79.    Xceligent denies all allegations contained in ¶ 79 of the Amended Complaint.

80.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 80 of the Amended Complaint and, therefore, denies the same.

81.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 81 of the Amended Complaint and, therefore, denies the same.

82.    Xceligent admits, on information and belief, that CoStar employs anticompetitive technological measures in violation of the antitrust laws and the FTC Order that CoStar agreed to follow,  and antitrust laws to prevent competitors, including Xceligent, from accessing broker listings and brochures through the brokers' own websites by utilizing its LoopLink product to attempt to control and assert ownership rights over non-proprietary, broker sourced information, and broker owned photographs, and to prevent competitors from accessing such information and photographs despite authorization granted to competitors by the broker or brokerage firm to access the listings and broker owned photographs.  Xceligent admits utilizing similar types of

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 20 of 139

technological measures used by CoStar to avoid blocking activities, including changing its IP address, in order to work around CoStar's anticompetitive and unlawful measures employed to block access to brokers' own listings and brochures, and to broker owned photographs. Xceligent is without knowledge or information sufficient to form a belief as to whether an unidentified, terminated former employee made the statement quoted in ¶ 82 of the Amended Complaint and, therefore, denies the same. Xceligent denies all remaining allegations contained in ¶ 82 of the Amended Complaint.

83.     Xceligent admits utilizing similar types of technological measures used by CoStar to avoid blocking activities, including changing its IP address, in order to work around CoStar's anticompetitive and unlawful measures employed to block access to brokers' own listings and brochures, and to broker owned photographs.   Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 83 of the Amended Complaint and, therefore, denies the same.

84.     Xceligent admits that certain LoopNet accounts were created by Xceligent employees prior to 2012, including, for example, the account registered by Nathan Lipowicz. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 84 of the Amended Complaint and, therefore, denies the same.

85.     Xceligent admits that Nate Lipowicz and Kevin Talbot have accessed LoopNet since 2012.   Xceligent denies the allegation that any access of LoopNet from multiple IP addresses, or otherwise, is suggestive of "a deliberate effort to skirt [any] LoopNet abuse monitor and evade detection."  Xceligent is without knowledge or information sufficient to form a belief

21

as to the truth of the remaining allegations contained in ¶ 85 of the Amended Complaint and, therefore, denies the same.

86.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 86 of the Amended Complaint and, therefore, denies the same.

87.     Xceligent states that the LoopNet Terms of Service speaks for itself, and Xceligent denies any inconsistent allegations or characterizations of the LoopNet Terms of Service. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 87 of the Amended Complaint and, therefore, denies the same.

88.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 88 of the Amended Complaint and, therefore, denies the same.

89.     Xceligent admits that, despite CoStar's anticompetitive conduct in violation of the government's FTC Order and antitrust laws, Xceligent continues its attempts to compete with CoStar, and to expand into some of the largest markets nationwide, including New York and southern Florida, but that CoStar's anticompetitive and illegal conduct has damaged and slowed Xceligent's efforts, causing Xceligent to incur additional cost and expense combating CoStar's conduct. Xceligent admits expanding from 33 to 46 U.S. markets, and that Xceligent is, at present, attempting to expand into some of the largest markets nationwide, including New York and South Florida. Xceligent admits Doug Curry has made public statements concerning this expansion. Xceligent is without knowledge or information sufficient to form a belief as to the

22

truth of the remaining allegations contained in ¶ 89 of the Amended Complaint and, therefore, denies the same.

90.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the claims that concern CoStar's investment of funds "to continually improve its products" contained in ¶ 90 of the Amended Complaint that concern and, therefore, denies the same.  Xceligent admits its products are offered at price points to the CRE Community lower than similar products offered by CoStar, and that Xceligent utilizes innovative methods and the fostering of positive partnerships within the CRE community in order to achieve these price points.  Xceligent denies all remaining allegations contained in ¶ 90 of the Amended Complaint.

91.    Xceligent denies engaging in unlawful misconduct as alleged by CoStar. Xceligent denies all remaining allegations contained in ¶ 91 of the Amended Complaint.

92.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that CoStar "found more than nine thousand instances of CoStar copyrighted photographs" on CommercialSearch and, therefore, denies the same.  Xceligent states that to the extent any claimed registered CoStar copyrighted photograph taken by one of CoStar's own photographers (versus the brokers' own photos) has been displayed on CommercialSearch, that display would have been inadvertent, as Xceligent was either without knowledge of the photograph's source or any applicable copyrights, or was without Xceligent's authorization.  Xceligent denies all remaining allegations contained in ¶ 92 of the Amended Complaint.

93.    Xceligent admits that, to the extent any claimed registered CoStar copyrighted photographs have been inadvertently obtained, uploaded and displayed on CommercialSearch, a portion of the photographs, on information and belief, were uploaded by, or at the direction of,

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 23 of 139

individual brokers or brokerage firms. Xceligent further admits that it has, on innumerable occasions, rejected photographs submitted by brokers and brokerage firms precisely because the photographs displayed a watermark, even when the watermark may have been added by CoStar to a broker owned photograph. Rejection of such photographs is Xceligent policy. Xceligent further admits that CDX listings and CommercialSearch listings are cross-populated in order to, among other reasons, provide customers with the greatest access to baseline data regarding CRE property features available on Xceligent's databases. Xceligent denies all remaining allegations contained in ¶ 93 of the Amended Complaint.

94.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that an anonymous, terminated former employee of Xceligent made the statements contained in ¶ 94 of the Amended Complaint and, therefore, denies the same. Although Xceligent can neither admit nor deny that the statements were made, Xceligent denies any allegations contained within those statements, and denies all remaining allegations contained in ¶ 94 of the Amended Complaint.

95.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 95 of the Amended Complaint and, therefore, denies the same.

96.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of ¶ 96 of the Amended Complaint and, therefore, denies the same. Xceligent denies all remaining allegations contained in ¶ 96 of the Amended Complaint. It hardly "defies logic" that a broker might attempt to upload CoStar-copyrighted photos onto CommercialSearch, and do so without ill intent. There are any number of rational explanations, including simple broker inadvertence, or an inability to differentiate

24

between photographs owned and allegedly copyrighted by CoStar that bear the CoStar watermark, and photographs of the same CRE property that are owned by the broker but that also bear the CoStar watermark because CoStar has watermarked the photograph despite holding no copyrights over the photograph, which CoStar grants itself the authority to do under its Terms of Service. Rarely does a broker include in its brochure all photographs that are taken of a property and that are available on the broker's electronic website. Brokers also regularly update their brochures, just as they update their listings. The fact that a photograph does not appear in a current broker brochure does not mean it did not appear in a previous broker brochure, and with or without a CoStar watermark.

97. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 97 of the Amended Complaint and, therefore, denies the same.

98. Xceligent denies all allegations contained in ¶ 98 of the Amended Complaint.

99. Xceligent admits adopting a new logo in late 2015. Xceligent further admits using a watermark that appears as a small grayscale image at the bottom right corner of a photograph—a quite typical location for a photograph watermark. Xceligent denies all remaining allegations contained in ¶ 99 of the Amended Complaint.

100. Xceligent denies all allegations contained in ¶ 100 of the Amended Complaint.

101. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that an unidentified, terminated former employee of Xceligent made the statements contained in ¶ 101 of the Amended Complaint and, therefore, denies the same. Although Xceligent can neither admit nor deny that the statements were made, Xceligent denies

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 25 of 139

any allegations contained within those statements, and denies all remaining allegations contained in ¶ 101 of the Amended Complaint.

102.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 102 of the Amended Complaint and, therefore, denies the same.

103.    Xceligent denies all allegations contained in ¶ 103 of the Amended Complaint.

104.    Xceligent admits that it has identified limited instances when a photograph bearing the CoStar watermark was inadvertently displayed on CommercialSearch, and that the CommercialSearch watermark was inadvertently added to the photograph by the digital watermarking program used by Xceligent to watermark photos uploaded to CommercialSearch. Xceligent is without knowledge or information sufficient to form a belief as to the truth of any allegation that the CoStar watermarked photograph displayed in ¶ 104 is copyrighted, or of any remaining allegations contained in ¶ 104 of the Amended Complaint and, therefore, denies the same.

105.    Xceligent denies any allegation that it "stole[] CoStar photographs". Xceligent denies the allegation that the presence of photographs at a low resolution on CommercialSearch indicates that the photographs were manually copied by Xceligent using a "snipping tool" or other software for creating screenshots. Xceligent denies the allegation that it pursues as a goal, or otherwise places any preference on quantity over quality with regard to the display of properties on Xceligent websites. Xceligent works closely with its broker partners to ensure properties achieve the most positive and broadest exposure in the CRE community. CoStar, on the other hand, undermines those efforts through anticompetitive conduct designed to limit the ability of brokers to achieve broad exposure for their properties in the CRE community.

26

Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 105 of the Amended Complaint and, therefore, denies the same.

106.     Xceligent admits that Exhibit F to Plaintiffs' Amended Complaint contains 100 photographs that contain CoStar's watermark and admits that Exhibit G is a chart containing alleged information about these photographs, including a CommercialSearch URL stating where Plaintiffs' allege each image was located.  Xceligent denies all remaining allegations contained in ¶ 106 of the Amended Complaint.

107.     Xceligent admits that some of the photographs on Exhibit F to Plaintiffs' Amended Complaint were uploaded to Xceligent's databases by Xceligent employees or Avion employees.  Xceligent denies that any such upload was improper or without customer permission and denies all remaining allegations contained in ¶ 107 Plaintiffs' Amended Complaint.

108.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegation that CoStar has "found thousands of instances of its copyrighted photographs in CommercialSearch", and, therefore, denies the same.  Xceligent denies all remaining allegations contained in ¶ 108 of the Amended Complaint.

109.     Xceligent states that the terms of service included with its products speak for themselves, and Xceligent denies any inconsistent allegations or characterizations of such terms of service.  Xceligent denies all remaining allegations contained in ¶ 109 of the Amended Complaint.

110.     Xceligent admits that it does not allow researchers to copy CoStar watermarked photographs, and that it is Xceligent policy to not copy or display photographs bearing a CoStar watermark, and to remove photographs bearing a CoStar watermark if inadvertently displayed in

27

violation of Xceligent's policy. Xceligent states that to the extent any claimed CoStar watermarked or copyrighted photograph has been displayed on CommercialSearch, that display would have been inadvertent, as Xceligent was either without knowledge of the photograph's source or any applicable copyrights, or was without Xceligent's authorization. Xceligent denies all remaining allegations contained in ¶ 110 of the Amended Complaint.

111. Xceligent admits that it does not allow researchers to copy CoStar watermarked photographs, and that it is Xceligent policy to not copy or display photographs bearing a watermark, and to remove photographs bearing a CoStar watermark that are inadvertently displayed in violation of Xceligent's policy. Xceligent admits it understands that the presence of a CoStar/LoopNet watermark or log indicates that such photograph may be CoStar-copyrighted, but does not definitively establish that the photographs are CoStar-copyrighted, particularly in light of CoStar's terms of use. Xceligent states that, because CoStar, under its Terms of Service, grants itself the right to watermark broker owned photographs over which CoStar can claim no copyright, there exists no mechanism for Xceligent to determine whether a photograph is, or is not a CoStar-copyrighted and registered photograph. To the extent CoStar engages in this practice of watermarking broker owned photographs, the practice would operate to prevent brokers from sharing their own photographs with competitors of CoStar in violation of the FTC Order and antitrust laws.

112. Xceligent denies all allegations contained in ¶ 112 of the Amended Complaint.

113. Xceligent denies all allegations contained in the first sentence of ¶ 113 of the Amended Complaint. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 113 of the Amended Complaint and, therefore, denies the same.

114.     Xceligent denies all allegations contained in ¶ 114 of the Amended Complaint.

115.     Xceligent denies all allegations contained in ¶ 115 of the Amended Complaint.

116.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of ¶ 116 of the Amended Complaint and, therefore, denies the same.  Xceligent denies all remaining allegations contained in ¶ 116 of the Amended Complaint.

117.     Xceligent denies all allegations contained in ¶ 117 of the Amended Complaint.

118.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last two sentences of ¶ 118 of the Amended Complaint (the sixth and seventh sentences) and, therefore, denies the same.  Xceligent denies all remaining allegations contained in ¶ 118 of the Amended Complaint.

119.     Xceligent admits that the claims asserted by CoStar have no basis, and that the timing of this lawsuit filed by the CoStar Companies is suspect in light of Xceligent's anticipated entry into the New York City market. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 119 of the Amended Complaint and, therefore, denies the same.

120.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 120 of the Amended Complaint and, therefore, denies the same.

121.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 121 of the Amended Complaint and, therefore, denies the same.

122.     Xceligent denies all allegations contained in ¶ 122 of the Amended Complaint.

29

123.     Xceligent admits Doug Curry incorporated Xceligent in Kansas City in 2000. Xceligent admits that, in 2000, Mr. Curry was contacted by several brokerage firms in the San Diego market that were attempting to create their own alternative to CoStar Group's service, had hired a local research professional to manage the collection of the firms' properties and listings for their database, and asked Xceligent to utilize its technology to house the content once the aggregation by the brokerage firms was complete.   CoStar, in an early anticompetitive move, blocked the use by the firms of their database.   The firms then retained Xceligent to build a new database from the ground up with original physical site inspections of all commercial structures in the San Diego market and to capture a time-stamped photo at the moment of inspection to certify the origination of the information.   Xceligent denies all remaining allegations contained in ¶ 123 of the Amended Complaint, including, without limitation, CoStar's misrepresentation of the circumstances surrounding Xceligent's expansion into San Diego.

124.     Xceligent denies the allegations contained in the first sentence of ¶ 124 of the Amended Complaint.   Xceligent admits that Ms. Trimmer made the statement quoted in the second sentence of ¶ 124 of the Amended Complaint, but states that it was made as part of a much more extended statement, and that the CoStar Companies have brazenly taken the statement out of context and grossly mischaracterized the meaning of the statement, which speaks for itself.   Xceligent denies all remaining allegations contained in ¶ 124 of the Amended Complaint.

125.     Xceligent denies all allegations contained in ¶ 125 of the Amended Complaint.

126.     Xceligent denies all allegations contained in ¶ 126 of the Amended Complaint.

127.     Xceligent denies all allegations contained in ¶ 127 of the Amended Complaint.

128.   Xceligent admits that data certification is a step in the work flow employed by Xceligent to open a new market.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 128 of the Amended Complaint and, therefore, denies the same.

129.   Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 129 of the Amended Complaint and, therefore, denies the same.

130.   Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 130 of the Amended Complaint and, therefore, denies the same.

131.   Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 131 of the Amended Complaint and, therefore, denies the same.

132.   Xceligent denies any allegation that its business is "unethical".  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 132 of the Amended Complaint and, therefore, denies the same.

133.   Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 133 of the Amended Complaint and, therefore, denies the same.

134.   Xceligent denies all allegations contained in ¶ 134 of the Amended Complaint.

135.   On information and belief, Xceligent admits that overseas Writs of Search and Seizure were issued by a trial court in the Philippines based upon claims made by CoStar without the presence of any other party that permitted CoStar to seize computers and hard drives from

Avion's premises in the Philippines. On information and belief, Xceligent further denies the any allegations or implications contained in footnote 6 that the same Avion researchers working under contract for Xceligent were also involved in the conduct described in footnote 6. Xceligent denies all remaining allegations contained in ¶ 135 of the Amended Complaint.

136.    Xceligent denies all allegations contained in ¶ 136 of the Amended Complaint.

137.    Xceligent denies the allegation that it attempted, poorly or otherwise, to mask its connection to Avion, and denies the allegation that Xceligent was involved in directing any "illicit activities". Xceligent denies all remaining allegations contained in ¶ 137 of the Amended Complaint.

138.    Xceligent admits, on information and belief, that CoStar employs anticompetitive technological measures in violation of the FTC Order and antitrust laws to prevent competitors, including Xceligent, from accessing broker listings and brochures through the broker's own websites by utilizing its LoopLink product to attempt to control and assert ownership rights over non-proprietary, broker sourced information, and broker owned photographs, and to prevent competitors from accessing such information and photographs despite authorization granted to competitors by the broker or brokerage firm to access the listings and broker owned photographs. Xceligent admits suggesting that Avion researchers utilize legal technological measures in order to work around CoStar's anticompetitive and illegal measures and to access broker listings and brochures, and broker owned photographs available through broker websites. Xceligent is without knowledge or information sufficient to form a belief as to the remaining allegations contained in ¶ 138 of the Amended Complaint and, therefore, denies the same.

139.    Xceligent admits, on information and belief, that CoStar employs anticompetitive technological measures in violation of the FTC Order and antitrust laws to prevent competitors,

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 32 of 139

including Xceligent, from accessing broker listings and brochures through the broker's own websites by utilizing its LoopLink product to attempt to control and assert ownership rights over non-proprietary, broker sourced information, and broker owned photographs, and to prevent competitors from accessing such information and photographs despite authorization granted to competitors by the broker or brokerage firm to access the listings and broker owned photographs. Xceligent admits suggesting that Avion researchers utilize legal technological measures in order to work around CoStar's anticompetitive and illegal measures and to access broker listings and brochures, and broker owned photographs available through broker websites. Xceligent is without knowledge or information sufficient to form a belief as to the remaining allegations contained in ¶ 139 of the Amended Complaint and, therefore, denies the same.

140. Xceligent is without knowledge or information sufficient to form a belief as to the truth of whether the "[a]uditor [n]otes" referenced in ¶ 140 were contained in any Avion file, and, therefore, denies the same. Xceligent denies the characterization of the note quoted and purportedly contained in the "[a]uditor [n]otes". Xceligent denies all remaining allegations contained in ¶ 140 of the Amended Complaint.

141. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 141 of the Amended Complaint and, therefore, denies the same. Although Xceligent can neither admit nor deny that the notes purportedly quoted in ¶ 141 from Avion auditors were made, Xceligent denies the characterization of the notes by CoStar.

142. Xceligent denies any allegation that accessing brokers' own listings is "wrong", and denies the remaining allegations contained in the first sentence of ¶ 142 of the Amended Complaint. Xceligent is without knowledge or information sufficient to form a belief as to the

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 33 of 139

truth of the remaining allegations contained in ¶ 142 of the Amended Complaint and, therefore, denies the same.

143.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 143 of the Amended Complaint regarding the spreadsheet allegedly found in Avion's files and, therefore, denies the same.  Xceligent denies all remaining allegations contained in ¶ 143.

144.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 144 of the Amended Complaint and, therefore, denies the same.

145.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 145 of the Amended Complaint and, therefore, denies the same.

146.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 146 of the Amended Complaint and, therefore, denies the same.

147.    Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 147 of the Amended Complaint and, therefore, denies the same.

148.    Xceligent denies the allegation contained in the first sentence of ¶ 148 of the Amended Complaint.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 148 of the Amended Complaint and, therefore, denies the same.

149.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 149 of the Amended Complaint and, therefore, denies the same.

150.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 150 of the Amended Complaint and, therefore, denies the same.

151.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 151 of the Amended Complaint and, therefore, denies the same.

152.     Xceligent denies any allegation that "systematic copying" by Avion of CRE content located on CoStar websites was authorized by Xceligent. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 152 of the Amended Complaint and, therefore, denies the same.

153.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 153 of the Amended Complaint and, therefore, denies the same.

154.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 154 of the Amended Complaint and, therefore, denies the same.

155.     Xceligent denies any allegation that Xceligent instructed, or authorized any person to instruct Avion employees to "crop out watermarks". Xceligent further denies CoStar's contention that its watermark automatically identifies CoStar as the owner of the photograph to which the watermark is added. Xceligent is without knowledge or information sufficient to form

35

a belief as to the truth of the remaining allegations contained in ¶ 155 of the Amended Complaint and, therefore, denies the same.

156. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 156 of the Amended Complaint and, therefore, denies the same.

157. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 157 of the Amended Complaint and, therefore, denies the same.

158. Xceligent admits that three photographs bearing the CoStar watermark were inadvertently displayed on CommercialSearch associated with the property located at 2021 E. Commercial Blvd., Fort Lauderdale, Florida 33308, and that the CommercialSearch watermark was inadvertently added to the photograph by the digital watermarking program used by Xceligent to watermark photos. Each of these photographs was removed immediately upon receiving notice via CoStar's Amended Complaint, and Xceligent is investigating how these photographs bearing CoStar watermarks were uploaded and displayed on CommercialSearch. Xceligent states that to the extent any claimed CoStar watermarked or copyrighted photograph has been displayed on CommercialSearch, that display would have been inadvertent, as Xceligent was either without knowledge of the photograph's source or any applicable copyrights, or was without Xceligent's authorization. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 158 of the Amended Complaint and, therefore, denies the same.

