**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

COSTAR GROUP, INC., COSTAR REALTY
INFORMATION, INC., and LOOPNET, INC.,

       Plaintiffs,

       v.

XCELIGENT, INC.,

       Defendant.

Case No. 4:16-cv-01288-FJG

**<u>SUGGESTIONS IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION…………...……………………………………….…………………………...1

LEGAL STANDARD……………………………………….…………………………...……3

ARGUMENT……………………………………………………………………..……4

I.   The Court Should Dismiss the Antitrust Claims………………...……………………….…4

    A.   The Counterclaim Fails To Allege Facts Capable of Supporting a Claim
         for Illegal Monopolization or Attempted Monopolization........................................ .....4

        1.   No Allegation of Illegal Monopoly Acquisition...…………………………………..5

        2.   CoStar's Alleged Refusal To Deal with Xceligent Fails To State
             a Sherman Act Claim...…………...…………………………………………………...5

        3.   CoStar's Alleged "Exclusive" Dealing Contracts Are Facially and Functionally
             Non-Exclusive…………………………...…………………………………………10

        4.   CoStar's Alleged Discounts Are Not Anticompetitive…………...………………..13

        5.   Defamation Is Not Cognizable Under the Sherman Act……………...…………15

    B.   The Counterclaim Fails to Allege Facts Capable of Supporting a Claim for an
         Exclusionary Agreement...………………………………………………………...…16

II.  The Court Should Dismiss the Defamation Claims………………………………………...17

    A.   Xceligent Does Not Sufficiently Allege
         Falsity…………………………………….…………………………………17

    B.   Xceligent Does Not Sufficiently Allege "Actual Malice" To Support Its
         Libel and Injurious Falsehood Claims…………...…………...……………….... ……...18

    C.   Xceligent Does Not Sufficiently Allege "Pecuniary Loss" To Support
         Its Injurious  Falsehood Claim…………………………………...……...…………19

CONCLUSION……………………………………………………………………….....20

# **TABLE OF AUTHORITIES**

## **CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ........................8, 11, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................3, 18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)....................................8

*Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328 (1990) .........................................................13

*Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340 (8th Cir. 1995) ..........................................13, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................3, 18

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015).........................................................................19

*State ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922 (Mo. 2005) .............................19, 20

*Broyles v. Wilson*, 812 F. Supp. 651 (M.D. La. 1993).................................................................16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................................15

*City of Malden v. Union Elec. Co.*, 887 F.2d 157 (8th Cir. 1989)..................................................8

*Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-CV-01241-JLK, 2010 WL
     1416823 (D. Colo. Apr. 7, 2010) .............................................................................................9

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)........................... passim

*Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305 (S.D.N.Y. 1992) ...............................9

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554 (8th Cir. 1998) ..........................15

*DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019 (8th Cir. 2002)..........................................17, 18

*Fairyland Amusement Co. v. Metromedia, Inc.*, 413 F. Supp. 1290 (W.D. Mo.
     1976) ......................................................................................................................................20

*HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007).............................................5, 9

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538 (8th Cir. 2015)..............3, 13, 14

*Lau v. Pugh*, 299 S.W.3d 740 (Mo. Ct. App. 2009) ....................................................................20

*Mayfield v. NASCAR*, 674 F.3d 369 (4th Cir. 2012)...................................................................19

Case 4:16-cv-01288-FJG   Document 128   Filed 08/17/17   Page 3 of 27

*McDonald v. Johnson & Johnson*, 722 F.2d 1370 (8th Cir. 1983)................................................15

*McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014).......................................................19

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) .......................................19

*Midwest Radio Co. v. Forum Publ'g Co.*, 942 F.2d 1294 (8th Cir. 1991) ...............................5, 10

*Miller v. Redwood Toxicology Lab., Inc.*, No. 11-115, 2011 WL 4340860 (D. Minn. Sept. 15, 2011) ...............................................................17

*Morgan v. Ponder*, 892 F.2d 1355 (8th Cir. 1989).........................................4, 5, 10, 14

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004)............................10

*N.Y. Merc. Exch., Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004).............................................................................10

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)...........................................................18

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576 (8th Cir. 2016)..............................................................................17, 18

*Overcast v. Billings Mut. Ins.*, 11 S.W.3d 62 (Mo. 2000) ............................................17

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009) ....................................6, 9, 13

*Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. 1984)......................................4

*Pippen v. NBC Universal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) ...........................................19

*Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987).................................10, 11

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012) ................................19

*Schriener v. Quicken Loans, Inc.*, No. 4:12-cv-1193, 2012 WL 6553830 (E.D. Mo. Dec. 14, 2012) .......................................................................15

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ..............................................4

*SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275 (8th Cir. 1981)....................................5

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) ...........................................................16

*U.S. Bank Nat'l. Ass'n v. Parker*, No. 4:09-cv-1755, 2010 WL 2735661 (E.D. Mo. July 9, 2010)...............................................................................15

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir. 1998)..............................17

iii

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ........................................................................6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).................................................................................................................................. passim

*Vincent v. Utah Plastic Surgery Soc'y.*, 621 F. App'x 546 (10th Cir. 2015)................................17

*Wandersee v. BP Prods. N. Am., Inc.*, 263 S.W.3d 623 (Mo. 2008) ......................................18, 20

