**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

COSTAR GROUP, INC., COSTAR REALTY
INFORMATION, INC., and LOOPNET, INC.,

      Plaintiffs,

v.

XCELIGENT, INC.,

      Defendant.

Case No. 4:16-cv-01288-FJG

REQUEST FOR ORAL ARGUMENT

**DEFENDANT XCELIGENT, INC.'S SUGGESTIONS IN OPPOSITION
<u>TO PLAINTIFF'S MOTION TO DISMISS</u>**

60173941.3

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTS ................................................................................................................ 1

LEGAL STANDARD ......................................................................................... 3

ARGUMENT ...................................................................................................... 3

A.     Xceligent Has Sufficiently Pleaded Claims for Monopolization by CoStar in
Violation of Sherman Act, Section 2. ..................................................... 3

      1.     CoStar willfully acquired and maintains its monopoly position through
anticompetitive conduct. .......................................................... 4

      2.     CoStar's blocking of Xceligent researchers from brokers' LoopLink-
supported websites and from LoopNet is an anticompetitive refusal to
deal. ........................................................................................ 5

      3.     CoStar forces customers into unlawful exclusive agreements. ............... 6

      4.     CoStar unlawfully ties and bundles its products. .................................. 10

      5.     CoStar has launched a campaign of false and defamatory statements about
Xceligent and its products and services in order to scare customers away
from doing business with Xceligent. ........................................ 15

B.     Xceligent Has Sufficiently Pleaded a Claim for the Use of Exclusionary Contracts
by CoStar in Violation of Sherman Act, Section 1. ........................................ 16

C.     Xceligent Has Sufficiently Pleaded Its Defamation Based Claims Premised on
CoStar's False and Misleading Statements. .................................................... 16

      1.     Xceligent Has Sufficiently Pleaded That CoStar's Statements Were False. ........ 17

      2.     Xceligent Has Sufficiently Pleaded CoStar's Culpability For Its
Defamation and Injurious Falsehood Claims. ........................................ 19

      3.     Xceligent Has Sufficiently Pleaded Its "Pecuniary Loss" To Support Its
Injurious Falsehood Claim. ................................................... 20

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. ASRC Comm'cn,*
No. 4:08CV1575 HEA, 2010 WL 1404179 (E.D. Mo. Apr. 8, 2010)....................................20

*Amerinet, Inc. v. Xerox Corp.,*
972 F.2d 1483 (8th Cir. 1992) .........................................................................................12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...........................................................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)......................................................................................................5, 6

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...........................................................................................................3

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) ...........................................................................................14

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ......................................................................................4, 10

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002) ...........................................................................................15

*CoStar v. John Doe,*
No. 1:14-cv-2304-AKH (S.D.N.Y. Apr. 2, 2014) ..............................................................8

*DataGate, Inc. v. Hewlett-Packard Co.,*
60 F.3d 1421 (9th Cir. 1995) .......................................................................................11, 12

*Fortner Enters., Inc. v. U.S. Steel Corp.,*
394 U.S. 495 (1969).........................................................................................................12

*Gen. Indus. Corp. v. Hartz Mountain Corp.,*
810 F.2d 795 (8th Cir. 1987) .............................................................................................5

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
491 U.S. 657 (1989).........................................................................................................19

*HDC Med., Inc. v. Minntech Corp.,*
474 F.3d 543 (8th Cir. 2007) .............................................................................................4

60173941.3

*Henley v. Brown,*
686 F.3d 634 (8th Cir. 2012) ........................................................................3

*Illinois Tool Works Inc. v. Independent Ink, Inc.,*
547 U.S. 28 (2006) ........................................................................................11

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.,*
164 F. Supp. 3d 1117, 1128 (D. Minn. 2016) ...............................................10

*International Travel Arrangers, Inc. v. Western Airlines, Inc.,*
623 F.2d 1255 (8th Cir. 1980) ......................................................................15

*Jefferson Parish Hosp. Dist No. 2 v. Hyde,*
466 U.S. 2 (1984) ..........................................................................................11

*Klein v. Victor,*
903 F. Supp. 1327 (E.D. Mo. 1995) ..............................................................19

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003) ..........................................................................13

*McWane, Inc. v. FTC,*
783 F.3d 814 (11th Cir. 2015) .........................................................................6

*Michaelis v. CBS, Inc.,*
119 F.3d 697 (8th Cir. 1997) ........................................................................19

*Miller v. Redwood Toxicology Lab., Inc.,*
No. 11-115 (DWF/LIB), 2011 WL 4340860 (D. Minn. Sept. 15, 2011).........18

*National Association of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories,*
850 F.2d 904 (2nd Cir. 1988) ........................................................................15

*Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd.,*
No. 4:14 CV 859 RWS, 2015 WL 1782661 (E.D. Mo. Apr. 20, 2015) .................19

*Raineri Const., LLC v. Taylor,*
63 F. Supp. 3d 1017, 1033 (E.D. Mo. 2014).................................................20

*Ringsred v. City of Duluth,*
187 F. Supp. 2d 1141 (D. Minn. 2001) ...........................................................8

*Suture Express, Inc. v. Owens & Minor Dist., Inc.,*
851 F.3d 1029 (10th Cir. 2017) ....................................................................11

*Tampa Elec. Co. v. Nashville Coal Co.,*
365 U.S. 320 (1961).................................................................................6, 7, 9

iii

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ..........................................................................................4

*United States v. Realty Multi-List, Inc.*,
  629 F.2d 1351 (5th Cir. 1980) ......................................................................................12