159. Xceligent admits that three photographs bearing the CoStar watermark were inadvertently displayed on CommercialSearch associated with the property located at 2021 E.

36

Commercial Blvd., Fort Lauderdale, Florida 33308, and that the CommercialSearch watermark was inadvertently added to the photograph by the digital watermarking program used by Xceligent to watermark photos. Each of these photographs was removed immediately upon receiving notice via CoStar's Amended Complaint, and Xceligent is investigating how these photographs bearing CoStar watermarks were uploaded and displayed on CommercialSearch. Xceligent states that to the extent any claimed CoStar watermarked or copyrighted photograph has been displayed on CommercialSearch, that display would have been inadvertent, as Xceligent was either without knowledge of the photograph's source or any applicable copyrights, or was without Xceligent's authorization. Xceligent denies all remaining allegations contained in ¶ 159 of the Amended Complaint.

160. Xceligent denies the defamatory accusation that it is engaged in "systematic stealing," and denies all remaining allegations contained in ¶ 160 of the Amended Complaint.

161. Xceligent denies the defamatory accusation that it is engaged in "organized theft", and denies all remaining allegations contained in ¶ 161 of the Amended Complaint.

162. Xceligent denies that it is "engag[ed] in wrongdoing", willfully or otherwise, and denies all remaining allegations contained in ¶ 162 of the Amended Complaint.

## COSTAR'S FIRST CLAIM FOR RELIEF

163. In response to ¶ 163 of the Amended Complaint, Xceligent restates and incorporates here by reference all its prior responses to allegations in the Amended Complaint as though fully set forth here.

164. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 164 of the Amended Complaint and, therefore, denies the same.

165. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 165 of the Amended Complaint and, therefore, denies the same.

166. Xceligent denies all allegations contained in ¶ 166 of the Amended Complaint.

167. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 167 of the Amended Complaint and, therefore, denies the same.

168. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 168 of the Amended Complaint and, therefore, denies the same.

169. Xceligent denies all allegations contained in ¶ 169 of the Amended Complaint.

170. Xceligent denies all allegations contained in ¶ 170 of the Amended Complaint.

171. Xceligent denies committing any acts of infringement. Xceligent denies all remaining allegations contained in ¶ 171 of the Amended Complaint.

172. Xceligent denies committing any acts of infringement. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶ 172 of the Amended Complaint and, therefore, denies the same.

173. Xceligent denies committing any acts of copyright infringement. Xceligent denies all remaining allegations contained in ¶ 173 of the Amended Complaint.

174. Xceligent denies all allegations contained in ¶ 174 of the Amended Complaint.

## COSTAR'S SECOND CLAIM FOR RELIEF

175.     In response to ¶ 175 of the Amended Complaint, Xceligent restates and incorporates here by reference all its prior responses to allegations in the Amended Complaint as though fully set forth here.

176.     The allegations contained in ¶ 176 constitute legal conclusions and no facts are stated in support of the conclusion.  Xceligent therefore denies the allegations.  To the extent the allegations can be construed as allegations of fact, the allegations are denied.

177.     Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 177 of the Amended Complaint and, therefore, denies the same.

178.     The allegations contained in ¶ 178 constitute legal conclusions and are not supported by sufficient facts.  Xceligent therefore denies the allegations.  To the extent the allegations can be construed as allegations of fact, Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies the same.

179.     Xceligent admits that the use of "Terms of Service" is common in the CRE listings database and CRE information services industries in which Xceligent and CoStar both operate.  Xceligent further admits that its products include terms of service.  Xceligent states that the terms of service included with its products speak for themselves, and Xceligent denies any inconsistent allegations or characterizations of such terms of service. Xceligent denies all remaining allegations contained in ¶ 179 of the Amended Complaint.

180.     Xceligent denies all allegations contained in ¶ 180 of the Amended Complaint.

181.     Xceligent admits that Nate Lipowicz and Kevin Talbot have accessed LoopNet since 2012.  Xceligent is without knowledge or information sufficient to form a belief as to the

truth of the remaining allegations contained in ¶ 181 of the Amended Complaint and, therefore, denies the same.

182.    Xceligent admits that Xceligent employees have been denied access to "LoopNet", and that the "Access Denied" notices as set forth above ¶ 66 of the Amended Complaint have accompanied this denial of access, which often occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application.  These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website.  Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information.  Xceligent further states that CoStar's denial of access to broker's own websites integrated with LoopNet is anticompetitive and exclusionary, in violation of the FTC Order and antitrust laws, and that the "terms of service" offered as legal support for this unlawful denial of access are unenforceable and anticompetitive in their application.  Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of ¶ 182 of the Amended Complaint, or of the remaining allegations contained in the second sentence of ¶ 182 of the Amended Complaint, and, therefore, denies the same.  Xceligent denies that Xceligent has violated the Terms of Service, and denies all remaining allegations in ¶ 182 of the Amended Complaint.

183.    Xceligent states that the Terms of Service included with CoStar Products, including the quoted portion of the LoopNet Terms of Service, are ambiguous, but otherwise speak for themselves, and Xceligent denies any inconsistent allegations or characterizations of

40

such Terms of Service. Any allegations that the Terms of Service are binding or enforceable constitute legal conclusions and are not supported by sufficient facts. Xceligent therefore denies any such allegations. Xceligent denies all remaining allegations contained in ¶ 183 of the Amended Complaint.

184. Xceligent states that the LoopNet Terms of Service speaks for itself, and Xceligent denies any inconsistent allegations or characterizations of the LoopNet Terms of Service. Any allegations that the Terms of Service are binding or enforceable constitute legal conclusions and are not supported by sufficient facts. Xceligent therefore denies any such allegations. Xceligent denies all remaining allegations contained in ¶ 184 of the Amended Complaint.

185. Xceligent denies all allegations contained in ¶ 185 of the Amended Complaint.

186. Xceligent denies all allegations contained in ¶ 186 of the Amended Complaint.

187. Xceligent denies that it has committed a breach of any of the Terms of Service. Xceligent denies all remaining allegations contained in ¶ 187 of the Amended Complaint.

188. Xceligent denies all allegations contained in ¶ 188 of the Amended Complaint.

189. Xceligent denies all allegations contained in ¶ 189 of the Amended Complaint.

190. Xceligent denies all allegations contained in ¶ 190 of the Amended Complaint.

191. Xceligent denies all allegations contained in ¶ 191 of the Amended Complaint.

## COSTAR'S THIRD CLAIM FOR RELIEF

192. In response to ¶ 192 of the Amended Complaint, Xceligent restates and incorporates here by reference all its prior responses to allegations in the Amended Complaint as though fully set forth here.

193. Xceligent admits the allegations contained in ¶ 193 of the Amended Complaint.

41

194. Xceligent denies all allegations contained in ¶ 194 of the Amended Complaint.

195. Xceligent admits that Xceligent employees have been denied access to "LoopNet", and that the "Access Denied" notices as set forth above ¶ 66 of the Amended Complaint have accompanied this denial of access, which often occurs when Xceligent employees visit brokerage firm websites, such as those of Colliers, CBRE or Cushman & Wakefield, that have integrated with LoopNet via the LoopLink application. These visits generally occur with the express permission or direction from a broker to update or obtain listings information from the broker's own listings available on the broker's or brokerage firm's own website. Listings information generated by brokers belongs to the brokers and is not owned by CoStar, notwithstanding CoStar's anticompetitive efforts to control and block competitor access to such information. Xceligent further states that CoStar's denial of access to broker's own websites integrated with LoopNet is anticompetitive and exclusionary, in violation of the FTC Order and antitrust laws, and that the "terms of service" offered as legal support for this unlawful denial of access are unenforceable and anticompetitive in their application.. Xceligent denies the allegations that Xceligent, its employee and agents violated the Terms of Service. Xceligent denies any remaining allegations contained in ¶ 195 of the Amended Complaint.

196. Xceligent admits utilizing the same types of technological measures used in the past by CoStar to avoid anticompetitive conduct, in order to work around CoStar's anticompetitive and unlawful measures employed to block access to brokers' own listings and brochures, and to broker owned photographs. Xceligent denies all allegations contained in ¶ 196 of the Amended Complaint.

197. Xceligent denies all allegations contained in ¶ 197 of the Amended Complaint.

198. Xceligent denies all allegations contained in ¶ 198 of the Amended Complaint.

199. Xceligent denies all allegations contained in ¶ 199 of the Amended Complaint.

## COSTAR'S FOURTH CLAIM FOR RELIEF

200. In response to ¶ 200 of the Amended Complaint, Xceligent restates and incorporates here by reference all its prior responses to allegations in the Amended Complaint as though fully set forth here.

201. Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of ¶ 201 of the Amended Complaint and, therefore, denies the same. Xceligent denies all remaining allegations contained in ¶ 201 of the Amended Complaint.

202. Xceligent denies all allegations contained in ¶ 202 of the Amended Complaint.

203. Xceligent admits that it has identified limited instances when a photograph bearing the CoStar watermark was inadvertently displayed on CommercialSearch, and that the CommercialSearch watermark was inadvertently added to the photograph by the digital watermarking program used by Xceligent to watermark photos uploaded to CommercialSearch. Xceligent denies all remaining allegations contained in ¶ 203 of the Amended Complaint.

204. Xceligent denies all allegations contained in ¶ 204 of the Amended Complaint.

205. Xceligent denies all allegations contained in ¶ 205 of the Amended Complaint.

206. Xceligent denies all allegations contained in ¶ 206 of the Amended Complaint.

## COSTAR'S FIFTH CLAIM FOR RELIEF

207. In response to ¶ 207 of the Amended Complaint, Xceligent restates and incorporates here by reference all its prior responses to allegations in the Amended Complaint as though fully set forth here.

208. Xceligent admits the allegations contained in ¶ 208 of the Amended Complaint.

43

209.     Xceligent denies all allegations contained in ¶ 209 of the Amended Complaint.

210.     Xceligent denies all allegations contained in ¶ 210 of the Amended Complaint.

211.     Xceligent denies the allegation that it "employs unfair methods to compete with CoStar." Xceligent is without knowledge or information sufficient to form a belief as to the truth of the allegations that unidentified current or former employees made the accusations alleged by CoStar in ¶ 211 of the Amended Complaint, and, therefore, denies the same. Xceligent denies the accusations contained in the alleged quotes from former Xceligent employees that are contained in ¶ 211 of the Amended Complaint.

212.     Xceligent denies all allegations contained in ¶ 212 of the Amended Complaint.

213.     Xceligent admits that it populates its databases legitimately, including with information obtained from public sources, brokers, and on-site investigation by research staff. Xceligent denies the allegations that its websites are populated with CoStar content. To the extent any information or photographs located on an Xceligent database or website can be sourced to a CoStar database, such information or photographs were either obtained from a broker or with authorization through a broker's website, or were inadvertently populated into Xceligent's databases without knowledge of its source or any claimed copyrights, or without Xceligent's authorization. Xceligent denies all remaining allegations contained in ¶ 213 of the Amended Complaint.

214.     Xceligent denies engaging in any misconduct as alleged by CoStar. Xceligent denies all remaining allegations contained in ¶ 214 of the Amended Complaint.

215.     Xceligent denies engaging in any unfair competition, or any unauthorized and illegal activities as alleged by CoStar. Xceligent denies all remaining allegations contained in ¶ 215 of the Amended Complaint.

44

## COSTAR'S PRAYER FOR RELIEF

A.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

B.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

C.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

D.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

E.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

F.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

G.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

H.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

I.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

J.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

K.      Xceligent denies that the CoStar Companies are entitled to the relief requested in this paragraph.

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 45 of 139

## XCELIGENT'S AFFIRMATIVE DEFENSES

Xceligent asserts the following affirmative defenses to the Amended Complaint filed by the CoStar Companies. All such defenses are pled in the alternative and do not constitute an admission of liability or that any of the CoStar Companies are entitled to any relief, and do not assume the burden of proof on such defenses that would otherwise rest on any of the CoStar Companies. Xceligent reserves the right to assert additional affirmative defenses based on information subsequently acquired through discovery and investigation or further amendment of the Amended Complaint or otherwise, if and to the extent such affirmative defenses are applicable.

## FIRST AFFIRMATIVE DEFENSE

As a defense to each claim for relief, the CoStar Companies' claims are barred, in whole or in part, by order of the FTC Order (Ex. A), either by operation of law or equity. *See, e.g.*, FTC Order (Ex. A) at § III.K.

## SECOND AFFIRMATIVE DEFENSE

As a defense to each claim for relief, the CoStar Companies' claims are barred, in whole or in part, by the doctrine of laches. The CoStar Companies inexcusably delayed asserting each of their claims for an unreasonable period and thereby unduly prejudiced Xceligent.

## THIRD AFFIRMATIVE DEFENSE

As a defense to each claim for relief, the CoStar Companies' claims are barred, in whole or in part, by estoppel. The CoStar Companies have made statements and committed acts inconsistent with the claims that they advance here, upon which Xceligent relied, and which, if repudiated, would cause injury to Xceligent. Among other things, the CoStar Companies have represented in court that it long has accessed brokers' publicly accessible commercial real estate

46

listings on competitors' websites in order to obtain information for its own products, and represented to the FTC that it would not directly or indirectly prevent brokers from sharing information with competitors. Xceligent reasonably relied upon these representations in creating listings for brokers, and would be injured if the CoStar Companies were allowed to repudiate those representations through its claims here.

### FOURTH AFFIRMATIVE DEFENSE

Each of the CoStar Companies' claims for relief is barred, in whole or in part, by the CoStar Companies' unclean hands. For example, on the pretext of protecting brokers' property, the CoStar Companies falsify brokers' listings on brokers' websites, without notice to brokers, creating misinformation within the CRE markets with no legitimate business reason. Rather, CoStar Companies engage in this conduct for the real and anticompetitive purpose of claiming rights to data and information of which they did not generate and do not have a right to protect.

### FIFTH AFFIRMATIVE DEFENSE

Each of the CoStar Companies' claims for damages is limited by the CoStar Companies' failure to mitigate damages. For example, the CoStar Companies did not timely assert their audit rights under the FTC Order (Exhibit A) or their takedown notice rights under the DMCA.

### SIXTH AFFIRMATIVE DEFENSE

Each of Counts I, III, and IV of the CoStar Companies' claims is barred, in whole or in part, by the applicable statutes of limitations. Any claim for copyright infringement must be filed within three years after the claim accrues. *See* 17 U.S.C. § 507(b). The CoStar Companies filed this action on December 12, 2016. CoStar Realty's claim for infringement is thus barred to the extent that it should have discovered any alleged infringement before December 12, 2013. The same statute bars the CoStar Companies' Digital Millennium Copyright Act claim. *See* 17 U.S.C.

§ 507. The CoStar's Companies' breach of contract claim is barred by D.C. Code § 12-301(7). The CoStar Companies' Computer Fraud and Abuse Act claim is barred by that Act's limitations provision because the CoStar Companies filed their claim more than two years after it should have discovered the impairment to the integrity or availability of data it alleges in its Complaint. *See* 18 U.S.C. § 1030.

**SEVENTH AFFIRMATIVE DEFENSE**

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by CoStar Realty's abandonment of its alleged copyrights to the photographs at issue. CoStar Realty intentionally permitted brokers and other third parties to use allegedly infringing photographs in their own marketing materials. By its intentional conduct, CoStar Realty abandoned any claim it may have had that any allegedly infringing photograph is protected under federal copyright law.

**EIGHTH AFFIRMATIVE DEFENSE**

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by CoStar Realty's forfeiture. The CoStar Companies authorized brokers and other third parties to publish allegedly infringing photographs and the resulting publications lacked the required copyright notice. The CoStar Companies thus forfeited any claim to protection under federal copyright law.

**NINTH AFFIRMATIVE DEFENSE**

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by the doctrine of fair use. Among other things, the allegedly infringed works are of minimal, if any, creative value, and Xceligent's alleged infringement of those works has not adversely effected the potential market, if any, for the infringed photographs.

## TENTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by its misuse of its purported copyrights. CoStar Realty has asserted copyright protections regarding photographs in an effort to prevent competitors from accessing or using information related to the subject matter of the photograph, including data regarding particular property listings that is not copyrighted and may not be copyrighted. Such activity violates various state and federal antitrust and copyright laws.

## ELEVENTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, because Xceligent is protected by the "safe harbor" provision of the Digital Millennium Copyright Act, 17 U.S.C. § 512. Xceligent is a "service provider" within the meaning of the statute, and stores certain photographs and data at the direction of third parties who use its websites and databases. Xceligent has taken the precautionary measures that the Act requires, by adopting and reasonably implementing a policy designed to exclude users who repeatedly infringe, designating an agent to receive infringement notices, and accommodating standard technical measures that copyright owners use to detect infringement. Xceligent also had no actual or apparent knowledge of the alleged infringing activity, and has never received a takedown notice from CoStar Realty. Xceligent did not have the right or ability to control the alleged infringing activity, nor did it receive a financial benefit directly attributable to the alleged infringing activity.

## TWELFTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, because Xceligent had permission, license, or implied license to copy the allegedly copyrighted

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 49 of 139

works. Copyright owners may grant implied licenses by consenting in the form of mere permission, or common industry practice. The CoStar Companies permitted, did not object, and followed common industry practice when they permitted brokers and other third parties to upload and access photographs and listing information from their various websites and databases. This activity is sufficient to be an implied license and bar the CoStar Companies' infringement claims.

## THIRTEENTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by the doctrine of acquiescence, because CoStar Realty knew of and manifested acquiescence in Xceligent's allegedly infringing conduct, and CoStar Realty intended that Xceligent rely on that acquiescence, and Xceligent reasonably relied to its detriment on CoStar's actions.

## FOURTEENTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is barred, in whole or in part, by the doctrine of equitable estoppel, because CoStar knew about Xceligent's infringing conduct, intended that its conduct be acted upon by Xceligent, Xceligent was ignorant of CoStar Realty's copyrights in the infringing photographs, and Xceligent relied upon CoStar Realty's conduct to its detriment.

50

## FIFTEENTH AFFIRMATIVE DEFENSE

CoStar Realty's claim for relief for copyright infringement is limited to the extent that it relates to an unpublished photograph that Xceligent allegedly infringed before the effective date of the photograph's registration with the Copyright Office, or to the extent that Xceligent's alleged infringement commenced after the first publication of the work but before the effective date of its registration. 17 U.S.C. § 412.

## SIXTEENTH AFFIRMATIVE DEFENSE

The CoStar Companies' claim for relief for breach of contract is barred because the alleged contracts are unenforceable as unconscionable and for reasons of public policy. The CoStar Companies' prohibition on competitive use imposes a restraint on trade greater than any legitimate interest the CoStar Companies might have in what it claims to be "proprietary" data. In addition, the CoStar Companies' restrictions violate state and federal antitrust laws because they are anticompetitive in intent and effect.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The CoStar Companies' claim for relief for breach of contract is barred because the CoStar Companies, by their conduct, waived any right they may have had to enforce the competitive use restrictions in the Terms of Service at issue.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The CoStar Companies' claim for violation of the Computer Fraud and Abuse Act is barred because it is premised upon Xceligent's alleged violation of terms of use that are themselves unenforceable and unconscionable and for reasons of public policy. The CoStar Companies' prohibition on competitive use imposes a restraint on trade greater than any legitimate interest the CoStar Companies might have in what it claims to be "proprietary" data.

51

In addition, the CoStar Companies' restrictions violate state and federal antitrust laws because they are anticompetitive in intent and effect.

## XCELIGENT'S PRAYER FOR RELIEF

WHEREFORE, Xceligent respectfully prays that the Court enter judgment in its favor and against the CoStar Companies as follows:

A.    Dismissing the Amended Complaint with prejudice and on the merits;

B.    Ruling that the CoStar Companies take nothing by said Amended Complaint;

C.    Awarding Xceligent its costs of suit herein, including reasonable attorney fees to the extent allowed by law; and

D.    Awarding Xceligent such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS OF DEFENDANT XCELIGENT, INC.

Xceligent, Inc., ("Xceligent") by and through its undersigned counsel, for its Counterclaim against CoStar Group, Inc. ("CoStar Group"), and CoStar Realty Information, Inc. ("CoStar Realty") (collectively "CoStar" or the "CoStar Companies") states:

## NATURE OF THE ACTION

1.    CoStar Group has long been a dominant provider of commercial real estate ("CRE") information service products in the United States market, and with its purchase of LoopNet in 2012, the CoStar Companies became the dominant provider of CRE listings database products as well. Xceligent is a direct competitor to CoStar, offering the marketplace CRE listings database and CRE information service products of its own. Rather than compete with Xceligent on an equal and fair playing field, CoStar employs anticompetitive schemes aimed at

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 52 of 139

denying Xceligent, and other competitors, the single most vital resource needed to effectively compete in the markets dominated by CoStar: information.