*Williams v. Capella Univ.*, No. 17-CV-0267, 2017 WL 1155735 (D. Minn. Mar. 7, 2017) ................................................................................................................................18

*Zean v. Fairview Health Servs.*, 858 F.3d 520 (8th Cir. 2017)....................................................10

## OTHER AUTHORITIES

Restatement (Second) of Torts § 623..............................................................................................20

Federal Rule of Civil Procedure 9(g).............................................................................................20

Case 4:16-cv-01288-FJG   Document 128   Filed 08/17/17   Page 5 of 27

## INTRODUCTION

Over the past thirty years, Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively "CoStar"), built the country's largest and most accurate commercial real estate information and marketing products. These products were not created overnight; nor do they maintain themselves. CoStar built them from the ground up—market by market, building by building, broker call by broker call, and photograph by photograph. To accomplish this task, CoStar relied upon the work of more than 10,000 researchers and an internal investment of nearly $5 billion over the past 30 years. To keep these databases up-to-date, CoStar employs more than 1,400 US-based researchers and spends more than $165 million *each year*. The result is a suite of products that fundamentally changed the commercial real estate industry by allowing larger participation, greater efficiencies, increased transparency, and a more diverse range of real estate transactions.

Defendant Xceligent, Inc. ("Xceligent"), CoStar's competitor, took a different approach. Instead of building competing products by relying solely on its own legwork—visiting buildings, calling brokers, and taking photographs—Xceligent stole content from CoStar and then sold competing products to the marketplace at lower prices. Indeed, when stripped of the rhetoric and self-serving statements, Xceligent's Answer is replete with admissions of liability. Specifically, Xceligent admits: (1) that its employees attempted to access CoStar products but were "blocked out" by CoStar's antipiracy measures, Answer ¶ 18; (2) Xceligent then instructed offshore researchers to use "technological measures in order to work around" CoStar's digital security, *id.* ¶¶ 138–139; (3) CoStar-copyrighted photos "were uploaded to Xceligent's database by Xceligent employees or [Xceligent's foreign agent's] employees," *id.* ¶ 107; and (4) then Xceligent added its "CommercialSearch watermark" to CoStar's photos, *id.* ¶ 104. These admissions confirm the hard evidence of Xceligent's wrongdoing set forth in the Amended Complaint including: (1)

screenshots showing Xceligent's offshore agents covertly accessing CoStar websites and copying content directly into Xceligent's databases, Am. Compl. ¶¶ 19–23; (2) CoStar-website accounts used by Xceligent managers, *id.* ¶ 84; and (3) Skype chats through which Xceligent managers taught foreign "researchers" how to circumvent CoStar's security measures, *id.* ¶¶ 137–138.

Unable to deny liability, Xceligent tries to change the subject by advancing counterclaims. Xceligent argues that CoStar violates federal antitrust laws by preventing brokers from doing business with Xceligent. Yet in 326 paragraphs, Xceligent fails to identify a single broker who is not doing business with Xceligent as a result of something CoStar did. Instead, Xceligent's argument is based on tortured hypotheticals regarding brokers who discard all of their own data, a rewriting of CoStar's customer contracts at odds with their plain text, and the fact that CoStar protects its copyrighted photographs and proprietary data from unlawful copying. Fatally, Xceligent pleads no actual facts to sustain its novel theory that CoStar blocks brokers from supplying CoStar competitors, like Xceligent, with their own information.

Xceligent's antitrust theory also is legally insufficient because it is predicated on the view that CoStar's databases and websites are a public good—like the railways—that Xceligent, a competitor, has the right to use in order to build its business. CoStar has no legal obligation to help competitors like Xceligent. Like every other participant in the American economy, CoStar is entitled to compete vigorously and exclude others, including (if not especially) its competitors from its property. This exclusion does not prevent Xceligent from building its products in the same way that CoStar did—by calling brokers, driving the market, and taking its own photos. But Xceligent instead took the easy way out by illegally stealing content from CoStar.

Xceligent's defamation, injurious falsehood, and false advertising claims are equally baseless. In each case, Xceligent fails to identify any false statement, any actual malice on the

part of CoStar, or any pecuniary loss. In fact, the publications containing CoStar's allegedly defamatory statements describe, in great detail, the foundation upon which CoStar based its statements. Xceligent's real motivation for challenging these statements is not that they are false, but because they are true.

Taken together, Xceligent's counterclaims ask the Court to (1) force CoStar to hand over its intellectual property to prop up its competitor and (2) muzzle CoStar from telling anyone about Xceligent's industrial-scale theft. These counterclaims, filed more than seven months after CoStar initiated this action, should be seen for what they are: a smokescreen to distract from Xceligent's own wrongdoing and a cudgel to expand the scope and cost of resolving this case promptly on its merits. All of them should be dismissed at the threshold.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Although a court "must accept as true all of the allegations contained in a complaint," it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "'A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (brackets omitted) (quoting *Twombly*, 550 U.S. at 555). "Given 'the unusually high cost of discovery in antitrust cases,' . . . the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Id.* (citation and internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 558).

3

**ARGUMENT**

**I.      The Court Should Dismiss the Antitrust Claims.**

Xceligent's counterclaims for Monopolization (Counts I and II), Attempted Monopolization (Counts III and IV), and "Use of Exclusionary Contracts" (Count V), lack merit and should be dismissed.