*Vitti v. Vockrodt*,
  No. 16-cv-00236-FJG, 2016 WL 4487884 (W.D. Mo. Aug. 24, 2016) .....................17, 18, 19

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)........................................................................................7, 13

**State Cases**

*Annbar Assocs. v. Am. Exp. Co.*,
  565 S.W.2d 701 (Mo. Ct. App. 1978)..........................................................................20

*Balderree v. Beeman*,
  837 S.W.2d 309 (Mo. Ct. App. 1992)..........................................................................17

*Englezos v. Newspress & Gazette Co.*,
  980 S.W.2d 25 (Mo. Ct. App. 1998)............................................................................19

*Kenney v. Wal-Mart Stores, Inc.*,
  100 S.W.3d 809 (Mo. 2003) (en banc) .........................................................................17

*State ex rel. BP Prods. N. Am. Inc. v. Ross*,
  163 S.W.3d 922 (Mo. banc. 2005)...............................................................................20

**Federal Statutes**

Clayton Act, 15 U.S.C. § 18 ..............................................................................................5

Sherman Act, 15 U.S.C. § 2..........................................................................................3, 16

**Rules**

Fed. R. Civ. P. 8(a)(2).....................................................................................................3

Case 4:16-cv-01288-FJG   Document 157   Filed 09/21/17   Page 5 of 27

Defendant Xceligent, Inc. ("Xceligent") offers the following suggestions in opposition to Plaintiffs CoStar Group, Inc.'s and CoStar Realty Information, Inc.'s (collectively "CoStar" or the "CoStar Companies") Motion to Dismiss (Doc. 127).

## INTRODUCTION

Xceligent's Counterclaim pleads claims against CoStar for the violation of antitrust laws (Counts I-V), and for publicly defaming Xceligent through false and misleading advertising and other statements (Counts VI-VIII). CoStar seeks the dismissal of these claims, arguing generally that Xceligent has failed to plead facts sufficient to support claims for antitrust violations or to support claims sounding in defamation. CoStar is mistaken, and its arguments are not supported by precedent. CoStar is a monopolist that has amassed monopoly power around the collection and distribution of Commercial Real Estate ("CRE") property information and the marketing of CRE property listings. Now, CoStar is engaged in a multifaceted scheme to entrench its monopoly power, and must be held liable for its anticompetitive and defamatory conduct.

## FACTS

Xceligent and CoStar are direct competitors in the markets for (1) CRE listings databases and (2) CRE information services. (Countercl. (Doc. 86) ¶ 1; *see also* Countercl. ¶ 13 (discussing the scope of CRE property)). The "CRE listings database" market covers databases that advertise CRE for lease or sale. (Countercl. ¶ 16). The listings database operates as a two-sided online catalogue of listings where customers may both publish and search listings for CRE available for lease or sale. (Countercl. ¶ 17). The "CRE information services" market covers products and services that offer detailed, property-level information about CRE (*e.g.*, transaction and tenant histories, property characteristics) often relying on listings content for a base set of

data. The information is collected and offered primarily to enable customers to locate, research, and evaluate CRE in connection with potential transactions. (Countercl. ¶ 15).

LoopNet (now owned by CoStar) has been the dominant if not sole provider of listings database products in United States markets; for many properties, LoopNet holds the only record of listings and of listings content. (Countercl. ¶ 36). Nearly all listings content available on LoopNet or via the LoopNet webhosting product, LoopLink, is originally generated by brokers or owners—*i.e.*, the content is derived from the customer, not CoStar. (Countercl. ¶¶ 36, 56-58). To compete in the listings database market, access to listings is essential. (Countercl. ¶ 37). Likewise, access to listings content is a critical input necessary for competition in CRE information services. (Countercl. ¶¶ 37, 45).

The Federal Trade Commission ("FTC") understood how critical listings and listings content is when entering its Decision and Order ("FTC Order") regarding CoStar's acquisition of LoopNet: significant conditions were placed on the acquisition in an attempt to avoid anticompetitive effects and promote competition, including the maintenance of "Xceligent as an independent competitor", and the assurance of "Xceligent's ability to grow and expand". (Countercl. ¶¶ 75-80, 89 & Exs. A, D). Among the many conditions, CoStar was barred from preventing brokers, owners, or anyone else, from sharing with Xceligent copies of their listings, or from providing Xceligent with content from their listings. (Countercl. ¶ 91 & Ex. A).

CoStar has ignored the FTC's directives and violated antitrust laws by denying Xceligent's and other competitors' access to listings in order to raise their costs, drive them out of business, and entrench CoStar's monopolies. CoStar imposes exclusionary contractual terms on customers to prevent them from using competitor products, (Countercl. ¶¶ 151-78), contaminates listings with false data to obstruct competitor access to content, (Countercl. ¶¶ 179-

2

98), actively blocks competitor's from accessing listings, (Countercl. ¶¶ 199-222), ties and bundles products to prevent Xceligent's expansion and growth, (Countercl. ¶¶ 223-32), and has even launched a campaign of false and defamatory statements against Xceligent, its products and services to scare customers away from Xceligent. (Countercl. ¶¶ 233-44).

## LEGAL STANDARD

A pleading need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A counterclaim need not contain "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the counterclaim need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Facial plausibility is achieved when the "pleaded factual content allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. On a motion to dismiss for failure to state a claim, the Court "take[s] all factual allegations as true and construe[s] all reasonable inferences in the [pleaders] favor." *Henley v. Brown*, 686 F.3d 634, 636 n.1 (8th Cir. 2012) (citation omitted).