2.  To deny their competitors this vital resource, the CoStar Companies have engaged in an anticompetitive scheme designed to raise competitor costs and to drive them out of business in order to entrench the CoStar Companies' monopoly positions in both the CRE information services and CRE listings database markets by: (A) imposing exclusionary contractual terms that prevent customers from using a competitor's products; (B) anticompetitive input foreclosure by contaminating broker listings with artificial data known to be false in order to obstruct competitor access to brokers' own data; (C) exclusionary contractual terms enforced by technological impediments that block Xceligent's access to a necessary input—customer data; (D) tying and bundling CoStar products and geographies to prevent Xceligent's geographic expansion and prevent Xceligent from achieving national scale; (E) pervasive false and defamatory statements about Xceligent and its products and services designed to scare customers away from doing business with Xceligent.

3.  In the face of CoStar's anticompetitive practices, competitors of the past have been driven out of the marketplace entirely. Xceligent is fighting to build a competitive share of the CRE listings database and CRE information services markets, but has been dramatically slowed by CoStar's anticompetitive conduct.

## PARTIES

4.  Xceligent is a provider within the United States of (i) CRE information services products; and (ii) CRE listings database products. Xceligent is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 103 SE Magellan Drive, Blue Springs, Missouri 64014.

53

5. CoStar Group is currently the largest and majority provider throughout the United States of (i) CRE information services products; and (ii) CRE listings database products. CoStar is a publicly held, for-profit corporation, organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal office and principal place of business located at 1331 L Street, NW, Washington, DC 20005.

6. CoStar Realty is a wholly owned subsidiary of CoStar Group and a provider of CRE listing databases and information services under the CoStar Group umbrella. CoStar Realty is a corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal office and principal place of business located at 1331 L Street, NW, Washington, District of Columbia 20005.

7. LoopNet, Inc. ("LoopNet") was a wholly owned subsidiary of CoStar Group and a provider of CRE listing databases and information services under the CoStar Group umbrella. LoopNet was, prior to January 1, 2017, a corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware with its principal office and principal place of business located at 101 California Street, 43rd Floor, San Francisco, California 94111. On January 1, 2017, LoopNet merged into CoStar Realty, and CoStar Realty is therefore the successor in interest as to LoopNet's liabilities.

## JURISDICTION, VENUE, AND COMMERCE

8. This Court has subject matter jurisdiction over this action and counterclaim pursuant to 28 U.S.C.A. §§ 1331 and 1337 because this is a civil action involving claims that arise under the federal laws of the United States, including the Sherman Act, 15 U.S.C.A. §§ 1-2, the Lanham Act, 15 U.S.C.A. § 1125, and other laws regulating commerce and protecting trade and commerce against restraints and monopolies.

54

9.     In addition, pursuant to 28 U.S.C.A. § 1367, this Court has supplemental jurisdiction over the state law causes of action asserted, which are defamation (libel) and injurious falsehood.

10.     Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391, and because the counterclaims arise out of the transactions and occurrences that are the subject matter of Plaintiffs' claims.

11.     The CoStar Companies sell and license CRE information services and CRE listings database products to customers throughout the world, across state lines and international boundaries.  The CoStar Companies are engaged in interstate and foreign commerce and their activities substantially affect interstate and foreign commerce.

## THE RELEVANT MARKETS

12.     The CoStar Companies and Xceligent are direct competitors in the markets for CRE information services and CRE listings databases.

13.     Commercial real estate or "CRE" consists of land or real property with or without any structures, fixtures, or other improvements of any kind, used at any time, suitable for use, or offered for sale or lease solely or primarily for retailing, manufacturing, shipping, governmental, the exploitation of natural resources, commercial, or business purposes of any kind.  CRE also includes residential structures containing five or more units used as short-term residences (*e.g.*, hotels and motels) or as long-term residences (*e.g.*, condominium and apartment buildings).  *See* FTC Order (Ex. A) at 3.

14.     The CoStar Companies and Xceligent each offer a variety of CRE products for the purpose of offering, selling, leasing, licensing, or otherwise providing data or other information from or access to databases containing CRE listings or CRE information, together

with services and product support relating primarily to the offering, sale, lease or other provision of CRE information services or CRE listings databases.

15. "CRE information services" includes services that provide detailed, property-level information (*e.g.*, information about specific real property or structures) about CRE that is gathered and made available primarily to enable customers to locate, research, or evaluate CRE property in connection with potential transactions. CRE information provided by such services includes, but is not limited to, CRE addresses, the prices at which property has been offered for lease or sale, the prices at which comparable property has been offered, leased or sold in the past, lease histories, property descriptions, detailed floor plans, photographs, tenant history, and vacancy rates. *See* FTC Order (Ex. A) at 4.[1]

16. A "CRE listing database" is an organized collection of information concerning CRE available or "listed" for lease or for sale, whether stored digitally, electronically, magnetically, or in any other format. The information includes, but is not limited to, CRE addresses, lease rate or sale price, square footage, photographs, narrative descriptions of the property, and Representative's contact information. *See* FTC Order (Ex. A) at 4.

17. The CRE "listing" itself, in this context, is simply the marketing record of a property that is or was offered for lease or sale. The listing contains only the property's basic characteristics, including, for example, property type (*e.g.*, industrial, office, or retail), year built, available square footage, lease rate or sale price, an image or flyer of the property, a narrative

---

[1] CRE information does not include: (i) CRE market analyses, market forecasts, or market projections prepared based upon collected CRE information; (ii) software applications or products (and any related software integration services) offered for sale or lease, or sold or leased separately, from data relating to CRE; or (iii) information or databases relating to the rental or leasing of residential units in residential structures containing five or more residential units, or the sale of individual units in such structures, which information or databases are not used by purchasers or sellers (or agents for purchasers or sellers) of residential structures containing five or more residential units to locate, research, or evaluate CRE, or to list CRE for sale or lease.

56

description of the property, and contact information for the broker or owner representing the property.

18.     CRE products offered by the CoStar Companies include or have included, but are not limited to, CoStar branded products such as CoStar Property, CoStar COMPS, CoStar Tenant ("CoStar Products"), and LoopNet branded products such as the freemium LoopNet product, and premium subscription fee products LoopNet Premium Lister, and LoopNet Premium Searcher ("LoopNet Products"). The CoStar Companies also offer website hosting services LoopLink and CoStar Connect.

19.     Xceligent has developed its own CRE products to compete with CoStar, including but not limited to Xceligent CDX, CommercialSearch, CommercialSearch Preferred, Xceligent Direct, and Xceligent Market Direct.

20.     These products offered by the CoStar Companies and by Xceligent can be categorized as either a CRE information service product or a CRE listings database product:

   A.     The CoStar Products and Xceligent CDX are private CRE information service products offered on a subscription fee basis to CRE industry participants, including brokers and other industry professionals, as well as owners, potential buyers, tenants, investors, and other interested parties. The products serve the intended and primary purpose of enabling customers to locate, research, and evaluate CRE property.

   B.     The LoopNet Products, CommercialSearch, and CommercialSearch Preferred are CRE listings database products that include publicly available freemium products and premium products offered on a subscription fee basis that are marketed to brokers and other industry professionals, as well as a broader cross section of owners, potential buyers, tenants and investors. The products serve the intended and primary

57

purpose of allowing brokers to market their properties for sale or lease to the general public.

C. LoopLink, CoStar Connect, and Xceligent Direct are CRE listing database products that provide website hosting services which give brokers the ability to integrate the broker's specific listings content into the broker's own publicly viewable website utilizing the listing database functionality offered on the one hand by the CoStar Companies (LoopLink and CoStar Connect), and on the other by Xceligent (Xceligent Direct).[2]

A. **CRE Information Services Product Market and the Sub-Market for National Customers.**

21. CRE information services products provide customers with in-depth information about specific properties, which is necessary for accurate evaluation of potential transactions, and to compare similar properties based on location and value. *See* FTC Complaint (Ex. B) at 3.

22. There is no reasonable substitute for CRE information services products. Without CRE information services, customers would be forced to rely on fragmented acquisition of CRE information, including through the hiring of third-parties to perform extensive and detailed building measurements, researching public records for past sale and lease histories, and by contacting other industry participants individually and in a piecemeal fashion to obtain relevant information. In many cases, customers would not even know how best to begin acquiring CRE information in a market. Lack of access to CRE information services would result in multiple customers each expending resources to conduct the same exact research. Consequently, if a hypothetical monopolist having control over the CRE information services market imposed a

---

[2]    *See* FTC Complaint, *In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.*, Docket No. C-4365 ("FTC Complaint") at 3, a true and correct copy of which is attached as Exhibit B and incorporated here by reference. .

58

five percent price increase over competitive prices, customers would not substitute away from the use of CRE information services products.

23. The potential customer base is comprised of (i) brokers, developers and owners, which account for approximately half of the potential market, in terms of revenue, and (ii) other industry participants, including, without limitation, financial services, institutional investors, REITS, pension funds, government, service providers, appraisers, and banks, which account for the remaining share of the potential market (also approximately half of the potential market, in terms of revenue).

24. This potential customer base for CRE information services is generally finite. The number of brokers, developers, owners and other CRE industry participants who need and will pay for CRE information services does not fluctuate in any significant way. Every competitor in the CRE information services market is competing for the same customers.

25. The product market, however, includes an identifiable sub-market for "national customers," which specifically include the largest CRE brokerages who are active in all major U.S. metropolitan areas, along with institutional investors that need access to national CRE information services. National customers require access to data and research across the United States, though—absent CoStar's anticompetitive conduct—customers can purchase that data from multiple providers. For example, an institutional investor may need to evaluate the investment potential of nationwide CRE or a Real Estate Investment Trust, or a broker may need to help a customer select a metropolitan area for their next purchase or lease (rather than simply a purchase or lease in a pre-selected metropolitan area).

26. These nationwide customers are readily identifiable to CRE information services providers, which allows them to price discriminate. Nationwide brokers operate in all or nearly

all the largest 65 United States' metropolitan areas, have hundreds of publicly-listed offices across the United States, and require hundreds of unique CRE information services logins for their employees. In contrast, non-nationwide brokers have much smaller geographic footprints and require fewer logins for their employees. Similarly, nationwide institutional investors can often be identified by the name of the company subscribing for service, or through a *de minimis* amount of additional research.

27. The CRE information services market is characterized by a high cost of entry into the market. For example, to offer CRE information services in a metropolitan area, a CRE information services provider must have comprehensive data and analytics on all CRE properties in the metropolitan area. This high cost of entry compels market participants to serve a material number of national customers to fund the business of providing information services products. This is due to the varying geographic coverage needs of potential customers, which, as discussed below, can be as broad as the U.S. (in the case of nationwide customers) or as narrow as a city neighborhood.

28. For example, looking at the first category of potential customers—brokers, developers and owners—in general, for any given local market, approximately half of these potential customers are interested in local services only. The remainder requires regional or national coverage, which can be purchased from different providers. Turning to the second category of potential customers, the "other industry participants", of these potential customers almost all require national scale, with the exception of the appraisal industry, which functions similar to the broker industry in that larger firms require national coverage, while only the smaller, local firms are in the market for local only services. The remainder of other industry participants, the financial service professionals, institutional investors, REITS, pension funds,

government service providers, and most banks, all generally, and with limited exception, require national coverage. All told, these market realities dictate that any CRE information services provider achieve national scale to profitably cover its fixed costs.

29.     The CRE information services market therefore has a high entry barrier that operates to deter any potential entrant. To date, Xceligent's owners have invested well over $150 million to build out and maintain Xceligent's CRE information services database and achieve its current level of coverage. But CoStar has prevented Xceligent from achieving complete or even near complete national coverage. CoStar, on the other hand, has already achieved national scale, and is the only company that has done so in the CRE information services market. As CoStar boasts in its Amended Complaint, the conglomerate has spent in excess of $5 billion to achieve and maintain this scale. But CoStar also oftentimes avoided the initial burden of building out an entire local data set from scratch, as they were able to rely on internal databases from large brokerage firms that had been developed over many years or by acquiring competitors in the markets as their starting point in a market.

**B.      CRE Listings Database Product Market and the Sub-Market for National Customers.**

30.     CRE listings database products provide two-sided online catalogues of CRE availabilities that not only allow industry professionals to both publish and search for CRE space available for sale and for lease, but also allow the general public an opportunity to search on their own for CRE space available for sale and for lease. *See* FTC Complaint (Ex. B) at 3.

31.     There is no reasonable substitute for CRE listings database products. Without access to a CRE listings database, customers would be forced to rely on fragmented marketing of CRE listings through individual brokerage websites, mailings, personal phone calls, and e-mails. To reduce some of the significant inefficiencies with such an inefficient undertaking, customers,

and brokers in particular, would need to create their own collection of CRE listings available for lease and sale (albeit one that would routinely be out of date) in order to meet client needs. Accordingly, if a hypothetical monopolist who had control over the CRE listings database product market imposed a five percent price increase over competitive prices, customers would not substitute away from the CRE listings database product.

32.     In contrast to the CRE information services market, the potential customer base for CRE listings database products is broader and includes the brokers, owners, developers, and certain other industry participants that are in the market for CRE information services, as well as the intended marketplace of tenants or buyers in the market for CRE property for lease or sale. Access to listings databases is essential to the business of these CRE industry participants "in order to publicize and locate available properties to meet their clients' needs", or their own needs.[3]

33.     Like the CRE information services product market, the CRE listings database product market also includes an identifiable sub-market for "national customers," which specifically include the largest CRE brokerages who are active in all major U.S. metropolitan areas, along with national and international buyers and investors pursuing investment opportunities nationwide. These national customers require access to listings databases across the United States, though they can purchase these from different providers.

34.     These nationwide customers are readily identifiable to CRE information services providers, which allows them to price discriminate. Nationwide brokers operate in all or nearly all the largest 65 United States' metropolitan areas, have hundreds of publicly-listed offices across the United States, and require hundreds of unique CRE information services logins for

_____

[3]        FTC Complaint (Ex. B) at 3.

62

their employees. In contrast, non-nationwide brokers have much smaller geographic footprints and require fewer logins for their employees. Similarly, nationwide institutional investors can often be identified by the name of the company subscribing for service, or through a *de minimis* amount of additional research.

35. The CRE listings database product market is characterized by a high cost of entry that compels market participants to serve a material number of national customers to cover their fixed costs. Like in the CRE information services product market, a CRE listings database provider must achieve national scale to fund its business.

36. The time and cost associated with researching, building and maintaining a listings database with complete or near complete coverage of sale and lease opportunities on a national scale presents a high entry barrier to the ability to compete in the CRE listings database market. This is an entry barrier that LoopNet has largely avoided through the evolution of an industry work flow through which brokers, who have largely grown to rely upon LoopNet, generate listings content for LoopNet. Nearly all the listings content available on LoopNet (including through the LoopLink webhosting product) is originally generated by brokers themselves uploading and updating listings content. Although brokers desire to have their listings content available through all available marketing resources, they do not have the time or resources to upload and update listings content on multiple databases. Accordingly, for any listings database provider to compete with LoopNet, the provider must build the listings database on its own through independent research, or with listings content simply forwarded by brokers for the provider to update and upload. In the latter circumstance, brokers believe and expect that other CRE listings database providers can and will use the brokers' own listings to access the brokers'

63

listing information, including any listings on LoopNet and any listings on the brokers' own LoopLink hosted website.

37.    Accordingly, access to existing broker and owner listings, and in particular to the factual information that is available within broker and owner listings, is essential to the business of CRE listings database providers and also is a critical input for CRE information services providers. *See* FTC Complaint (Ex. B) at 3.

### C.    The Relevant Geographic Scope of the Product Markets is a Metropolitan Area.

38.    Geographic coverage needs for CRE listing databases and CRE information services vary across customers—it can be as broad as the U.S. or as "narrow as a city neighborhood."[4]

39.    However, very few customers view CRE information from different metropolitan areas as substitutes for one another, and the same may be said of CRE listings.

40.    Accordingly, for customers of CRE information services, a metropolitan area is a relevant geographic market. Before beginning their search, CRE information services customers have often narrowed down their research needs to a particular metropolitan area. For example, they need to know past prices paid for CRE buildings in the Kansas City metropolitan area, and past prices for CRE buildings in Little Rock, Arkansas would likely be irrelevant (or relevant only as a comparison and thus a complement, and not a substitute, for information about past prices in Kansas City).

---

[4]    FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment ("FTC Analysis"), In the Matter of CoStar Group, Inc., 2 ("Real estate brokers, lenders, investors, developers, appraisers, government agencies, and others connected to the CRE industry require listings databases and information services with geographic coverage that corresponds to their unique scope of operations. The coverage needs of a given customer may be as broad as the entire United States, or as narrow as a city neighborhood."). A true and correct copy of the FTC Analysis is attached as Exhibit C, and incorporated here by reference.

64

41.     Thus, if a hypothetical monopolist that offered the only CRE information services product covering a particular metropolitan area increased prices by five percent over competitive prices, then a sufficient number of non-nationwide customers would accept the price increase rather than switch to a CRE information services in a different metropolitan area (which could necessitate a decision to move their business).

42.     Similarly, for customers of CRE listings databases, a metropolitan area is a relevant geographic market.  As with CRE information services customers, CRE listings database customers have often narrowed down their research needs to a particular metropolitan area, many CRE listings database customers have often narrowed their desired geography to a particular metropolitan area, *e.g.*, the Kansas City metropolitan area.  For example, a restaurant chain may have made a decision to expand their business to the Kansas City metropolitan and are looking for property to lease, and thus, a property in the St. Louis metropolitan area is not a substitute.  Or a dentist already in Kansas City is looking for a new building to operate her pre-existing business—a building in the Des Moines metropolitan area would be unsuitable as her current dental patients customers would not drive to Des Moines from Kansas City for dental care.

43.     Moreover, these customers have chosen a particular metropolitan area based on criteria unrelated to the price of CRE listing databases—for example, they already have decided that the best location to serve their customers is the Kansas City metropolitan area.

44.     Thus, if a hypothetical monopolist that offered the only CRE listings database product covering a particular metropolitan area increased prices by five percent, then a sufficient number of customers would accept the price increase rather than switch to a CRE listing

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 65 of 139

database in a different metropolitan area (which could necessitate a decision to move their business).

45.     Moreover, as discussed above, a CRE information services provider or CRE listings database provider must achieve national scale in order to fund its business. To achieve national scale, a CRE information services provider or CRE listings database provider must achieve complete or near complete data coverage for all CRE properties, and all current sale and for lease listings in the largest 60 metropolitan areas having a population greater than 900,000. These metropolitan areas include the following:

| New York-Northern New Jersey-Long Island, NY-NJ-PA | Denver-Aurora, CO | Memphis, TN-MS-AR |
|---|---|---|
| Los Angeles-Long Beach-Santa Ana, CA | Pittsburgh, PA | Louisville-Jefferson County, KY-IN |
| Chicago-Naperville-Joliet, IL-IN-WI | Portland-Vancouver-Beaverton, OR-WA | Richmond, VA |
| Dallas-Fort Worth-Arlington, TX | Cincinnati-Middletown, OH-KY-IN | Oklahoma City, OK |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | Sacramento-Arden-Arcade-Roseville, CA | Hartford-West Hartford-East Hartford, CT |
| Houston-Sugar Land-Baytown, TX | Cleveland-Elyria-Mentor, OH | New Orleans-Metairie-Kenner, LA |
| Miami-Fort Lauderdale-Pompano Beach, FL | Orlando-Kissimmee, FL | Buffalo-Niagara Falls, NY |
| Atlanta-Sandy Springs-Marietta, GA | San Antonio, TX | Birmingham-Hoover, AL |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | Kansas City, MO-KS | Salt Lake City, UT |
| Boston-Cambridge-Quincy, MA-NH | Las Vegas-Paradise, NV | Raleigh-Cary, NC |

66

| | | |
|---|---|---|
| Detroit-Warren-Livonia, MI | San Jose-Sunnyvale-Santa Clara, CA | Rochester, NY |
| Phoenix-Mesa-Scottsdale, AZ | Columbus, OH | Tucson, AZ |
| San Francisco-Oakland-Fremont, CA | Indianapolis-Carmel, IN | Tulsa, OK |
| Riverside-San Bernardino-Ontario, CA | Charlotte-Gastonia-Concord, NC-SC | Fresno, CA |
| Seattle-Tacoma-Bellevue, WA | Virginia Beach-Norfolk-Newport News, VA-NC | Honolulu, HI |
| Minneapolis-St. Paul-Bloomington, MN-WI | Austin-Round Rock, TX | Bridgeport-Stamford-Norwalk, CT |
| San Diego-Carlsbad-San Marcos, CA | Providence-New Bedford-Fall River, RI-MA | Albany-Schenectady-Troy, NY |
| St. Louis, MO-IL | Nashville-Davidson-Murfreesboro-Franklin, TN | New Haven-Milford, CT |
| Tampa-St. Petersburg-Clearwater, FL MSA | Milwaukee-Waukesha-West Allis, WI | Albuquerque, NM |
| Baltimore-Towson, MD | Jacksonville, FL | Omaha-Council Bluffs, NE-IA |

## COSTAR HAS MONOPOLY POWER IN EACH RELEVANT MARKET

A. **Development of National Electronic CRE Databases and Services, Dominated Exclusively by CoStar and LoopNet.**

46.     Unlike the numerous multiple listing services ("MLS") that had developed and long been available to the residential property marketplace, CoStar Group has long been the only source of centralized commercial property data.