**A.      The Countercomplaint Fails To Allege Facts Capable of Supporting a Claim for Illegal Monopolization or Attempted Monopolization.**

Xceligent repeatedly denigrates CoStar as a "monopolist" and pretends that label states a claim.  But even assuming *arguendo* that Xceligent's name-calling was accurate, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, *is not only not unlawful; it is an important element of the free-market system*."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*") (emphasis added); *see also Paschall v. Kansas City Star Co.*, 727 F.2d 692, 704 (8th Cir. 1984) (en banc) ("Again, we emphasize that there is nothing unlawful about the mere possession of monopoly power.").

To state a claim for *illegal* monopolization, a plaintiff must allege "that 1) the defendant possessed monopoly power in the relevant market and 2) the defendant *willfully acquired or maintained this monopoly power by anticompetitive conduct* as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'"  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (internal quotation marks omitted) (emphasis added); *accord Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir. 1989).  Similarly, to state an attempted monopolization claim, a plaintiff must allege:  "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

4

"'Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition.'" *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (quoting *Morgan*, 892 F.2d at 1358). "When a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a Sherman Act violation." *Id.* at 549–50 (brackets and internal quotation marks omitted); *see also Midwest Radio Co. v. Forum Publ'g Co.*, 942 F.2d 1294, 1297–98 (8th Cir. 1991) (same). Xceligent fails to allege any conduct that could satisfy those requirements.

### 1. No Allegation of Illegal Monopoly Acquisition.

As an initial matter, Xceligent solely attempts to allege that CoStar used anticompetitive means to *maintain* a monopoly. *See* Countercls. ¶ 149. It does not—and could not—allege that CoStar *acquired* a monopoly through anticompetitive conduct. Rather, it concedes that CoStar obtained its market position by innovating the very concept of a national commercial real estate ("CRE") database, and then expanding that database "through a series of mergers and acquisitions." *Id.* ¶¶ 47–50, 64–74. That is precisely the type of innovative behavior the antitrust laws are meant to encourage. *See Trinko*, 540 U.S. at 407. A claim of illegal monopoly acquisition could not plausibly be premised on such facts. *See, e.g., SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1280 (8th Cir. 1981) (noting plaintiff did not challenge acquisition of monopoly power where defendant innovated product and rivals entered market years later).

### 2. CoStar's Alleged Refusal To Deal with Xceligent Fails To State a Sherman Act Claim.

The core premise underlying Xceligent's monopoly allegations is the belief that CoStar has an obligation to permit competitors to access LoopNet, the CRE marketplace for which CoStar paid more than $800 million and has invested tens of millions more, for the purpose of creating competing CRE databases, and that it engages in anticompetitive conduct if it declines

5

to do so.  *See, e.g.*, Countercls. ¶ 151 (alleging that CoStar "convert[s] user-submitted photographs and information into CoStar property, which users are then forbidden from sharing with CoStar's competitors"); *id.* ¶ 201 (alleging that CoStar "employs technological measures to block competitor access to brokers' own lists inventories that reside on LoopLink hosted websites, or solely on LoopNet"); *id.* ¶ 248 (same).  According to this theory, CoStar has "forced [Xceligent] to build from scratch" its own competing CRE database, thereby raising its costs and reducing competition.  *Id.* ¶ 249.  Xceligent's theory of liability has no basis in law.

As the Supreme Court has explained, "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers." *Trinko*, 540 U.S. at 407–08.  "Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  *Id.* "Thus, as a general matter, the Sherman Act 'does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Id.* (brackets omitted) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  As a result, with "few existing exceptions . . . *there is no duty to aid competitors*," *id.* at 411 (emphasis added), and a party alleged to have provided "insufficient assistance . . . to rivals" has not violated the Sherman Act, *id.* at 410; *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448–51 (2009).

"Insufficient assistance" is all that Xceligent truly alleges in this case.  It contends that "[b]uilding from the ground up a CRE database covering local, regional, and ultimately the national market is both costly and time intensive."  Countercls. ¶ 252.  Xceligent would like to avoid those costs, and it reasons that it would be much cheaper and easier to build a CRE

6

database by copying the contents of LoopNet. Thus, the "anticompetitive" acts it alleges CoStar engaged in consist of nothing more than actions to prevent the copying of LoopNet by would-be competitors—i.e., asserting property rights over the contents of its property, LoopNet, *id.* ¶¶ 151–169; allegedly making slight changes to information in LoopNet to identify and deter thieves, *id.* ¶¶ 179–98;[1] and blocking competitors' access to LoopNet, *id.* ¶¶ 199–222. The common thread in each of those allegations (which, notably, fail to identify a single broker who did not provide information to Xceligent because of something CoStar did), is that they all describe CoStar's alleged refusal to allow LoopNet to become a shortcut for the creation of a competing CRE database. But as *Trinko* explains, there would be no incentive for a company like CoStar to build a national CRE database if it could then be "[c]ompell[ed] . . . to share the source of [its] advantage" with other firms who did not make the same investment. 540 U.S. at 407. It is for that reason—"[t]o safeguard the incentive to innovate," *id.*—that the antitrust laws impose no general obligation to render assistance to competitors. If Xceligent chooses, it can invest the time and expense required to build its own CRE database. *See* Countercls. ¶ 252. But the Sherman Act provides no basis to force CoStar to provide a short-cut that would accelerate the growth of Xceligent's business, while eroding the value of CoStar's.