## ARGUMENT

**A.     *Xceligent Has Sufficiently Pleaded Claims for Monopolization by CoStar in Violation of Sherman Act, Section 2.***

The Sherman Act, 15 U.S.C. § 2, declares it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." To state a monopolization claim, a claimant pleads facts to show that the defending party (1) "possessed monopoly power in the relevant

market",[1] and (2) "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (internal quotation omitted).

Initially, apparently relying on *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007), CoStar claims that "[w]hen a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a Sherman Act violation." (Suggestions in Support of Pls. Mtn. to Dismiss (Doc. 128) ("CoStar's Sugg.") at 9-10). But CoStar incorrectly cites *HDC Med*—all it does in the face of an asserted business justification is shift the burden back to the claimant to *either* demonstrate the business justification is pretextual or that the anticompetitive effects outweigh the procompetitive effects. *See HDC Med., Inc.*, 474 F.3d at 550. *See also United States v. Microsoft Corp.*, 253 F.3d 34, 67 (D.C. Cir. 2001) ("Microsoft failed to meet its burden of showing that its conduct serves a purpose other than protecting its operating system monopoly.").

1. *CoStar willfully acquired and maintains its monopoly position through anticompetitive conduct.*

CoStar's assertion that a monopolization claim requires *acquisition* of a monopoly through anticompetitive conduct is wrong, as its very quote from *Concord Boat* demonstrates. (CoStar's. Suggestions at 4-5 ("[T]he defendant willfully acquired or *maintains* this monopoly power by anticompetitive conduct.") (emphasis added)) Xceligent satisfies the pleading requirement by alleging that CoStar used anticompetitive conduct to *maintain* its monopoly. But Xceligent also alleges illegal acquisition of monopoly power through CoStar's unlawful

---

[1] CoStar does not challenge that it is a monopolist in both CRE information services and CRE listings databases.

60173941.3

acquisition of LoopNet, a monopolist in CRE listings databases. (Countercl. ¶ 78.) The FTC declined to challenge that acquisition only because CoStar entered into the FTC Order containing protections to prevent the acquisition from violating § 7 of the Clayton Act, 15 U.S.C. §18, but CoStar has repeatedly violated that FTC Order. (Countercl. ¶¶ 86, 176, 211, 214.)

### 2. CoStar's blocking of Xceligent researchers from brokers' LoopLink-supported websites and from LoopNet is an anticompetitive refusal to deal.

CoStar has unlawfully refused to deal with Xceligent by terminating LoopNet's prior, voluntary course of dealing with Xceligent without a legitimate business justification—that is, one that does not depend on reducing competition in the market for CRE information services. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985) (addressing a refusal to deal in the form of "mak[ing] an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 803-04 (8th Cir. 1987) (holding that the refusal to deal "impaired competition in an unnecessarily restrictive way, and that [i]f a firm has been 'attempting to exclude rivals on some basis other than efficiency' it is fair to characterize its behavior as predatory" (quoting *Aspen Skiing*, 472 U.S. at 605)).

CoStar correctly identifies that a "decision to cease participation in a cooperative venture" is central to liability under *Aspen Skiing*, but claims (both falsely and contrary to the well-pleaded allegations in the counterclaims) that there is no history of LoopNet allowing CRE information services competitors to access listings at broker's direction. (*See* CoStar's. Sugg. at 8). Until shortly after its acquisition by CoStar, LoopNet had provided Xceligent with access to broker listing data.[2] (Countercl. ¶ 213.) Like the plaintiff in *Aspen Skiing*, Xceligent is only

---

[2] LoopNet provided Xceligent with access to broker listing data before LoopNet purchased an interest in Xceligent on the same terms as the public. LoopNet also allowed CoStar to access broker listings on the same terms as the public before CoStar acquired it.

seeking access on the same terms that CoStar makes LoopNet available to the general public. *Aspen Skiing Co.*, 472 U.S. at 610–11 (rejecting sale at retail showed defendant was "apparently motivated entirely by a decision to avoid providing any benefit to Highlands even though accepting the coupons would have entailed no cost to Ski Co. itself, would have provided it with immediate benefits, and would have satisfied its potential customers").

Xceligent's access at broker direction to publicly-available websites would not destroy the value of LoopNet. As CoStar admits, brokers desire to market their listings as widely as possible and direct listings database providers to obtain content from LoopNet. (Countercl. ¶¶ 205, 208-09). LoopNet benefits from Xceligent accessing its CRE listings because it makes LoopNet a more attractive place for brokers to centralize listing records. Thus, but for the impact of CoStar's refusal to deal on competition in CRE information services, CoStar would allow Xceligent to access otherwise publicly available LoopNet listings. CoStar's conduct thus reflects a sacrifice of upstream profits to maintain its monopoly downstream, as in *Aspen Skiing*.

Accordingly, Xceligent's counterclaim sufficiently states a claim for the offense of monopolization through a refusal to deal.

### 3. *CoStar forces customers into unlawful exclusive agreements.*

Exclusive dealing is unlawful when a firm with monopoly power enters into exclusive agreements with customers that foreclose a substantial percentage of the market, and the exclusivity either lacks a procompetitive justification or the anticompetitive effects outweigh procompetitive effects. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–27 (1961). When evaluating exclusive deals, there is no presumptive legality: "the Supreme Court's instruction [is to] consider 'market realities' rather than 'formalistic distinctions.'" *McWane, Inc. v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015) (quoting *Eastman Kodak*, 504 U.S. at 466). CoStar claims only that the contracts at issue are not exclusive. (CoStar's Sugg. at 10).