47.     Before CoStar emerged as a national competitor, the CRE industry relied primarily on internal research databases internal to each brokerage for the aggregation of CRE information, limited largely to the brokerages own current and past (historical) property listings.

67

48.     Gradually, in the late 1980s, a few local data providers began to appear in larger metropolitan statistical areas (MSAs), to offer the CRE industry a more centralized, although still highly localized source for CRE data.

49.     In 1987, Andrew Florance founded Realty Information Group, Inc. ("RIG"), to provide information services to the CRE community in the Washington D.C. area.

50.     Over the next decade, RIG became CoStar Group, and through a series of mergers and acquisitions, expanded to a national platform by acquiring the growing number of local data providers that were serving MSAs across the nation.  At the same time, and to help fuel its expansion, CoStar Group obtained the internal CRE databases of large, national brokerage firms in exchange for information and proactive research services.

51.     By the late 1990s, CoStar Group had become the largest national collector and distributor of CRE for-lease listings.  CoStar Group expanded into new markets, and where a competitor existed, CoStar Group would eventually drive out or buy out the competition.

52.     CoStar Group's acquisition of local data providers, coupled with data exchange agreements entered with large brokerage firms, helped supply CoStar Group with a substantial amount of CRE data. This allowed CoStar Group to oftentimes avoid the initial burden of building the entire property set from scratch, as they were able to rely on internal databases from large brokerage firms that had been developed over many years as the starting point in a market. Supplemented with proactive research to collect the CRE data that could not be traded for or acquired, CoStar amassed the largest collection of CRE data nationwide, and quickly became the only CRE information services provider in most major U.S. markets that offered a platform for industry professionals to conduct market research.  As a result, CoStar Group had become the de facto provider of CRE information services.

53.     Meanwhile, by the mid-1990s, LoopNet began to develop national prominence as the primary source for CRE industry professionals to market their properties for sale to the general public. This arrival of LoopNet altered the CRE data landscape, and shaped the way CRE industry professionals marketed their information and maintained their inventory of publicly marketed space.

54.     Originally, LoopNet was developed as a free listing site and search engine for CRE industry professionals and the public generally.  To that end, in 1999 LoopNet entered into an exclusive agreement with the National Association of Realtors® ("NAR") to "create one of the largest sources of commercial property listings and transaction-related tools and services available on the Internet."  Press Release, NAR, NAR and HomeStore.com Join LoopNet to Form Dominant Online Commercial Property Listing Source (Dec. 1, 1999).  Through the agreement, LoopNet joined "with several large commercial real estate brokerage companies, each of which will exclusively endorse the LoopNet.com site as its preferred national commercial listing service."  *Id.*  Most importantly, the LoopNet platform was to be "available without cost to the listing broker," thus assuring the NAR and its members "of [LoopNet's] intention to remain an industry-friendly site."  *Id.* (internal quotations omitted).

55.     As a result, nearly all brokerage firms, brokers and other listings professionals in the U.S. proceeded to modify their marketing and management strategy around LoopNet's nationally sponsored and free listing platform.  Brokers and owners uploaded their CRE listings directly to LoopNet, maintaining and updating the listings information through LoopNet.  Over time, many companies shifted the process of managing their listing inventories from an internal database to using LoopNet's online system, relying on LoopNet as the exclusive platform for the storage of their publicly marketed inventory.

56. LoopNet created a tool, called LoopLink, which allowed the general public to search a company's listing inventory housed in LoopNet directly on the company's website. LoopLink quickly became the most widely used tool to power the websites of the largest firms in the U.S.

57. This caused many listings professionals to become dependent on LoopNet not merely as a marketing platform for listings, but as a repository of broker-owned company listing data, as they did not have the manpower to keep two versions current. For many, the only comprehensive and up to date inventory of their listings is in LoopNet.

58. The firms using LoopLink and CoStar Connect to power their websites now represent approximately 30% of the total square footage of the US commercial real estate inventory. Access to these listings, and in particular to the factual information that is available within the listings, is essential to the business of CRE listing database providers. If these listings available through LoopLink and CoStar Connect hosted websites are not available to CoStar competitors, it will be impossible for any business to compete with CoStar in the CRE listings database market, because, in many cases, the only copies the broker has of his or her listings are those copies available through a LoopLink hosted website.

59. Eventually, most CRE industry professionals relied on CoStar Group for their CRE information service needs and on LoopNet (at the time a separate company) for their CRE listings database needs. CoStar Group dominated the former market, while LoopNet dominated the latter. Both companies held effective monopolies in their respective markets.

60. Over the period of 1995 to 2003, numerous companies attempted to develop alternative products to those offered by CoStar Group and LoopNet. These potential competitors all failed in either the listings database or information services markets, with some citing

70

anticompetitive conduct on the part of CoStar Group as the reason for exiting the CoStar Group dominated information services market. By about 2003, only three viable companies providing services in at least 5 markets remained: CoStar Group, LoopNet, and the one remaining company new to the marketplace, Xceligent.

## B. CoStar's History of Inorganic Growth Through the Acquisition of Competitor Data Providers.

61. CoStar Group's dominant position has been acquired and maintained over time through a shrewd merger and acquisition strategy to slow and diminish market entry and competitor expansion.

62. The adolescent and young adult years of CoStar Group are marked by a series of substantial acquisitions through which CoStar Group expanded its market share in both the CRE listings database and CRE information services markets.

63. CoStar Group's acquisitions have primarily targeted upstart and established companies that were, or threatened to become competitors in the CRE industry. As a result, not only has CoStar Group's share of the listings database and information services markets increased substantially, but market competition has nearly been eliminated.

64. From 1994 to 1999, CoStar Group made significant acquisitions of local and regional CRE data providers across the nation, including, without limitation, Space Data Graphics Inc., (1994, serving the New York metropolitan area)[5], New Market Systems (1997, serving the San Francisco metropolitan area)[6], Core Data Services (1998, serving the Houston

---

[5] *See* Douglas Fruehling, *The skyline's the limit*, Washington Business Journal, May 12, 1997, *available at* http://www.bizjournals.com/washington/stories/1997/05/12 /focus1.html.
[6] *See* Adam Feuerstein, *Big RIG pulls real estate research vehicle into Bay Area*, San Francisco Business Times, Aug. 17, 1997, *available at* http://www.bizjournals.com/ sanfrancisco/stories/1997/08/18/ newscolumn1.html.

metropolitan area)[7], Leasetrend, (1999, serving the Charlotte, Cincinnati, Cleveland, and Columbus metropolitan areas)[8], and Jamison Research (1999, serving the Atlanta and Dallas-Ft.Worth metropolitan areas)[9]. On information and belief, CoStar Group also acquired during this time period CRE data providers in Chicago, Boston and San Fransisco.

65. CoStar Group has focused its inorganic growth strategy not only on the opening of new markets to establish a national presence, but also on the accumulation of data. In 1999, CoStar Group acquired COMPS.COM by merger in a deal valued by CoStar Group at approximately $102 million. Through the acquisition of COMPS.COM, CoStar Group bought a substantial volume of comparable sales information[10], namely, a database of over 400,000 commercial real estate transactions totaling over $466 billion, which was servicing approximately 20,000 CRE industry participant customers. *See* Press Release, CoStar Group, Inc., CoStar Group to Acquire COMPS.COM for $102 Million (Nov. 4, 1999) (available on Westlaw).

66. CoStar Group continued its inorganic growth strategy with the acquisition of REAL-NET in 2002, opening the Portland and Pacific Northwest markets to CoStar Group. *See* Aimee Curl, *CoStar to acquire Portland-based REAL-NET*, Daily Journal of Commerce, Sept.

---

[7] *See* Lynn J. Cook, *Top real estate data company enters market with acquisition*, Houston Business Journal, Aug. 23, 1998, *available at* http://www.bizjournals.com/houston /stories /1998/08/24/story5.html.

[8] *See* Around the Region, The Washington Post, Dec. 27, 1999, *available at* 1999 WLNR 89160009.

[9] *See* Press Release, CoStar Group, Inc., CoStar Group Successfully Integrates Dallas/Ft.Worth Property Data From Jamison Research Acquisition (Sept. 13, 1999) (available on Westlaw).

[10] "Comparable sales information" refers to property sales records that are used by CRE industry participants (brokers, buyers, sellers, lenders, etc.) to evaluate the market value of a property based on comparison of the property to other properties with similar characteristics in the local area that have been recently sold.

24, 2002, *available at* http://djcoregon.com/news/2002/09/24/costar-to-acquire-portlandbased-realnet/.

67.     CoStar Group's acquisition of Peer Market Research, Inc. ("PeerMark") in 2004 is another exemple.  PeerMark was competing head-to-head with CoStar Group in the Nashville and Memphis, Tennessee markets.  By buying out PeerMark, CoStar Group removed its main competitor.  Of course, included in the transaction was PeerMark's established database of CRE information, which CoStar added to the numerous other local databases bought over the years. Press Release, CoStar Group, Inc., CoStar Group Completes PeerMark Acquisition (May 4, 2004) (available on Westlaw).

68.     Soon after the acquisition of PeerMark, CoStar Group expanded its position in Denver with the acquisition of burgeoning competitor RealComp, buying the company's 32 clients, "more than 5000 records and seven years of historical comparable sales data." Press Release, CoStar Group, Inc., CoStar Acquires Denver Information Provider (Sept. 21, 2004) (available on Westlaw).

69.     By 2005, CoStar Group had acquired CRE data covering over "457,000 office and industrial properties in the U.S."  On January 20, 2005, CoStar Group announced it would add over 200,000 retail properties to its database that year.  To achieve this, CoStar Group first acquired National Research Bureau for $4.1 million cash, which at the time was the "leading provider of property information to the shopping center industry."  With this purchase, CoStar Group bought "the most comprehensive database of information on 40,500 shopping centers totaling over 4.8 billion square feet of Gross Leasable Area," plus information on over "70,000 property owners and leasing contacts and over 500,000 retail tenants throughout the U.S."  Press

Release, CoStar Group, Inc., CoStar Launches Major Expansion into Retail Real Estate Sector (Jan. 21, 2005) (available on Westlaw).

70.    The history behind CoStar Group's acquisition of First CLS, Inc., in 2008 is revealing.  In 2000, First CLS, Inc. was established to directly compete with CoStar Group in the Atlanta market, solely at the local level.  Tony Wilbert, *Online Service to Track Vacancies*, Atlanta Journal Constitution, June 6, 2000, at D2.  In 2006, First CLS, Inc. partnered with Xceligent to increase its competitive capabilities. The Xceligent partnership helped First CLS, Inc. significantly increase its market presence.  In 2008, CoStar Group bought out First CLS, Inc., thereby eliminating the competition, and acquiring First CLS, Inc.'s customers, who were all shifted to CoStar Group's products.  *See* CoStar absorbs Dorey Cos., DoreyPro, Atlanta Business Chronicle, Apr. 2, 2008, *available at* http://www.bizjournals.com/atlanta/stories/2008/03/31/daily27.html.

71.    In 2009, CoStar Group followed the First CLS, Inc. acquisition with the acquisitions of Property and Portfolio Research, Inc. (PPR),  a "provider of global real estate analysis, market forecasts and credit risk analytics to the commercial real estate industry," and Resolve Technology, a "provider of business intelligence and portfolio management software serving the institutional real estate investment industry."  Press Release, CoStar Group, Inc., CoStar Group Acquires Property & Portfolio Research, Inc. (July 20, 2009) (title shortened) ("PPR Release") (available on Westlaw); Press Release, CoStar Group, Inc., CoStar Group Acquires Resolve Technology (Oct. 20, 2009) (title shortened) ("Resolve Release") (available on Westlaw).   Both acquisitions are symbolic of CoStar Group's inorganic growth strategy, leveraging a "strong financial position by acquiring companies that can position it for strong future growth."  PPR Release.  The acquisition of Resolve Technology, for example, included

74

the acquisition of new customers from the ranks of "real estate advisory and investment management firms, REITs, pension funds, and life insurance companies"—CRE industry participants that are "engaged in direct real estate investments". Resolve Release.

72.     As discussed in greater detail below, in 2012, CoStar Group closed on its acquisition of LoopNet in a partially horizontal, partially vertical acquisition that, as initially structured, drew complaint from the FTC for violations of antitrust laws.

73.     Not long after the LoopNet acquisition was closed, on March 3, 2014, CoStar Group announced its acquisition of Apartments.com for $585 million in cash. Through this purchase, CoStar Group bought an already established internet company operating several websites designed to market properties to prospective renters on behalf of owners and property managers. Of course, as with CoStar Group's acquisition of LoopNet, as part of the acquisition of Apartments.com, CoStar Group bought and paid for the collection of CRE data regarding apartment buildings already amassed by Apartments.com. *See* Press Release, CoStar Group, Inc., CoStar To Acquire Apartments.com (Mar. 3, 2014) (available on Westlaw).

74.     The above acquisitions are representative of CoStar Group's expansion strategy: buying up competitors and growing its database of CRE information through merger and acquisition agreements, amassing market power with the strike of a pen. As one journalist has reported, CoStar's "expansion—more than 20 acquisitions in nearly 30 years—comes as some in the real estate industry grow increasingly leery of the data behemoth's market power." Konrad Putzier, *CoStar's Crusade*, The Real Deal (Aug. 1, 2016), *available at* https://therealdeal.com/issues_articles/costars-crusade/.

> **C.     CoStar's Anticompetitive, Partially Horizontal and Partially Vertical Acquisition of LoopNet.**

75

75.     In 2011, following a series of legal battles between CoStar Group and LoopNet, CoStar Group announced plans to acquire LoopNet.

76.     Because only three multi-market companies remained to compete in the CRE listings database and CRE information services markets, CoStar Group's move to acquire LoopNet raised significant concern and opposition from within the CRE community. Hundreds of commercial real estate professionals across the country petitioned the Federal Trade Commission ("FTC") to block the acquisition.

77.     By this time, LoopNet also held 100% of the preferred stock in Xceligent, and since CoStar Group, LoopNet and Xceligent were the only remaining competitors in the CRE listings database and CRE information services markets, CoStar Group's plan to buy LoopNet held significant anticompetitive potential. Investigation by the FTC ensued.

78.     Following an intensive merger review investigation, the FTC issued an administrative complaint challenging the proposed transaction as anticompetitive, and charging CoStar Group and LoopNet with violations of Section 5 of the FTC Act, 15 U.S.C.A. 45, and Section 7 of the Clayton Act, 15 U.S.C.A. 18, asserting grounds that the merger (a) would eliminate "actual, direct and substantial competition between CoStar and LoopNet and between CoStar and Xceligent;" and (b) would increase "the likelihood that CoStar will exercise market power unilaterally." FTC Complaint (Ex. B) at 3-4.

79.     Negotiations followed among the FTC, Xceligent, CoStar Group, and LoopNet in order to resolve the complaint, and a proposed consent order emerged to settle the charges that CoStar's planned acquisition of LoopNet violated antitrust laws as anticompetitive. *See* Press Release, Federal Trade Commission, FTC Places Conditions on CoStar's $860 Million

Acquisition of LoopNet (April 26, 2012) ("FTC Press Release"), a copy of which is attached as Exhibit D and incorporated here by reference.

80. At its core, and because access to CRE data is critical to CRE industry participants, the proposed consent order was intended to "maintain[] Xceligent as an independent competitor and ensur[e] Xceligent's ability to grow and expand" and to "foster continued competition in [listings databases and information services] markets." Press Release, Federal Trade Commission." FTC Press Release (Ex. D). The FTC required the divestiture of Xceligent, since it was the only multi-state direct competitor to CoStar, and Xceligent was given time to find an investor to fund expansion as a condition to CoStar's acquisition of LoopNet.

81. The proposed consent order was then the subject of a 30-day public comment period, during which numerous CRE industry participants wrote to the FTC to express their concerns over the proposed merger, its anticompetitive impact, and the monopolization of the CRE information services and database listings that could result.

82. For example, Ronald Fredette, of KW Commercial, expressed the following concerns:

> The merger of Costar + LoopNet is anti-competitive and will create a monopoly. This is not in the best interests of Commercial Real Estate Service Providers, the General Public and the Commercial Real Estate Community. The Commercial Real Estate Service Providers, the General Public and the Commercial Real Estate Community are critically dependent on service providers such as Costar and LoopNet….LoopNet and Costar are considered to be the only genuine and reliable providers of these critical services on a nationwide basis. To allow a merger of these two companies will create a monopoly. Excelligent [sic] while developing with similar services, has only 33 markets, and is not considered to be a genuine nationwide data source for these critical and necessary services currently provided only by Costar and LoopNet. In the event that Costar and LoopNet are allowed to merger [sic], the users of these data services will be held captive to anti-competitive pricing. The integrity of these critical data services that the Commercial Real Estate Service Providers, the General Public and the Commercial Real Estate Community so desperately depend on will be compromised. This merger is considered anti-competitive, [will] create a

monopoly, will stagnate growth and cause irreparable harm and damage to a dependent general public and a recovering Commercial Real Estate Market.

Comment from Ronald Fredette, KW Commercial, New Hampshire, to Proposed Consent Agreement In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc., FTC File No. 1110172 ("Proposed Consent Agreement") (April 30, 2012), a copy of which is attached as Exhibit E and incorporated here by reference (also available at https://www.ftc.gov/policy/public-comments/comment-00004-20).

83. Comments of William Dator, Coldwell Banker, included the following:

The Co-Star Loopnet merger will prevent a large number of commercial real estate brokers from access to the market now served by Loop-Net. Co-Star must not be permitted to require every licensee in an office to pay their fees before they will grant access to the commercial brokers. This merger will give Co-Star a virtual monoply [*sic*] on how commercial real estate is marketed in the United States and I strongly urge the FTC to fully investigate Co-Star's past actions and future plans. This merger should be rejected. Thank You.

Comment from William Dator, Coldwell Banker, Ramsey, New Jersey, to Proposed Consent Agreement (April 27, 2012), a copy of which is attached as Exhibit F and incorporated here by reference (also available at https://www.ftc.gov/policy/public-comments/comment-00003-25).

84. Approving of the order based on its goal of promoting competition between CoStar and Xceligent, Tim Strange, of Sperry Van Ness and William T. Strange & Assoc., commented:

CRE listings databases and information services are critical to the commercial real estate industry. We want to see Xceligent as an independent competitor with the ability to grow and expand. This settlement order will foster continued competition.

Comment from Tim Strange, Sperry Van Ness and William T. Strange & Assoc., to Proposed Consent Agreement (May 4, 2012), a copy of which is attached as Exhibit G and incorporated here by reference (also available at https://www.ftc.gov/policy/public-comments/comment-

78

00011-17).

85.     On August 29, 2012, the proposed consent order, with some slight revision, was approved and formally issued by the FTC.  *See* FTC Order (Ex. A).

86.     The FTC Order placed numerous and significant conditions on the acquisition of LoopNet by CoStar Group.

87.     Not later than five calendar days following the closing and final consummation of the acquisition, CoStar Group was required to divest to DMG Information, Inc. ("DMGI") all rights, title, and interest in Xceligent owned by LoopNet, all of LoopNet's rights, title, and interest in (i) Commercialsearch.com, and (ii) certain customer data held by LoopNet.  FTC Order (Ex. A) at 10.