To be sure, courts have recognized two very limited circumstances in which a company may be required to deal with its rivals, but neither applies here. First, in a decision that it later described as "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, the Supreme Court held that a ski resort that had "cooperated for years" with its rival in a profitable joint venture could face liability for terminating that venture in order to put its rival out of

---

[1] This allegation relies nearly exclusively on two paragraphs in the Amended Complaint, which solely reference unintentional errors introduced into the data. *See* Am. Compl. ¶¶ 115–116; Countercls. ¶¶ 179–198. For this reason alone, Xceligent's allegation need not be credited.

Case 4:16-cv-01288-FJG   Document 128   Filed 08/17/17   Page 12 of 27

business.  *Id.* at 408–09 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)).  But central to the Court's reasoning was "the defendant's decision to cease participation in a cooperative venture," which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end."  *Id.* at 409.  No such allegation has been, or could be, made here.  Protection of its investment in LoopNet is fundamental to CoStar's business, and it has never permitted others to use it for the creation of their own competing CRE databases.

Second, courts have recognized an "essential facilities doctrine" under which a firm with sole possession over a "bottleneck" in an industry may be required to license that facility to competitors.  *See, e.g.*, *City of Malden v. Union Elec. Co.*, 887 F.2d 157, 160 (8th Cir. 1989).  Even assuming that the doctrine remains good law—which is in considerable doubt[2]—its basic requirements cannot be met here.  For one thing, the doctrine only requires a company to share access to its facility "when such use is economically and technically feasible."  *Id.*  There is no economically feasible way for CoStar to allow another company to copy its CRE database and license it as a competing service.  The very act would destroy the value of LoopNet.

Just as importantly, the doctrine has no application if there are alternative ways of accessing the facility.  *See Trinko*, 540 U.S. at 411 ("the *indispensable requirement* for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose" (emphasis added)); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016) (essential facilities doctrine does not apply if the plaintiff had alternatives to defendant's facility, even if those alternatives were not "conducive to [its] existing business model" (internal quotation marks omitted)).  That limitation forecloses any attempt by Xceligent to rely upon the doctrine.  As Xceligent pleads, there are alternative ways

---

[2] In *Trinko*, the Supreme Court noted that it has "never recognized such a doctrine," but found "no need either to recognize it or to repudiate it here."  540 U.S. at 411.

8

of compiling a database of CRE information—including, at minimum, by obtaining information from public records searches; by taking photographs and measurements of publicly accessible buildings; and by asking brokers to share the information that they "originally generated" and provided to CoStar. Countercls. ¶¶ 22, 36.[3]  Although these alternatives are more "costly and time intensive" than Xceligent would like, *id.* ¶ 252, their existence forecloses any legal basis to use the essential facilities doctrine to force CoStar to share the fruits of its own investment in a national CRE database or marketplace.  *See Trinko*, 540 U.S. at 411.[4]

The two inapposite circumstances just described are the only exceptions courts have ever recognized to the proposition that companies possess "no duty to aid [their] competitors" and do not violate the Sherman Act by refusing to deal with them.  *Trinko*, 540 U.S. at 411; *Pac. Bell Tel. Co.*, 555 U.S. at 448.  Because neither exception applies here, Xceligent's core allegation that CoStar attempted to block competitors from using LoopNet to create their own competing databases, *see* Countercls. ¶¶ 151–222, does not state a claim.

Finally, even if the Sherman Act had imposed a duty on CoStar to cooperate with its competitors, the particular acts alleged by Xceligent still would not constitute a plausible basis to find that it engaged in anticompetitive conduct.  As noted above, conduct will only be considered anticompetitive when it is undertaken for *no other purpose* than to foreclose competition.  *HDC*

---

[3] Indeed, Xceligent incredibly suggests that one of the biggest impediments to accessing CRE information is that brokers "often lack[] the time *and the interest* to keep listings up to date and accurate."  Countercls. ¶ 131 (emphasis added).  If CoStar were an unlawful monopolist, it would stand to reason that brokers—the customers over whom it holds that alleged monopoly power—would want to help a potential competitor.  Xceligent's belief that brokers have no real "interest" in assisting the creation of another CRE database is a powerful indictment of its claim.

[4] *See also Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305, 332 (S.D.N.Y. 1992) (trademark database not an "essential facility" because it was capable of being replicated from public records); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-CV-01241-JLK, 2010 WL 1416823, at *2, 15–16 (D. Colo. Apr. 7, 2010) (finding "the only industry-wide database of individuals who have tested positive for drug or alcohol use in the past" was not an essential facility because the plaintiffs could create their own database).