6

**CoStar forces customers to enter into explicitly exclusive agreements for CRE Listings.** Xceligent alleges that CoStar has specifically told customers they cannot share their listings with Xceligent. (Countercl. ¶ 177). CoStar attempts to dismiss the allegation as conclusory, (CoStar's Sugg. at 13 n. 9), but it is quite specific: Xceligent alleges that CoStar is making specific statements to brokers that they cannot share their listings with Xcelignet while maintaining a relationship with CoStar's.[3] (Countercl. ¶ 177).

**CoStar forces brokers to enter into *de facto* exclusive agreements by modifying broker records.** Unlawful exclusive agreements include *de facto* agreements that in practice bar customers from using a competitor by imposing substantial costs for doing so. *See, e.g., Tampa Elec.*, 365 U.S. at 326 (affirming that a contract does not have to "contain specific agreements not to use the (goods) of a competitor" to be considered exclusive, "if the practical effect . . . is to prevent such use" (internal quotation omitted)); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (holding contractual penalties are "as effective as express purchase requirements because no risk averse business would jeopardize its relationship with the largest [provider] of [a product] in the market." (internal quotation omitted)).

LoopNet and broker's LoopLink-supported websites are used by brokers as record systems, storing the original and often only copies of their listings. (Countercl. ¶ 195.) It is not practical for a broker to maintain a parallel system internally; thus, brokers expect to rely on listings they upload to LoopNet as source material for additional advertisements, and it is important to keep listings uniform. (Countercl. ¶¶ 36, 131.) A LoopNet listing is not akin to a copy of a manufactured article as CoStar suggests—it is the original from which the broker

---

[3] Xceligent is prepared to disclose in discovery a communication from the national brokerage firm indicating that it has an agreement with CoStar that does not allow the firm to have its listings on Xceligent's listings database.

60173941.3

makes and distributes copies. CoStar is well aware of this industry reality. (Countercl. ¶¶ 202-13). Modification of LoopNet listings is modification of the broker records.

CoStar requires that customers allow it to introduce random errors into listings on LoopNet, which it calls "fingerprinting." (Countercl. ¶¶ 157-59, 179.) CoStar then takes the position that it can sue its customers and benefit from a *prima facie* case "in the event that any third party has access to property listings that can be identified as having such unique adjustments." (Am. Compl., Ex. A; Countercl. ¶¶ 160-64.) Because CoStar introduces the errors without telling the customer which data elements CoStar has changed, a customer risks bearing heavy litigation costs if it shares *any* of its listing data with Xceligent.

These "fingerprints" effectively create perpetual exclusive agreements. Once a broker lists on LoopNet, the broker cannot cancel LoopNet unless the broker is willing to incur the significant cost of re-creating all its listing content from verifiably original sources, otherwise CoStar will sue the broker for inadvertently providing "fingerprinted" data to a new listing platform. (Countercl. ¶¶ 194-95.) CoStar has followed through on these threats (Countercl. ¶ 217),[4] including through this lawsuit. Thus, while CoStar's suggestion that Xceligent must plead "powerful incentives" toward exclusivity in order to show a *de facto* exclusive agreement has no support in case law, (*see* CoStar's Sugg. at 11), the fact that CoStar backs up its exclusivity with threats of ruinous litigation is certainly a powerful incentive.

These exclusive deals have no procompetitive benefits. Nearly all the listings content available on LoopNet (and via LoopLink) is originally generated by brokers. (Countercl. ¶ 36).

---

[4] While not specifically pleaded, in 2015, CoStar sued John Doe customers for uploading fingerprinted data to a CoStar competitor, CompStak. Complaint at 3, *CoStar v. John Doe*, No. 1:14-cv-2304-AKH (S.D.N.Y. Apr. 2, 2014). The Court may take judicial notice of pleadings in another case when ruling on a motion to dismiss. *See, e.g.*, *Ringsred v. City of Duluth*, 187 F. Supp. 2d 1141, 1153 (D. Minn. 2001), *aff'd*, 39 F. App'x 480 (8th Cir. 2002*)* (holding that a court may take notice of judicial notice of public records in a motion to dismiss).

CoStar's fingerprints introduce inaccuracy to listings content, harming both customers and the marketplace. (Countercl. ¶ 193). CoStar does not undertake any customer-specific investment, and its exclusive dealing does not lead customers to invest additional effort in creating content. If anything, CoStar's conduct would lead brokers to invest less in creating accurate content, since restricting a listing's distribution reduces its value, and thus reduces the effort a broker would be willing to invest to create and maintain a listing. CoStar's fingerprinting accomplishes nothing except raising its competitor's costs of acquiring listings content. (Countercl. ¶ 197). Thus, even if some procompetitive benefit exists, it would be outweighed by the anticompetitive harm suffered by brokers losing the ability to freely distribute their listings to CoStar's competitors.