88.     This divestiture was accomplished pursuant to a Purchase Agreement entered as of March 28, 2012, among Xceligent, LoopNet, Xceligent Holdings, Inc., DMGI, and CoStar.

89.     As recited in the FTC Order:

> The purpose of the divestiture of the Xceligent Interest and the LoopNet Assets is to preserve Xceligent as an independent, viable, and effective competitor in the relevant markets in which Xceligent was engaged at the time of the announcement of the Acquisition, to facilitate Xceligent's expansion of its product line and its geographic coverage, and to remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's Complaint.

FTC Order (Ex. A) at 14.[11]

90.     In addition to the required divestiture, the FTC Order placed numerous procompetitive restrictions on the conduct of CoStar Group and LoopNet, whether acting directly or indirectly, or through any corporate device, in connection with the actual or any

---

[11]     All capitalized terms in quotations from the FTC Order are defined as set forth in the Definitions section of the FTC Order at pages 2-9.

79

potential marketing, sale, or other provision of CRE listings or CRE information, including, although not limited to, the restrictions discussed below.

91.     First, CoStar Group and LoopNet were prohibited, for a period of five years after the FTC Order was issued, from prohibiting or restricting any customer from providing competitors, including Xceligent, with CRE listings or CRE information derived from sources other than certain CoStar Group owned databases; specifically, the CoStar Products, LoopNet Premium Lister, and LoopNet Premium Searcher.  As recited in the FTC Order:

> A.     For five (5) years after the Order Date, Respondents shall cease and desist from inviting, entering into, implementing, continuing, enforcing, or attempting or threatening thereto, any existing or future oral or written condition, requirement, policy, agreement, contract or understanding (in effect on the Order Date or that goes into effect after the Order Date) with any Customer that:
>
> > 1.     Directly or indirectly prohibits or restricts a Customer from providing any CoStar Competitor (including, but not limited to, the Acquirer and Xceligent) CRE Listings or CRE Information that relates to Represented Property or Nonrepresented Property, which CRE Listings or CRE Information was obtained or derived by the Customer from a source other than a CoStar Database.

FTC Order (Ex. A) at 14.

92.     Notably, neither the freemium version of LoopNet available to the public, nor LoopLink are identified as databases for which CoStar Group and LoopNet were permitted to maintain data sharing restrictions upon customers.

93.     Second, the FTC Order expressly bars CoStar Group and LoopNet, for a period of five years after issuance of the FTC Order, from in any way prohibiting *any* customer from becoming a customer of a competitor:

> A.     For five (5) years after the Order Date, Respondents shall cease and desist from inviting, entering into, implementing, continuing, enforcing, or attempting or threatening thereto, any existing or future oral or written condition, requirement, policy, agreement, contract or understanding (in

effect on the Order Date or that goes into effect after the Order Date) with any Customer that:

…

2.      Directly or indirectly prohibits a Customer from subscribing to any service provided by, or purchasing access to any database containing CRE Listings or CRE Information from, a CoStar Competitor.

FTC Order (Ex. A) at 15.

94.      Third, the FTC Order expressly bars CoStar Group and LoopNet, for a period of five years after issuance of the FTC Order, from prohibiting a customer from endorsing any competitor:

A.      For five (5) years after the Order Date, Respondents shall cease and desist from inviting, entering into, implementing, continuing, enforcing, or attempting or threatening thereto, any existing or future oral or written condition, requirement, policy, agreement, contract or understanding (in effect on the Order Date or that goes into effect after the Order Date) with any Customer that:

…

4.      Directly or indirectly prohibits a Customer from publicly endorsing or recommending that Persons subscribe to any service provided by, or purchase access to any database containing CRE Listings or CRE Information from, a CoStar Competitor.

FTC Order (Ex. A) at 14-15.

95.      Fourth, for five years after issuance of the FTC Order, CoStar and LoopNet were prohibited from suspending or terminating the provision of CRE listings or CRE information to customers pursuant to contract, except under limited circumstances. *See* FTC Order (Ex. A) at 16.

96.      In sum, CoStar and LoopNet were prohibited from suspending or terminating customers: (1) without consent of the customer, except with respect to persons who cease to be

81

agents or employees of a customer, or who allow others to use their accounts; (2) without obtaining a court order or arbitration award, and satisfying certain procedural requirements; (3) unless a good faith determination, recorded in writing, is made that the customer is violating intellectual property or valid use restrictions under the contract, and certain procedural requirements are followed, including a meet and confer in good faith; or (4) for failure to pay, unless notice of default is provided with an opportunity to cure, and notice of suspension or termination is provided five days prior to any action taken. *See* FTC Order (Ex. A) at 16-17.

97. These restrictions on CoStar Group's and LoopNet's authority to terminate customers at will are necessary to foster Xceligent as a competitor, to facilitate Xceligent's expansion, and to avoid the chilling effect on Xceligent's ability to compete if CoStar Group were, for example, able to terminate a customer for (i) doing business with both CoStar Group and Xceligent or both LoopNet and Xceligent, (ii) providing broker sourced CRE data to Xceligent, (iii) being a member of an Xceligent advisory board, or (iv) serving on Xceligent's board of directors.

98. Fifth, for five years after issuance of the FTC Order, CoStar and LoopNet were expressly prohibited from entering into certain tying arrangements with customers:

> F. For five (5) years after the Order Date, Respondents shall cease and desist from inviting, entering into, implementing, continuing, enforcing, or attempting thereto, or threatening to enforce any oral or written condition, requirement, policy, agreement, contract or understanding with any Customer that either explicitly or implicitly:
>
> > 1. Conditions the sale, lease, or license of, or the subscription to, one or more of Respondents' CRE Product Offerings to the sale, lease, or license of, or subscription to, one or more other of Respondents' CRE Product Offerings;
> >
> > 2. Conditions the sale, lease, or license of, or the subscription to, one or more of Respondents' CRE Product Offerings to the sale, lease, or license of, or subscription to, one or more of Respondents' CRE

Product Offerings in more than one CoStar Sales Market; or,

3.  Conditions the sale, lease, or license of, or the subscription to, one or more of Respondents' CRE Product Offerings to the sale, lease, or license of, or subscription to, one or more of Respondents' CRE Product Offerings in a different CoStar Sales Market.

FTC Order (Ex. A) at 18.

99.    Limited exceptions to the prohibition on tying arrangements are provided under the FTC Order, including with respect to offering LoopNet premium content on a national basis only, and offering commercially reasonable discounts and other incentives if a customer purchased more than one product, *see* FTC Order (Ex. A) at 18, but of course, CoStar and LoopNet also remain subject to Section 1 of the Sherman Act, 15 U.S.C § 1, and its prohibition against tying arrangements entered in restraint of trade, and Section 3 of the Clayton Act, 15 U.S.C. § 18, and its prohibition against exclusivity arrangements that "substantially lessen competition", among other legislative prohibits, and the FTC Order did not, and could not relieve CoStar or LoopNet of liability for violating any such prohibitions.

100.    Finally, the FTC Order expressly prohibits CoStar and LoopNet from discriminating against, penalizing, or otherwise retaliating against any customer for conducting business with any competitor, or otherwise interacting with a competitor in the manner for which the FTC Order provides express allowance.

101.    For example, termination of a customer's contract because the customer does business, or otherwise interacts with a competitor, including Xceligent, in the manner for which the FTC Order provides express allowance, is considered prohibited retaliation. *See* FTC Order (Ex. A) at 19-20.

102.    These numerous and comprehensive restrictions and prohibitions placed upon the conduct of CoStar Group and LoopNet as a condition of CoStar Group's acquisition of LoopNet

83

were essential to maintain a competitive marketplace in the CRE information services and CRE listings database markets.

103.    As the FTC explained, the FTC Order "requires the combined CoStar-LoopNet to take certain steps that will ensure that Xceligent is able to continue to compete and expand aggressively," and "is designed so that . . . [Xceligent] will be able to rapidly grow . . . into a more complete, national listings database and information services alternative to the merged CoStar-LoopNet."  FTC Press Release (Ex. D).

104.    In a marketplace reordered by CoStar Group's acquisition of LoopNet, the conduct condemned by the FTC Order is anticompetitive:  the conduct, if pursued by CoStar Group from its market position, would prevent Xceligent and other companies from competing, resulting in violation of the antitrust laws just as originally feared by the FTC when the acquisition was announced.

105.    The FTC Order sought to avoid those anticompetitive and illegal results by detailing the conduct Costar would have to avoid after acquiring LoopNet.

106.    Accordingly, noncompliance with the restrictions and prohibitions of the FTC Order would not merely constitute a violation of the FTC Order—problematic in its own respects—but would also be anticompetitive in violation of federal antitrust laws.  Unfortunately, CoStar has blatantly and repeatedly violated the FTC Order.

D.    **The CoStar Companies Enjoy Monopoly Positions In Both the CRE Information Services and CRE Listings Database Markets.**

107.    The customer base for both the CRE information services and CRE listings database markets is generally measured based upon "paid seats", which quantifies the number of separate accounts paid for within the market, with larger companies often paying for multiple

84

seats because generally only one individual is permitted to be associated with and use an account.

108.    In fiscal year 2016, the CRE information services market served, on information and belief, just over 115,000 paid seats nationwide.  Revenue from these paid seats eclipsed $425 million.

109.    On information and belief, CoStar's current share of paid seats in the CRE information services market is approximately 87%, or at least 100,000 paid seats, and easily the largest share of the market.

110.    Because of CoStar's anticompetitive conduct, CoStar has a near-100% share of the business of companies requiring nationwide coverage in the CRE information services market.

111.    In contrast, Xceligent's current share of paid seats in the CRE information services market is no more than 13%, or approximately 15,000 paid seats.  At that number, Xceligent holds the second largest number of paid seats in the CRE information services market

112.    CoStar therefore has monopoly power in the market for CRE information services, holding a current share of approximately 87% of the total market nationwide, as measured by paid seats.

113.    As for the CRE listings database market, in fiscal year 2016 the market served, on information and belief, just over 87,000 paid seats nationwide.

114.    On information and belief, CoStar's current share of paid seats in the CRE listings database market is approximately 99%, or approximately 87,000 paid seats, and easily the largest share of the market.  (Based on visitors, which may include customers without paid accounts, CoStar's LoopNet claims 5 million monthly visitors).

85

115. Because of CoStar's anticompetitive conduct, CoStar has a near-100% share of the business of companies requiring nationwide coverage in the CRE listings database market.

116. In contrast, Xceligent's current share of paid seats in the CRE listings database market is less than 1%, or less than 500 paid seats. (Based on visitors, which may include customers without paid accounts, Xceligent's CommercialSearch has approximately 300,000 monthly visitors).

117. Accordingly, CoStar also has monopoly power in the CRE listings database market, holding a current share of approximately 99% of the total market nationwide, as measured by paid seats.

118. Although full and complete market share data is not currently available to Xceligent at the level of discrete metropolitan areas, on information and belief, CoStar is dominant in an overwhelming majority of metropolitan areas. For example, of the 60 metropolitan areas for which coverage is required in order to achieve national scale, CoStar is, on information and belief, the dominant provider of CRE information services and CRE listings database products in at least 54 of the 60 metropolitan areas.

119. The CoStar Companies have enjoyed these monopoly positions in both the CRE listings database and CRE information services markets since CoStar Group acquired LoopNet. Now, with Xceligent entering the national scene, the CoStar Companies are deploying anticompetitive tactics against Xceligent's expansion. The CoStar Companies actions violate the antitrust laws, and are in direct violation of the FTC Order that is intended to prevent the CoStar Companies from establishing a monopoly.

### THE COMPETITIVE THREAT THAT XCELIGENT POSES TO COSTAR'S
### MONOPOLY OVER CRE INFORMATION SERVICES AND
### CRE LISTINGS DATABASES

120.     In 1998, Doug Curry, the future founder and CEO of Xceligent, ran one of the largest residential appraisal firms in the Midwest, and decided to expand the business to cover commercial appraisals.

121.     At the time, the concept of centralizing commercial property data had not yet reached Kansas City, and the commercial property community continued to conduct business by relying on the fragmented acquisition of commercial data through phone calls, faxes, and courthouse records, with email now added to the mix as well.

122.     In that landscape, Xceligent was founded by Mr. Curry with the goal of organizing Kansas City, Missouri CRE listings into a comprehensive electronic database similar to the multiple listing service ("MLS") commonly used in residential real estate transactions.

123.     The early focus of Xceligent was in the development of technology that would allow real estate brokers to crowd-source CRE information.

124.     In 2000, shortly after Xceligent had developed its database to house the crowd-sourced CRE listings, Mr. Curry was contacted by several firms in the San Diego market.

125.     The San Diego firms were attempting to create their own alternative to CoStar Group's service, and hired a local research professional to manage the collection of the firms' properties and listings for their database.

126.     At this time, the firms asked to utilize Xceligent's technology to house the content once the aggregation was complete.  As the firms completed their version, CoStar filed for an injunction and the firms faced a lawsuit if they could not prove the origination of property information and building imagery.

87

127.     Based on the court's request, the firms deleted their aggregated database and retained Xceligent to build a new database from the ground up with original physical site inspections of all commercial structures in the San Diego market, including the capture of a time-stamped photo at the moment of inspection to certify the origination of the information.

128.     Xceligent performed the inspections, collected the property information, and captured original photos, thereby becoming the second company in the United States to have created a researched universe of commercial properties from the ground-up, however without using any of the major firms' internal database or relying on the acquisition of a competitor.

129.     Following Xceligent's successful research of San Diego, the company was soon invited into many other U.S. markets to create an original researched universe of commercial properties from the ground-up, including Atlanta, Des Moines, Nashville, and Columbus.

130.     As Xceligent expanded its platform, the company also developed the necessary operations and processes to proactively research non-subscriber listings, while continuing to rely on crowd sourcing for subscriber listings.

131.     When attempting to further expand, however, Xceligent began to recognize that, although brokers desired to have their listings up to date, they often lacked the time and the interest to keep listings up to date and accurate.  As a result, much of the crowd-sourced listings information would not remain current.

132.     Xceligent determined it could add value to brokerages by supplementing and independently verifying their CRE information, and not just that of non-subscribers.

133.     As Xceligent grew, it spent over three years refining its research methodology and increasing its expertise in first-hand research and data verification through partnership with the CRE community, listening to broker preferences for collecting, maintaining and updating data,

88

and relying on the expertise of brokers to certify a core set of data for use in tracking market health analytics.

134.    Xceligent created a unique Data Strategy process for the collection of information from CRE professionals representing buildings in a market.  The Data Strategy process involves Xceligent executives meeting with listing companies in a market and physically documenting each company's internal processes for updating their listing inventory. Xceligent then identifies and documents each company's preferred method for Xceligent researchers to collect and maintain their information on a monthly basis.  This process creates a systematic approach towards verifying the origin of record for every piece of data collected.

135.    Through these documented Data Strategies, Xceligent began receiving requests from listing companies to update their listing inventory from their websites hosted by LoopLink. Xceligent agreed to update listings in this manner, at the customer's request, with the condition that the Xceligent researcher will call the broker back to verify the information on each listing for accuracy and to gather any missing information.

136.    Xceligent formed peer-nominated Advisory Boards in each of its markets to certify the quarterly market analytics.   The Xceligent Advisory Boards are comprised of the top leasing professionals in a market, who define key market parameters, such as: submarket boundaries, building classifications, and the identification of commercial properties to include in a "tracked set" to create quarterly market health analytics.  Each quarter, the Advisory Boards certify the significant transactions occurring on this "tracked set" of properties to ensure Xceligent provides the most accurate and transparent information possible.

137.    Over time and with its industry-centric business model, Xceligent developed an excellent reputation for research, verification, accuracy, and customer service.  This led to CRE

interest groups in several major cities approaching Xceligent and asking Xceligent to start the development of CRE information service databases in their markets.

138.    At this time, several of the largest brokerage firms in the U.S. approached Xceligent and requested Xceligent to expand its services into the largest 65 U.S. markets, so the firms would have a national competitor to CoStar and the industry would have a choice of national information providers.

139.    To continue its quest to achieve a national presence, Xceligent partnered with LoopNet.  In 2007 LoopNet, which as discussed above was now the prominent provider of listings database products (and not yet a CoStar acquisition), provided funding that allowed Xceligent to expand into an additional 15 smaller U.S. markets. In the summer of 2009, LoopNet invested additional funds into Xceligent allowing for expansion into the larger Tier 1 U.S. markets.  With this investment, LoopNet became the majority holder of Xceligent preferred stock, and created the first real opportunity for a true national competitor to CoStar Group.

140.    As discussed in more detail above, in 2011, CoStar Group moved to acquire LoopNet for $860 million.

141.    As discussed above, for the acquisition of LoopNet by CoStar Group to gain FTC approval, however, LoopNet was required to sell its interest in Xceligent, but not before Xceligent had the ability to find a new investor that would fund the national expansion into the top 65 markets and fulfill the original request of the national firms.  The Daily Mail and General Trust ("DMGT") then replaced LoopNet as the primary investor in Xceligent.  With DMGT's investment, Xceligent continued expansion efforts into Cleveland, Southern California, Phoenix, Las Vegas, Charlotte, Raleigh-Durham, Orlando, Tampa, South Florida (Miami area), and Houston.

142.     At this time, and as an additional condition of the FTC's approval of the LoopNet acquisition and LoopNet's required sale of its Xceligent interest, the FTC expected Xceligent to become not only a competitor to CoStar but also to build a competitor for the LoopNet listings database.

143.     As part of this process, Xceligent partnered with the National Association of REALTORS® ("NAR"), which then contributed a fledgling CRE marketing platform originally established by NAR to compete with LoopNet.

144.     Xceligent rebranded the NAR marketing platform as CommercialSearch.com and set out to expand the site's coverage.

145.     Over the next four and a half years, in its quest to achieve a national scale comparable to CoStar, Xceligent grew its market coverage from 36 markets to 53 and its workforce from 160 to over 1,300.

146.     In January 2016, Xceligent began expanding into the remaining 6 Tier 1 U.S. markets, including the New York Tri-State region, the largest U.S. market.  Upon completion, this expansion would establish Xceligent as a true competitor to the CoStar Companies, now comprised of CoStar Group, CoStar Realty, and LoopNet.

147.     In December of 2016, after almost a year of research and the near completion of Xceligent's database, Xceligent kicked off intensive business development efforts in the New York tri-state region.   That same month, the CoStar Companies filed its lawsuit against Xceligent.

148.     Whenever Xceligent has opened a new market, there has been opportunity to chip away at CoStar's market share.  To date, however, procompetitive impacts have been minimal, with the CoStar Companies retaining substantial market share.  The entry by Xceligent into the

91

national scene can alter that landscape, offering the CRE industry its first direct competitor to the now established CoStar Companies conglomerate in both the listings database and information services markets. Nationwide access to CRE data is, however, necessary to compete effectively at any level in the marketplace, whether local, regional, or national.

## COSTAR'S ANTICOMPETITIVE CONDUCT

149. The CoStar Companies have engaged in an anticompetitive scheme designed to raise competitor costs and drive them out of business in order to entrench their monopoly positions in both the CRE information services and CRE listings database markets by:

      A.     Imposing exclusionary contractual terms that prevent customers from using a competitor's products.

      B.     Anticompetitive input foreclosure by contaminating broker listings with artificial data known to be false in order to obstruct competitor access to brokers' own data.

      C.     Exclusionary contractual terms enforced by technological impediments and active conduct that block Xceligent's access to a necessary input—customer data.

      D.     Tying and bundling CoStar Products and geographies to prevent Xceligent's geographic expansion and prevent Xceligent from achieving national scale.

      E.     Pervasive false and defamatory statements about Xceligent and its products and services designed to scare customers away from doing business with Xceligent.

150. CoStar's misconduct is willful and outrageous, undertaken with evil motive and reckless indifference to the rights of Xceligent, and for the anticompetitive purpose of raising

Xceligent's costs, and restricting Xceligent's access to customers in order to drive Xceligent out of the CRE information services and CRE listings database markets.

### A. Imposing Exclusionary Contractual Terms that Prevent Customers from Using a Competitor's Products.

151. The CoStar Companies impose terms and conditions on the access and use of publicly accessible websites—including brokers' own websites—that seek to convert user-submitted photographs and information into CoStar property, which users are then forbidden from sharing with CoStar's competitors. The natural—and intended—consequence is the stifling of competition in both the CRE listings database and CRE information services markets.