*Med., Inc.*, 474 F.3d at 549–50. "When a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a Sherman Act violation." *Id.* (alteration and internal quotation marks omitted); *see also Morgan*, 892 F.2d at 1358 (same); *Midwest Radio Co.*, 942 F.2d at 1297–98 (same). The conduct Xceligent is challenging serves an obvious business purpose: to prevent others from free-riding on CoStar's sizeable investment in creating and maintaining LoopNet. *See* Countercls. ¶¶ 29, 182, 189. It is well-established that "[t]he prevention of free-riding, which is an inherently economic motivation, provides a valid business justification." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296–98 (11th Cir. 2004); *see also N.Y. Merc. Exch., Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) ("NYMEX's settlement prices have value because they are viewed as proxies for market prices, and NYMEX has a legitimate interest in preventing rivals from free-riding on this reputation."); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987) (recognizing benefits of preventing free-riding). For that reason as well, Xceligent fails to allege sufficient anticompetitive conduct to state a claim.

### 3.    CoStar's Alleged "Exclusive" Dealing Contracts Are Facially and Functionally Non-Exclusive.

Xceligent also attempts to manufacture anticompetitive conduct by baselessly alleging that CoStar has entered into "exclusionary" contracts with brokers. *See* Countercls. ¶¶ 151–178. Xceligent alleges no facts that could plausibly support a finding of exclusive dealing—and attaches and incorporates into its Countercomplaint contracts that *contradict* those allegations. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (if the language of the attached contract contradicts the allegations of the complaint, the contractual language governs for purposes of dismissal).

10

Exclusive dealing contracts "impos[e] an obligation on a distributor to deal only in the goods of a single supplier." *Ryko Mfg. Co.*, 823 F.2d at 1233; *see also Aerotec Int'l, Inc.*, 836 F.3d at 1180–81 (exclusive dealing is an "agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor and forecloses competition" (internal quotation marks omitted)).[5]

Xceligent fails to identify any such agreement entered into between CoStar and any customer. Quite the opposite, the agreements to which Xceligent erroneously applies that label admittedly "*purport to grant CoStar only a 'non-exclusive' license to broker-submitted content.*" Countercls. ¶ 170 (emphasis added). Specifically, Xceligent points to the LoopNet terms of service, which "provide that a broker who submits a listing retains 'any applicable ownership rights' in their 'Submitted Content,'" while "LoopNet receives a []*non-exclusive* . . . right and license . . . with respect to all such Submitted Content." *Id.* ¶¶ 154–155 (emphasis added). Those agreements could not be clearer in their lack of exclusivity. Brokers who supply CRE information to LoopNet are free to supply the same information to Xceligent or any other CRE database provider they choose. The requisite "obligation . . . to deal only in the goods of a single supplier," *Ryko Mfg. Co.*, 823 F.2d at 1233, is nowhere to be found.

Neither is this a circumstance in which a facially non-exclusive agreement could be labeled *de facto* exclusive based upon its practical effects. To the extent courts have recognized that possibility, they have done so where the terms of an agreement create powerful incentives for customers to behave as though their contracts were exclusive even when they are not. *See, e.g.*, *Aerotec Int'l*, 836 F.3d at 1180–81 (finding no evidence of *de facto* exclusive dealing where

---

[5] Even if an exclusive dealing contract exists, its legality depends upon the degree of competition foreclosed. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000); *Ryko Mfg. Co.*, 823 F.2d at 1233.

11

the defendant did not provide "all-or-nothing" discounts or rebates or require purchasers to meet market penetration targets); *Concord Boat*, 207 F.3d at 1059 (rejecting claim that a volume-based "discount program was in any way exclusive" because it "did not require the boat builders to commit to Brunswick for any specified period of time").

Xceligent pleads no contractual incentives or penalties that could impose *de facto* exclusivity over CoStar's agreements with brokers.[6]  While Xceligent focuses on CoStar's contractual right to add watermarks or make adjustments to listing information, Countercls. ¶ 157, the type of exclusivity that creates—dominion over a *particular copy* of information, as opposed to exclusivity *with the broker* who provided it—is not the concern of the antitrust laws.[7] And as Xceligent specifically alleges, the reason some unspecified brokers choose to put information in LoopNet while not providing it to other databases is that they lack "the time and interest to keep listings up to date and accurate" and "do not have the time or resources to upload and update listings content on multiple databases."  Countercls. ¶ 36; *id.* ¶ 131.  Even crediting the truth of those allegations, they do not amount to an *agreement* between CoStar and these supposed brokers to deal exclusively.[8]  It would stand antitrust law on its head to hold that a

---

[6] Nor could it, because elsewhere Xceligent expressly agrees that in reality "'brokerages [are] free to provide their own photographs and information' to Xceligent."  *See* Dkt. 122 at 9.  That explains why Xceligent does not plead facts—for example, the identity of any broker that has in fact failed to provide information about even one property to Xceligent because of a (de facto or otherwise) exclusive agreement with CoStar—in support of its theory.

[7] For example, nearly all product retailers have the exclusive right to sell the particular copy of the manufactured articles on their shelves.  That does not mean they have an exclusive dealing arrangement with the manufacturer, which can provide other copies to other stores.

[8] As additional reasons for brokers' reliance on LoopNet, Xceligent imagines that unidentified brokers might sometimes "travel[] without access to [their] files," Countercls. ¶ 169, and hypothesizes that some (again, unspecified) brokers discard their own copies of photographs and CRE information after providing them to LoopNet, *id.* ¶¶ 195, 219.  Even if this fact-free speculation were to be credited, and it should not be, Xceligent identifies nothing in CoStar's *agreements* with brokers that would incentivize them to take such implausible actions.

business could be found liable for entering into an exclusive dealing *agreement* simply because its customers *unilaterally* decide not to engage a competing service that they lacked the "time and interest" to utilize.