**CoStar forces brokers to enter into *de facto* exclusive agreements that bar competitors from the broker's own website and CoStar enforces the terms by blocking competitors' access**. As CoStar admits, brokerages that contract to use LoopLink to power their own websites and display their own listings, are "required to post prominently the relevant Terms of Service, which warn users that the database constitutes the valuable property and copyrighted information of CoStar and forbids users from uploading, posting, or otherwise transmitting *any portion of CoStar's information*. LoopLink pages also include a copyright warning advising that *users may not reproduce or transmit the information without express written consent*." (Am. Compl. ¶ 61.) (emphasis added). Contrary to CoStar's assertions, these terms, by their plain meaning, are exclusive deals because their "practical effect is to prevent [brokers] from using" Xceligent's servics. *See Tampa Elec.*, 365 U.S. at 326.

CoStar enforces its exclusive terms of use by repeatedly blocking IP addresses associated with Xceligent researchers on all LoopNet-related sites, even when customers want Xceligent to access their listings. (Countercl. ¶ 201.) CoStar's blocking is perpetual—Xceligent only regains

9

access by changing its IP address until CoStar discovers the new one. And CoStar itself admits that the blocking is intentional. (Am. Compl. ¶¶ 64-65).

These terms of use have no procompetitive benefits. Again, CoStar is not making any customer-specific investments, and the additional traffic from Xceligent would be *de minimis*, desired by the customer, and would not impair the functionality of any CoStar site. The harm to brokers from being unable to share listings from their own websites, however, is significant. Even if CoStar could characterize avoiding the *de minimis* additional traffic as a cognizable procompetitive justification, the significant harm to brokers would outweigh it.

Accordingly, Xceligent's counterclaim allegations of exclusive dealing are sufficient to state a claim for the offense of monopolization.

### 4. CoStar unlawfully ties and bundles its products.

CoStar, apparently relying on *Concord Boat*, 207 F.3d at 1060, complains that Xceligent has not pleaded sufficient detail to show that "CoStar's cost to provide the bundled services exceed the price it charges for those services." But *Concord Boat* is inapposite, because it involved a contract for a single product in a single geographic market. *See id.* at 1062 (distinguishing the case from those in which, as here, there are "allegations of tying or bundling with another product."); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1128 (D. Minn. 2016) (noting *Concord Boat* "at least implicitly recognize[d] the theory" that bundling discounts can be anticompetitive). Xceligent alleges the tying and bundling of two products: CoStar has repeatedly forced customers to purchase its CRE information services if the customer wants access at all or on economically reasonable terms to CoStar's listings database products. (Countercl. ¶¶ 227-29). Xceligent also alleges tying and bundling across multiple geographic markets: CoStar has repeatedly forced customers to purchase its information service

10

products in one geography if the customer wants access at all or on economically reasonable terms to CoStar's information service products in another market. (Countercl. ¶¶ 224-25).

CoStar is unlawfully tying and bundling LoopNet with CoStar products and unlawfully tying and bundling CoStar products across multiple geographic markets. CoStar does not challenge the claim that its conduct meets the actual elements of tying or bundling claims.

**CoStar is unlawfully tying LoopNet and CoStar**. Tying arrangements are *per se* unlawful when: "(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Suture Express, Inc. v. Owens & Minor Dist., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017); *accord Jefferson Parish Hosp. Dist No. 2 v. Hyde*, 466 U.S. 2, 19-21 (1984) (*abrogated in part on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006). Moreover, unlawful tying occurs whether the conditioning takes the form of a contractual requirement or a threat to refuse to deal absent the purchase of both products. *See DataGate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426-27 (9th Cir. 1995) (threatening to deny access to a product if a second product was purchased from a competitor satisfies the conditioning element).

CoStar does not challenge the claim that LoopNet and CoStar are separate products, nor could it. (Countercl. ¶¶ 14-16, 18, 20-37). CoStar also does not challenge the claim that it conditions the sale of LoopNet on a customer's subscription to CoStar by raising the price of LoopNet when a customer does not subscribe to CoStar, or seeks to cancel its subscription. (Countercl. ¶¶ 227-28). Nor does CoStar challenge that it has made it economically unreasonable to buy LoopNet and CoStar products separately by charging the same price

11

whether the customer buys both or just one.  (Countercl. ¶¶ 227-28); *see, e.g., Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992) ("[A]n illegal arrangement may still be shown if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option." (internal quotation omitted)).

CoStar does not challenge the sufficiency of its power to restrain trade in CRE information services.  CoStar has monopoly power in the listings database market, (Countercl. ¶ 117), over a product that is a necessity for brokers.  *Cf. Metro. Multi-List, Inc.*, 934 F.2d at 1577 (noting "considerable evidence in the record that [residential] multilist services are a necessity for brokers"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1361 (5th Cir. 1980) ("Knowledge of available listings of real estate is a broker's 'stock in trade.'").

CoStar does not challenge that it forecloses a substantial volume of commerce by preventing Xceligent from competing for information services customers that require LoopNet. (Countercl. ¶¶ 109-10, 231-32).  In any case, the standard for substantial volume is above *de minimis*, which is met here.[5]  *See Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) (affirming that the volume foreclosed must be "substantial enough in terms of dollar-volume so as not to be merely *de minimis*", and that "the relevant figure is the total volume of sales tied by the sales policy under challenge"); *Datagate, Inc.*, 60 F.3d at 1426 ("[A] dollar volume of $100,000 per year for an unspecified number of years would hardly be de minimis").

CoStar's tying conduct also violates the rule of reason, as it has no efficiencies and significantly harms competition.  In sum, CoStar's anticompetitive tying forecloses access to customers and prevents Xceligent from competing for nearly all of the 87% of CRE information services customers that do not currently use Xceligent.  (Countercl. ¶ 109.)