152. To begin, CoStar purports to inform visitors to www.loopnet.com that their use of the site binds them to LoopNet's terms and conditions ("LoopNet Terms"), which are only displayed if the visitor clicks a hyperlink, as shown below.



153. CoStar presents a similar prompt to those who register with LoopNet to submit CRE listings, with a hyperlink to the same LoopNet Terms. When a broker registers with LoopNet, he or she obtains an "exclusive membership privilege", which the terms purport to forbid being "transferred to anyone other than the registered Member." Am. Compl., Ex. A at 2.

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 93 of 139



154.     The LoopNet Terms provide that a broker who submits a listing retains "any applicable ownership rights" in their "Submitted Content," which is defined to include "property descriptions, photographs, images, videos . . . , graphics, or other information . . . for each listing" that the broker submits.  *Id.* at 3.

155.     LoopNet receives a "non-exclusive . . . right and license . . . with respect to all such Submitted Content."  *Id.*

156.     But the broker's supposed retention of ownership rights and LoopNet's non-exclusive license are undermined in practice and converted into an effectively exclusive license by other LoopNet terms.

94

157.    For example, the "non-exclusive" license permits LoopNet to "modify" a broker's listing, including by "add[ing] digital watermarks to certain parts of your property listing" or by "adjust[ing] portions of the information contained . . . within property listings." *Id.* at 4.

158.    In other words, CoStar reserves to itself the right to add its claimed copyright watermark to broker owned photographs, and to alter property feature data points in the broker's own listings.

159.    By the LoopNet Terms, CoStar is not required to notify brokers when, or explain how, LoopNet has modified their listings, but provide that the "adjustments will have no material impact on the meaning and interpretation of property listings." *Id.*

160.    If a broker's listing "incorporates content provided by LoopNet," including any information about the listing, the broker may use that content "strictly in connection with [their] listing." *Id.* at 3-4.

161.    The LoopNet Terms include this content among the categories of "information obtained from [LoopNet]," which, along with "listings . . . and any other information otherwise made available to you in [LoopNet], (individually and collectively, the 'Content')," the broker must agree to "treat . . . as proprietary to LoopNet." *Id.* at 4.

162.    The LoopNet Terms then purport to forbid the broker from providing that Content to any LoopNet competitors:

> You shall not use or reproduce any Content that is obtained from the Service, or that is otherwise made available to You in [LoopNet], for or in connection with any other listing service or device. You further shall not use [LoopNet] in any other manner for or in connection with any other listing service or device. You shall not use the LoopNet Service as part of any effort to compete with LoopNet .

95

. . .

*Id.* at 5.

163. Thus, a broker who submits a listing to LoopNet provides LoopNet a non-exclusive interest in the listing that LoopNet may effectively convert into an exclusive one, simply by modifying the listing's content, and without notice to the broker. The broker is then forbidden from sharing that information with competitors of CoStar.

164. The broker must agree that it "shall constitute a prima facie breach" of the LoopNet Terms if LoopNet determines that a "third party," such as a competitor, "has access" to the broker's modified listing. *Id.* at 4.

165. The LoopNet Terms further require the broker to agree that "Content reserved for Members" is confidential, and to protect that information "as a trade secret of LoopNet." *Id.* at 4. The LoopNet Terms do not explain which Content is "reserved for Members."

166. The LoopNet Terms also purport to bind users of broker websites hosted by LoopNet via its LoopLink product. CBRE's website provides an example of how these terms are presented to those seeking to search a broker's website for the broker's listings.



167.     A separate set of terms, the LoopLink Terms of Use ("LoopLink Terms"), also purport to govern use of broker websites hosted by LoopNet.

168.     Like the LoopNet Terms, the LoopLink Terms permit LoopNet to modify any content that a broker submits on her brokerage's website, and prohibit her from sharing that information with any competitors of LoopNet or CoStar.     *See* LoopLink® Service Terms of Use ("LoopLink Terms"), a copy of which is attached as Exhibit H and incorporated here by reference.

169.     A simple example illustrates that the natural consequence of both the LoopLink and LoopNet Terms is to stifle competition in the CRE listing database market through instilling a fear of litigation:

        A.     Two CBRE brokers represent the same property owner.  Broker 1 creates a LoopNet listing for the property on behalf of the owner, and includes photographs of the property that Broker 1 has taken.  As per its stated practice of modifying listings, *see* Am. Compl. ¶¶ 114-16, LoopNet then modifies Broker 1's listing by adding a fraction of an acre to the lot size and appending CoStar watermarks to property photographs.

        B.     Displeased with the level of interest that the LoopNet listing has generated, Broker 2 suggests marketing the property on CommercialSearch as well, in order to increase the listing's exposure to potentially interested tenants.

97

C.     Broker 1 agrees with the suggestion, and tells Broker 2 to do so by pulling the listing from CBRE's website, which is hosted by LoopLink, as Broker 1 is traveling and without access to his files on the property.

D.     Broker 2 creates a new listing on CommercialSearch that incorporates the watermarked photographs and modified lot size.

E.     Both brokers have exposed themselves to suit for potentially violating the LoopNet Terms and LoopLink Terms.  Both have arguably used or reproduced content "made available" in LoopNet "for or in connection with" a competitor listing service, even though the information was submitted in LoopNet by Broker 1 and publicly available on CBRE's own website.  Indeed, Broker 2 arguably would have violated the LoopNet Terms even if she did not include the LoopNet-modified information in the CommercialSearch listing, because all of the information submitted by Broker 1 was "made available" to Broker 2 in LoopNet.

F.     Assume that Broker 1 must create the CommercialSearch listing himself because Broker 2 fears a lawsuit by the dominant provider of the CRE listings databases on which she relies.  Broker 1 then determines that LoopNet has modified the property's lot size, and is able to recall the correct size for the new listing.  However, he no longer has access to the original photographs of the property; only the LoopNet-watermarked versions are available.

G.     If Broker 1 removes the watermarks, he is, in CoStar's view, in violation of the LoopNet Terms, which prohibit "tamper[ing] with any . . . proprietary notice printed or stamped on, affixed to, or encoded or recorded in the LoopNet Service."  Am. Compl., Ex. A.  If Broker 1 does not remove the watermarks, he must obtain "the prior

Case 4:16-cv-01288-FJG   Document 86   Filed 06/28/17   Page 98 of 139

written permission of LoopNet" in order display the photographs, because the LoopLink Terms forbid him from "display[ing] such marks in any manner" without that permission. LoopLink Terms (Ex. H) at 8.  To create a listing with a competitor to CoStar, Broker 1 must obtain LoopNet's permission to display his own photographs, which he submitted for a listing that he created, and which he chose to display on his brokerage's own publicly accessible website.

170.    CoStar imposes similar terms on users of its subscription-based service.  *See* Am. Compl., Ex. B.  Like both the LoopNet and LoopLink Terms, the CoStar Terms of Use ("CoStar Terms") purport to grant CoStar only a "non-exclusive" license to broker-submitted content, but, on information and belief, CoStar then proceeds to modify that content without notice to the broker, and prohibits the broker from then sharing that content with CoStar's competitors.  *See id.* at 10.

171.    The CoStar Terms likewise alert the broker that CoStar may pursue her if it believes that the information it has modified has appeared somewhere outside of CoStar's database:  "You accept that . . . a prima facie breach . . . of these Terms of Use on your part may be assumed by CoStar."  *Id.* (emphasis added).  *Id.* at 9.

172.    Accordingly, the CoStar Terms discourage brokers from sharing information that they submit to CoStar, and thus stifle competition in the CRE information services market, for the same reasons that the LoopNet and LoopLink Terms do so.  Unless a broker can identify with certainty the ways in which CoStar has modified the broker's information—modifications explicitly designed by CoStar to "have no material impact," id., and which thus are likely to escape the broker's notice—she risks liability by submitting the same information to a CoStar competitor.

99

173. In addition to permitting CoStar to effectively convert broker information and data into CoStar information and data, both the CoStar Terms and LoopLink Terms require brokers to agree that virtually all of the information presented therein is CoStar's "copyrighted information."

174. The LoopLink Terms require users to "acknowledge that the Product . . . and the other Content constitute the valuable property and copyrighted information of LoopNet." *See* LoopLink Terms (Ex. H) at 4.

175. The CoStar Terms likewise require users to "acknowledge that the . . . Content, Information, Passcode-Protected Product, Non-Passcode-Protected Product, and Product constitute the valuable property and confidential copyrighted information of CoStar and its licensors." Am. Compl., Ex. B at 17.

176. CoStar also retaliates against industry participants that publicly support Xceligent, or merely consider doing so. For example, in 2016, CoStar without cause cancelled services provided to Bates Commercial, claiming that Bates Commercial violated a CoStar License Agreement. In CoStar's view, Bates was a "direct or indirect competitor of CoStar…." The only basis for the claim, however, was that Mr. Tray Bates, a prominent broker operating in South Texas, was serving on Xceligent's Board of Directors as the NAR's designated representative. CoStar's suspension of Bates Commercial's services was nothing more than retaliation against Mr. Bates for his association with Xceligent in order to discourage other prominent brokers and industry professionals from associating with Xceligent. The suspension was a direct violation of the bar under the FTC Order precluding retaliation against brokers who conduct business with any CoStar competitor, or otherwise interact with a CoStar competitor.

177. In addition, earlier this month, Xceligent was informed by a national brokerage firm that CoStar representatives had led the brokerage firm to believe that it was not permitted to support Xceligent publicly, or to share listings information with Xceligent.

178. Xceligent's business is harmed by CoStar's anticompetitive exclusive dealing for customers. By foreclosing customers, CoStar is able to increase Xceligent's cost of acquiring customers and increase the prices that customers pay because they are locked in to CoStar's service.

**B.** **Anticompetitive Input Foreclosure by Contaminating Broker Listings with Artificial Data Known to be False in Order to Obstruct Competitor Access to Brokers' Own Data.**

179. By its own admission in its Amended Complaint, CoStar knowingly publishes false data regarding CRE property in both its private databases, and public broker listings in order to "fingerprint" the data for the purpose, as CoStar claims, of "catch[ing] thieves stealing CoStar's proprietary information." Am. Compl. ¶ 115.

180. For example, CoStar has by its own admission falsely publicized the size of a lot having a street address of 13330 – 13420 College Blvd as 7.47 acres, while knowing that the actual size is 5.36 acres—more than 2 acres smaller (approximately 39%) than advertised. Am. Compl. ¶ 116.

181. For a property with the street address of 11410 W. 105th St. S, CoStar falsely publicized the rentable building area ("RBA") as 4,865 square feet. Am. Compl. ¶ 116. The actual RBA for the property is 4,835 square feet. This 30 square foot (approximately 0.6%) difference is unlikely to be noticed by a broker, owner, or tenant and thus very likely to become the accepted value for the RBA of the property distributed throughout the property's historical record, while cheating the owner out of additional rent.

101

182.     CoStar is responsible for publication of these fake data points, and eagerly takes credit for the publication.  *See* Am. Compl. ¶ 116.  CoStar claims that these fake data point "fingerprints" allow them to protect its "proprietary data".  As CoStar argues:  if the fake data points are found on a competitor's website, then the fake data point must have been "stolen" by the competitor.  *Id.* ¶¶ 114-15.

183.     CoStar's claims, however, are easily deconstructed as false.

184.     As the self-proclaimed "leading provider of commercial real estate information in the United States", CoStar's knowing and intentional publication of fake data points regarding property features does more than "fingerprint" CoStar's data.

185.     CoStar's fake data regarding property features ranging from lot size to RBA, to building vintage, to available parking space, to parking ratios, and including any number of other easily manipulated property features are transmitted by CoStar into the stream of CRE information exchanged throughout the United States among innumerable CRE industry participants deceived by CoStar's false representation of property features.

186.     No practical mechanism is available for identifying this fake data (other than correction by CoStar with public notice), since re-measurement would require CoStar's broker, lender, buyer and seller customers to constantly check and re-check the published data that CoStar heralds as comprehensive and accurate—a monumental and practically impossible task.

187.     Consequently, there is nothing to prevent the fake data intentionally inserted by CoStar, from weaving its way throughout CRE industry records, including:  broker listings and historical records, deed and title records, property tax assessments, commercial leases, appraisals, etc.

188.     Reasonably believing that the data is accurate, CoStar's fabricated "fingerprints" are exchanged, used, and reused by CRE industry participants—and the fact that a broker, lender, buyer, seller or even a competitor has the same data point is hardly proof that the data point was obtained by that industry participant directly from CoStar.  The industry participant's acquisition of the fake data point could just as easily be several degrees removed from CoStar's willful misrepresentation:  for example, a broker could have obtained the fake data point from CoStar; the fake data point could have been input into a commercial lease entered between the property owner and a tenant; the commercial lease or an abstract containing the fake date point could have been recorded in the local public property records; and then a competitor pulls that fake data point from the property records.  Any number of scenarios can be imagined by which an industry participant obtains the fake data point from a source other than CoStar.

189.     It is amazing that CoStar admits engaging in this conduct willfully, and with pride on the auspices of protecting "proprietary" information.  Am. Compl. ¶ 115.

190.     For one, property features are not proprietary—CoStar holds no legal ownership rights over the lot size value of any property, or over any other measurable property feature.

191.     While CoStar claims it uses "proprietary tools and data" to estimate these fake data points, there is nothing proprietary about fabricating the lot size of a property by over representing its size by multiple acres; or in claiming that a property was built in 1978, when in fact it was built in 1914.

192.     From the claims of current and former employees posted on Glassdoor.com (the same site relied upon by CoStar for many of its quotes attributed to former employees of Xceligent found in Plaintiffs' Amended Complaint), it appears CoStar does not even obtain these

fake data points through estimating, but rather from active misrepresentation forced upon their employees by unachievable quotas:

> "The info product is very flawed, it looks good but the tactics they use to manage researchers encourages bad data in the name of metrics."

> "Tons of employees lie or cheat to take advantage of the inexperience or clueless managers. The company sells commercial real estate data[,] however the people who gather the data are unreliable. How can the data be trusted if so many employees lie about getting it just to hit requirements or juke a weak system."

> "What's worse than CoStars glassdoor ratings? CoStars yelp ratings from current and former clients. Everyone hates us.…

> Metrics, metrics, metrics. Numbers really mean nothing. Our quality of work sucks because of the numbers we need to meet – causing us to rush and submit crappy work.… [W]e aren't treated like human beings, but robots."

> "Awful employee morale, ever changing metrics, questionable integrity, Napoleonic CEO.… You find yourself trying to "cheat" the system so that you can make your numbers on a day when you just don't feel like talking to people. Some will go so far as to 'update' their listings inaccurately just so that they can make their numbers for the week."

> "Managers will have researchers plug in 1000s of fake contacts (information) into the 'reliable' database just to see the numbers go up. The pressure from the upper management causes the manager and the Director to simply turn there [*sic*] eye and reward the research associates for putting in false information, pretty ludicrous right? Not only did management ignore what was really happening but rewarded those who had falsified hundreds of contacts at the end of the quarter as 'researchers of the month' or those individuals received higher bonuses. Its [*sic*] really eye opening to watch people put false information into the database and not only be promoted but praised by management who know that the numbers are false."

> "The clear 'cheaters' who dump suspect to total fabricated data are often those who are richly rewarded.…"

193. More problematic, however, is the trickle-down effect of CoStar's fabricated "fingerprinting" on the CRE industry. By inserting false data into the stream of CRE information, CoStar perpetrates a fraud on its own customers: the features of an owner's

property are misrepresented; a broker's listing is displayed with potentially material inaccuracy; a taxing authority relying upon the false data may unfairly assess taxes on a property.

194. But even worse is the inability of brokers to differentiate between accurate data, and fake data, which is where CoStar's true, and anticompetitive end game resides.

195. Since brokers have for years relied on LoopNet and CoStar Products as a repository for their CRE data, many brokers do not have backup copies or historical files. All that information has been uploaded and stored with LoopNet or CoStar Products (or both), just as many people now upload and store their music, photos, and documents on various cloud based systems. Data that originated with the broker is now intermingled with data "researched" by CoStar, including any fake data. A broker wishing to transfer or even simply to share her data with a competitor cannot differentiate between data that originated with the broker, and data that originated with CoStar. If the broker does attempt to share data with a competitor, the broker risks sharing fake data, and triggering a breach of CoStar's terms of use.

196. Indeed, the final step required to build a comprehensive database is conducting interviews with individual brokers that represent the buildings. An individual broker has the legal right to describe the structure he represents, its availability for lease or for sale, and to provide the physical characteristics of the building's interior. These characteristics can only be provided by the listing broker, as they are not available to Xceligent when it inspects the building. CoStar's anticompetitive tactics hinder and sometimes outright block Xceligent's ability to conduct this critical interview with the listing broker, thereby precluding Xceligent from gathering information on space availability, the sale listing, or the physical characteristics of the building. This is directly caused by CoStar's methodical planting of false information

without broker notification, thereby creating fear that the broker may not know if or when his listing has been comingled with false CoStar data without his knowledge.

197.    CoStar's fake data substantially raises the costs for any potential competitor that wishes to receive information from a client about the client's buildings or a client wishing to submit the information on their buildings to a CoStar competitor.  On information and belief, there are approximately 4 million properties (if not more), each with up to 600 data points per property, contained in the CoStar database.  Since no client is able to determine which fields CoStar falsified, when the falsification occurred, or when falsification may occur in the future, creating a nationally competitive database would require the re-inspection of 4 million structures' exterior and interior, documenting every field of data, its source, and the date of inspection.  This would result in the coordination of over 200,000 licensed real estate agents and well over 2 million property owners verifying well over 2.4 billion attributes, which would be logistically unachievable. This record keeping burden is therefore one of the most egregious monopolistic practices that CoStar has put in place.

198.    Xceligent's business is harmed by CoStar's anticompetitive input foreclosure. This input foreclosure has prevented Xceligent from growing its CRE listing database and reduced the quality of its CRE information services.

C.    **Exclusionary Contractual Terms Enforced by Technological Impediments and Active Conduct that Block Xceligent's Access to a Necessary Input— Customer Data.**

199.    CoStar imposes contractual and technological impediments designed specifically to block and otherwise impede competitor access to brokers' CRE data and photographs.

200.    Brokers widely believe they have the right to share their CRE listings data with anyone they choose, including Xceligent and any other competitor to CoStar.  In line with

106

industry practice, brokers frequently direct Xceligent researchers to gather listings data from the brokers' LoopLink hosted website. Brokers that do not utilize LoopLink, but that do maintain inventory on LoopNet, frequently direct researchers to gather listings data from that inventory on LoopNet, or a broker will simply email a link to the broker's inventory on LoopNet.

201. CoStar, however, employs technological measures to block competitor access to brokers' own listings inventories that reside on LoopLink hosted websites, or solely on LoopNet, claiming the authority to do so under the LoopNet Terms of Service. As CoStar freely admits, Xceligent researchers are repeatedly blocked from accessing broker listings based on alleged violations of the LoopNet Terms of Service. These blocks are imposed not in response to systematic copying of LoopNet listings, as CoStar claims, but occur when a researcher has been directed or otherwise authorized to access and obtain the broker's own listings either through a LoopLink hosted website, or within the broker's own LoopNet inventory. Indeed, as a matter of Xceligent policy, researchers are only permitted to access broker listings on LoopLink hosted websites, or within a broker's inventory on LoopNet, when directed or otherwise authorized by the broker.

202. CoStar is intimately aware that blocking competitors from LoopLink hosted websites and to LoopNet is anticompetitive input foreclosure. Before CoStar acquired LoopNet, CoStar and LoopNet were involved in multiple lawsuits against each other. The issue of LoopNet blocking CoStar's access to LoopLink hosted websites and to LoopNet was a primary issue. CoStar's CEO, Andy Florance, submitted two declarations in a lawsuit in which he detailed, under penalty of perjury, how CoStar Group intentionally had accessed LoopNet and used LoopNet listings for competitive purposes.

107

203.    In a 2009 declaration, Florance admits CoStar Group had "openly and notoriously" accessed CRE information on LoopNet:

<u>CoStar's Use of the Non-Password-Protected Areas of LoopNet's Website</u>

15.    CoStar has openly and notoriously accessed information on the non-password protected areas of LoopNet's website both before and since the 2005 Settlement Agreement was signed. Specifically, CoStar has accessed, among other things, LoopNet's press releases, earnings calls, product descriptions, pricing descriptions, marketing materials, and listings, and made use of that information for competitive purposes.

*See* Declaration of Andrew C. Florance, *LoopNet, Inc. v. CoStar Group, Inc.*, Los Angeles County Super. Ct. No. BC380863 (Apr. 7, 2009) ("2009 Declaration"), a copy of which is attached as Exhibit I and incorporated here by reference.