In short, Xceligent has not identified any facts from which a jury could conclude CoStar and its customers entered into an anticompetitive exclusive dealing arrangement.[9]

### 4. CoStar's Alleged Discounts Are Not Anticompetitive.

Xceligent next alleges that CoStar engaged in anticompetitive conduct by offering *discounts* to incentivize customers to use more than one of its services. *See* Countercls. ¶¶ 223–232. But as the Eighth Circuit has repeatedly warned, courts must exercise "great caution and a skeptical eye when dealing with unfair pricing claims." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 343 (8th Cir. 1995). "This is because '[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.'" *Concord Boat*, 207 F.3d at 1060 (alteration in original) (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 340 (1990)). "In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Pac. Bell Tel. Co.*, 555 U.S. at 451 (internal quotation marks omitted). "To avoid chilling aggressive price competition, [the Supreme Court has] carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *Id.* Specifically, a plaintiff must sufficiently allege facts showing that (1) the defendant's prices are

---

[9] In a single conclusory paragraph, Xceligent alleges that CoStar caused an unidentified brokerage firm to believe it was not permitted to share listing information with Xceligent. Countercls. ¶ 177. This conclusory assertion of a single broker's mistaken belief, with no allegation of the effect, if any, that had on the marketplace, is insufficient to allege that CoStar maintained an illegal monopoly through anticompetitive conduct. *See Insulate SB*, 797 F.3d at 543 (pleading antitrust claims requires more than conclusory labels).

13

below cost, and (2) there is a "dangerous probability" the defendant will be able to recoup its losses later. *Id.* (ordering dismissal of claim that lacked these allegations). "If a firm has discounted prices to a level that remains above the firm's average variable cost, 'the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive.'" *Concord Boat*, 207 F.3d at 1061 (internal quotation marks omitted) (quoting *Morgan*, 892 F.2d at 1360).[10]

Xceligent alleges no facts that could overcome the "strong presumption of legality" that attaches to CoStar's pricing of LoopNet and other CoStar products. In one conclusory paragraph, it alleges that by bundling prices in two different geographic areas, CoStar "*effectively* offers the competitive geography (the one where Xceligent is present) for free, which is *obviously* below CoStar's costs." Countercls. ¶ 224 (emphases added). In another conclusory paragraph, it alleges that by bundling two different services, CoStar "*effectively* offers the competitive product . . . for free, which is *obviously* below CoStar's costs." *Id.* ¶ 228 (emphases added). These allegations appear designed to mimic the legal standard, but that sort of conclusory labeling is not enough to state a claim. *See Insulate SB*, 797 F.3d at 543 ("a formulaic recitation of the elements of a cause of action will not do" (internal quotation marks omitted)). The Countercomplaint contains no allegations from which one could conclude that CoStar's cost to provide the *bundled services* exceed the price it charges for *those services*. For all that the Countercomplaint alleges, CoStar is offering a basket of different services at

---

[10] The FTC Order that Xceligent frequently cites, *see, e.g.*, Countercls. ¶¶ 87–96, explicitly provides that CoStar may provide exactly this type of discount: "Respondents may offer to or provide Customers commercially reasonable or customary discounts and other incentives if Customers purchase more than one of Respondents' CRE Product Offerings or purchase CRE Product Offerings in more than one geographic area." *See* Countercls., Ex. A, § III.F(3).

14

discounted prices that are both attractive to its customers, and above its own costs. That is "the very essence of competition." *Concord Boat*, 207 F.3d at 1061–62.[11]

The speculative nature of Xceligent's allegations is reinforced by the fact that it bases those allegations solely "on information and belief." *See* Countercls. ¶¶ 224–227 & 229. As many courts in this Circuit have held, such allegations are "simply too speculative" to state a claim upon which relief can be granted. *U.S. Bank Nat'l. Ass'n v. Parker*, No. 4:09-cv-1755, 2010 WL 2735661, at *3 (E.D. Mo. July 9, 2010); *see also Schriener v. Quicken Loans, Inc.*, No. 4:12-cv-1193, 2012 WL 6553830, *2 (E.D. Mo. Dec. 14, 2012) (same), *aff'd* 774 F.3d 442 (8th Cir. 2014). Given the Eighth Circuit's admonition to treat predatory pricing claims with "great caution and a skeptical eye," *Bathke*, 64 F.3d at 343; *Concord Boat*, 207 F.3d at 1060, they cannot be based on such flimsy grounds.

### 5. Defamation Is Not Cognizable Under the Sherman Act.

For its final allegation of anticompetitive conduct, Xceligent seeks to recycle its claims for defamation and commercial disparagement into antitrust claims. *See e.g.,* Countercls. ¶¶ 233–244. In addition to the substantive reasons for dismissing those allegations, *see infra* Part II, the law does not permit a party to convert a defamation claim into a Sherman Act violation.