---

[5] While not required to be specifically pleaded, Xceligent estimates this customer group accounts for hundreds of millions of dollars.

60173941.3

**CoStar is unlawfully tying CRE information services across geographic markets**. Geographic markets are separate products when offered to regional and national customers seeking coverage in multiple markets. (Countercl. ¶¶ 38-45, 224). CoStar makes it economically unreasonable to buy geographic markets *al la carte* by charging the same price whether the customer subscribes in every geographic market in which the customer operates or in a subset. (Countercl. ¶¶ 224-25). Thus, CoStar penalizes customers by requiring them to pay twice for the services when they use a competitor. CoStar has sufficient economic power in the market because it is both a monopolist and has the broadest geographic coverage. (Countercl. ¶¶ 29, 112). Thus, CoStar forecloses a substantial volume of commerce through its geographic tying. CoStar's tying also violates the rule of reason as it forecloses Xceligent from competing for 87% of customers and has no procompetitive justification. (Countercl. ¶ 109).

**CoStar is unlawfully bundling LoopNet and CoStar products**. The standard for anticompetitive bundling varies across circuits, and the Eighth Circuit has not yet adopted a specific standard, but CoStar's conduct is unlawful under existing standards. *See Inline Packing Int'l*, 164 F. Supp. 3d at 1129 (noting the lack of controlling precedent and declining to adopt a specific standard as the defendant's conduct was unlawful under the approaches of all circuits). The Third Circuit essentially applies the rule of reason: bundling is unlawful where a firm structures pricing in a manner that forecloses a substantial portion of the market from competitors, resulting in anticompetitive effects. *See LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003). The standard is particularly appropriate where, as here, a monopolist is engaged in a wide range of non-price conduct, as the approach more accurately captures the total anticompetitive effect of the monopolist's conduct. *See ZF Meritor, LLC*, 696 F.3d at 277 (adopting discount-attribution standard for single-product loyalty discounts, but applying *LePage's* because

"[p]laintiffs did not rely solely on the exclusionary effect of Eaton's prices, and instead highlighted a number of anticompetitive provisions in the" agreements.).

The Ninth Circuit imposes a further element: that the effective price of the competitive product—subtracting the standalone cost of the monopoly product from the price of the bundle—must fall below an appropriate measure of cost. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008). When a LoopNet customer cancel's its CoStar product (for which the customer was paying, say, $400/month bundled with LoopNet) in order to switch to Xceligent, CoStar informs the customer that the price of the LoopNet subscription will go up by an amount equivalent to the price that was (ostensibly) being charged for the CoStar product (in the example, bringing the cost of LoopNet alone to $400/month). No matter the actual cost of the CoStar product, CoStar is effectively selling it for free, which is obviously below cost. (Countercl. ¶¶ 224-25, 227-28).

Xceligent's allegations are not conclusory labels as CoStar argues—it is reasonable to infer that CoStar's costs are greater than zero, and CoStar admits spending over $165 million annually on its CRE information services database. (Am. Compl. ¶ 38).

CoStar does not challenge that it has foreclosed competition in a significant portion of the competitive market, namely preventing Xceligent from competing for 87% of CRE information services customers. (Countercl. ¶¶ 109, 230). This foreclosure prevents Xceligent from effectively competing with CoStar.

**CoStar is unlawfully bundling geographic markets**. CoStar's effective price for competitive geographic markets is zero, well below any measure of cost. When a customer attempts to cancel a CoStar product in one geography to switch to Xceligent, CoStar responds by increasing the customer's rate on the customers remaining geographies by the rate of the

14

canceled geography.  (Countercl. ¶¶ 224-25).  Thus, under the attribution test, CoStar is selling the competitive product for free, which is below any measure of its costs.

CoStar has foreclosed competition in a significant portion of the market.  (*See* Countercl. ¶¶ 109-10, 226).  In sum, CoStar's bundling prevents Xceligent competing for 87% of the customers.  Although Xceligent is working to expand, it cannot do so instantaneously to prevent CoStar's anticompetitive bundling due to significant barriers to entry, which CoStar increases through its exclusive dealing and bundling.  (Countercl. ¶ 29).

Accordingly, Xceligent has pleaded sufficient facts to demonstrate both tying and unlawful bundling in violation of the Sherman Act. [6]

### 5. CoStar has launched a campaign of false and defamatory statements about Xceligent and its products and services in order to scare customers away from doing business with Xceligent.

CoStar claims that defamation is never actionable under the antitrust laws.  (CoStar's Sugg. at 17).  Reams of precedent say otherwise:  A monopolist is liable for the offense of monopolization when the monopolist engages in a campaign of false and misleading advertising directed to raise a competitor's costs and foreclose competition.  *See International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1268, 1270 (8th Cir. 1980).  In *International Travel,* the Eighth Circuit held that an airline's ad campaign against a competitor, which employed false, misleading, and deceptive advertising, and was directed at prospective customers,  violated the Sherman Act.  *Id.* at 1268-70.  *Accord, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (spreading misleading information to disparage a competitor's product can constitute exclusionary conduct).  In *National Association of*

---

[6] Notice pleading does not require Xceligent to plead a bullet point list detailing each example (of which Xceligent is currently aware) where CoStar has employed this pricing scheme. Although Xceligent is prepared to provide a more definite statement, such detail is more appropriately for discovery, and CoStar has already requested the information through discovery.

*Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories*, 850 F.2d 904, 916 (2nd Cir. 1988), the Second Circuit held that allegations of the publication of false and misleading statements were sufficient to state a claim for violation of § 2. Contrary to CoStar's contentions, defamatory statements are indeed cognizable under the Sherman Act.