204.    In his previous 2008 Declaration, Mr. Florance had explained the circumstances of such access:

4.    CoStar researchers obtain the most complete and up-to-date information about commercial real estate in a variety of ways, including by visiting properties in person, contacting commercial brokers directly via telephone and email, and obtaining information from brokers by phone, email, or fax. In some cases, our researchers find out about listings by asking the broker a series of questions about the property in question. In other cases, the brokers themselves have already written up a description of the property. In the latter cases, commercial brokers often direct CoStar researchers to take their listings from the brokers' own websites or email their listings to CoStar. Because brokers make money when their properties are sold or leased, they are naturally eager to obtain the maximum possible exposure for their listings. CoStar has long employed these techniques both for listings that have no connection to LoopNet and for listings represented by brokers that, as discussed below, have paid LoopNet to host the listing portion of the brokers' website.

108

*See* Declaration of Andrew Florance, *LoopNet, Inc. v. CoStar Group, Inc.*, Los Angeles County Super. Ct. No. BC380863 (Mar. 5, 2008) ("2008 Declaration"), a copy of which is attached as Exhibit J and incorporated here by reference.

205.     In his 2009 Declaration, Mr. Florance refers to CoStar Group's practice of accessing broker data through LoopNet as "CoStar's right":

> 3.     That agreement to limit access to the password-protected areas but allow full access to the non-password-protected areas was the direct result of negotiation sessions I had with Richard Boyle, LoopNet's CEO, and Brent Stumme, LoopNet's CFO. As I related in my earlier declaration, Mr. Boyle volunteered that LoopNet never had any desire to block CoStar from broker websites that used the LoopLink technology. Moreover, I made it clear to Mr. Boyle at that session that brokers were directing CoStar's researchers to LoopNet's website by emails to obtain listing information concerning the broker's own listings, and that CoStar researchers in turn were making use of that listing information to update the CoStar databases. At no time did LoopNet ever object to this conduct. To the contrary, Mr. Boyle specifically said that he would never interfere with CoStar's right to update its database from broker websites or from listings on the LoopNet website to which brokers had directed CoStar by email.

2009 Declaration (Ex. I).

206.     Reflected by these statements from CoStar's own CEO is CoStar's intimate familiarity with the industry practice of brokers frequently directing CRE researchers to obtain information concerning their listings from LoopNet—indeed, CoStar Group has "openly and notoriously" participated in and thus condoned the practice.

207.     Indeed, CoStar Group's practice of accessing brokers' listings on LoopNet, either through the brokers' LoopLink hosted website or directly on LoopNet, was so common place that CoStar Group claimed surprise when LoopNet sued CoStar Group regarding the access:

> 2     7.      In March of 2005, LoopNet, Inc. filed a lawsuit against CoStar in California
> 3   regarding CoStar's access to LoopNet's website. Because LoopNet had not raised any issues
> 4   related to CoStar's access to LoopNet with CoStar prior to filing its complaint, CoStar was
> 5   surprised by the lawsuit. CoStar indicated its willingness to discuss the issues raised by LoopNet
> 6   in good faith.

2008 Declaration (Ex. J).

208. Moreover, CoStar is fully aware that a broker, as a matter of fiduciary duty, must be permitted to market her listings as widely as possible on all available listings databases that serve the broker's market. In the words of CoStar's founder and CEO:

> 15     3.      Commercial real estate brokers understand that it is critical for their listings to
> 16   appear within CoStar's comprehensive database of properties for lease and for sale. This is true
> 17   for a number of reasons, including the following:
>
>                             \*        \*        \*
>
> 1     •   Commercial real estate brokers owe a fiduciary duty to the property owners that
> 2      contract with them to market their listings as widely as is appropriate under the
> 3      circumstances (and in some states the law requires as much). The value of listing
> 4      with CoStar is illustrated by the fact that 90% of Fortune 500 companies have
> 5      conducted commercial real estate transactions with brokerage firms that use
> 6      CoStar's information services;

2008 Declaration (Ex. J).

209. CoStar recognizes also that blocking access to a broker's own listings, and restricting the broker's ability to share the listing runs contrary to the interests and needs of the CRE market, and to the interests of brokers—and, in the words of Mr. Florance, would be "outrageous":

110

22.     I recognized from Mr. Boyle's ready acknowledgment that CoStar's researchers had the right to update CoStar's database from LoopLink-using broker websites that LoopNet knew that telling its customers that LoopNet could restrict its customers' ability to market their commercial listings would be outrageous and would present LoopNet with a marketing nightmare.   I assume that Mr. Boyle's statement was attributable to a statement I made during the discussion concerning CoStar use of broker websites to update CoStar's databases – that LoopNet would not want CoStar to tell a mutual customer (such as CB Richard Ellis) that LoopNet had barred CoStar from going to the customer's website to obtain listings.

2008 Declaration (Ex. J).

210.     Thus, CoStar's current practice of blocking competitor access to brokers' own information and listings is fundamentally anticompetitive.  In Mr. Florance's view, the practice of IP blocking is not only anticompetitive, it constitutes intentional interference with existing business relationships without justification or authority:

30.     LoopNet has been preventing CoStar's researchers from obtaining listing information provided to them by third party brokers from the non-password protected areas of LoopNet.com and *from the broker's own websites*. These brokers have typically given CoStar explicit permission to obtain such information, and, in fact, those brokers that are CoStar clients (which represent the vast majority of the top brokerage firms in the United States) explicitly give CoStar the permission to obtain listing information from their websites as a part of CoStar's standard licensing agreement.  LoopNet thus has been actively interfering with CoStar's contractual relationship with its clients that use the LoopLink technology, such as CB Richard Ellis, NAI Global, and Grubb & Ellis.

2009 Declaration (Ex. I).

111

211.    CoStar is therefore fully aware that efforts to block access to LoopNet, and to broker owned data, including through IP blocking, is anticompetitive, and that such conduct, in this case, constitutes violation of the FTC Order.  As explained by Mr. Florance:

> 13.    In coming to this conclusion, we discussed a number of things, including the issue of blocking each other's IP addresses from accessing our websites.  IP blocking would mean that no one with a CoStar IP address could visit LoopNet's website at all.  However, I noted that CoStar would still be visiting websites using LoopNet's LoopLink technology to obtain information to update CoStar's database, and thus total IP blocking would not work, as it could block CoStar's access to those broker websites.  I specifically mentioned the website of a leading commercial real estate brokerage firm, CB Richard Ellis, which used LoopLink technology to display its property listings.

2008 Declaration (Ex. J).

212.    Finally, it should come as no surprise that CoStar is also familiar with the technological tools available for protecting the right to access broker websites and listings. When LoopNet would deny CoStar Group access to broker websites and listings database, CoStar Group employed technological measures to avoid LoopNet's denial of access:

> 26.    To avoid LoopNet's unlawful self-help efforts to block access, CoStar decided to engage in its own self-help by using technological and other means to avoid LoopNet's denial of access.  On February 18, CoStar used different Internet addresses to access the non-password protected areas of LoopNet.com and broker websites, avoiding LoopNet's illegal blocking without necessitating the Court's intervention.  From February 18 through February 27, CoStar's countermeasures worked to allow CoStar the access to LoopNet.com and the broker websites provided for in the 2005 Settlement Agreement.

2009 Declaration (Ex. I).

213.    Of course, now that CoStar Group has acquired LoopNet, the newly formed CoStar Companies conglomerate has changed its tune, and now claims that Xceligent (and by extension any other competitor), may be lawfully excluded from accessing the same broker listings and websites that CoStar Group previously claimed were available to competitors as a matter of right.

214.    Blocking Xceligent's, or any other competitor's ability to access a broker's own listings either through a LoopLink hosted website, or within the broker's own LoopNet inventory is anticompetitive input foreclosure. The practice also violates the FTC Order's bar against directly or indirectly prohibiting or restricting any customer from providing a competitor with the customer's own CRE data.

215.    However, CoStar's efforts to block Xceligent's access to CRE data through exclusionary contracts do not end with the imposition of technological enforcement measures. CoStar actively seeks to enjoin brokers from sharing any CRE data with Xceligent.

216.    For example, Xceligent has attempted repeatedly to partner with local CRE brokerage firms to exchange services offered by Xceligent (including services within both the listings database and information services markets) for a copy of the firm's internal CRE database consisting of data collected for CRE listings and historical analytics. At nearly every turn, CoStar has blocked, or at least attempted to block, these partnerships through the assertion of control over a broker's own internal CRE database.

217.    On information and belief, CoStar has repeatedly asserted this brand of control through reliance upon CoStar's anticompetitive terms of use (as discussed above) or other contractual terms and conditions entered between CoStar and brokerage seeking to partner with Xceligent. CoStar employs the anticompetitive terms to threaten or pursue legal action against

113

the brokerage firm, claiming that the firm's past or current use of CoStar products precludes the firm from sharing any part of an internal CRE database with any competitor of CoStar because any data that originated from the broker is now comingled with, and cannot be separated from CoStar owned data. Because the brokerage firm has no way of differentiating between their original data and data supplied by CoStar, and because CoStar is either unable or unwilling to do so itself, the firms are blocked from sharing their own data with Xceligent.

218.    CoStar's play to control brokers' own content is not limited to the data itself, but extends as well to broker owned photographs over which CoStar has no copyrightable interest. Notwithstanding this lack of copyrightable interest, under the terms and conditions for its products, CoStar grants to itself the authority to place its copyright watermark on broker owned photographs submitted to CoStar or uploaded to LoopNet. By engaging in this practice, CoStar displays these photographs on its websites as the property of CoStar, even though the photographs are unquestionably the property of the broker.

219.    By employing this brand of control over brokers' own content, CoStar places the onus on brokers to keep extensive records sufficient to prove that content is in fact the brokers' own content, and that the brokers' own content has not been comingled with CoStar content or that any comingled content has been removed. Since most firms reduced the size or eliminated their research departments upon the advent of LoopNet, virtually all firms nationwide now have databases that likely contain some amount of comingled content. In this environment, it is nearly impossible and most certainly economically untenable for any broker or brokerage to produce a database untarnished by CoStar content.

220.    As a consequence, not only are brokers barred by CoStar from sharing CRE data with CoStar competitors, but CoStar has made it economically untenable for customers in the

114

CRE listings database market to switch from CoStar to a competitor, since the customer will be unable to transfer their comingled listings content to a competitor.

221.     These practices employed by CoStar to assert control over brokers' own content, and to block competitor access to that content through technological and contractual impediments is anticompetitive input foreclosure—nothing less than a thinly veiled attempt by CoStar to unilaterally control CRE data nationwide, and by extension, to unilaterally exercise power in both the CRE listings database and CRE information services markets.

222.     Xceligent's business is harmed by CoStar's anticompetitive input foreclosure. This input foreclosure has prevented Xceligent from growing its CRE listings database and has reduced the quality of its CRE information services.  Notably, these are the same types of harms that CoStar itself stated occur when LoopNet blocked CoStar's access to LoopNet.

**D.     Tying and Bundling CoStar Products and Geographies to Prevent Xceligent's Geographic Expansion and to Prevent Xceligent from Achieving National Scale.**

223.     In addition to utilizing exclusionary contract and other terms and conditions to control brokers' own data, CoStar also employs pricing techniques in its offers to customers to prevent those customers from subscribing to Xceligent for metropolitan areas it services and to products that compete head-to-head with CoStar products through anticompetitive bundling and tying.

224.     First, on information and belief, CoStar utilizes a hidden bundled pricing technique designed to discourage and ultimately prevent regional and national customers from subscribing to products offered by both CoStar and Xceligent in the CRE information services markets.  The technique, if it can truly be called that, is simple.  If a regional broker seeks to subscribe to Xceligent's product to cover part of the broker's region, and to CoStar's product for

the other part of the broker's region (because Xceligent does not yet have full regional coverage), CoStar will price the partial coverage at or near CoStar's price to cover the entire region. CoStar thus effectively offers the competitive geography (the one where Xceligent is present) for free, which is obviously below CoStar's costs. The broker who wants to utilize Xceligent's product, believing it to be superior where available, is forced to decide between paying substantially more for regional coverage in order to use Xceligent's product, or simply purchasing full regional coverage from CoStar at the same or nearly the same price as the partial regional coverage price and receiving a lesser product. In the end, the broker often chooses the less costly, CoStar only option.

225. This scenario has, on information and belief, played out with at least one brokerage firm in the Southeast. The firm requested the ability to reduce their CoStar subscription from several markets to a single market. The firm planned to subscribe to Xceligent in the other markets. As related to Xceligent, CoStar notified the firm that even if the firm reduced the number of markets that the firm subscribed to, there would be no rate reduction correlating to the service reduction.

226. CoStar is fully aware that Xceligent cannot yet offer full national coverage to potential customers in the CRE information services market. This pricing technique that, on information and belief, is employed by CoStar is therefore exclusionary and designed to foreclose a substantial amount of competition in the CRE information services market.

227. Second, on information and belief, CoStar employs similar, hidden service bundling and tying techniques to discourage customers from cancelling services offered by CoStar in the CRE information services market in order to subscribe to services offered by Xceligent, while retaining services offered by CoStar in the CRE listings database market.

116

228. For example, numerous brokers have related to Xceligent representatives the following scenario. A broker seeks to cancel products offered by CoStar in the CRE information services (*e.g.,* CoStar Property) market in order to subscribe to Xceligent's comparable product (*e.g.,* CDX), but seeks to continue subscription to CoStar's listings database product (*e.g.*, LoopNet). In response, CoStar advises the broker that if the CoStar Property account is cancelled, the broker's LoopNet fee will be increased, and in some cases to a level that matches the combined fees previously paid by the broker for both CoStar Property and LoopNet. CoStar thus effectively offers the competitive product (CoStar Property, which is competing with Xceligent's CDX) for free, which is obviously below CoStar's costs. In this way, CoStar discourages the broker from cancelling CoStar services in order to subscribe to Xceligent services.

229. This scenario too has, on information and belief, played out with several brokerage firms. An Xceligent customer in the Midwest was notified that its LoopNet subscription rate was going to increase substantially unless the firm subscribed to CoStar services. Other Xceligent customers in the Southeast were notified that if they terminated CoStar services and subscribed to Xceligent, their LoopNet rates would increase substantially.

230. As with the CRE information services market, CoStar is fully aware that Xceligent cannot yet offer full national coverage to potential customers in the CRE listings database market. Accordingly, CoStar's practice of tying products offered in the CRE information services market to products offered in the CRE listings database market is specifically designed to foreclose competition in the CRE information services market, and to prevent customers from subscribing to Xceligent products by making it economically untenable to for customers to do so.

117

231.     Xceligent's business is harmed by CoStar's anticompetitive geographic bundling and tying.  By preventing Xceligent's expansion, or slowing it, CoStar is able to prevent Xceligent from competing for nationwide customers.  Further, Xceligent's ability to compete for non-nationwide, multi-geography customers is diminished if a customer needs service in a metropolitan area that Xceligent does not serve.

232.     Xceligent's business is harmed by CoStar's anticompetitive product bundling and tying.  By bundling and tying products, CoStar's conduct increases Xceligent's barriers to entry and severely weakens Xceligent's ability to compete for customers who want to use its products but also need a CoStar product.

**E.     Pervasive False and Defamatory Statements About Xceligent and Its Products and Services Designed to Scare Customers Away from Doing Business with Xceligent.**

233.     Over the last 15 years, CoStar has continuously misrepresented Xceligent to potential customers.  On information and belief, CoStar staff members have falsely informed potential customers that Xceligent does not have the necessary financial backing to continue its operations, that Xceligent is grossly understaffing its research operations, was lying to customers about its research staffing capabilities, and that Xceligent is not conducting nearly the level of proactive research as it claimed.  All of these statements were made knowing they were false and in an effort to block Xceligent from successfully gaining market share against CoStar.

234.     CoStar's unlawful conduct extends beyond its anticompetitive practices.  Acting through its officers, employees, and agents, CoStar has published numerous statements about Xceligent that are false, defamatory, and injurious to Xceligent.

118

235. In December 2016, CoStar published a document on its public website that it claims contains "Facts and Information" about Xceligent's conduct, as shown in the screenshot below.





236. In that document, CoStar published the following false statements:

A. "Xceligent . . . has been caught stealing and reselling CoStar's content on an industrial scale";

B. "Hundreds of Xceligent employees and agents . . . were notified over 600 times that what they were doing was wrong, yet continued to bombard the site using masked identities";

C. "Xceligent has paid an army of workers in the Philippines and India low wages to hack into CoStar and steal content";

D. "[B]y setting up a massive piracy operation, Xceligent threatens to stifle the ability of U.S. companies to compete";

E. "Xceligent associates have admitted that Xceligent's business model is 'unethical' and involves 'steal[ing]'";

119

F. "THEFT BY NUMBERS . . . 600+ times notified that they were in breach of LoopNet's terms and what they were doing was ILLEGAL";

G. "THEFT BY NUMBERS . . . 10,000 instances of CoStar data and photos on Xceligent's website";

H. "XCELIGENT'S CULTURE OF THEFT STARTS AT THE TOP"; and

I. "THIS ISN'T THE FIRST TIME XCELIGENT HAS STOLEN COSTAR'S DATA – IT'S IN THEIR DNA."

CoStar Group, *Xceligent, A Daily Mail Company, Is Conducting An Industrial-Scale Overseas IP Theft Operation, December 2016*, a copy of which is attached as Exhibit K, and incorporated here by reference.

237. Each of the above statements was and is false, defamatory, and injurious to Xceligent.

238. Within the same publication containing those false statements, CoStar provided to the media the contact information for its "strategic communications firm," as shown below.

MEDIA CONTACT
JOELE FRANK, WILKINSON BRIMMER KATCHER
DAN KATCHER / JAMIE MOSER / JONATHAN KEEHNER
212.355.4449

239. In early 2017, CoStar published a revised presentation in which it repeated the same false, defamatory, and injurious statements that it published in December 2016. *See* CoStar Group, *Xceligent, A Daily Mail Company, Is Conducting An Industrial-Scale Overseas IP Theft Operation*, a copy of which is attached as Exhibit L, and incorporated here by reference.

240. On or about May 23, 2017, CoStar again published a revised presentation containing the same false, defamatory, and injurious statements that it had published at least twice before. *See* CoStar Group, *Xceligent, A Daily Mail Company, Is Conducting An Industrial-Scale Overseas IP Theft Operation*, a copy of which is attached as Exhibit M, and incorporated here by reference.

241. CoStar asserted that both of its 2017 presentations likewise contained "Facts and Information" about Xceligent.

242. In addition to the false statements that it had made in December 2016 and early 2017 publications, CoStar published in the May 2017 presentation a number of allegations that it claimed were made by a former Xceligent employee:

   a.     "Xceligent managers . . . instructed me . . . to access LoopNet listings and copy all of the property listing information . . . to populate Xceligent's databases."

   b.     "Xceligent Market Analysts . . . populated the Xceligent databases using information that we copied mainly from LoopNet. We did so because that was what Xceligent managers told us to do." *See* Ex. M.

243. On information and belief, CoStar has repeated the above and similar false and defamatory statements, directly and indirectly, to members of the media who cover the CRE industry and to potential consumers of Xceligent's services.

244. Xceligent's business is harmed by CoStar's anticompetitive defamation as it raises Xceligent's cost of acquiring customers, each of whom must be convinced of the validity of Xceligent's data and freedom from suit.

## ANTITRUST INJURY

245.     CoStar's anticompetitive conduct has foreclosed effective competition in both the CRE information services market and the CRE listings database market, causing substantial harm to both markets.

246.     As a direct and proximate result of CoStar's anticompetitive practices, Xceligent has suffered antitrust injury—Xceligent has suffered injury of the type the antitrust laws are intended to prevent, and the injury flows from that which makes CoStar's acts unlawful.

247.     Indeed, CoStar's anticompetitive conduct has caused significant damage to Xceligent, including, without limitation, millions of dollars in (i) additional input costs expended to build the databases necessary to compete and acquire customers in the CRE information services and CRE listings database markets, and (ii) lost revenues and lost profits from unrealized market share.

248.     Through the use of anticompetitive terms and conditions, the altering and otherwise comingling of fake data into broker listings, and the imposition of technological and contractual impediments designed to block Xceligent's access to brokers' own CRE data, CoStar has obstructed and restrained, and continues to obstruct and restrain Xceligent's ability to access and obtain brokers' own CRE data for the purpose of building a CRE database with the national coverage necessary for Xceligent to effectively compete in the CRE listings database and CRE information services markets.