In any antitrust claim, plaintiffs are required to plead and prove "antitrust injury, which is to say injury of the type the *antitrust laws* were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977) (emphasis added); *see also McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983) ("a mere causal connection between an antitrust violation and harm to

---

[11] Xceligent also refers to these allegations as a form of "tying." *See* Countercls. ¶¶ 223, 232. That label mischaracterizes Xceligent's claim, as there is no allegation that CoStar conditions the license of one product on an agreement to license a second one. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 559 (8th Cir. 1998) (defining elements of a tying claim).

a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect"). Xceligent's allegations of defamation and disparagement cannot satisfy that requirement. As courts have unanimously held, injury to "reputation, dignity and emotional damages are not the type of injuries redressable by the antitrust laws." *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006); *see also Broyles v. Wilson*, 812 F. Supp. 651, 655 (M.D. La. 1993) (reputational harm caused by defamatory comments "is not the type of conduct the antitrust laws were enacted to prohibit or punish"), *aff'd*, 3 F.3d 439 (5th Cir. 1993) (unpublished). Accordingly, Xceligent cannot satisfy its obligation to plead and prove anticompetitive conduct by incorporating its defamation and disparagement claims.

## B. The Countercomplaint Fails to Allege Facts Capable of Supporting a Claim for an Exclusionary Agreement.

In addition to its monopolization claims, Xceligent pleads a stand-alone cause of action for the use of exclusionary agreements in violation of section one of the Sherman Act. *See* Countercls. ¶¶ 299–306 (Count V). Xceligent pleads no new facts in support of that cause of action. Instead, it relies upon the same allegations as its monopolization claims, *id.* ¶ 301, including the allegation that agreements conferring a "*non-exclusive*" right to license brokers' CRE information, somehow constitute exclusive agreements, *id.* ¶¶ 151–178.

For all of the reasons stated previously, the agreements Xceligent is challenging contain neither language imposing an obligation to deal exclusively with CoStar, nor incentives that would have the functional effect of an exclusivity provision. For that reason, Xceligent has not stated a claim under section one of the Sherman Act. *See Aerotec Int'l*, 836 F.3d at 1180–81 (An exclusive dealing claim "cannot succeed without evidence of exclusive dealing").

## II. The Court Should Dismiss the Defamation Claims.

Xceligent's false advertising (Count VI), libel (Count VII), and injurious falsehood (Count VIII) claims boil down to the bald assertion that CoStar's statements about Xceligent's theft are "false." But Xceligent does not plead any facts to support that conclusion, and therefore fails to satisfy the minimum pleading requirements for these claims. In addition, Xceligent does not adequately allege the "actual malice" element of libel or injurious falsehood or the "pecuniary loss" element of injurious falsehood. All three of these claims should be dismissed.

### A. Xceligent Does Not Sufficiently Allege Falsity.

Falsity is a required element of Xceligent's claims. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998) (Lanham Act false advertising); *Overcast v. Billings Mut. Ins.*, 11 S.W.3d 62, 70 (Mo. 2000) (en banc) (libel); *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580 (8th Cir. 2016) (injurious falsehood). Therefore, Xceligent must allege "sufficient facts, as opposed to mere conclusions," to plead that CoStar's statements were false. *DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022 (8th Cir. 2002).

Courts regularly dismiss these types of claims for failure to plead facts supporting a conclusion of falsity. For example, a court dismissed statutory misrepresentation claims concerning a drug testing company's statements that tests were government-"approved" and performed with the "most sophisticated" equipment, using "the same [analysis] as that applied under the Lanham Act" to false advertising claims, because the plaintiff did not "provide[] any facts to support its conclusory allegation" that the statements were untrue. *Miller v. Redwood Toxicology Lab., Inc.*, No. 11-115 (DWF/LIB), 2011 WL 4340860, at *5, *7 (D. Minn. Sept. 15, 2011) (internal quotation marks omitted), *aff'd*, 688 F.3d 928 (8th Cir. 2012); *see also Vincent v. Utah Plastic Surgery Soc'y.*, 621 F. App'x 546, 550 (10th Cir. 2015) (affirming dismissal of Lanham Act claims because allegations of falsity were "wholly unsupported by even a single

17

relevant fact"). Similarly, a court recently concluded that an inventor failed to state a claim that he was defamed by the statement that he had not cured a disease. *See Williams v. Capella Univ.*, No. 17-CV-0267 (DSD/FLN), 2017 WL 1155735, at \*4 (D. Minn. Mar. 7, 2017), *report and recommendation adopted*, 2017 WL 1157100 (D. Minn. Mar. 27, 2017). Even though the inventor alleged that the statement was "false and defamatory," and that he had "a patent pending with the USPTO," the court found his "conclusory" pleading insufficient because he "must not only allege, but *plausibly* allege, that the statement was false." *Id.* (internal quotation marks omitted); *see Others First, Inc.*, 829 F.3d at 580–81 (noting that "for a statement to be actionable as injurious falsehood it must be defamatory," and finding multiple statements "non-actionable as a matter of law" because they were true).

Here, Xceligent repeatedly labels CoStar's statements "false." *See* Countercls. ¶¶ 2, 149, 233–234, 237, 240, 242–243, 284, 315–316, 318, 322. But such conclusory allegations do not meet federal pleading standards because Xceligent has not alleged *any* facts to support them. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557; *DuBois*, 276 F.3d at 1022. Xceligent does not plead facts, by way of example, from which a jury could conclude that the documented instances of Xceligent contractors stealing CoStar's data, or being instructed to crop out CoStar watermarks in copied photographs, are untrue—nor could it. Accordingly, these claims fail.