Here, CoStar has launched an ad campaign against Xceligent that employs false, misleading, and deceptive advertising, is directed to customers, and seeks to foreclose Xceligent's ability to compete by scaring customers away from doing business with Xceligent. (Countercl. ¶¶ 233-44). The campaign is indeed harmful to Xceligent's reputation, but as Xceligent has alleged, the false and misleading campaign also causes antitrust injury by raising Xceligent's cost of acquiring customers, a competitive harm. (Countercl. ¶¶ 244, 251-52). These allegations state a claim against CoStar for the offense of monopolization.[7]

**B.** **Xceligent Has Sufficiently Pleaded a Claim for the Use of Exclusionary Contracts by CoStar in Violation of Sherman Act, Section 1.**

For all of the reasons stated previously, Xceligent has stated a claim that CoStar has used unlawful explicit and *de facto* exclusive agreement. Thus, Xceligent has stated a claim under § 1 based on CoStar's monopoly power, and its exclusive deals, tying and bundling, each of which involves a contract in restraint of trade and has caused Xceligent antitrust injury. (*See, e.g.*, Countercl. ¶¶ 107-19; (CoStar's monopoly power); Countercl. ¶¶ 151-222 (exclusive dealing); Countercl. ¶¶ 223-32 (tying and bundling); (Countercl. ¶¶ 245-50, 252-58 (antitrust injury)).

**C.** **Xceligent Has Sufficiently Pleaded Its Defamation Based Claims Premised on CoStar's False and Misleading Statements.**

---

[7] CoStar has not specifically challenged Xceligent's attempted monopolization claims separate from its challenges directed to Xceligent's allegations of anticompetitive conduct. The allegations of anticompetitive conduct pleaded in support of Xceligent's monopolization claim likewise support the claim of attempted monopolization.

CoStar is engaged in a campaign of publicly defaming Xceligent through false and misleading advertising and other statements. Arising from this conduct, Xceligent asserts counterclaims against CoStar for violation of the Lanham Act (Count VI), defamation (Count VII), and injurious falsehood (Count VIII). CoStar limits its challenge to these claims to the assertions that Xceligent has (1) not sufficiently alleged falsity, (2) not sufficiently alleged "actual malice" to support defamation and injurious falsehood, and (3) not sufficiently alleged "pecuniary loss" to support injurious falsehood. Here too, CoStar is mistaken.

### 1. Xceligent Has Sufficiently Pleaded That CoStar's Statements Were False.

CoStar argues that Xceligent must plead facts to *disprove* CoStar's various false accusations in order to support its defamation claims. (CoStar Sugg. at 17). That is not the law, as this Court recognized when disposing of arguments indistinguishable from CoStar's. *See Vitti v. Vockrodt*, No. 16-cv-00236-FJG, 2016 WL 4487884, at *6 (W.D. Mo. Aug. 24, 2016) (holding falsity sufficiently pleaded where the plaintiff quoted defendant's statements and alleged the statements were false, and explaining that defendant's argument "would be better resolved on summary judgment").[8] CoStar has published and disseminated numerous statements that Xceligent committed criminal and other wrongful acts, and labeled them "Facts." (Countercls. ¶¶ 149, 233-244, 308-09, 315-16, 322). Xceligent quoted CoStar's statements, and pleaded that each was false. *See id.* ¶¶ 236, 308-09, 318. The allegations are sufficient to plead falsity in support of Xceligent's defamation claims. *See Vitti*, 2016 WL 4487884, at **5-6.

---

[8] Xceligent does not concede that it bears the burden to prove the falsity of CoStar's defamatory statements. *See Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 814 n. 2 (Mo. 2003) (en banc) (declining to resolve whether truth is an affirmative defense to be proven by defendant); *Balderree v. Beeman*, 837 S.W.2d 309, 326 (Mo. Ct. App. 1992) (noting that common law presumption that defamatory speech was false applied where private plaintiff sued nonmedia defendant for statements not of public concern), *overruled on other grounds by Amick v. Pattonville-Bridgeton Terrace Fire Prot. Dist.*, 91 S.W.3d 603 (Mo. 2002) (en banc).

60173941.3

The case law cited by CoStar is innaposite. In *Williams v. Capella University*, the plaintiff claimed that defendant had defamed him by falsely stating that "[plaintiff] had not cured sickle cell anemia"—put differently, plaintiff was claiming *he had cured sickle cell anemia.* No. 17-CV-0267, 2017 WL 1155735, at *4 (D. Minn. Mar. 7, 2017). The court dismissed his claim because he pleaded no facts to support "the extraordinary claim that he had cured a disease." *Id.* Xceligent's claims do not depend on proving positive facts, as in *Williams*, let alone extraordinary ones. CoStar's reliance on *Vincent v. Utah Plastic Surgery Society* is also misplaced; the language CoStar quotes refers not to plaintiffs' failure to plead facts showing falsity, but to plaintiffs' failure to plead facts showing that the false statements "caused confusion among Plaintiffs' clients." 621 F. App'x 546, 550 (10th Cir. 2015) (unpublished). In *Miller v. Redwood Toxicology Laboratory, Inc*., the court required a plaintiff to plead additional allegations to support the falsity of defendant's statement that its product was "approved by the U.S. Department of Health and Human Services", but only after citing materials outside the pleadings showing that the Department had in fact licensed and certified defendant's products. *See Miller v. Redwood Toxicology Lab., Inc*., No. 11-115 (DWF/LIB), 2011 WL 4340860, at *7 (D. Minn. Sept. 15, 2011) (dismissing claims brought under Minnesota statutes).