249.     As a direct and proximate result of CoStar's anticompetitive conduct, Xceligent has been and will continue to be compelled to incur substantially higher input costs in an effort to enter and compete in the national CRE listings database and CRE information services markets.  These costs include, but are not limited to, the millions of dollars in salary, travel and

other costs that have been expended by Xceligent (i) to develop, create, and document CRE data strategies specific to local markets through meetings with local brokers and other CRE industry professionals; and (ii) to implement the strategies, research CRE data and build a CRE database from the ground up. Because, unlike CoStar, Xceligent is forced to build from scratch the entire CRE database for the local, regional, and ultimately the national markets.

250. Additionally, because CoStar has blocked and continues to block Xceligent's access to brokers' own CRE data, Xceligent must also overcome unnecessary negative data quality perception as a direct result of Xceligent's constrained efforts to efficiently collect information from brokers. This is a direct result of CoStar's restrictive and exclusionary tactics that disrupt the natural workflow of CRE professionals to effectively share their content with other information providers through many channels, including their website. Xceligent is therefore compelled to incur substantial additional costs of building a CRE database, and slowing substantially Xceligent's national expansion.

251. CoStar's derogatory marketing campaigns and slanderous communications with potential Xceligent customers by CoStar's local representatives in a market directly impact Xceligent's ability to realize market share and profits through fair and honest competition.

252. In addition to raising Xceligent's costs of doing business, CoStar's anticompetitive conduct has also substantially slowed Xceligent's national expansion. Building from the ground up a CRE database covering local, regional, and ultimately the national market is both costly and time intensive. It is of course much easier, less costly, and considerably faster to simply acquire, as CoStar did in many markets, the internal CRE database of a brokerage firm. But for CoStar's anticompetitive conduct, the internal CRE databases of brokerage firms would be equally available to Xceligent.

123

253.    However, since CoStar has blocked and continues to block Xceligent's access to brokers' own CRE data, Xceligent is compelled to incur the time costs of building a CRE database from scratch, slowing substantially Xceligent's national expansion.

254.    There is no procompetitive benefit from CoStar's blocking of Xceligent from customer data as the data belongs to the customers, who are paying CoStar to store and display it to the public—including to Xceligent—for them.  The customers themselves are making the investment in data creation, not CoStar, so CoStar is not incentivized to invest in data creation through exclusive dealing.

255.    As a direct and proximate result of CoStar's anticompetitive conduct for which there is no procompetitive benefit, Xceligent has experienced millions of dollars in lost revenue and lost profits from unrealized market share that Xceligent would have otherwise acquired already through the completion of its expansion into the local and regional markets necessary to achieve national coverage and entry into the CRE information services and CRE listings database markets on the national level.  Without, Xceligent has been unable to offer its suite of products to a substantial portion of the potential customer base in both the CRE information services and CRE listings database markets.

256.    Additionally, and as a result of CoStar's *de facto* long-term exclusive deals and exclusionary product pricing practices, Xceligent has experienced lost revenues from potential customers electing not to switch from CoStar's (much more expensive) products to Xceligent's (much less expensive) products solely due to the increased costs that would be imposed by CoStar after the switch on any CoStar products retained by the customer.

257.    Finally, CoStar's anticompetitive conduct has caused and will continue to cause substantial harm to competition in general in the CRE listings database and CRE information

service markets. Absent CoStar's unlawful conduct, Xceligent's entry and growth would have introduced much-needed competition to these markets, and opened the way for future competitors, increasing market efficiency, providing greater transparency, accuracy and access to information and research, fostering the development of new and innovative products, increasing consumer choice, and lowering product costs for brokers and other CRE industry participants who are now paying higher fees than would otherwise prevail in a truly competitive marketplace.

258.     CoStar's anticompetitive conduct reflects a thinly veiled attempt to obstruct and restrain the entry by Xceligent and other competitors into the CRE information services and CRE listings database markets. CoStar seeks to entrench further its monopoly position, in order to continue charging supra-competitive prices, all at the expense of brokers and other industry professionals and, ultimately, the public.

## CLAIMS FOR RELIEF

### Count I:  Monopolization of the CRE Information Services Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)

259.     Xceligent incorporates here by reference all preceding paragraphs.

260.     The CRE information services market constitutes a relevant product market. A metropolitan area is the relevant geographic market for the product market. A sub-market exists for national customers.

261.     The CoStar Companies possessed and currently possess monopoly power in the CRE information services market in a substantial majority of metropolitan areas in the United States, and in the nationwide customer sub-market.

262.     Barriers to entry and barriers to expansion by existing firms are high in this market.

263. The CoStar Companies, with approximately 87% share of the CRE information services market nationwide and, on information and belief, a similar dominant position in a substantial majority of significant metropolitan areas, have the power to control price in the CRE information services market, and to exclude competition from the market.

264. The CoStar Companies willfully and wrongfully obtained and/or maintained its monopoly in the CRE information services market by engaging in the anticompetitive, exclusionary conduct set forth in the preceding paragraphs of this Counterclaim.

265. The anticompetitive effects of the CoStar Companies' conduct far outweigh any purported procompetitive justifications.

266. The CoStar Companies, through their anticompetitive, exclusionary conduct, have harmed consumers and the marketplace and impaired competition by, without limitation, depriving consumers of access to alternative and innovative CRE information services products that house CRE data more accurate than similar products offered by CoStar, greater choice through the ability to select information services products tailored to cover only the geographic scope of CRE data desired, and lower prices for information services products, including the CDX line of products offered by Xceligent, which healthy and fair competition would have provided.

267. As a direct, foreseeable, and proximate result of the CoStar Companies' anticompetitive, exclusionary conduct, Xceligent was damaged by, without limitation, substantially higher input costs incurred by Xceligent to pursue entry into the CRE information services market, lost revenue and profits from sales of the CDX line of products, and diminution in value of Xceligent's CRE information services business, all in amounts to be proven at trial.

126

268.     The CoStar Companies' anticompetitive and exclusionary conduct has directly and proximately caused injury to Xceligent's business and property, as set forth above. Xceligent's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Xceligent will suffer immediate and irreparable injury for which Xceligent is without an adequate remedy at law.

## Count II:  Monopolization of the CRE Listings Database Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)

269.     Xceligent incorporates here by reference all preceding paragraphs.

270.     The CRE listings database market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.  A sub-market exists for national customers.

271.     The CoStar Companies possessed and currently possess monopoly power in the CRE listings database market in a substantial majority of metropolitan areas in the United States, and in the nationwide customer sub-market.

272.     Barriers to entry and barriers to expansion by existing firms are high in this market, and include the cost to research, build and update the CRE listings database on the national scale necessary to compete in the market and fund the business.

273.     The CoStar Companies, with approximately a 99% share of the CRE listings database market nationwide and, on information and belief, a similar dominant position in a substantial majority of significant metropolitan areas, have the power to control price in the CRE listings database market, and to exclude competition from the market.

274. The CoStar Companies willfully and wrongfully obtained and/or maintained its monopoly in the CRE listing database market by engaging in the anticompetitive and exclusionary conduct set forth in the preceding paragraphs of this Counterclaim.

275. The anticompetitive effects of the CoStar Companies' conduct far outweigh any purported procompetitive justifications.

276. The CoStar Companies, through their anticompetitive, exclusionary conduct, have harmed consumers and the marketplace and impaired competition by, without limitation, depriving consumers of access to alternative and innovative listings database products housing CRE data more accurate than similar products offered by CoStar, and lower prices for listings database products, including the CommercialSearch line of products offered by Xceligent, which healthy and fair competition would have provided.

277. As a direct, foreseeable, and proximate result of CoStar Companies' anticompetitive, exclusionary conduct, Xceligent was damaged by, without limitation, substantially higher input costs incurred by Xceligent to pursue entry into the CRE listings database market, lost revenue and profits from sales of the CommercialSearch line of products, and diminution in value of Xceligent's CRE listings database business, all in amounts to be proven at trial.

278. The CoStar Companies' anticompetitive and exclusionary conduct has directly and proximately caused injury to Xceligent's business and property, as set forth above. Xceligent's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Xceligent will suffer immediate and irreparable injury for which Xceligent is without an adequate remedy at law.

128

**Count III:  Attempted Monopolization of the CRE Information Services Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)**

279.    Xceligent incorporates here by reference all preceding paragraphs.

280.    The CRE information services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.  A sub-market exists for national customers.

281.    The CoStar Companies willfully and wrongfully attempted to obtain and maintain monopoly power in the CRE information services market.

282.    Barriers to entry and barriers to expansion are high in the CRE information services market.

283.    The CoStar Companies, with approximately 87% share of the CRE information services market nationwide and, on information and belief, a similar dominant position in a substantial majority of significant metropolitan areas, have the power to control price in the CRE information services market, and to exclude competition from the market.

284.    The CoStar Companies acted with specific intent to monopolize the CRE information services market, including by pursuing the following anticompetitive conduct more fully detailed above:

A.    Imposing exclusionary contractual terms that prevent customers from using a competitor's products.

B.    Anticompetitive input foreclosure by contaminating broker listings with artificial data known to be false in order to obstruct competitor access to brokers' own data.

129

C.    Exclusionary contractual terms enforced by technological impediments and active conduct that block Xceligent's access to a necessary input—customer data.

D.    Tying and bundling CoStar Products and geographies to prevent Xceligent's geographic expansion and prevent Xceligent from achieving national scale.

E.    Pervasive false and defamatory statements about Xceligent and its products and services designed to scare customers away from doing business with Xceligent.

285.    The CoStar Companies, through their anticompetitive, exclusionary conduct, have harmed consumers and the marketplace and impaired competition by, without limitation, depriving consumers of access to alternative and innovative CRE information services products that house CRE data more accurate than similar products offered by CoStar, greater choice through the ability to select information services products tailored to cover only the geographic scope of CRE data desired, and lower prices for information services products, including the CDX of products offered by Xceligent, which healthy and fair competition would have provided.

286.    The CoStar Companies have a dangerous probability of successfully monopolizing the CRE information services market.

287.    As a direct, foreseeable, and proximate result of the CoStar Companies' anticompetitive, exclusionary conduct, Xceligent was damaged by, without limitation, substantially higher input costs incurred by Xceligent to pursue entry into the CRE information services market, lost revenue and profits from sales of the CDX line of products, and diminution in value of Xceligent's CRE information services business, all in amounts to be proven at trial.

288.    The CoStar Companies' anticompetitive and exclusionary conduct has directly and proximately caused injury to Xceligent's business and property, as set forth above.

130

Xceligent's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Xceligent will suffer immediate and irreparable injury for which Xceligent is without an adequate remedy at law.

### Count IV: Attempted Monopolization of the CRE Listings Database Market in Violation of Sherman Act, Section 2 (15 U.S.C. § 2)

289.    Xceligent incorporates here by reference all preceding paragraphs.

290.    The CRE listings database market constitutes a relevant product market. A metropolitan area is the relevant geographic market for the product market. A sub-market exists for national customers.

291.    The CoStar Companies willfully and wrongfully attempted to obtain and maintain monopoly power in the CRE listing database market.

292.    Barriers to entry and barriers to expansion are high in the CRE listings database market.

293.    The CoStar Companies, with approximately a 99a% share of the CRE listings database market nationwide and, on information and belief, a similar dominant position in a substantial majority of significant metropolitan areas, have the power to control price in the CRE listings database market, and to exclude competition from that market.

294.    The CoStar Companies acted with specific intent to monopolize the CRE listings database market, including by pursuing the anticompetitive conduct alleged in Paragraph 284 and detailed above.

295.    The CoStar Companies, through their anticompetitive, exclusionary conduct, have harmed consumers and the marketplace and impaired competition by, without limitation, depriving consumers of access to alternative and innovative listings database products housing

131

CRE data more accurate than similar products offered by CoStar, and lower prices for listings database products, including the CommercialSearch line of products offered by Xceligent, which healthy and fair competition would have provided.

296. The CoStar Companies have a dangerous probability of successfully monopolizing the CRE listings database market.

297. As a direct, foreseeable, and proximate result of the CoStar Companies anticompetitive, exclusionary conduct, Xceligent has been damaged by, without limitation, substantially higher input costs incurred by Xceligent to pursue entry into the CRE listings database market, lost revenue and profits from sales of the CommercialSearch line of products, and diminution in value of Xceligent's CRE listings database business, all in amounts to be proven at trial.

298. The CoStar Companies' anticompetitive and exclusionary conduct has directly and proximately caused injury to Xceligent's business and property, as set forth above. Xceligent's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Xceligent will suffer immediate and irreparable injury for which Xceligent is without an adequate remedy at law.


**Count V:  Use of Exclusionary Contracts in Violation of Sherman Act, Section 1**
**(15 U.S.C. § 1)**

299. Xceligent incorporates here by reference all preceding paragraphs.

300. The CRE information services market and CRE listings database market constitute relevant product markets.  A metropolitan area is the relevant geographic market for each of these product markets.  A sub-market exists for national customers.

301. Through agreements with its customers, in particular agreements embodying the conduct alleged in Paragraph 284 and detailed above, the CoStar Companies have unreasonably restrained trade in CRE information services products and CRE listings database products.

302. The foregoing acts and practices, and the continuing course of CoStar's anticompetitive conduct, have harmed consumers and competition.

303. The anticompetitive effect of the CoStar Companies' exclusionary conduct far outweighs any claimed procompetitive justifications.

304. The CoStar Companies, through their anticompetitive and exclusionary conduct, have harmed consumers and the marketplace and impaired competition by, without limitation, depriving consumers of access to alternative and innovative CRE information services products that house CRE data more accurate than similar products offered by CoStar, greater choice through the ability to select information services products tailored to cover only the geographic scope of CRE data desired, and lower prices for information services products, including the CDX line of products offered by Xceligent, which healthy and fair competition would have provided.

305. As a direct, foreseeable, and proximate result of the CoStar Companies' anticompetitive, exclusionary conduct, Xceligent has been damaged by, without limitation, substantially higher input costs incurred by Xceligent to pursue entry into the CRE information services market, lost revenue and profits from sales of the CommercialSearch line of products, and diminution in value of Xceligent's CRE listings database business, all in amounts to be proven at trial.

306. The CoStar Companies' anticompetitive and exclusionary conduct has directly and proximately caused injury to Xceligent's business and property, as set forth above.

133

Xceligent's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Xceligent will suffer immediate and irreparable injury for which Xceligent is without an adequate remedy at law.

### Count VI: False or Deceptively Misleading Advertising in Violation of the Lanham Act (15 U.S.C. § 1125)

307.     Xceligent incorporates here by reference all preceding paragraphs.

308.     Through its officers, agents, and employees, the CoStar Companies have made numerous false or misleading statements about Xceligent and its products and services, as noted above.

309.     Among other things, CoStar has claimed in publications that Xceligent:

A.      "has been caught stealing and reselling CoStar's content,"

B.      has a "CULTURE OF THEFT [that] STARTS AT THE TOP,"

C.      has theft "in their DNA,"

D.      runs a "massive piracy operation," and

E.      "populated the Xceligent databases" with content "copied" from CoStar.

*See* Exs. K, L, and M.

310.     Within these same publications, the CoStar Companies promoted their own products and services, including by asserting that:

A.      "COSTAR PLAYS A VITAL ROLE IN THE U.S. ECONOMY";

B.      "25 million people go online and use CoStar products every month to facilitate more than a trillion dollars annually of real estate leases, sales and mortgage originations"; and

134

C. "CoStar has created tens of thousands of U.S. jobs and has paid billions of dollars of U.S. salaries and taxes to create the essential content needed by the U.S. commercial real estate market." *See* Exs. K, L, and M.

311. The CoStar Companies disseminated these statements within the CRE industry and caused them to enter interstate commerce by publishing them on its website and, on information and belief, by repeating them (directly and through its agents) to members of the media who cover the CRE industry and to potential consumers of Xceligent's services.

312. The CoStar Companies' deceptive promotions were likely to influence the purchasing decisions of consumers of CRE listings databases and information services.

313. The CoStar Companies have injured Xceligent through its deceptive promotions, in an amount to be proven at trial.

## Count VII:  Defamation (Libel)

314. Xceligent incorporates here by reference all preceding paragraphs.

315. Through its officers, agents, and employees, the CoStar Companies have made numerous false and defamatory statements about Xceligent as noted above.

316. Among other false statements, the CoStar Companies have published as "Facts and Information" the statements that Xceligent:

a. "has been caught stealing and reselling CoStar's content";

b. paid foreign workers "to hack into CoStar and steal content";

c. "set[] up a massive piracy operation"; and

d. "instructed [employees] to crop out the CoStar watermarks photos [employees] copied from LoopNet." *See* Exs. K, L, and M.

135

317.    The CoStar Companies knew that its statements were false, or acted with reckless disregard to their truth or falsity.

318.    Each of the CoStar Companies' statements is defamatory, in that each falsely accuses Xceligent of specific instances of wrongful conduct or indictable criminal offenses.

319.    The CoStar Companies published these false, defamatory statements to third persons by, among other means, displaying them on its website.

320.    The CoStar Companies' publication of these statements damaged Xceligent's reputation, in an amount to be proven at trial.


**Count VIII:  Injurious Falsehood**

321.    Xceligent incorporates here by reference all preceding paragraphs.

322.    The CoStar Companies published each of the false, defamatory statements about Xceligent and its business, as described above.

323.    The CoStar Companies intended, knew, or should have known that publishing those statements would cause pecuniary harm to Xceligent.

324.    The CoStar Companies knew that the statements were false, or acted with reckless disregard to their truth or falsity.

325.    Xceligent has suffered pecuniary harm as a result of the CoStar Companies' publication of the false statements.

326.    The pecuniary harm that Xceligent has suffered includes, but is not limited to, the legal fees it has incurred in bringing this claim.

136

## PRAYER FOR RELIEF

WHEREFORE, Xceligent respectfully request that the Court adjudge and decree that:

A.      The CoStar Companies have wrongfully obtained and/or maintained monopolies in the national markets for CRE information services and CRE listings databases in violation of Section 2 of the Sherman Act; and/or unlawfully attempted to obtain and maintain monopolies in those markets in violation of Section 2 of the Sherman Act;

B.      The CoStar Companies entered into exclusionary agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.      Xceligent be awarded its actual damages under Counts I-V in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, along with interest on such damages;

D.      Xceligent be awarded injunctive relief prohibiting the CoStar Companies and all persons, firms and corporations acting on their behalf and under their direction or control, from engaging in any further conduct unlawful under Sections 1 and 2 of the Sherman Act, in any manner whatsoever, including, without limitation, and injunction:

      i.      prohibiting the CoStar Companies from blocking access to hosted broker websites (whether by contractual or technological means);

      ii.     prohibiting the CoStar Companies' willful manipulation or "fingerprinting" of broker data;

      iii.    prohibiting the CoStar Companies from watermarking property photos which were not photographed by CoStar employees;

      iv.     prohibiting the CoStar Companies from advising its customers, or advising brokers that customers and brokers cannot share their own listings with Xceligent;

v.      prohibiting CoStar from preventing public access to broker-generated property data and images; and

vi.      prohibiting the CoStar Companies from tying customers to contracts in geographic markets for CRE services which are not desired by brokers.

E.      Grant such other relief as is necessary or appropriate to restore and maintain competitive conditions in the markets affected by the CoStar Companies' unlawful conduct;

F.      Xceligent be awarded its costs of suit, including reasonable attorneys' fees to the extent allowed by law, including, without limitation, as provided in Section 4 of the Clayton Act;

G.      Xceligent be awarded actual and punitive damages under counts VI – VIII in an amount to be determined at trial; and

H.      Xceligent be granted such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38.1, Xceligent demands a trial by jury on all claims and counterclaims.

Dated:  June 28, 2017                    POLSINELLI PC

                                          */s/ Robert A. Henderson*
                                          ROBERT A. HENDERSON        #28566
                                          JOHN M. TYNER              #58864
                                          AMY D. FITTS               #61460
                                          900 W. 48th Place, Suite 900
                                          Kansas City, Missouri  64112
                                          (816) 753-1000
                                          Fax:  816-753-1536
                                          rhenderson@polsinelli.com
                                          jtyner@polsinelli.com
                                          afitts@polsinelli.com

                                          *ATTORNEYS FOR XCELIGENT, INC.*

138

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document was filed electronically with the above-captioned court, with notice of case activity to be generated and sent electronically by the Clerk of said court this 28th day of June, 2017, to all counsel of record.

_/s/ Robert A. Henderson_
Attorney for Xceligent, Inc.