## B. Xceligent Does Not Sufficiently Allege "Actual Malice" To Support Its Libel and Injurious Falsehood Claims.

The requisite fault for libel and injurious falsehood is "actual malice"—i.e., that CoStar made a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see Wandersee v. BP Prods. N. Am., Inc.*, 263 S.W.3d 623, 635 (Mo. 2008) (en banc). Every court of appeals that has addressed the issue after *Iqbal* and *Twombly* has concluded that a party "*must plead facts* giving

rise to a reasonable inference that the defendants acted to intentionally avoid learning the truth."

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 704 (11th Cir. 2016) (emphasis added); *see also*

*Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016);

*McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBC Universal Media, LLC*,

734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. NASCAR*, 674 F.3d 369, 377–78 (4th Cir. 2012);

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56–58 (1st Cir. 2012).

Rather than plead such facts, Xceligent repeatedly recites the actual malice standard.  *See*

Countercls. ¶¶ 233, 317, 324.  That is not good enough.  Xceligent, like the plaintiff in *Michel*,

needed to plead a "basis from which a reasonable inference of actual malice can be drawn," such

as an indication that CoStar's statements were "fabricated by the defendants, wholly imaginary,

based on an unverified anonymous phone call, inherently improbable, or obviously worthy of

doubt."  816 F.3d at 705.  There is no reason to believe Xceligent ever could plead such facts.

Indeed, the publications containing CoStar's allegedly defamatory statements meticulously

describe the foundation upon which CoStar based its statements—including photographs,

screenshots, account records, quotations from former Xceligent employees and contractors, and

side-by-side portrayals of identical CoStar and Xceligent content.  *See* Countercls., Ex. K, at 6–

10, 13–19; Ex. L, at 6–13, 16–22;, Ex. M, at 6–13, 17–40.  Xceligent pleads *nothing* to support a

plausible conclusion that CoStar knew all of this information, including the information housed

in the business records seized from Xceligent's own offshore contractor, was somehow false or

recklessly disregarded its falsity.  No such facts exist, and the Court should dismiss these claims.

### C.    Xceligent Does Not Sufficiently Allege "Pecuniary Loss" To Support Its Injurious Falsehood Claim.

An injurious falsehood claim requires adequate allegations of "pecuniary loss."  *See State*

*ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005) (en banc) (internal

quotation marks omitted).  Because pecuniary loss is a type of special damages, Rule 9(g) requires them to be "specifically stated." Fed. R. Civ. P. 9(g); *see* Restatement (Second) of Torts § 623 A cmt. g (injurious falsehood "arose as an action on the case for the special damage resulting from the publication"); *Ross*, 163 S.W.3d at 928–29 (following the Restatement); *see also Fairyland Amusement Co. v. Metromedia, Inc.*, 413 F. Supp. 1290, 1292 (W.D. Mo. 1976) (dismissing complaint for failure to plead a "sufficiently specific" claim of special damages).

The only loss Xceligent alleges is the loss it chose to impose on itself:  "the legal fees it has incurred in bringing this claim."  Countercls. ¶ 326.  But Missouri courts only consider legal fees as a pecuniary loss if they are incurred in litigation "necessitated" by another party in the context of slander of title, malicious prosecution, or similar situations.  *Lau v. Pugh*, 299 S.W.3d 740, 750–52 (Mo. Ct. App. 2009) (internal quotation marks omitted) (slander of title); *see Wandersee*, 263 S.W.3d at 635 (awarding fees for defending felony charges resulting from defendant's "false allegation of theft" in injurious falsehood action).  Even in those cases, courts "reject" recovery of fees for bringing the action for damages.  *Lau*, 299 S.W.3d at 750 n.12 (recoverable costs for slander of title are limited to "fees expended in clearing up the disparaged title").  Otherwise, every plaintiff could assert a pecuniary loss simply by paying a lawyer to file an injurious falsehood claim, which would effectively read the element out of the claim. Because Missouri courts do not recognize the only damages Xceligent has pleaded as sufficient to state a claim, and because Xceligent has not pleaded pecuniary loss with specificity, its injurious falsehood claim fails on this basis too.

## CONCLUSION

For the reasons stated, the Court should dismiss Xceligent's counterclaims.

Dated:  August 17, 2017

Respectfully Submitted,

By: /s/ Nicholas J. Boyle

Eric M. Anielak - MO Bar # 45653
Elizabeth Fessler - MO Bar # 67169
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Fax: (816) 421-5547
eanielak@shb.com

Nicholas J. Boyle (*pro hac vice*)
C. Bryan Wilson (*pro hac vice*)
Matthew H. Blumenstein (*pro hac vice*)
Jonah E. Perlin (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
nboyle@wc.com

*Attorneys for Plaintiffs CoStar Group, Inc.*
*and CoStar Realty Information, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document was filed electronically with the above-captioned court and served by e-mail, on this 17th day of August 2017, to the following counsel:

Robert A. Henderson
John Tyner
Amy D. Fitts
Polsinelli PC
900 W. 48th Street
Suite 900
Kansas City, MO 64112
Telephone: (816) 374-0530

*Attorneys for Defendant Xceligent, Inc.*

/s/ Elizabeth A. Fessler
Elizabeth A. Fessler