But even under CoStar's incorrect statement of the law, its argument collapses with its premise that Xceligent's allegations do not explain *how* CoStar's statements could plausibly be false. This is how:

- Xceligent has not paid others to "hack into CoStar";

- Xceligent has not "stolen" from CoStar, been "caught stealing," or otherwise engaged in any "theft" from CoStar;

- Xceligent has not "set up a massive piracy operation"; and

18

- Xceligent did not commit "ILLEGAL" acts hundreds of times in the face of an explicit warning that its actions were "ILLEGAL," as CoStar stated, and so on.

(Countercl. ¶¶ 236-37); *see, e.g.*, *Klein v. Victor*, 903 F. Supp. 1327, 1336-37 (E.D. Mo. 1995) (reading allegation that defendants falsely stated that plaintiff said *x* to mean that plaintiff had not said *x*, and denying motion to dismiss libel claim based on that falsehood).

### 2. Xceligent Has Sufficiently Pleaded CoStar's Culpability For Its Defamation and Injurious Falsehood Claims.

CoStar is incorrect that actual malice is the "requisite fault for libel." (CoStar Sugg. at 18). Xceligent is not a public figure;[9] it need only plead that CoStar was at fault in publishing its false statements, which Xceligent has done. *See, e.g.*, *Englezos v. Newspress & Gazette Co.*, 980 S.W.2d 25, at 30-31 & n.2 (Mo. Ct. App. 1998). And while actual malice is required to recover punitive damages on its libel claim[10], and to state a claim for injurious falsehood, Xceligent has pleaded that CoStar published its false, defamatory statements with actual malice. (Countercl. ¶ 317); *see Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd.*, No. 4:14 CV 859 RWS, 2015 WL 1782661, at *11 (E.D. Mo. Apr. 20, 2015) (denying motion to dismiss claims of defamation and injurious falsehood which pleaded generally that defendants knew their statements were false or acted in reckless disregard of their truth or falsity).

Moreover, Xceligent has pleaded that CoStar defamed Xceligent as part of its anticompetitive scheme, seeking to "scare customers away from doing business with Xceligent," (Countercls. ¶¶ 2, 149, 233)—facts from which one may infer CoStar's actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (noting that while ill

---

[9] CoStar does not argue that Xceligent is a public figure—nor could it at this stage. *See Michaelis v. CBS, Inc.*, 119 F.3d 697, 702 (8th Cir. 1997) ("Defendants bear the burden on this issue."); *Vitti*, 2016 WL 4487884, at *5 (explaining that whether qualified privilege applies is "better decided on summary judgment").

[10] *See Englezos*, 980 S.W.2d at 31, 35 (affirming award of actual damages to plaintiff, and directing verdict for defendant on punitive damages in the absence of actual malice).

60173941.3

will should not be conflated with actual malice, the former may provide circumstantial evidence of the latter); *Allen v. ASRC Comm'cn*, No. 4:08CV1575 HEA, 2010 WL 1404179, *3 (E.D. Mo. Apr. 8, 2010) (plaintiff plausibly pleaded actual malice by alleging that defendant's actions "were 'purposely calculated' to cause injury to Plaintiff").

### 3. Xceligent Has Sufficiently Pleaded Its "Pecuniary Loss" To Support Its Injurious Falsehood Claim.

Xceligent has pleaded that CoStar repeated its false statements to the CRE industry media and to potential Xceligent customers, thereby "rais[ing] Xceligent's cost of acquiring customers"—a pecuniary loss under Missouri law. (Countercls. ¶¶ 243-44); *see Annbar Assocs. v. Am. Exp. Co.*, 565 S.W.2d 701, 708 (Mo. Ct. App. 1978) (holding that where "[w]idely disseminated injurious falsehood…depriv[es] [plaintiff] of a market that he would otherwise have found," plaintiff need not show specific lost sales) (quoting Restatement (Second) of Torts § 633, cmt. h); *Raineri Const., LLC v. Taylor*, 63 F. Supp. 3d 1017, 1033 (E.D. Mo. 2014) (holding that plaintiff sufficiently pleaded pecuniary loss by alleging that defendants adversely affected plaintiff's business in making false statements to plaintiff's customers). And CoStar is incorrect that the legal fees Xceligent has incurred do not constitute a pecuniary loss. *See State ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005) (en banc).

## CONCLUSION

For the reasons stated, Xceligent has sufficiently pleaded its counterclaims against CoStar for antitrust violations (Counts (I-V), and for publicly defaming Xceligent (Counts VI-VIII). CoStar's Motion to Dismiss should be denied in its entirety.

60173941.3

Respectfully submitted,

POLSINELLI PC

_/s/ Robert A. Henderson_
ROBERT A. HENDERSON #28566
JOHN M. TYNER #58864
AMY D. FITTS #61460
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
rhenderson@polsinelli.com
jtyner@polsinelli.com
afitts@polsinelli.com

_COUNSEL FOR XCELIGENT, INC._

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the above and foregoing was filed electronically with the above-captioned court, with notice of case activity to be generated and sent electronically by the Clerk of said court this 21st day of September, 2017, to all counsel of record.

_/s/ Robert A. Henderson_
_COUNSEL FOR XCELIGENT, INC._
